UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff,

     -v-

EDWARD BRONSON and
E-LIONHEART ASSOCIATES, LLC,
d/b/a FAIRHILLS CAPITAL,

                         Defendants,

          -and-

FAIRHILLS CAPITAL, INC.,

                         Relief Defendant.

Case No. 12-CV-6421 (KMK)

OPINION AND ORDER

Appearances:

Kevin McGrath, Esq.
Wendy Tepperman, Esq.
William Edwards, Esq.
Securities and Exchange Commission
New York, NY
*Attorneys for Plaintiff*

Alex Lipman, Esq.
Ashley Baynham, Esq.
James Michael Smith, Esq.
Nixon Peabody LLP
New York, NY
*Attorneys for Defendants*
*Edward Bronson, E-Lionheart Associates, LLC, and*
*Fairhills Capital, Inc.*

KENNETH M. KARAS, District Judge:

      Plaintiff, the United States Securities and Exchange Commission ("SEC") filed a

Complaint against Edward Bronson ("Bronson") and E-Lionheart Associates, LLC

("E-Lionheart" and, with Bronson, collectively "Defendants"), alleging violations of the securities registration requirements under Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c).  The SEC also asserts a claim of unjust enrichment against Relief Defendant Fairhills Capital, Inc. ("FCI" or "Relief Defendant"). Bronson, E-Lionheart, and FCI jointly filed a Motion to Dismiss, which, for the reasons stated herein, is denied.

I.  Background

A.  Factual Background

1.  Bronson's and E-Lionheart's Penny Stock Scheme

The SEC alleges that Edward Bronson, operating through E-Lionheart, a company of which he is the sole managing member, engaged in a scheme to purchase shares of penny stocks from issuing companies and quickly resell them in violation of the applicable registration and resale restrictions under the Securities Act.[1]  According to the SEC, by purchasing the securities

---

[1] "Penny stocks" are securities issued by small companies that trade at less than $5 per share.  *See Penny Stock Rules*, U.S. Sec. and Exch. Comm'n, http://sec.gov/answers/penny.htm (last visited Mar. 26, 2014).  Penny stocks are not typically sold on securities exchanges, but rather are traded in an over-the-counter market.  *See SEC v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402, 2009 WL 875997, at *4 (E.D.N.Y. Mar. 27, 2009) (noting that penny stocks are "generally sold in the over-the-counter . . . market and generally not listed on an exchange") (internal quotation marks omitted) (alteration in original).

The specific penny stocks at issue in this case allegedly were quoted and traded on OTC Link, an electronic quotation and trading system.  (Compl. ¶ 10.)  Penny stocks may be difficult to accurately price and are particularly susceptible to market manipulation due to the lack of liquidity in the market, minimal standard requirements for over-the-counter trading, paucity of publicly available information on the companies issuing these stocks, and the fact that many of these companies are either newly formed or approaching bankruptcy.  *See The Lowdown on Penny Stocks*, Investopedia (Mar. 24, 2012), http://www.investopedia.com/articles/03/ 050803.asp.  Accordingly, penny stocks are considered to be particularly high risk and not suitable to all investors.  *See China Energy*, 2009 WL 875997, at *4 (noting that the penny stock market is "highly speculative," and "'[b]ecause it is wrapped in secrecy and operates in relative obscurity, the penny stock market lends itself to manipulation far more easily than a market

directly from the issuing companies at a discounted rate and reselling the same securities to the public at the current over-the-counter market rate, the Defendants could turn a quick profit. (Compl. ¶¶ 15–17, 25–31.)

Specifically, according to the SEC, Defendants followed a familiar pattern to effectuate the alleged scheme.  (*Id.* ¶ 15.)  "Operating from E-Lionheart's office in White Plains, Bronson, or E-Lionheart personnel acting at Bronson's direction, 'cold called' OTC Link quoted companies to ask if they were interested in obtaining capital."  (*Id.*)  If the cold call was met with interest, "Bronson, or E-Lionheart personnel acting at his direction, would offer to buy stock in the company at a rate that was deeply discounted from the price the company's stock was then trading at."  (*Id.*)  If the offer was accepted, "Bronson (or E-Lionheart personnel acting at his direction) prepared a subscription agreement and other documents to effect the transaction."  (*Id.* ¶ 16.)

Notwithstanding that "all" the Defendants' activities allegedly occurred in New York, and "irrespective of the location of the company's business, the subscription agreement represented that the company was making an offering of its stock that was exempt from registration because it was being made pursuant to Rule 504(b)(1)(iii) of Regulation D and a Delaware state law exemption from registration [§ 73-207(b)(8)]."  (*Id.* ¶ 19.)  An attorney "referred and/or paid by Bronson, but purportedly acting on the company's behalf, provided an opinion letter to the company's transfer agent asserting that the securities could be issued

where information is readily available and circulated to investors.'") (alteration in original) (quoting H.R. Rep. No. 101-617 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1408, 1422)).

without a restrictive legend" based on these supposed exemptions.[2]  (*Id.*)  This made it possible for Defendants to resell the securities in the public marketplace.  (*Id.* ¶¶ 20–21.)  Yet, the attorney providing this opinion about Delaware law was not licensed to practice in Delaware. (*Id.* ¶ 21.)  Indeed, the SEC claims that the securities transactions that formed the alleged scheme had little to no nexus to Delaware.  The securities themselves were allegedly sent to E-Lionheart's White Plains business address and "[m]any of the companies that issued the securities had no business operations in Delaware."  (*Id.* ¶ 22.)

