1525secMS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    SECURITIES and EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
              v.                        12 Civ. 6421(KMK)(JCM)
6                                       Status Conference
     EDWARD BRONSON, E-LIONHEART
7    ASSOCIATES, LLC, doing business
     as Fairhills Capital, and
8    FAIRHILLS CAPITAL, INC.,

9                   Defendants.

10   -------------------------------x

11                                      White Plains, N.Y.
                                        February 5, 2015
12
     Before:
13
                    HON. JUDITH C. McCARTHY,
14
                                        Magistrate Judge
15
                          APPEARANCES
16

17   HAIMAVATHI VARADAN MARLIER
         Attorney  for Plaintiff
18   KEVIN P. McGRATH

19
     MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO, P.C.
20       Attorneys  for Defendants
     BENJAMIN S. FISCHER
21   RACHEL N. AGRESS

22

23

24

25   Digital recording.


                MARY M. STATEN, CSR, RPR, RMR
                      (914) 390-4027

1              THE DEPUTY CLERK:   In the matter of the Securities and

2    Exchange Commission versus Edward Bronson.

3              Counsel, please state your appearances for the record.

4              MR. McGRATH:  Good morning, your Honor.

5              Kevin McGrath, from Haimavathi Marlier, for the SEC.

6              THE COURT:  Good morning.

7              MR. FISCHER:  Good morning, your Honor.

8              Benjamin Fischer and Rachel Agress, from Morvillo,

9    Abramowitz, Grand, Iason & Anello, for the defendants.

10             THE COURT:  Good morning.

11             MR. FISCHER:  Good morning.

12             THE COURT:  Okay.  So this is our initial conference.

13   I know this case has been going on for a little while.  But

14   it's the first time before me, and it's been referred to me for

15   general pretrial purposes.

16             What I'd like to do today is two things.

17             First, I'd like to hear about generally what this case

18   is about and where everybody's at with discovery.  And then

19   I'll tell you what my plan is for pretrial supervision and what

20   my expectations are.  And of course, if you have any questions

21   for me about that, this is the time to ask.

22             So if you'd like to tell me a little bit about what

23   this case is about.

24             MR. McGRATH:  Yes, your Honor.

25             Thank you.

1              Essentially, the SEC charges Mr. Bronson and his

2     companies with engaging in a pattern and practice where they

3     purchase billions of shares of penny stocks from issuers that

4     were not registered.  And then they purchased them at

5     below-market rates, and then immediately turned around and

6     resold them into the market, making 50 percent or more in

7     profit.

8              The scheme occurred over a number of years, and, by

9     our estimates, Mr. Bronson made over $10 million in profits.

10             We understand the answer and the defendant's defense

11    that he's going to claim that the shares were not subject to

12    registration, which is what we claim the violation was.  They

13    should have been registered, and then they should not have been

14    resold by him without re-registration.

15             The defense is that the shares were subject to an

16    exemption from registration under Delaware law.

17             We have three responses to that.

18             One is that under the exemption in question, the

19    shares had to be exempt from registration in every state in

20    which the transactions occurred, and there were multiple states

21    involved in these transactions.  Mr. Bronson was located in New

22    York.  Most of the issuers were doing business in states other

23    than Delaware.  The transfer agents who processed the

24    transactions were not located in Delaware.  The attorneys who

25    rendered opinions were, for the most part, not located in

1525secMS

1    Delaware.

2              So in our view, in order for any exemption to apply,

3    the defendants would have to establish that they were -- that

4    they qualified for an exemption under each state law where the

5    transactions took place.  That would be the first response to

6    that defense.

7              The second response would be, even if only Delaware

8    were applied, there were not -- there was not sufficient nexus

9    between the defendant and the transactions in Delaware.  And

10   Judge Karas has issued an opinion in response to the motion for

11   summary disposition that addressed what's necessary to

12   establish nexus in Delaware.  A mere incorporation is not

13   sufficient.  Mr. Bronson incorporated down in Delaware, but

14   Judge Karas found that that's all there is, there's not

15   sufficient nexus.

16             So we would argue that even if there's some argument

17   that the transactions all took place in Delaware, which we

18   don't think they did, there's not sufficient nexus there for

19   Mr. Bronson to take advantage of the Delaware exemption.

20             And thirdly -- that's second, but thirdly, even if

21   Delaware law was the only law that applied, the Delaware law

22   doesn't meet the federal securities exemption for registration.