The SEC alleges that, upon receipt of the shares, Defendants quickly resold them to the public, sometimes in multiple tranches, supposedly acting under the exemption-from-resale restrictions provided in the aforementioned SEC rule and Delaware Code provision.  (*Id.* ¶¶ 16, 17, 20.)  Defendants allegedly replicated this method of purchasing and quicky reselling newly issued shares multiple times with approximately 100 different issuers, and repeated the process several times with the same issuer.  (*Id.* ¶ 18.)  According to the SEC, the public investors, who had no access to the type of information typically contained in a registration statement, bought the securities at approximately double the price paid by Defendants.  (*Id.* ¶ 17.)  Since August 2009, Bronson and E-Lionheart are alleged to have reaped profits of more than $10 million through this scheme.  (*Id.* ¶ 1.)

---

[2] According to the Complaint,

> [c]ompanies use transfer agents to keep track of the individuals and entities that own their stock.  In the absence of a registration statement, transfer agents will issue stock certificates bearing a 'restrictive legend'—indicating limitations on the transfer or sale of the security—unless the transfer agent receives assurances in the form of an attorney opinion letter that adequately explains why it is lawful to issue the certificates without a restrictive legend.

(Compl. ¶ 20.)

<u>2.  Role of Fairhills Capital, Inc.</u>

The SEC further alleges that Bronson secreted assets from the stock-flipping scheme in Relief Defendant FCI, a Delaware corporation which was formed in 2010, registered to the same White Plains address as E-Lionheart, and features Bronson as its President and owner.  (*Id*. ¶ 9.) Within a week of FCI's registration to do business in New York, Bronson allegedly transferred $10,000 from E-Lionheart's account to FCI.  (*Id.* ¶ 32.)  According to the SEC, Bronson subsequently transferred $600,000 from an account held by E-Lionheart to FCI.  (*Id*. ¶ 34.)  "The overwhelming majority of transactions in FCI's bank account" were "transfers to-and-from E-Lionheart's principal bank account."  (*Id.* ¶ 35.)  And, one of the few transfers out of FCI's bank account not directed at E-Lionheart was an alleged $35,000 payment to an attorney acting on behalf of an issuer in connection with a sale of securities to E-Lionheart.  (*Id.*)  Indeed, according to the SEC, none of the securities sold by Defendants involved transactions on FCI's behalf, and the transferred proceeds were not in return for any consideration.  (*Id.*)  Finally, FCI allegedly holds title to a Land Rover, a Ferrari, a Rolls Royce, and a Mercedes Benz, the title of which was formerly held by Bronson.  (*Id.* ¶ 33.)  The SEC seeks to reclaim these assets by naming FCI as a Relief Defendant under a theory of unjust enrichment.  (*Id.* ¶¶ 40–41.)

<u>B.  Procedural Background</u>

The SEC filed the Complaint on August 22, 2012, asserting violations of Sections 5(a) and 5(c) of the Securities Act against Bronson and E-Lionheart and alleging a claim for unjust enrichment against FCI.  (Dkt. No. 1.)  On February 1, 2013, Defendants served a Motion To Dismiss, (Dkt. No. 17), and supporting Memorandum of Law (Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 18)), to which the SEC served a Memorandum of Law in Opposition on March 1, 2013 (Pl.'s Mem. of Law in Opp. to Defs.' Mot. To Dismiss

("Pl.'s Mem.") (Dkt. No. 19)).  Defendants filed a Reply Memorandum of Law on March 15,

2013.  (Defs.' Reply Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Reply Mem.") (Dkt.

No. 20).)

## II.  Discussion

### A.  Standard of Review

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to

construe the factual allegations contained in the Complaint as true and draw all reasonable

inferences in favor of the plaintiff.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.

2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6),

accepting all factual allegations in the complaint and drawing all reasonable inferences in the

plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d

463, 466 (S.D.N.Y. 2008) (same).  Moreover, "[i]n adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (quotation marks omitted).

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Instead,

the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to

relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may

6

be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Aschroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

"A court may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 395 (S.D.N.Y. 2011) (internal quotation marks omitted) (citing *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005)); *see also Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint." (internal quotation marks omitted) (alteration in original)) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)).

B.  Analysis

1. Legal Landscape

a.  Federal and State Securities Registration Requirements

A basic overview of the applicable securities laws is necessary to understand how

Defendants' scheme is alleged to have operated and how Defendants claim their behavior was

lawful.  Under Section 5 of the Securities Act, securities offered for sale must be registered by

filing a registration statement with the SEC, unless a statutory exemption to the registration

requirement applies.  *See* 15 U.S.C. § 77e.  Registration "protect[s] investors by promoting full

disclosure of information thought necessary to informed investment decisions."  *SEC v. Ralston*

*Purina Co.*, 346 U.S. 119, 124 (1953); *see also Adato v. Kagan*, 599 F.2d 1111, 1115–16 (2d

Cir. 1979) ("The securities acts are designed to protect investors by promoting full disclosure of

information thought necessary to informed investment decisions." (internal quotation marks

omitted)).  "To fulfill that goal, registration statements filed with the SEC make available to the

public certain information about the company and the offered security."  *SEC v. Luna*, No. 10-

CV-2166, 2014 WL 794202, at *7 (D. Nev. Feb. 26, 2014) (citing 15 U.S.C. §§ 77f(a), (d)).

Specifically, "[r]egistration statements must disclose, among other things, identifying

information about the business, its officers, and its underwriters; information about the purposes

for which the security is being offered to supply funds and the amounts which will be devoted to

those purposes; and information about the business's financial health."  *Id.* (citing 15 U.S.C. §§

77f, 77g, 77aa).  "Companies that have registered securities under the Securities Act must also

abide a regime of regular reporting of material information established in the Securities

Exchange Act of 1934."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir.

2010).  Consequently, "[w]hen a company fails entirely to register its securities and nonetheless

8

proceeds to sell them generally to the public, . . . the entire system of mandatory public disclosure is evaded to public detriment."  *Id.* at 1085–86.