23             So those are essentially the three responses we have

24   to the claim that these shares were exempt.

25             It's strict liability, so there's no intent involved

1    here.  We don't think there's going to be a lot of dispute

2    about the fact that shares were purchased and resold, where

3    they were purchased, where they were resold.  As I understand

4    it, the case is going to come down to, you know, this nexus

5    issue and interpretation of the federal exemption statute,

6    which is 504(b)(1)(iii).

7              And that's essentially the summary of the case from

8    our perspective.

9              THE COURT:  Thank you.

10             Before we go to discovery, I want to give counsel a

11   chance to respond to that.

12             MR. FISCHER:  Thank you, your Honor.

13             Good morning.

14             Mr. McGrath said it is a case that turns on whether my

15   client properly relied on federal and state registration

16   exemptions for each of the transactions at issue in this case.

17   He had an attorney opinion letter saying that he was properly

18   relying, that the opinion -- the opinion that the attorney gave

19   said that the exemptions did apply to him, and as well as the

20   issuer.  So there's an issuer who issues the security, and then

21   my client's company purchased the securities from the issuer

22   and sold them.  The attorney who reviewed this said, "Looks

23   good to us" in a three-page letter that was fairly detailed,

24   and blessed the transaction.

25             The issue is whether or not he was entitled to rely on

1    those registration exemptions.

2            The issue that was briefed before Judge Karas in the

3    "motion to dismiss" phase simply -- that issue the way that was

4    decided was, the allegations of the complaint, the SEC's

5    allegations, were not sufficient to establish that he properly

6    relied.

7            So that was sort of coming out of the box.  As most

8    motions -- as all motions to dismiss do, they rely on the face

9    of the complaint.

10           We believe that Mr. Bronson properly relied.  That

11   belief is bolstered by the fact that after the briefing on the

12   motion to dismiss -- and I might as well give your Honor a

13   sneak preview of an issue you may see in a couple of weeks, and

14   it's an interesting issue.

15           After the briefing on the motion to dismiss, prior to

16   my firm being involved in the case, but after the briefing on

17   the motion to dismiss and after Judge Karas issued his decision

18   and order, the SEC produced some interesting correspondence.

19   And that correspondence made clear that in 2010 and, I think,

20   2011, the SEC went and solicited Delaware securities officials

21   and said, "Hey.  What is your interpretation of this?  We

22   have -- here's an attorney opinion letter opining on

23   transactions engaged in by this guy, Edward Bronson," my

24   client," and his company, E-Lionheard.  Can you weigh in on

25   this, Officials?  You know, High and Mighty Officials of

1    Delaware, what do you think?"

2           Their response was essentially, "This looks good to

3    us."

4           That was not made available to us at the briefing, so

5    we think that there are significant issues post-motion to

6    dismiss that we're going to need to get into here.

7           It was made available to us post-briefing, I think

8    likely because there was another Rule 504 case pending before

9    Judge Scheindlin in the Southern District that essentially

10   arose -- essentially involves the same facts, whether the

11   parties could rely on these registration exemptions.  And I

12   think that the parties in that case -- the SEC produced those

13   documents to us in this case, sua sponte.

14          Judge Scheindlin held that those documents were not

15   protected by any "law enforcement" privilege.  As I understand

16   and have now read and reviewed the SEC's responses to our

17   document requests and interrogatories and have had discussions

18   with them, they will be taking -- they will again,

19   notwithstanding the decision by Judge Scheindlin in the other

20   case, they again intend to press this privilege issue.

21          So that is an issue that I suspect we will raise

22   before your Honor.  We think it's relevant, important, and it

23   gets to the meaning of what this very important law means in

24   this case.  So it's something you'll see down the road.

25          So in a nutshell, we think he properly relied on the

1    exemptions, and that the exemptions were applicable to him.

2              THE COURT:  Okay.  Thank you.

3              MR. FISCHER:  Thank you, your Honor.

4              THE COURT:  Okay.  How much has been done?  I know

5    there's been motion practice.  How much has been done in

6    discovery?

7              MR. McGRATH:  Well, we've exchanged initial

8    disclosures.  We've exchanged document and requests for

9    interrogatories.  We've responded to each other's requests.