To state a cause of action under Section 5 of the Securities Act, the SEC must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (internal quotation marks omitted).  "Section 5 'imposes strict liability on offerors and sellers of unregistered securities' regardless of any degree of fault, negligence or intent on the seller's part."  *SEC v. StratoComm Corp.*, — F. Supp.2d —, 2014 WL 689116, at *16 (N.D.N.Y. Feb. 19, 2014) (quoting *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)).  "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." *Cavanagh*, 445 F.3d at 111 n.13; *see also SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011) (same).  "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public."  *Cavanagh*, 445 F.3d at 115; *see also SEC v. Ishopnomarkup.com, Inc.*, No. 04-CV-4057, 2007 WL 2782748, at *3 (E.D.N.Y. Sept. 24, 2007) ("Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public.").

When Congress enacted the Securities Act, it expressly provided that existing state securities legislation should remain in effect.  *See* 15 U.S.C. § 77r (1994) ("Nothing in this subchapter shall affect the jurisdiction of the securities commission (or any agency or office performing like functions) of any State or Territory of the United States, or the District of Columbia, over any security or any person.").  "State securities laws, commonly referred to as 'blue sky laws,' have existed since the early part of the twentieth century."  Daniel J. Barrison,

Comment, *State Blue Sky Laws: An Alternative to the Federal Securities Laws and States Common Law in Third-Party Accountant Malpractice Cases*, 57 Temp. L.Q. 601, 642 (1984) (footnote omitted); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 641(1982) (noting that "[s]tates have traditionally regulated intrastate securities transactions").[3]  The Supreme Court has upheld the states' authority to enact such laws against Commerce Cause challenges.  *See Hall v. Geiger-Jones Co.*, 242 U.S. 539 (1917); *Caldwell v. Sioux Falls Stock Yards Co.*, 242 U.S. 559, 567 n.68 (1917); *Merrick v. N.W. Halsey & Co.*, 242 U.S. 568 (1917).  "The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States." *Edgar*, 457 U.S. at 641; *see also Hall*, 242 U.S. 557–58 ("The provisions of the law . . . apply to dispositions of securities *within* the state, and while information of those issued in other states and foreign countries is required to be filed, they are only affected by the requirement of a license of one who deals with them *within* the state. . . . Such regulations affect interstate commerce in [securities] only incidentally.").  Today, every state has its own securities legislation, each with myriad regulations.  *See* J. Liam Gruzs, Note, *Responding to an Unforeseen Variation: Why Ohio Should Provide a Statutory Right of Rescission to All Defrauded Parties in a Stock-for-Stock Exchange,* 43 Val. U. L. Rev. 307, 312 (2008) (noting that every state and territory has promulgated state securities regulation).  However, even though "the American Bar Association, North American Securities Administrators Association (NASAA) and the SEC approved the Uniform Securities Act in 1956, state blue sky laws lack uniformity in many areas, including registration requirements and exemptions therefrom."

---

[3] The term "blue sky laws" is said to reflect the evil against which the laws are aimed—that is, "speculative schemes that have no more basis than so many feet of 'blue sky.'" *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (some internal quotation marks omitted).

William K. Sjostrom, Jr., *Going Public Through an Internet Direct Public Offering: A Sensible Alternative for Small Companies?*, 53 Fla. L. Rev. 529, 545 (2001) (footnotes omitted).

b.  Federal Law Exemptions to Registration—Regulation D and Rule 504

Registered securities offerings can be expensive, time consuming, and burdensome, especially for smaller companies.  *Id.* at 575 n.76 ("Initial public offerings are expensive. . . . [and] also [are] costly in terms of time as personnel must be diverted from their regular duties to gather information, aid in preparing the offering documents and contribute to marketing the deal.").  Thus, for certain emerging companies, "a registered offering is not an option for them. That leaves exempt offerings, or, in other words, offerings conducted in compliance with exemptions from registration."  William K. Sjostrom, Jr., *Relaxing the Ban: It's Time to Allow General Solicitation and Advertising in Exempt Offerings*, 32 Fla. St. U. L. Rev. 1, 8 (2004). "The most commonly relied-on exemptions for stock offerings by emerging companies are those provided by Regulation D under the Securities Act."  *Id.*  "Regulation D, adopted in 1982, was designed to facilitate capital formation while protecting investors by simplifying and clarifying existing exemptions for private or limited offerings, expanding their availability, and providing more uniformity between federal and state exemptions."  Revisions of Limited Offering Exemptions in Regulation D, Securities Act Release No. 27922, Investment Company Act Release No. 33-8828, 72 Fed. Reg. 45,116-01, 45,116 (proposed Aug. 3, 2007); *see also* Bryn Vaaler, *Financing a Small Business in Mississippi: A Practitioner's Guide to Federal and State Securities Exemptions Part I*, 63 Miss. L.J. 129, 142 (1993) ("The purpose of Regulation D was to streamline and coordinate the limited offering and nonpublic exemptions under sections 3(b) and 4(2) of the Securities Act in order to provide a more coherent pattern of exemptive relief (particularly aimed at the capital formation needs of small business) and to achieve uniformity

11

between state and federal exemptions in order to facilitate capital formation consistent with the protection of investors.").  "Regulation D provides exemptions from Securities Act registration for securities offerings under three separate rules: Rules 504, 505 and 506."  Revision of Rule 504 of Regulation D, the "Seed Capital" Exemption, Securities Act Release No. 33-7644, 64 Fed. Reg. 11,090-01, 11,090 (Mar. 8, 1999).  Of these, Rule 504 is the only relevant exemption at issue in this case.  Rule 504, promulgated pursuant to section 3(b) of the Securities Act, is known as the "seed capital" exemption and is limited to offerings by non-reporting companies that do not exceed an aggregate annual amount of $1 million.  *See* 72 Fed. Reg. at 45,133.  Rule 504 places "substantial reliance upon state securities laws," but it does not exempt stock offerings from federal anti-fraud and other civil-liability provisions.  64 Fed. Reg. at 11,090.