10   And we had a meet-and-confer regarding some of the issues that

11   were presented by the different requests and responses.  Those

12   meet-and-confers are ongoing.  I think there's one sort of

13   major discovery issue that I think is holding us up a little

14   bit right now.

15             The FBI executed a search warrant of Mr. Bronson's

16   offices a number of years ago.  They gave us 41 boxes of

17   documents that were seized pursuant to that search warrant.

18   But after we got them and before we started looking at them, I

19   asked to see whether there was any privilege review done.  It

20   turned out there hadn't been.

21             So I spoke with Mr. Fischer about how to deal with

22   this situation, and we agreed that our office would place a

23   taint team of attorneys, separate from the investigative and

24   trial attorneys, to review those documents for privilege.

25   That's been done.  But when we did that review, we were

1   operating under the impression that there would not be an

2   assertion of attorney-client privilege with respect to the

3   attorneys who issued the opinion letters that Mr. Bronson is

4   relying upon that Mr. Fischer just referred to.

5           So what we pulled out, pursuant to the taint review,

6   were communications between Mr. Bronson and attorneys unrelated

7   to the 504 transactions.

8           In recent discussions with Mr. Fischer, we sort of got

9   a bit of an issue that hasn't been resolved yet is, in their

10  answer, they've asserted reliance on advice of counsel.

11  Normally, if that's a defense, then we would be entitled to

12  inquire of the client and the attorney what communications

13  occurred to see whether there was good faith reliance on the

14  advice of counsel.

15          At least as of now, Mr. Fischer is not prepared to

16  waive that privilege.  And so we are then in the position --

17  there's two issues that result from that.

18          One is -- and this is something I'll flag for your

19  Honor that I think is going to come up sooner rather than

20  later -- to the extent that that privilege is not waived -- and

21  I understand Mr. Fischer has asked us to give him a little more

22  time to think about it -- we think we're going to need to brief

23  this for your Honor's resolution before we go forward with

24  depositions.  It doesn't make sense for us to be disposing

25  Mr. Bronson where this issue has not been resolved.  And we

1    also would want to depose some of the attorneys who issued the

2    opinion letters, find out from them what they knew, what they

3    told Mr. Bronson, et cetera, et cetera.

4         So that's a briefing issue that we see coming up, and

5    we'd like to get that done sooner rather than later.

6         Secondly -- and this is discussions we just had in the

7    last day or two with Mr. Fischer -- we've asked them whether

8    they'd be willing to do the privilege review for the

9    approximately 34, 35 hundred documents that were identified

10   when we ran the 504 opinion attorneys' names through the

11   database.  And I think we're going to get an answer in the next

12   couple of days whether his firm is prepared to do that.  If

13   not, we'll do it.  It's just going to take a little more time.

14        So there's this cache, essentially, of 41 boxes of

15   documents that are in limbo.  We're going to turn over those

16   boxes to Mr. Fischer in the next week or so.  But we haven't

17   been able to -- Ms. Marlier and myself have not been able to

18   get access to those.  So that's sort of held up the next stage,

19   which would be depositions.

20        And that's what leads me to the last point I'll make

21   now, which is that right now, under the Court's order,

22   depositions have to be completed by April 9th.  It's now almost

23   the middle of February.  We haven't exchanged the bulk of the

24   documents yet.  We haven't gotten any documents in response to

25   our document request.  So I don't see that -- I want this case

1    to move along, obviously.  But frankly, I don't see that we're

2    going to be able to comply with the April 9th deadline.

3              So I'm just giving -- I'm not sure that we're in a

4    position now to reasonably predict what date we're going to

5    need to extend that.  I'm obviously going to want to try to

6    move this as quickly as possible.  But that's something I

7    wanted to alert your Honor to.

8              THE COURT:  Thank you.

9              MR. FISCHER:  Your Honor, just to add to that issue,

10   we both think -- I think we're in agreement that the 41 boxes

11   are going to create a lot of efficiencies, because we think

12   that there is a substantial chance that -- substantial

13   likelihood that they contain a large majority of even the

14   responsive documents that we would have to produce.

15             So yes, we don't have access to them.  But it will be

16   great when we do, because I think that will be -- I think we're

17   all in agreement here that those -- that will actually -- it

18   may be taking a little while to get them because of

19   privilege-related issues and things like that, but it's going

20   to ultimately be efficient when we do.