"Rule 504 sets forth the requirements for four separate exemptions from the registration requirements of the Securities Act."  75 Fed. Reg. at 45,133.  "Among these is Rule 504(b)(1)(iii), which provides an exemption from registration for offers and sales of securities that are conducted 'according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "accredited investors" as defined in [Rule 501(a)].'"  *Id.* (alteration in original) (footnote omitted); *see also* 17 C.F.R. § 230.504(b)(1)(iii) (1999).[4]  Thus, for a Rule 504(b)(1)(iii) exemption to apply, (a) a security sale or offer must be made exclusively according to state law exemptions from registration; (b) these state law exemptions must permit general solicitation and general advertising; and (c) the purchasers of the securities must be "accredited investors."  *See* 17 C.F.R. § 230.504(b)(1)(iii).

---

[4] An "accredited investor" is defined as a person or entity that falls within one of several categories under 17 C.F.R. § 230.501(a), the applicable portions of which are discussed in greater detail below.  *See* 17 C.F.R. § 230.501(a).

"Securities sold without registration in reliance on this provision are not subject to the limitations on resale established in Rule 502(d) and, as such, are not 'restricted securities . . . .'" 72 Fed. Reg. at 45,133; *see also* 17 C.F.R. § 230.504(b)(1) (providing an exemption for transactions that meet the requirements of Rule 504(b)(1)(i)–(iii) from the resale restrictions imposed by 17 C.F.R. § 230.502(d) ("Except as provided in § 120.504(b)(1), securities acquired in a transaction under Regulation D . . . cannot be resold without registration under the Act or an exemption therefrom.")).[5]

The SEC added Rule 504(b)(1)(iii) as a new exemption to Rule 504 in 1999 in an attempt "to apply the appropriate federal securities law treatment to offerings made under state registration exemptions that satisfied its conditions." 72 Fed. Reg. at 45,133. This addition was "part of a series of changes designed to deter abusive practices in Rule 504 offerings while not impeding legitimate 'seed capital' offerings." *Id.* at 45,134. In particular, the SEC "had been concerned for some time with abusive practices in Rule 504 offerings, many of which involved 'pump and dump' schemes for securities of non-reporting companies that traded over the counter. *Id.*[6] According to the SEC, these problematic offerings "generally involved the securities of 'microcap' companies, i.e., those characterized by thin capitalization, low share

---

[5] As Defendants note, in 2007 the SEC considered changing Rule 504(b)(1)(iii) to deem securities issued thereunder to be "restricted securities," thus barring their immediate re-sale. *See* 72 Fed. Reg. at 45,134. This proposed change apparently was driven by concerns shared by the SEC and state securities regulators about abusive "pump and dump" practices involving Rule 504(b)(1)(iii) offerings. *See* Ultimately, the SEC did not adopt the proposed changes. *See* Disqualification of Felons and Other "Bad Actors" from Rule 506 Offerings, 76 Fed. Reg. 31,518, 31,519 (June 1, 2011).

[6] *See United States v. Downing*, 297 F.3d 52, 54 (2d Cir. 2002) (describing an alleged "pump and dump" scheme as one where "the schemers [first] artificially inflate, or 'pump,' the price of [a] stock by bribing stock promoters to sell it, and [then] 'dump' the stock once the price [becomes] sufficiently high" (alterations in original) (internal quotation marks omitted)).

prices, limited public information and little or no analyst coverage."  64 Fed. Reg. at 11,091.

Added to the mix were "market innovations and technological changes, most notably, the

Internet," which "created the possibility of nation-wide Rule 504 offerings for securities of non-

reporting companies that were once thought to be sold locally."  *Id.*

### 2.  "Accredited Investor" Status of Bronson and E-Lionheart

As noted, for a sale or offering to qualify for a registration exemption under Rule

504(b)(1)(iii), it must be made only to "accredited investors" as defined in Rule 501(a) of

Regulation D.  *See* 17 C.F.R. § 230.504(b)(1)(iii).  If Defendants were not "accredited investors"

in the transactions at issue here, then they would have no basis to invoke the Rule 504(b)(1)(iii)

exemption.  The Securities Act defines an "accredited investor" as a person or entity falling

within one of several categories.  *See* 17 C.F.R. § 230.501(a).  Defendant Bronson claims

accredited-investor status as either a "natural person whose individual net worth, or joint net

worth with that person's spouse, exceeds $1,000,000," or as a "natural person who had an

individual income in excess of $200,000 in each of the two most recent years or joint income

with that person's spouse in excess of $300,000 in each of those years and has a reasonable

expectation of reaching the same income level in the current year." (*See* Defs.' Mem. 10 n.5);

*see also* 17 C.F.R. §§ 230.501(a)(5), (a)(6) (setting forth net-worth and income requirements,

respectively).  Defendant E-Lionheart claims accredited-investor status as an "entity in which all

of the equity owners are accredited investors," pursuant to Rule 501(a)(8), as Bronson is asserted

to be the sole managing member of E-Lionheart. (*See* Defs.' Mem. 10 n.5; *see also* Compl.

¶ 8.); *see also* 17 C.F.R. § 230.501(a)(8).  Put another way, if Bronson is an "accredited

investor," then so too is E-Lionheart; if he is not, then E-Lionheart is not.