21             I do think that it makes sense for us to review the

22   universe for privilege so that the SEC can carve out what we

23   are calling "attorney-client communications" from its

24   production, not review them, give them to us, because I think,

25   to the extent that we are going have a fight about our

1    assertion of privilege, I don't want to do that in a vacuum,

2    and only want to do that if I know what I'm asserting privilege

3    over.

4         So I do think it makes sense for us to -- because

5    ultimately, there may be -- that may narrow the issues, too,

6    and create more efficiencies.  So I think that makes sense, and

7    I think we're all sort of in agreement on that.

8         We've met all the other deadlines going forward, so I

9    think that's good, and we generally are having productive

10   meet-and-confers.

11        THE COURT:  Now, since your client is relying on

12   good-faith reliance on an attorney opinion, what is your

13   position on waiving the privilege?  Is it just that you need to

14   know what documents you're truly waiving before you say what

15   you're going to waive, or do you have a principle approach that

16   you don't intend to waive the privilege?

17        MR. FISCHER:  No, I think it's a little bit of both,

18   your Honor.  First, I don't want to do it in a vacuum.  And

19   second of all, I think that right now, what we're relying on is

20   the opinion letters of the attorney that were sort of made

21   public to everyone.  And you know, I don't know that that

22   should result in a waiver of the privilege.  It's not -- it's

23   not an issue where you have to claw deep into the -- you know,

24   the e-mails and see what the advice is.  The advice is clear on

25   the face of the documents.  And the advice is consistent on the

1    face of the documents.  Ms. Sorliss has already been --

2              THE COURT:  But the SEC does not know you're relying

3    on that, and they -- and it's a good-faith reliance, but the

4    SEC does not know what might have also been said before that

5    opinion, what discussions might have been had that resulted in

6    that opinion.

7              You know, before you -- this is an area I'm actually

8    looking at right now in another case, so I'm intimately

9    familiar with it.

10             Before you assert that privilege, I strongly encourage

11   you to read the cases that are out there on it, because once

12   you have that defense, you really are putting into play, you

13   know, not just that single document.  And I think your case is

14   based on that defense.  So you may disagree on the depth of the

15   disclosure, but I think that is probably more than just your

16   letter.

17             Without knowing, you know, more facts, I don't want to

18   rule on it, but I just from -- and I've been reading a lot of

19   cases in the last week about this.  I basically don't waste

20   everybody's time.  Look at it yourself, and, you know, make

21   sure that whatever you bring to my, you know, attention to

22   decide is as narrowly tailored as it should be, because I think

23   that, given the defense you have, you're likely to have to

24   probably disclose more than you necessarily on the initial

25   blush want to.

1             MR. FISCHER:  We appreciate that, your Honor.  We will

2      get on top of that and circle back with the SEC.

3             THE COURT:  Now, let me tell you --

4             MR. FISCHER:  But I think, your Honor --

5             I'm sorry to interrupt.

6             THE COURT:  Yes.

7             MR. FISCHER:  I think it makes sense to do that in the

8      context of us reviewing the documents.

9             THE COURT:  I think you need to know what's out there

10     and what the world is, because you're going to need to be

11     telling me what it is --

12            MR. FISCHER:  True.

13            THE COURT:  -- that's out there and what the world is.

14     So you have to have that information.

15            MR. FISCHER:  Right.

16            THE COURT:  Yes, it's two months to April 9th, and no,

17     you're not likely to get everything done by then.

18            Let me tell you a little bit about how I view these

19     discovery orders, and particularly with Judge Karas's, because

20     Judge Karas's are unique from the other judges here in the

21     White Plains courthouse, to the extent that he has a caveat on

22     the bottom, Page 3, that "There will be no extensions to the

23     discovery schedule without the permission of the Court, nor

24     should counsel assume that any extensions will be granted."

25     And then he goes on to say, "Counsel may seek permission for an

1    extension of the discovery deadline with the Magistrate Judge

2    to whom the case is referred, but only after consenting to

3    allowing the Magistrate Judge to handle the case for all

4    purposes."