14

The facts as currently pled in the Complaint are insufficient for the Court to conclusively determine Defendants' status throughout the entire duration of the alleged scheme.  The Complaint acknowledges Bronson's ownership of E-Lionheart, but it does not contain allegations establishing Bronson's status as an "accredited investor."  For example, while the Complaint alleges that Defendants made more than $10 million in profits in a scheme for which the proceeds were "approximately double the price at which E-Lionheart had acquired the shares," (Compl. ¶ 10, 19), it does not calculate Bronson's net worth or detail his income history (or his spouse's, if he had one).  And, the Court will not infer Defendants' eligibility to make these investments as accredited investors simply from the fact that Defendants are alleged to have illegally made millions of dollars from their scheme.  *See Mabry*, 769 F. Supp. 2d at 395 ("A court may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, *only* if the facts supporting the defense appear on the face of the complaint, and it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." (internal quotation marks omitted) (emphasis added)); *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010) ("Dismissal is proper only when, drawing all reasonable inferences in favor of the *plaintiff*, the court concludes that the plaintiff's own factual allegations prove the defendant's [affirmative] defense." (emphasis added)); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416–17 (S.D.N.Y. 2007) (denying motion to dismiss based on affirmative defense that was unsupported by factual allegations in the complaint).  *See generally Davis v. Ind. State Police*, 541 F.3d 760, 763 (7th Cir. 2008) (concluding that *Twombly* "did not revise the allocation of burdens concerning affirmative defenses," and restating the rule that "[c]omplaints need not anticipate, and attempt to plead around, potential affirmative defenses").

15

When the SEC made this very point, Defendants simply retorted that it "cannot be taken seriously." (Defs.' Reply Mem. 4 n.2.)  Defendants' summary rejection of this claim largely relies on the profits the SEC alleges Defendants illicitly reaped as a result of the supposed scheme. (*Id.*)  Yet, even taking the SEC's allegations regarding the total ill-gotten gains of Defendants accumulated *by the end* of the alleged scheme, there is simply no allegation that Bronson or E-Lionheart qualified as an "accredited investor" in *every* transaction executed during the scheme, especially those occurring in the very early stages.  Indeed, there are no allegations about any of these early transactions, including, for example, any assertions regarding the value of these transactions or Bronson's income or net worth at the time these transactions were executed.  Moreover, even if Bronson has profited handsomely from the stock scheme described in the Complaint, there are no allegations in the Complaint itself about Bronson's net worth, which could have been minimized by any debts he also might have incurred during the time period, or what income Bronson has made (or has reported he made).

The Court recognizes that Defendants may be able to establish, with readily available evidence, that Bronson and/or E-Lionheart were "accredited investors" throughout the history of the alleged scheme, but in considering their Motion To Dismiss the Court may not consider such evidence.  *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d at 416–17 (denying motion to dismiss based on affirmative defense unsupported by facts in the complaint, even though factual basis for the affirmative defense could easily be established by "three or four depositions of key witnesses").  Thus, based on the allegations in the Complaint, or the lack thereof, regarding Bronson's net worth and income during the existence of the alleged scheme, the Court cannot conclude that as a matter of law Defendants satisfy Rule 510(b)(1)(iii)'s accredited-investor requirement and denies Defendants' Motion for this reason.

16

### 3. Applicability of Delaware Security Act § 73-207(b)(8)

Even if the Complaint established that Defendants were accredited investors throughout the duration of the alleged scheme, and therefore, that they could invoke Rule 504(b)(1)(iiii), the Court would nonetheless deny Defendants' Motion.  Based on the allegations in the Complaint, the SEC has pled a prima facie case that Defendants have violated Section 5 of the Securities Act.  No registration statement was filed or in effect as to the securities at issue; Defendants, directly or indirectly, sold or offered to sell these securities; and Defendants used interstate transportation or communication means and/or the mails.  Defendants do not contest this. Instead, they assert, as an affirmative defense, that the securities at issue were exempt from the registration requirements under Rule 504(b)(1)(iii) and a provision of the Delaware Securities Act.

As discussed above, to qualify for an exemption from the federal securities-registration requirements under Rule 504(b)(1)(iii), (1) the offer and sale must be made "[e]xclusively according to state law exemptions from registration," (2) the state law exemption must "permit general solicitation and general advertising," and (3) the sale must be made "only to 'accredited investors' as defined in § 230.501(a)."  17 C.F.R. § 230.504(b)(1)(iii).  According to Defendants, "the Delaware Securities Act prohibits the offer or sale of any security in Delaware unless (1) it is registered, (2) *the security or transaction is exempt*, or (3) the security is a federally covered security."  (Defs.' Mem. 10 (citing Del. Code Ann. tit. 6, § 73-202).)  They further claim that the securities transactions at issue in this case were exempt from any registration requirements under Delaware Securities Act § 73-207(b)(8).[7]  (Defs.' Mem. 10–11.)  This section provides a

---

[7] Prior to 2011, including during the period when Defendants were relying on the exemptions provided by this section, this provision existed in the Delaware code at § 7309(b)(8).

registration exemption for "[a]ny offer or sale to a bank, savings institution, trust company, insurance company, investment company . . . , pension or profit-sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in some fiduciary capacity."  Del. Code Ann. tit. 6, § 73-207(b)(8).  Defendants assert that E-Lionheart qualifies as an institutional buyer and therefore falls within the Delaware law exemption.[8]  (Defs.' Mem. 10 n.5.)  They further assert that § 73-207(b)(8) applies because the parties to the securities transactions at issue so stipulated in the subscription agreements.  (Compl. ¶ 19; Defs.' Mem. 14-15.)