5             So let me tell you how that plays out.

6             On the internal deadlines that are in here -- and

7    internal deadlines would be any deadline except the final

8    deadline of when discovery is closed -- I will be able to move

9    those, because I -- you know, I understand that sometimes, you

10   know, you think can you get something done by "X" date, and you

11   need another week or two weeks to get it done.  And so -- but

12   that final deadline, I cannot move and will not move.  That has

13   to go to Judge Karas.

14            Looks like here, I can't really tell exactly what your

15   final deadline is, except you do have that there's going to be

16   experts.  That'll be concluded on June 8th.  So I'm going to

17   consider that your final deadline, although you do have a

18   conference before Judge Karas on May 22nd, which might mean

19   that he's considering something earlier the final deadline.

20            That April 9th deadline is a deadline that I do

21   believe that is something that I could move, but I don't plan

22   on moving it right now.  The way I like to conduct, you know,

23   supervision of pretrial is, you know, the parties should work

24   as diligently as possible to get everything done before that

25   date.  When you need an extension of time, you need to let me

1   know what has been done, what has been completed, and why you

2   specifically need that extension of time.  And if I believe

3   that that extension of time is being requested because of

4   things that are not totally within your control or just the

5   nature of litigation where we can't always predict what's going

6   to happen, I will not unreasonably withhold consent to adjourn

7   it.

8          However, if it just sits and I can tell the case

9   hasn't been touched in, you know, the two months between now

10  and then, you're likely to get, you know, a much different

11  reaction from me.

12         You know, my goal is to keep these cases moving, to

13  keep the attorneys focused on them, and not having them put on

14  the back burner.  We all have lots of priorities, and sometimes

15  when you have a judge making sure this case remains the

16  priority, it remains the priority.  And that's my goal here.

17         But I am also, I think, quite reasonable in granting

18  time.  And when I -- and one of the reasons why I wouldn't,

19  although I know you're going to need it, wouldn't grant time at

20  this point, is, I don't have any idea, and I don't think you

21  have any idea, how much time you need.  And I try to be

22  reasonable in asking the parties -- counsel, "What do you

23  really think you're going to need in this," because to

24  arbitrarily put a deadline down, you know, it will just be

25  another request for an extension, and I'd rather avoid it.  I'd

1    rather stick with deadlines that are realistic, that the

2    parties can meet, that they've thought about.

3          So for instance, if you know that there are certain

4    depositions, you know, my feeling is that once the documents

5    are disclosed, you need to start talking about when you're

6    going to schedule those depositions and put holds on dates, so

7    that, you know, things move forward and don't get stalled.

8          And those are the kinds of questions I'm going to ask

9    you at my status conferences.  We'll do these conferences

10   regularly.  I usually do anywhere from four to eight weeks,

11   depending on how well the parties are getting along and what's

12   going on in the case.  If there's stuff that I think is going

13   to come up, I'll schedule a status conference just earlier so

14   we can check in.

15          I will typically -- both of you are coming from New

16   York, as far as I can tell from looking at the sheet in front

17   of me.  I will typically do those status conferences after the

18   initial one by telephone.  But I do not do discovery disputes

19   by telephone, because I find that it's really much better and

20   much more helpful for everybody to be in person to hammer them

21   out.

22          I will issue a discovery order in this case.  That

23   discovery order does not supplant the federal rules.  The

24   federal rules apply.  So, you know, the federal rules relating

25   to issues with discovery require the parties to meet and confer

1   prior to bringing any dispute to the Court.  And I strongly

2   encourage that.

3           Meet and confer does not mean sending letters and

4   e-mails back and forth.  It means having a dialogue and

5   conversation.  It doesn't have to be in person, but there has

6   to be over the phone or something.  And it also can't be just

7   the staff.  But before it comes to me, I want to know that the

8   principals on the case have talked about it, because I have

9   found that when I get here, maybe an associate's talked about

10  it.  But once the principals really start, you know, hammering

11  it out, the problem is not -- it's a different problem.  It may

12  not be a problem, or it may be a different problem.

13          And I want the parties to try to resolve as much as

14  they can before they ask the Court to get involved and resolve

15  it.  And my typical approach is to look and figure out what

16  people truly need.  So it's usually not what one person wants.

17  It may be what I can assess from talking to people what you

18  need to either prosecute or defend your case.

19          And so you may walk out of here not getting exactly

20  what you want, but my hope is that it's what, you know, is

21  realistic in keeping cases moving.  Sometimes it will be

22  everything you want, sometimes it will be less than what you

23  want.