The SEC challenges Defendants' invocation of § 73-207(b)(8) on two grounds.  First, the SEC contends that the securities transactions executed as part of the alleged scheme "had either no nexus, or an insufficient nexus, to Delaware."  (Compl. ¶ 22.)  Thus, according to the SEC, Defendants cannot rely on the Delaware Securities Act, and the specific exemption provided therein, to invoke Rule 504(b)(1)(iii).  Second, the SEC argues that this provision does not "permit 'general solicitation and general advertising,' as required by Rule 504(b)(1)(iii)."  (*Id.* ¶ 23.)

---

78 Del. Laws ch. 175 (2011).  To avoid potential confusion, the Court will refer to this provision by its current location in the Delaware code, § 73-207(b)(8).

[8] In the SEC's Opposition to Defendants' Motion To Dismiss, the Commission argues that the "type of state law exemption the Commission had in mind when it enacted SEC Rule 504(b)(1)(iii)" is embodied by Delaware Rule 503, not the state registration exemption provided by Delaware §73-207(b)(8).  (Pl.'s Mem. 10–11.)  Defendants do not assert an affirmative defense under Delaware Rule 503, however.  Thus, Defendants contend that the SEC's argument regarding Rule 503 is "entirely irrelevant," as "more than one exemption was available" to Defendants.  (Defs.' Reply Mem. 9.)  As such, the Court will assess only the affirmative defense asserted by Defendants under Delaware § 73-207(b)(8).

According to Defendants, the SEC's nexus claim is "irrelevant as a matter of law, " because "[n]othing in rule 504(b)(1)(iii) requires that the offer or sale occur in, or have any connection to, the state in which the issuer is claiming an exemption." (Defs.' Mem. 11.)  As support for this point, Defendants purport to rely on the language of Rule 504(b)(1)(iii) itself, particularly as compared to the language of the other two subsections of Rule 504(b)(1).[9]  (*Id*. at 12.)  As Defendants explain, "[b]oth subsection (i) and subsection (ii) of Rule 504(b)(1) require that the offers and sales are made 'in one or more states' that either 'provide for the registration of securities' . . . or 'have no provision for the registration of the securities' so long as the securities have been registered in at least one state that provides for registration." (*Id.* (citing Rule 504(b)(1)(i), (b)(1)(ii)).)   "In contrast," Defendants argue, Rule 504(b)(1)(iii) "does not require that the offers or sales be made 'in one or more states,'" but only "provides that the offers or sales must be made '*according to state law exemptions*.'"  (*Id.*)

---

[9] Rule 504(b)(1) provides for an exemption from the federal security-registration requirement for offers or sales of securities made:

(i) Exclusively in one or more states that provide for the registration of the securities, and require the public filing and delivery to investors of a substantive disclosure document before sale, and are made in accordance with those state provisions;

(ii) In one or more states that have no provision for the registration of the securities or the public filing or delivery of a disclosure document before sale, if the securities have been registered in at least one state that provides for such registration, public filing and delivery before sale, offers and sales are made in that state in accordance with such provisions, and the disclosure document is delivered before sale to all purchasers (including those in the states that have no such procedure); or

(iii) Exclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "accredited investors" as defined in [Rule 510(a)].

17 C.F.R. § 230.504(b)(1).

19

When interpreting a rule, the Court must begin with the plain language used therein.  *See Resnik v. Swartz*, 303 F.3d 147, 151 (2d. Cir. 2003) ("In interpreting an administrative regulation, as in interpreting a statute, we must begin by examining the language of the provision at issue.").  In so doing, the Court is to give the Rule's "terms, read in their appropriate context, their ordinary, common meaning . . . ." *Duarte-Ceri v. Holder*, 630 F.3d 83, 92 (2d Cir. 2010); *see also Bilski v. Kappos*, 130 S. Ct. 3218, 3226 (2010) ("[I]n all statutory construction, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (internal quotation marks and alterations omitted)); *Alhovsky v. NYC Dep't of Parks & Recreation*, No. 11-CV-3669, 2012 WL 3552916, at *2 (S.D.N.Y. Aug. 16, 2012) ("'[W]hen interpreting a statute or regulation, we are required to read that statute or regulation as a whole, . . . since the meaning of [its] language, plain or not, depends on context.'" (quotation marks omitted and second alteration in original) (quoting *Rock of Ages Corp. v. Sec'y of Labor,* 170 F.3d 148, 155 (2d Cir.1999)).

Looking at the plain language of Rule 504(b)(1), the Court is unpersuaded by Defendants' argument.  First, subsections (i) and (ii) differ in their language because they govern transactions where a registration statement has been filed in one or more states.  In short, both subsections (i) and (ii) provide exemptions from the federal registration requirements only when the offer or sale complies with all applicable state blue sky laws, even extending applicable state compliance requirements to cover states without registration requirements in order to qualify for federal registration exemption.  In this way, subsections (i) and (ii) provide exemptions from federal registration requirements when state-law registration compliance would supplant the need for federal registration because no state's registration requirements would be violated and buyers in states without regulations would benefit from the registration requirements from other

states. Yet, the subsection (iii) exemption does not depend on the filing of a registration statement.  Instead, it covers certain offers or sales that are exempt from registration under state law, thus obviating the need to reference registration requirements in any particular state. Therefore, the omission of the phrase in subsection (iii)  "in one or more states" has no legal consequence.