24          So I strongly encourage people to kind of resolve and

25  figure out what they truly need with each other before they

1    bring it to the Court's attention.

2           Issues of privilege in discovery, of course, have to

3    come to the Court's attention if you can't agree on that.  And

4    I understand that.

5           These deadlines as they're set should not be ignored.

6    So if April 9th comes and goes and we haven't moved that

7    deadline, you need to contact the Court, because this is a

8    court order, and you'd be in violation of the court order.  And

9    there's no reason for that.  I'm pretty accessible, so, you

10   know, we can, you know, turn things around rather quickly.  But

11   the more advance notice I have, the better thought I'll be able

12   to put into it.

13          Do you have any questions about any of that?

14          MR. McGRATH:  No, your Honor.

15          Thank you.

16          MR. FISCHER:  No.  It's very helpful, your Honor.

17          THE COURT:  The other thing is, in my discovery order,

18   you're going to see deadlines by which you need to bring

19   disputes to the Court's attention.  That deadline is meant so

20   that disputes aren't sat on, and then two months later, you

21   bring it to the Court's attention.  I want to see the case

22   moving.  So if there's a dispute that's slowing it down, the

23   purpose of that discovery order is to make sure that the

24   parties will talk about it and keep it moving.

25          However, a dispute -- you know, we've gotten calls,

1    and I keep trying to refine that order to make sure it's as

2    clear as possible.  We've gotten calls about when does this

3    dispute start?

4              Once you return, you know, your discovery responses

5    and you see an objection in there and you know that you're

6    going to want those documents, that they're withholding "X"

7    amount of documents, you need to talk, have that conversation,

8    meet and confer, to say, "Really?  Come on.  Are you not going

9    to be turning over any of this, or are you only going to be

10   turning over this?"  And if the dispute then becomes something

11   that you can tell that you can't resolve, that's when those

12   deadlines start coming in.

13             Yes.

14             MR. FISCHER:  Can I raise an issue in that regard,

15   Judge?

16             THE COURT:  Yes.

17             MR. FISCHER:  So in the process of meeting and

18   conferring relates to our privilege issue, which I'll call it

19   the assertion of the reliance on counsel, but their privilege

20   assertion over documents, their communications with state's

21   attorneys and regulators in Delaware that were held by Judge

22   Scheindlin not to be privileged, they have asserted a privilege

23   over those in their document requests and interrogatories, and

24   they're not going to be making those documents available.  So

25   we know that now, and I haven't seen your discovery order, but

1   we know that.

2          I think we both also agree, similar to what I was

3   saying before, that that issue will become, you know, ripe and

4   focused when we see their privilege log.

5          So I haven't seen your discovery order and maybe

6   there's a mechanism for dealing with that, but I just wanted --

7   if not -- I don't view it as ripe.

8          THE COURT:  It's not ripe yet, because you haven't

9   seen the privilege log.  You haven't had a conversation

10  necessarily about it.  But it's the type of thing where you

11  know that that's an issue.

12         So two months from now isn't when it should come to my

13  attention.  It's something that should be focused on.  You

14  should get the information you need so you can really analyze

15  it and have a conversation about what exactly is -- you know,

16  if there's anything that would be released or not, and then it

17  comes to my attention, but not two months, because you know

18  it's an issue.

19         My goal is not to have people hold onto issues until,

20  you know, later on, because it affects -- it's a domino affect.

21  It will affect questions people can ask at depositions.  It

22  will affect whether -- what you need in discovery and what

23  you're going to have.

24         MR. FISCHER:  Right.

25         THE COURT:  So don't wait.  Get the information you

1    need, and have that dialogue, and then, you know, write to me.

2         I do require premotion letters.  And sometimes I don't

3    require motions.

4         On privilege, I've been -- the last privileged issue

5    I've been dealing with, I required, you know, the briefing

6    because I really wanted to understand it, especially in that

7    case, which is a little bit more complicated than even your

8    case, so . . .

9         But I start with premotion letters.  We'll have a

10   conference, we'll talk about it, and I'll decide at that

11   conference whether there's a need for full briefing on it.

12        MR. FISCHER:  And your Honor, will we be able to tell

13   sort of how you -- you know, how you want the issues presented,

14   whether by brief or letter through the discovery order or your

15   rules?