Second, Defendants' claim that subsection (iii) "merely provides that the offers and sales be made '*according to state law exemptions*,' (Def.'s Mem. 12), but not in the state whose exemption is invoked, is improper as it reads out the term "exclusively."  By using that term, the SEC plainly required that the offers or sales were exempt in each state where they occurred. Indeed, the use of the word "exclusively" in subsection (i) only fortifies the point.  Subsection (i) provides an exemption for offers and sales made "[e]xclusively in one or more states that provide for the registration of securities . . . and are made in accordance with those state provisions."  17 C.F.R. § 230.504(b)(1)(ii).  In contrast, subsection (ii) permits sales in states other than the state of registration, but only if the registration statement is filed in at least one state *and* all investors receive the requisite disclosure documents, and, therefore, does not use the term "exclusively."  *Id.* § 230.504(b)(1)(ii).  Thus, both subsections (i) and (iii) use the word "exclusively" to define and limit the exemptions in each: subsection (i) exempts only those offers and sales made "exclusively" in those states where a registration statement is filed; subsection (iii) exempts offers and sales made "exclusively" in those states where applicable exemptions are permitted.  If subsection (iii) operated the way Defendants assert—that is, to allow for offers or sales of securities if exempted in only one state, then subsection (iii) would read like subsection (ii).  Moreover, Defendants' reading of subsection (iii) would allow issuers to make offers or sales of securities nationwide, under the supposed auspices of a single state's

exemption regime, even if that exemption conflicted with the laws of every other state.  Yet, any such offers or sales could not be "exclusively according to state law exemptions," as they could be partially *according to* and partially *contrary to* state law exemptions.  Moreover, Defendants provide no explanation as to how to square their proposed reading of the Rule (which would require only one state's exemption requirements be met) with the use of the plural "exemptions" in subsection (iii).  If this subsection could be satisfied by complying with only one of multiple applicable state exemptions, it would presumably use the singular "exemption."  Thus, the Court concludes that the language of Rule 504(b)(1)(iii) requires compliance with those state-law exemptions where the securities are offered or sold, and rejects Defendants' contention that compliance with one state's exemption requirements is sufficient for federal exemption purposes.

Finally, even if the Court were to accept Defendants' proposed interpretation of Rule 504(b)(1)(iii) and agree that this regulation requires only satisfaction of one state's registration-exemption provision in order to qualify for a federal registration exemption, and assuming Defendants could demonstrate that a particular state's exemption requirements had been satisfied, the Court would still need to determine whether the state-law exemption Defendants invoke applies to the transactions alleged in the Complaint.

Defendants claim that the subscription agreements between Defendants and the issuing companies, which provided that § 73-207(b)(8) governed the transactions, are sufficient to trigger application of Rule 504(b)(1)(iii).  (Defs.' Mem. 13.)  In support of this contention, Defendants rely on Delaware case law describing the ability of "Delaware citizen[s]" to choose Delaware common law in commercial relationships, (*id.* at 15), and some authority for the

22

proposition that Delaware's long-arm statute can apply when the parties agree to be governed by Delaware law.  Defendants' claims outreach the supporting authority.

State statutes are generally presumed to apply only within the jurisdictional boundaries of the state.  *See O'Neill v. Mermaid Touring, Inc.*, — F. Supp. 2d —, 2013 WL 4829266, at *4 (S.D.N.Y. Sept. 10, 2013) (recognizing the "settled rule of statutory interpretation [ ] that unless expressly stated otherwise, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state . . . enacting it") (alterations in original) (internal quotation marks omitted); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1027 n.3 (N.D. Cal. 2011) (recognizing the existence of a "presumption against extraterritoriality, which provides that state laws may not be applied to conduct occurring outside [their] borders" (internal quotation marks omitted)); 73 Am. Jur. 2d *Statutes* § 243 (2014).  Indeed, as noted, the Supreme Court relied on the limited territorial reach of state blue sky laws to reject Commerce Clause challenges to them. *See Edgar*, 457 U.S. at 641.  The Delaware Securities Act is no exception, as Delaware courts have held that the Delaware Securities Act only applies where "there is a sufficient nexus between Delaware and the transaction at issue."  *Vichi v. Koninklijke Philips Elecs., N.V.*, No. 2578-VCP, 2009 WL 4345724, at *19 (Del. Ch. Dec. 1, 2009); *see also Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977) (interpreting the "Delaware Securities Act as a Blue Sky Law governing transactions which are subject to Delaware jurisdiction under traditional tests," and finding that the Delaware Securities Act did not apply to the challenged transaction because "[p]laintiffs [were] residents of Pennsylvania and were not solicited [in Delaware].  Nor [did] it appear that the contract was made in Delaware nor that any part of the 'sale' occurred [there]."), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983); *accord JAC Holding Enters. v. Atrium Capital Partners, LLC*, — F. Supp. 2d —, 2014 WL 643808, at

*24 (E.D. Mich. Feb. 10, 2014) ("The Delaware courts have held that the Delaware Securities Act imposes liability only where the transaction in question bears a 'sufficient nexus' to the State.").

Therefore, for Defendants to successfully assert a Delaware registration exemption as a basis for an their affirmative defense in their Motion To Dismiss, it must be clear on the face of the Complaint that the Delaware Securities Act applies to the transactions at issue.  However, the Complaint contains the following allegations that, for purposes of this Motion, are assumed to be true: (1) E-Lionheart, while a Delaware limited liability company, has at all times relevant here maintained its sole business address in White Plains, New York, and also does business as "Fairhills Capital," (Compl. ¶ 8); (2) Bronson is a New York resident and the sole managing member of E-Lionheart, (*id.* ¶ 7); (3) FCI, while a Delaware corporation, maintains the same business address as E-Lionheart in White Plains, New York, (*id.* ¶ 9); (4) Bronson and E-Lionheart "did not prepare, negotiate or execute any of the subscription agreements or other transactional documents in Delaware," (*id.* ¶ 22); (5) the securities were sent to E-Lionheart's business in White Plains, (*id.*); and (6) the attorneys who prepared opinion letters to the issuers were not licensed to practice in Delaware and the transfer agents to whom the opinion letters were sent were not located in Delaware, (*id.*).  Regarding the issuers themselves, the Complaint alleges that "many" of them "had no business operations in Delaware."  (*Id.*)  Put another way, based on these allegations, Defendants are not able to establish a territorial nexus between the securities transactions at issue and Delaware, other than the fact that E-Lionheart is a Delaware limited liability company.