16        THE COURT:  Yes.  Look at my discovery order and look

17   at my rules, because I do require letters and certain amount of

18   pages -- I can't remember off the top of my head, probably only

19   five or even less -- really laying out what you expect the

20   issues are.

21        But for instance, if there's an issue with a privilege

22   log and how it's laid out, I need to see a sample of that

23   privilege log when you send it in.  And then we will either set

24   up a conference, you know, quickly, unless we have a regular

25   conference scheduled, if our conference is scheduled and we can

1    convert that.  And if that's a telephone conference, we'll

2    convert it into an in-person conference, if there's discovery

3    issues that need to be handled, and we'll talk then about the

4    issues.

5         In that case, I am expecting the parties to come in

6    and really be able to argue why they need it.  And then I'll

7    decide.  If I don't have enough information at that time, and I

8    want more briefing on it, I'll ask for it.  But I try not to do

9    briefing just for the sake of briefing.  It's not a good use of

10   everybody's resources if I feel like everybody has enough

11   information before.  So I want that letter to include what the

12   lawyers and -- generally basically, a summary of what your

13   brief would be.  Okay?

14        Anything else for today that we want to deal with?

15        MR. McGRATH:  No, your Honor.

16        Thank you.

17        MR. FISCHER:  Just a moment.

18        MR. McGRATH:  Thank you for the helpful guidelines.

19        (Pause)

20        MR. FISCHER:  We're good, your Honor.

21        Thank you very much.

22        THE COURT:  Okay.  So what I'd like to do is schedule

23   another conference.  And I think -- unless the parties -- I've

24   also had parties who say they want to come in and they would

25   like to do things in person, but unless the parties, you know,

1    like they need to come in next time, I can do the next one by

2    telephone.

3              Is that okay?

4              MR. FISCHER:  That's fine with us, your Honor.

5              THE COURT:  Okay.  Now, since I think that you have

6    some issues that you're probably going to be dealing with in

7    the next month, that will give you a better sense of what

8    you're going to need for the extension of discovery.  I don't

9    want to wait a full eight weeks, which I typically would do.

10   But eight weeks is going to get you to the end of your fact

11   discovery.

12             So I'm thinking, you know, four or five weeks, which

13   brings us into the second week of March, the week of the 9th.

14             Do you think, based on what you know you have to

15   exchange and do, that that's a good time to have another

16   conference?

17             MR. McGRATH:  I do, your Honor.

18             I think that there's going to be a lot of momentum in

19   the next two or three weeks with documents exchanged.  And we

20   are communicating on a regular basis.  But we do know there's

21   going to be a couple of issues coming for heads-up.  I think

22   four weeks out would be appropriate, four or five weeks.

23             THE COURT:  Yes.

24             So looking at the week of the 9th --

25             March 11 at 10:00, and that will be for a telephone

1    conference.  Does that work for everybody?

2             MR. McGRATH:  Works for me, your Honor.

3             MR. FISCHER:  Yes, your Honor.

4             THE COURT:  And again, if the privilege issues over

5    the next four weeks are beginning to come to a head, let's try

6    to, you know, get that also before the Court so we can make

7    decisions about that.  Because once I get it, I still have to

8    have -- these issues are not easy issues, in the sense that I

9    value the importance of the privilege.  And so I want to make

10   sure when I issue decisions on this I get it right.  So I need

11   to have -- you know, I want to make sure that if that's going

12   to be an issue, that, you know, we deal with it and start

13   getting it before me as soon as possible, so that I don't end

14   up holding up anything in discovery.  Because that's the one

15   thing that's very important to me.

16            On discovery issues, I don't want them to sit, because

17   I don't want to, you know, interfere with the ability of the

18   case to move forward.  And if those issues are going to

19   interfere with the ability of the case to move forward, we need

20   to get them before the Court sooner rather than later.  Okay?

21            MR. McGRATH:  Great.

22            THE COURT:  Anything else today?

23            MR. FISCHER:  Not from us, your Honor.

24            THE COURT:  Okay.  Thank you.

25            MR. McGRATH:  Thank you very much, your Honor.

1525secMS

1        THE COURT:   Thank you very much, I appreciate it.

2        It's nice meeting you all.

3        MR. FISCHER:   Likewise.

4        THE COURT:   Have a good day.

5        Matter is adjourned.

6                          -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25