From this list of allegations, the only possible nexus between Delaware and the transactions allegedly comprising the illicit scheme is that E-Lionheart was incorporated in

Delaware.  (Compl. ¶ 8.)  However, the case law is clear that incorporation alone is not a sufficient nexus to trigger application of Delaware's Securities Act.  *See Singer*, 380 A.2d at 981 (holding that a Delaware corporation is not bound by the Securities Act "simply because the company is incorporated" there); *see also JAC Holding Enters.*, 2014 WL 643808, at *24 ("The only connection to Delaware that emerges from the pleaded facts . . . is that JAC is chartered there.  But the Delaware Supreme Court 'do[es] not read the [Delaware Securities] Act as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered" in Delaware (brackets in original)); *Dofflemyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372, 377 n.78 (D. Del. 1983) ("The parties have not suggested that there is any connection between the events challenged in the present action and the State of Delaware, other than the fact that the defendant corporations are incorporated here. . . .  Thus, on the basis of these facts, it is clear from *Singer* that a Delaware court would not entertain an action under the Delaware Blue Sky law.").[10]  Given the factual allegations in the Complaint, and  "according to the law" of Delaware, there is an insufficient nexus between the transactions and Delaware to allow Defendants to invoke § 73-207(b)(8).  Accordingly, the Court denies Defendants' Motion To Dismiss.[11]

---

[10] While no party has raised this point, Defendants' claim that the Delaware Securities Act could be chosen by issuers to govern securities that were not offered or sold to or from Delaware might raise serious Commerce Clause questions.  *See In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 755 F. Supp. 2d 857, 888 (S.D. Ohio 2010) (dismissing securities-fraud claim based on Ohio securities laws because application of Ohio's law to transactions wholly outside of Ohio would "violate the extraterritoriality principle of the Commerce Clause"); *cf. A.S. Goldmen & Co. v. N.J. Bureau of Sec.*, 163 F.3d 780, 788 (3d Cir. 1999) (rejecting Commerce Clause challenge to application of New Jersey securities laws because the seller offered and sold the securities from New Jersey).

[11] Because the Court agrees with the SEC that Defendants have not established a sufficient nexus between the transactions at issue in this case and Delaware, it need not and does

<u>4.  Unjust Enrichment of Fairhills Capital, Inc.</u>

Relief Defendant FCI further moves to dismiss the SEC's claim of unjust enrichment with respect to the automobiles in its possession, arguing that the SEC fails to "allege that the source of the money [used] to purchase these automobiles came from ill-gotten proceeds, let alone the alleged profits of the Rule 504 transactions."  (Defs.' Mem. 20–21.)  In order to prevent unjust enrichment, the Court "may order disgorgement against a relief defendant who is not accused of wrongdoing in a securities enforcement action provided that the defendant: '(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  *SEC v. Aronson*, No. 11-CV-7033, 2013 WL 4082900, at *13 (S.D.N.Y. Aug. 6, 2013) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)*, reconsidered in part by* 2013 WL 6501324 (S.D.N.Y. Dec. 11, 2013)).  In applying this remedy, the court need not limit disgorgement to the actual assets received by the relief defendant.  *See SEC v. Spongetech Delivery Sys., Inc.*, No. 10-CV-2031, 2011 WL 887940, at *9 n.6 (E.D.N.Y. Mar. 14, 2011) ("To hold . . . that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. . . .  [F]or example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." (alterations in original) (internal quotation marks omitted)).  Instead, disgorgement merely demands return of a sum equal to the amount wrongfully obtained.  *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir. 2011) (noting that "'disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset'" (quoting *SEC v. Banner Fund Int'l,* 211 F.3d 602, 617

_____

not consider the question of whether § 73-207(b)(8) permits general solicitation and advertising.

(D.C. Cir. (2000))); *see also SEC v. Contorinis,* — F.3d —, 2014 WL 593484, at *4 (2d Cir. Feb. 18, 2014) (noting that "disgorgement is required whether the insider trader has put his profits into a bank account, dissipated them on transient pleasures, or given them away to others").

Here, the SEC has pled that FCI "obtained proceeds from Defendants' unlawful conduct" and "has no legitimate claim to these funds**."** (Compl. ¶ 41.)  The Complaint alleges that the "overwhelming majority" of FCI's assets were transfers from E-Lionheart, (*id.* ¶ 35), including a single day's transfer of more than $600,000, (*id.* ¶ 34), and the titles to at least one of four automobiles (*id.* ¶ 33).  Furthermore, the Complaint asserts that FCI's bank account is being used to hold "certain portions of [Bronson's] illegal trading activity."  (*Id.* ¶ 36.)  As such, the SEC has satisfactorily pled a claim of unjust enrichment against FCI.  While the SEC has not specifically pled that the automobiles possessed by FCI must be disgorged, a defendant may be expected to liquidate assets if necessary to satisfy a disgorgement order.  *See, e.g., SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 137–38 & n.7, 142 (S.D.N.Y. 2008) (holding the defendant in contempt for failing to satisfy a disgorgement order and noting that defendant "failed to liquidate" any of his multiple properties or three vehicles and continued to spend extravagantly).  The Court finds no basis for limiting Plaintiff's properly pleaded unjust enrichment claim to exclude certain assets in FCI's possession, including the aforementioned automobiles.  FCI's Motion To Dismiss this claim is therefore denied.

### III. Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is denied.  The Clerk of

Court is respectfully directed to terminate the pending motion.  (Dkt. No. 17.)

SO ORDERED.

Dated: March 31, 2014
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

28