UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                                        :
SECURITIES AND EXCHANGE COMMISSION,                                     :
                                                                        :
                              Plaintiff,                                :
                                                                        :
              v.                                                        :    No. 12 Civ. 6421 (KMK)(JCM)
                                                                        :
EDWARD BRONSON and                                                      :
E-LIONHEART ASSOCIATES, LLC,                                            :
d/b/a FAIRHILLS CAPITAL,                                                :
                                                                        :
                              Defendants                                :
              and                                                       :
                                                                        :
FAIRHILLS CAPITAL, INC.,                                                :
                                                                        :
                              Relief Defendant.                         :
------------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN LAW IN SUPPORT OF ITS MOTION FOR SUMMARY
<u>JUDGMENT AGAINST DEFENDANTS AND RELIEF DEFENDANT</u>**

Kevin P. McGrath
Haimavathi V. Marlier
Christopher J. Dunnigan
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1100
mcgrathk@sec.gov (McGrath)
marlierh@sec.gov (Marlier)
dunniganc@sec.gov (Dunnigan)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................1

SUMMARY OF THE TRANSACTIONS..........................................................................3

   A.  The Defendants ....................................................................................................3

   B.  The Issuers ..........................................................................................................4

   C.  E-Lionheart's Principal Place of Business and the Regus Group Leases...........5

   D.  The Mechanics of the Rule 504(b)(1)(iii) Transactions ....................................6

   E.  Misrepresentations Made in the Subscription Agreement ..................................7

   F.  The Opinion Letters' Discussion of Rule 504(b)(1)(iii) and Delaware Law.....................8

   G.  Other Red Flags Regarding Use of Delaware Law...........................................10

   H.  Accredited Investor Status .................................................................................11

   I.  Outside Investors and Employees Co-Funded Certain E-Lionheart's Rule 504(b)(1)(iii) Purchases and Shared in Resale Proceeds................................11

   J.  Post-Litigation Rule 504(b)(1)(iii) Transactions .............................................11

   K.  Fairhills Capital Inc. .........................................................................................11

ARGUMENT ....................................................................................................................12

   A.  Defendants Violated Section 5..........................................................................12

     1.  The Statutory and Regulatory Scheme ......................................................12

     2.  The SEC Has Established a *Prima Facie* Section 5 Violation as to Defendants.........13

     3.  Defendants Cannot Sustain Their Burden of Proof of Establishing An Exemption From Registration Pursuant to Rule 504(b)(1)(iii) .....................................14

       a.  The Delaware State Law Exemption Does Not Satisfy Rule 504(b)(1)(iii) ..........14

       b.  Even if Delaware Law Provided a Qualifying Exemption, Defendants Cannot Sustain Their Burden of Establishing An Exemption From Registration in Each State Where the Transactions Occurred.........17

       c.  Defendants Must Establish That  E-Lionheart was an Accredited Investor ..........18

   B.  The Court Should Order the Relief the SEC Seeks Against Defendants....................19

     1.  Defendants Should be Permanently Enjoined From Violating Section 5...................19

2.    Defendants Should be Ordered to Disgorge, with Prejudgment Interest Thereon, Their Ill-Gotten Gains ....................................................................................................22

3.    The Court Should Impose Civil Penalties …………………………………………...23

4.    The Court Should Impose a Permanent Penny Stock Bar on Defendants ..................24

CONCLUSION.............................................................................................................................25

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Dofflemeyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372 (D. Del. 1983) .................................... 18

*SEC v. Bronson*, 14 F. Supp. 3d 402 (S.D.N.Y. 2014) ........................................................ passim

*SEC v. Cavanagh,* 445 F.3d 105 (2d Cir. 2006) ............................................................... 13, 14, 19

*SEC v. Commonwealth Chem. Secs., Inc.,* 574 F.2d 90 (2d Cir.1978) ....................................20, 22

*SEC v. ConnectAJet.com, Inc.*, No. 3:09-cv-1742-B,
2011 WL 5509896 (N.D. Tex. Nov. 9, 2011)........................................................................ 21-22

*SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450 (2d Cir.1996) ..................................................20,22

*SEC v. Kahlon,* No. 4:12-cv-517, 2015 WL 5813239 (E.D. Texas Sept. 30, 2015) .................... 17

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)....................................................................................... 24

*SEC v. Moran,* 944 F. Supp. 286 (S.D.N.Y. 1996)……………………………….. ............... 22

*SEC v. Opulentica,* 479 F. Supp. 2d 319 (S.D.N.Y. 2007)............................................................ 24

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) .................................12-13

*SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953) ......................................................................... 12

 *SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013)......................................................................22,24

*SEC v. Softpoint, Inc.,* 958 F. Supp. 846 (S.D.N.Y. 1997),
*aff'd*  159 F. 3d 1348 (2d Cir. 1998) ................................................................................ 13

*SEC v. Tavella*, 77 F. Supp. 3d 353 (S.D.N.Y. 2015)................................................................... 20

*Singer v. Magnavox Co.,* 380 A.2d 969 (Del. 1977) ................................................................... 18

*Strato Comm Corp.* 2 F. Supp. 3d 240 (N.D.N.Y. 2014) ............................................................13

*Weinberger v. OUP, Inc.* 457 A.2d 701 (Del. 1983) ....................................................................18

**Statutes**

*Securities Act of 1933*

Section 2(a), 15 U.S.C. § 77b(a) ............................................................................12

Section 5(a), 15 U.S.C. § 77e............................................................................12

Section 20(d), 15 U.S.C. § 77t(d) ........................................................................23

*Securities Exchange Act of 1934*

Section 3(a), 15 U.S.C. § 78c(a) ..........................................................................4

Section 3(a)(51), 15 U.S.C. § 78c(a)(51) ..............................................................24

Section 20(b), 15 U.S.C. § 78t(b) ........................................................................19

*Delaware Securities Act*

Section 7302(a)(15) (renumbered as Section 73-103(a)(17)), 6 Del. C. §73-103(a)(17) ............ 15

Section 7304(a) (renumbered as Section 73-202), 6 Del. C. § 73-202 ................................8, 14-15

Section 7309(b)(8) (renumbered as 73-207(b)(8)), 6 Del. C. § 73-207(b)(8)...................... passim

**Rules**

Rule 500(f) of Regulation D, 17 C.F.R. § 230.500(f)................................................ 14

Rule 501 of Regulation D, 17 C.F.R. § 230.501........................................................ passim

Rule 504(b)(1)(iii) of Regulation D, 17 C.F.R. § 230.504(b)(1)(iii) .................................... passim

Rule 3a-51-1 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.3a51-1 ........................ 24

17 C.F.R. § 201, subpart E, Table IV ......................................................................23

17 C.F.R. § 242.600(b) ........................................................................................24

Rule 503 of the Delaware Securities Act, 18 DE Reg. 394 ..........................................16

Rule 510 of the Delaware Securities Act, 15 DE Reg. 394 ................................................ passim

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law—along with its Local Rule 56.1 Statement of Undisputed Facts ("SOF") and the declarations of Doreen Rodriguez, Gregorie Sylvester, and Kevin McGrath and all exhibits thereto—in support of its motion for summary judgment and certain relief against Defendants Edward Bronson and E-Lionheart Associates, LLC ("E-Lionheart") (collectively "Defendants") and Relief Defendant Fairhills Capital, Inc. ("FCI") on all claims.

## PRELIMINARY STATEMENT

Bronson and his company E-Lionheart violated Section 5 of the Securities Act of 1933 (the "Securities Act")  by purchasing billions of shares from at least 63 penny stock companies (the "Issuers") in 353 tranches at steeply discounted prices and quickly reselling them to the investing public without registration, generating over $9.6 million in profits. The New York-based Defendants schemed to evade the Securities Act's registration requirements by creating a sham corporate presence in Delaware to invoke a registration exemption allegedly available under Rule 504(b)(1)(iii) of Regulation D [17 C.F.R. § 230.504(b)(1)(iii)] ("Rule 504(b)(1)(iii)") and Delaware Securities Act Section 7309(b)(8), (subsequently renumbered as Section 73-207(b)(8)) ("Section 7309(b)(8)").[1] However, the securities were not exempt from registration.[2]

This case is ripe for summary judgment. It is undisputed that: (1) no registration statements were filed or in effect with respect to the securities; (2) Defendants sold such securities; and (3) interstate transportation, communication or the mails were used in connection with the offer or sale of the securities. Thus, the SEC has established its *prima facie* case. It is

---

[1] Delaware Securities Act Section 7309(b)(8), (subsequently renumbered as Section 73-207(b)(8)), is available at http://delcode.delaware.gov/title6/title6.pdf (last visited June 10, 2016).

[2] The initial issuances to Defendants, and their resales, are referred to as the "Rule 504(b)(1)(iii) transactions."

also undisputed that FCI obtained ill-gotten gains from the unlawful scheme. The burden shifts to Defendants to establish a registration exemption for each tranche, which they cannot do.

Defendants have contended that the initial issuances were exempt from registration under Rule 504(b)(1)(iii) and Delaware law, yielding "freely tradeable" securities that made their resales also exempt. Their contention fails for multiple reasons. *First*, Section 7309(b)(8) is not a qualifying state law registration exemption under Rule 504(b)(1)(iii). Rule 504(b)(1)(iii) is only available if the transactions satisfy a qualifying state law registration exemption that permits general solicitation and general advertising and permits sales only to accredited investors. Delaware Section 7309(b)(8) is a narrow exemption for offers and sales only to a limited number of institutional purchasers. It certainly does not permit general solicitations and general advertising to the public. Accordingly, Defendants' sole claimed exemption fails as a matter of law and the Court need not address any other argument to grant the SEC summary judgment.

*Second,* Delaware law does not apply because the offers or sales did not occur in Delaware. This Court has already concluded that Rule 504(b)(1)(iii) applies only to transactions that comply with state law exemptions in *each* of the states where the offers and sales occurred. It has also followed clear case law that incorporation alone is not a sufficient nexus to invoke Delaware law. Defendants have admitted that they conducted all business relating to the Rule 504(b)(1)(iii) transactions from New York only, and none of the Issuers who offered and sold securities to Defendants did so from Delaware. Thus, Defendants cannot rely on Delaware law to establish a registration exemption.

*Third,* E-Lionheart must establish that it was an accredited investor. E-Lionheart claims accredited-investor status through Bronson, its sole managing member. However, Bronson's federal tax returns call his accredited investor status into serious question. In addition, E-

Lionheart employees and other investors co-funded numerous Rule 504(b)(1)(iii) transactions and shared in resale profits. For these transactions, Defendants must establish that each of these individuals were accredited investors. Also, Rule 510(c) Pursuant to the Delaware Securities Act[3] ("Delaware Rule 510(c)") prohibits the use of Section 7309(b)(8) "if the institutional buyer is in fact acting only as an agent for another purchaser that is not an institutional buyer or financial institution," which E-Lionheart did for its co-investors and employees.

Thus, Defendants will not be able to establish an exemption from the registration requirements for the securities they sold and summary judgment should enter. The SEC also requests that the Court: (1) permanently enjoin Defendants from future Section 5 violations; (2) order Defendants and Relief Defendant to disgorge their ill-gotten gains, plus prejudgment interest; (3) order Defendants to pay civil penalties based on their egregious and fraudulent conduct; and (4) impose a permanent penny stock bar on Defendants.

## SUMMARY OF THE TRANSACTIONS

### A.     The Defendants

Edward Bronson resided in Ossining, New York during the relevant period, August 2009 through August 2012. SOF ¶ 1. He graduated from New York Law School in 1995 and has been a member of the New York bar since that time. *Id.* ¶¶ 8-9. In 2005, Bronson formed E-Lionheart as a Delaware limited liability company and was its sole "managing member." *Id.* ¶¶ 2, 4. That same year, he registered E-Lionheart as an active foreign limited liability company in New York, with a Manhattan address, and listed himself as its Registered Agent. *Id.* ¶ 21. From 2005 through 2007, E-Lionheart's office was in Manhattan. *Id.* ¶ 22.  E-Lionheart started doing

---

[3] The Rules Pursuant to the Delaware Securities Act are available at
http://regulations.delaware.gov/AdminCode/title6/Fraud/200/Securities.pdf (last visited June 10, 2016).

business as Fairhills Capital sometime in 2008 or 2009. *Id.* ¶ 20. At all times relevant, E-Lionheart operated out of New York, first from Bronson's residence in Ossining, New York and later from two White Plains, New York offices. *Id.* ¶¶ 23-25.

B.     **The Issuers**

Between August 2009 and December 2011, E-Lionheart purchased over 48 billion shares of penny stock from at least 63 microcap companies in 353 transactions or "tranches."[4] SOF ¶¶ 32, 42-43. E-Lionheart paid around $12 million for the shares, purchasing them at a deep discount averaging around 45% from the then-prevailing market price. *See id.* ¶¶ 44, 46-47. E-Lionheart resold virtually all of these stocks at prevailing open market prices within days or at most weeks after it purchased them, garnering a profit of over $9.6 million. *Id.* ¶ 47; Decl. of Doreen Rodriguez ("Rodriguez Decl.") Ex. 1 (calculation of net profits). At E-Lionheart's suggestion, the Issuers sold the unregistered securities to E-Lionheart under a claimed exemption from registration under Rule 504(b)(1)(iii) and an allegedly qualifying Delaware registration exemption, Section 7309(b)(8). SOF ¶¶ 33, 56.

However, neither the Issuers nor Defendants transacted the unregistered offerings in Delaware. SOF ¶¶ 22-28, 54-56, 100-10, 118. E-Lionheart conducted all of its business in New York. *Id.* ¶¶ 22-28, 56, 100-10, 118. None of the Issuers dealt with E-Lionheart from any business address in Delaware. *Id.* ¶¶ 54-55.

No registration statements were filed or in effect with the SEC or the Delaware Investor Protection Unit for any of the securities that E-Lionheart purchased from the Issuers, or resold to the public. SOF ¶¶ 36-38.

---

[4] "Penny stocks" are traded below five dollars per share and not listed on a national exchange. *See* 15 U.S.C. § 78c(a)(51)(A); *see also SEC v. Bronson*, 14 F. Supp. 3d 402, n.1 (S.D.N.Y. 2014) (defining "penny stocks").

C.     **E-Lionheart's Principal Place of Business and the Regus Group Leases**

E-Lionheart's principal place of business was New York: its employees conducted all business relating to the Rule 504(b)(1)(iii) transactions from New York, except for one employee who worked in Florida. SOF ¶¶ 100-10. Indeed, during the relevant period, E-Lionheart admitted three times in this very Court that its principal place of business was New York:

- Plaintiff, E-Lionheart, was at all times relevant herein a Delaware Limited Liability Company having its principal place of business in the State of New York;

- E-Lionheart is a Delaware Limited Liability Company having its principal place of business in the State of New York; and

- Plaintiff Lionheart is a Delaware Limited Liability Company having a principal place of business within this Judicial District at 245 Main Street, Suite 390, White Plains, NY 10601. Edward Bronson is the sole and Managing Member of Lionheart and a citizen and resident of New York State.

*Id.* ¶¶ 102-05. And from 2005 through 2011, E-Lionheart filed only federal and New York State tax returns. *Id.* ¶¶ 26-28.

In July 2009, FCI leased a "virtual office" in Wilmington, Delaware from the Regus Group ("Regus"), instructing Regus to list it, and answer its phone, under the name E-Lionheart. SOF ¶¶ 111, 113. The virtual office lease, among other things, provided E-Lionheart a Delaware mailing address and telephone number and the right to use an office two days per month. *Id.* ¶ 112. FCI requested that Regus daily forward any mail E-Lionheart received to White Plains, New York and faxes to a New York fax number. *Id.* ¶ 114. In May 2011, E-Lionheart leased a dedicated office in Regus's Wilmington location. *Id.* ¶ 116. However, E-Lionheart employees never worked from or even visited any office in Delaware for the Rule 504(b)(1)(iii) transactions. *Id.* ¶¶ 101, 118.

5

### D.    The Mechanics of the Rule 504(b)(1)(iii) Transactions

E-Lionheart's transactions followed a typical pattern: its employees in White Plains, New York called a microcap company to ask if they were interested in obtaining capital. SOF ¶ 56. E-Lionheart employees offered Issuers various financing options, including selling unrestricted securities to E-Lionheart purportedly under Rule 504(b)(1)(iii) at a discount of 10% to 90% from the stock's then-prevailing market price. *Id.* ¶¶ 57-59.

E-Lionheart employees, or an attorney, typically sent the Issuer a set of deal documents, including a Subscription Agreement and an attorney Opinion Letter. SOF ¶ 63. These documents were standardized; there is very little variation in substance (other than transactional specifics like the issuer's name and number of stocks) across the hundreds of unregistered share transactions. *Id.* ¶¶ 63, 90.

The Subscription Agreement typically listed E-Lionheart's address as 1000 N. West Street, Suite 1200, Wilmington, DE, but instructed that the stock certificates be sent to its White Plains, New York address or to its broker. SOF ¶¶ 68-69, 79. The Issuers sent signed Subscription Agreements to Bronson in New York, where he (or his employees) counter-signed them. *Id.* ¶¶ 71-72.

The fully executed Subscription Agreement was then sent to the Issuer, the Issuer's designated transfer agent, and to the lawyer retained for the transaction. SOF ¶¶ 73-75. E-Lionheart employees, in New York, wired funds to the designated escrow agent, typically the attorney, who was not located in Delaware. *Id.* ¶¶ 74, 121, 156-67.  The attorney then issued an Opinion Letter, stating that the issuance was exempt under Rule 504(b)(1)(iii) and Delaware law, and sent it to the transfer agent (not located in Delaware), who then issued the stock certificates without a restrictive legend and sent them to E-Lionheart's White Plains, New York office, or to E-Lionheart's brokers (not located in Delaware). *Id.* ¶¶ 78-80, 119. After E-Lionheart received

6

the shares, or received confirmation that its broker had received the shares, it typically instructed the escrow agent to forward the funds to the Issuer, which the attorney did after deducting a fee (typically $3,000) for issuing the Opinion Letter. *Id.* ¶ 75.  E-Lionheart did not transmit the purchase funds for the securities to any locations in Delaware. *See id.* ¶¶ 54-55, 74, 77. Once the shares cleared for trading, which typically took three to seven days, E-Lionheart, from New York, immediately resold the unregistered securities to the public. *Id.* ¶¶ 83-87.

> ### E.     Misrepresentations Made in the Subscription Agreement

The Subscription Agreements signed by Bronson contained numerous misrepresentations designed to feign compliance with Rule 504(b)(1)(iii). They stated that E-Lionheart's principal place of business was in Delaware:

- … It is intended that the Shares will only be issued to entities formed pursuant to the laws of the State of Delaware that maintain its principal place of business within the State of Delaware; and

- The undersigned is an entity formed pursuant to the laws of the State of Delaware and maintains its principal place of business within the State of Delaware and/or the undersigned is an "accredited investor" as defined under Rule 501 of Regulation D and/or the Subscriber is an "institutional investor" as defined under Sections 7309(b)(8) of the Delaware Securities Act and Section 510(a)(1)[5] of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act;

SOF ¶¶ 91-94, *see also id.* ¶¶ 100-109. The Subscription Agreements also contained statements that E-Lionheart would not immediately re-sell the shares, which was inconsistent with what Defendants actually did, *id.* ¶ 99:

- The undersigned will not engage in any activity that will constitute a distribution of the Shares and will not violate Regulation M or any federal or state securities laws; and

- The undersigned has not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares.

---

[5] The Subscription Agreements, Opinion Letters, and other transactional documents incorrectly refer to "Section 510(a)(1)" of the Delaware Securities Act, as opposed to "Rule 510."

*Id.* ¶¶ 97-98. Further, the Subscription Agreements claimed that E-Lionheart was an accredited investor. *Id.* ¶¶ 95-96.

### F.    The Opinion Letters' Discussion of Rule 504(b)(1)(iii) and Delaware Law

E-Lionheart employees typically introduced the Issuers to an attorney who would issue an Opinion Letter. SOF ¶ 119. Attorney Virginia Sourlis issued Opinion Letters in connection with 196 of E-Lionheart's 353 Rule 504(b)(1)(iii) transactions. *Id.* ¶ 124.  Bronson knew Sourlis was admitted to practice, and maintained an office, in New Jersey only. *Id.* ¶¶ 121-23. Indeed, the Sourlis Opinion Letter stated that: "The undersigned is licensed only in the State of New Jersey and this opinion covers, in part, Delaware statutory law, where the undersigned is not licensed." *Id.* ¶¶ 139-40.  Sourlis also had a retainer agreement with E-Lionheart and advised it on Rule 504(b)(1)(iii) and other legal matters.[6] *Id.* ¶ 120.

The Sourlis Opinion Letter opined, based in part on the representations of the Issuer and E-Lionheart, that: "The Purchaser [E-Lionheart] . . . qualifies for the exemption from registration set forth in the Securities Act pursuant to Rule 504 of Regulation D, Section 7309(b)(8) of the Delaware Securities Act [now § 73-207(b)(8)] and Section 510(a)(1)[7] of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act."[8] SOF ¶ 125.

Sourlis further stated that Section 7309(b)(8) of the Delaware Securities Act "provides for an exemption from the registration and notice filing requirements set forth in Section 7304,

---

[6] Thomas Boccieri issued 89, and Keisha Perry issued 24, Opinion Letters, which closely mirrored the relevant language of the Sourlis Opinion Letters; as did most of the Opinion Letters issued by the remaining attorneys. *Id.* ¶¶ 156-69.  None of the attorneys who issued Opinion Letters were admitted to practice in Delaware or had offices there. *Id.* ¶ 169.

[7] *See* n.6, *supra* (discussing erroneous reference to Delaware "Section 510" as opposed to Delaware "Rule" 510).

[8] The Sourlis Opinion Letters also stated that she was providing "a legal opinion as legal counsel for the Company [also defined as the Issuer]." *Id.* ¶ 128.

7309A, and 7312 of the Delaware Securities Act where the investor is a validly formed business entity in which all of its equity owners are accredited in accordance with Rule 501(a)(5)-(6)." SOF ¶ 132. Some Sourlis Opinion Letters opined: "The Delaware applicable exemption does not prohibit general solicitation or general advertising and therefore, the exemption allows general solicitation and general advertising." *Id.* ¶ 136. Others merely stated, conclusorily, that "there is no restriction prohibiting general advertising or general solicitation."[9] *Id.* ¶ 134.

Bronson read Rule 504(b)(1)(iii) before engaging in the transactions and understood that it required compliance with a state law exemption that "permitted general solicitation and general advertising." SOF ¶ 151. He also knew that Section 7309(b)(8) made no reference to general solicitation or general advertising. *Id.* ¶ 152. He knew that the Delaware Securities Act generally prohibited all offers and sales unless they were otherwise explicitly exempted from registration. *Id.* ¶ 153. Despite this, Bronson did not have any discussions with Sourlis about Section 7309(b)(8) after reading that statute; nor did he question how she could opine that it "permitted general solicitation and general advertising" as required by Rule 504(b)(1)(iii) when it made no such reference. *Id.* ¶ 146.

The Sourlis Opinion Letter further stated that: "We have relied upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser has a legitimate investment intent in purchasing the Shares, and the Purchaser's representations as to its net worth and investment intent." SOF ¶ 138. Bronson was aware of this statement, yet intended to promptly resell the securities. *Id.* ¶ 155. The Opinion Letter stated that "Rule 504 is available to a company that, at the time of the offering …. is a bona fide resident of the state

---

[9] Sourlis's later Opinion Letters were much more circumspect, limited to a one and a half page conclusory opinion that "the Shares … are exempt from registration under Rule 504…" without any analysis of Rule 504 or reference to Section 7309(b)(8) or any other section of Delaware law (although the related Subscription Agreements referenced Section 7309(b)(8). *Id.* ¶ 127.

where the offering is made." *Id.* ¶ 130. Bronson did not question Sourlis on the meaning of the

phrase "bona fide resident." *Id.* ¶ 150. Bronson knew that Sourlis' Opinion Letter stated that the

purchaser had to be purchasing the securities for its own account," *id.* ¶ 154, but he also knew

that certain co-investors and E-Lionheart employees funded many of the transactions and had a

right to share in the resale profits. *Id.* ¶¶ 186-218.

G.    <u>Other Red Flags Regarding Use of Delaware Law</u>

In late 2009, Carl Duncan, counsel for one of the Issuers, sent a series of emails to Sourlis

and E-Lionheart employees Mark Grober and Naton Wells, questioning whether it was

appropriate to rely upon a Delaware registration exemption for sales to New York-based E-

Lionheart. SOF ¶¶ 170-77. In a December 1, 2009 email, Duncan wrote:

> Why is DE the applicable law since the standard is where is the offer and sale made?
> In this case, SDVI's contact with your client is in New York, is doing business there
> and the cert will be sent there, right? I am concerned that you are basing the opinion
> entirely on your client' having been incorporated in Delaware.

*Id.* ¶ 171. Sourlis, in a December 1, 2009 email, copying Grober, responded:

> Our client was formed in the state of Delaware, they have a physical office in the state of
> Delaware, they do business in the state of Delaware, they pay taxes in the state of
> Delaware and are qualified and licensed to do business in the state of Delaware.

*Id.* ¶ 172. When Sourlis wrote this email, E-Lionheart's only "physical office" in Delaware was

its Regus "virtual office" and the only "taxes" it paid in Delaware, at most, were an annual

minimum franchise taxes. *Id.* ¶¶ 173, 175.

Duncan responded to this email by stating, in part:

> I don't see the relevance, certainly the persuasiveness, of DE incorporation and doing
> business qualifications, etc. has to do with (i) the NY-centric factual circumstances of the
> proposed offering or (ii) the applicable securities standard, namely, where the offering is
> being made.

*Id.* ¶ 176. He later asked: "… what does DE incorporation have to do with applicable securities

standards and all contacts are in NY, not DE …" *Id.* ¶ 177.

In 2010, E-Lionheart employee Evan Solomon expressed concerns to Bronson whether E-Lionheart could properly rely upon Rule 504(b)(1)(iii) and Delaware law. SOF ¶ 178. Bronson told him not to worry about it; that they were not valid concerns, and that it was his [Bronson's] "head on the block." *Id.* ¶ 179.

### H.     Accredited Investor Status

E-Lionheart claimed that it was an accredited investor under Rule 501(a)(8), i.e., "an entity in which all of the equity owners are accredited investors." *See* SOF ¶¶ 93, 95-96, 132. However, Bronson's federal income tax returns from 2009 through 2011 raise serious questions concerning his accredited investor status. *Id.* ¶¶ 222-24.

### I.     Outside Investors and Employees Co-Funded Certain E-Lionheart's Rule 504(b)(1)(iii) Purchases and Shared in Resale Proceeds

Certain outside investors and E-Lionheart employees had agreements with E-Lionheart and/or Bronson to co–fund and share in the proceeds of many of the Rule 504(b)(1)(iii) transactions, and co-funded scores of tranches of E-Lionheart's Rule 504(b)(1)(iii) purchases from dozens of Issuers. SOF ¶ 186-218.

### J.     Post-Litigation Rule 504(b)(1)(iii) Transactions

After the SEC filed this litigation in August 2012, Bronson, through several entities, engaged in at least 19 more Rule 504(b)(1)(iii) transactions, claiming the same exemptions at issue here. SOF ¶¶ 220-21.

### K.     Fairhills Capital Inc.

Bronson formed FCI in 2010 as a Delaware corporation and served as President and sole owner. SOF ¶¶ 6, 225. FCI initially shared E-Lionheart's Ossining, New York address. *Id.* ¶ 31. Bronson transferred monies between E-Lionheart, FCI and Fairhills Capital Offshore  and testified that there was "no rhyme or reason" or quid pro quo" for his decision to do so other than

11

his desire to move money from one entity to another. *Id.* ¶ 225. None of E-Lionheart's transfers of cash or goods to FCI were in exchange for consideration, including its $10,000 December 20, 2010 transfer and its $600,000 February 10, 2011 transfer. *Id.* ¶ 226. And E-Lionheart's December 2010 transfer of title to a 2011 Mercedes Benz to FCI was done only because Bronson wanted the car covered under FCI's umbrella car insurance policy. *Id.* ¶ 227.

## ARGUMENT

### A.   Defendants Violated Section 5

1.   The Statutory and Regulatory Scheme

Section 5 of the Securities Act, 15 U.S.C. § 77e, provides, in relevant part, that:

(a)  Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly –

   (1)  to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

   (2)  to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale ….

(c)  It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security….

Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), defines a "security" to mean "any stock," among other investments. Registration "protect[s] investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124 (1953). "Companies that have registered securities under the Securities Act must also abide a regime of regular reporting of material information established in the Securities Exchange Act of 1934." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072,

1085 (9th Cir. 2010). Consequently, "[w]hen a company fails entirely to register its securities and nonetheless proceeds to sell them generally to the public, . . . the entire system of mandatory public disclosure is evaded to public detriment." *Id.* at 1085-86.

> 2.      The SEC Has Established a *Prima Facie* Section 5 Violation as to <u>Defendants</u>

To establish a *prima facie* violation of Section 5, the SEC must show: (1) no registration statement was filed or in effect with respect to the securities in question; (2) the defendant, directly or indirectly, sold or offered to sell such securities; and (3) interstate transportation, communication or the mails was used in connection with the offer or sale of the securities. *See SEC v. Cavanagh,* 445 F.3d 105, 111, n. 13 (2d Cir. 2006). Scienter is not an element of a Section 5 violation. *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997), *aff'd* 159 F. 3d 1348 (2d Cir. 1998). "Section 5 'imposes strict liability on offerors and sellers of unregistered securities' regardless of any degree of fault, negligence or intent on the seller's part." *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014) (citing *Strato Comm. Corp.* 2 F. Supp. 3d 240, 263-64 (N.D.N.Y. 2014)).

It is undisputable that Defendants sold securities, *see* SOF ¶¶ 17, 32, 42-47; that the securities were unregistered, *id.* ¶¶ 36-38, Decl. of Kevin P. McGrath ("McGrath Decl.") Ex. 1 (Am. Ans. ¶¶ 12, 14, 17, 19); and that the offers and sales of securities were done through the use of interstate facilities or the mails, *see* SOF ¶¶ 39-40, 56-89. Accordingly, the SEC has established *prima facie* violations of Section 5. "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." *Bronson*, 14 F. Supp. 3d at 408 (quoting *Cavanagh,* 445 F. 3d at 111, n.13).

3.      Defendants Cannot Sustain Their Burden of Proof of Establishing An
        Exemption From Registration Pursuant to Rule 504(b)(1)(iii)

Defendants' resale transactions do not satisfy any registration exemption because the

initial sales from the Issuers to Defendants did not satisfy Rule 504(b)(1)(iii) and Defendants

invalidly relied solely upon that exemption in reselling those unregistered securities to the public.

"Registration exemptions are construed strictly to promote full disclosure of information

for the protection of the investing public." *Bronson*, 14 F. Supp. 3d at 408 (citing *Cavanagh*, 445

F. 3d at 115). Also, Regulation D's Preliminary Note 6, which was in effect at the time of the

transactions at issue and codified in Rule 500(f) in 2013, provides: "In view of the objectives of

these rules and the policies underlying the Act, Regulation D is not available "for any transaction

or chain of transactions that, although in technical compliance with Regulation D, is part of a

plan or scheme to evade the registration provisions of the Act." *See* 17 C.F.R. § 230, n.6 (2010);

*see also* 17 C.F.R. § 230.500(f) (2013). Rule 504, known as the "seed capital" exemption,

generally exempts from registration the offer and sale of up to $1 million of securities by a non-

reporting issuer that is not a development stage or investment company. Rule 504(b)(1)(iii)

provides an exemption from registration for "offers or sales of securities" that are made:

> Exclusively according to state law exemptions from registration that permit general
> solicitation and general advertising so long as sales are made only to "accredited
> investors" as defined in Rule 501(a).

a.      The Delaware State Law Exemption Does Not Satisfy Rule 504(b)(1)(iii)

Defendants incorrectly rely on Section 7309(b)(8) and Rule 510(a)(1) of Part E of the

Rules and Regulations thereunder (hereinafter "Delaware Rule 510(a)(1)").  Section 7309(b)(8)

does not permit general solicitation or general advertising, as required by Rule 504(b)(1)(iii).

The Delaware Securities Act makes it "unlawful for any person to offer or sell any security" in

Delaware unless it is registered, exempt, or is a federal covered security. 6 Del. C. § 7304

14

(subsequently renumbered as Section 73-202). The Delaware Securities Act defines "offer" to "includ[e] every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." 6 Del. C. § 7302(a)(15) (subsequently renumbered as Section 73-103(a)(17)(a)). Section 7309(b)(8) provides only that

> [t]he following transactions are exempted from [the registration provisions] . . . of this title: . . . (8) Any offer or sale to a bank, savings institution, trust company, insurance company, investment company as defined in the Investment Company Act of 1940, pension or profit-sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in some fiduciary capacity.

Delaware Rule 510(a)(1) defines the term "institutional buyer" to include "an 'accredited investor' as defined in SEC Rule 501(a)(1)—(4),(7) and (8)…". SEC Rule 501(a)(8) includes in the definition of "accredited investor" "[a]ny entity in which all of the equity owners are accredited investors." 17 C.F.R. § 230.501(a)(8).

Thus, Section 7309(b)(8) exempts "offers or sales" only to a narrow group of sophisticated entity investors. It does not exempt offers or sales to natural persons. Indeed, Section 7309(b)(8) makes no reference to general solicitation and general advertising. A general solicitation is one directed at the public at large, and may reach both accredited and non-accredited investors, natural persons and entities. Such a solicitation is beyond Section 7309(b)(8)'s narrow exemption for offers and sales only to a limited number of entities.  Thus, Section 7309(b)(8) does not satisfy the requirements of Rule 504(b)(1)(iii).[10]

Although a plain reading of Section 7309(b)(8) makes clear that it does not permit general solicitation and advertising, this is confirmed by a March 28, 2016 interpretive opinion

---

[10] Moreover, because Section 7304 makes it unlawful to "offer or sell any security" unless it is registered, exempt, or a federal covered security, and "offer" is defined to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security …" Section 7302(a)(17a.), Section 7304 itself certainly does not permit general solicitation and advertising.

by the Delaware Department of Justice's Investor Protection Director ("Delaware Interpretive Opinion"). McGrath Decl. Ex. 7. The Delaware Interpretive Opinion affirms that Section 7309(b)(8) "permits no solicitation or advertising other than an 'offer' or 'sale' to the types of buyers listed therein."[11] *Id.* at 2.

Indeed, the one provision of Delaware law that does permit "General Announcements" of proposed offerings, Delaware Rule 503, not only limits sales to accredited investors, but also limits sales only to purchasers "who are purchasing for investment and not with the view to or for sale in connection with a distribution of the security." It further provides that any resale within 12 months of sale shall be presumed to be with a view toward distribution and not for investment. *Id.* Moreover, this provision permitting only certain "general announcements" would be unnecessary if Delaware law otherwise permitted general solicitation and advertising.[12]

In addition, Delaware Rule 510(c) provides that: "The offer or sale of securities is not exempt under Section 7309(b)(8) or this rule if the institutional buyer is in fact acting only as an agent for another purchaser that is not an institutional buyer or financial institution listed in Section 7309(b)(8)." Thus both Delaware Rules 503 and 510(c) make clear that Delaware did not want its accredited investor exemptions to be used, as Defendants did here, as a conduit to promptly resell those securities to the unaccredited public.

Thus, Section 7309(b)(8) does not satisfy Rule 504(b)(1)(iii) and the Court need go no further in determining that summary judgment should be granted.

---

[11] The Delaware Interpretive Opinion refers to Section 73-207(b)(8) of the Delaware Securities Act, but confirmed that this section was previously titled 6 Del. C. § 7309(b)(8) before August 16, 2011: "[t]he language and meaning remains the same because the 2011 statutory revision only changed the numbering of the section." McGrath Decl. Ex. 7 at 3.

[12] Indeed if, as Defendants contend, Section 7309(b)(8) permits general solicitation and general advertising, it would be incongruous that Delaware Rule 503(c) would impose a 12-month holding period before resale on more restricted general announcements.

b.  Even if Delaware Law Provided a Qualifying Exemption, Defendants
Cannot Sustain Their Burden of Establishing An Exemption From
<u>Registration in Each State Where the Transactions Occurred</u>

Rule 504(b)(1)(iii) requires that the offers and sales of securities be made "*exclusively*

according to state law exemptions from registration …" (Emphasis added.) Accordingly, as this

Court has already concluded, Defendants must establish an exemption in each state where the

offer and sale occurred: "By using that term [referring to 'exclusively'], the SEC plainly required

that the offers or sales were exempt in each state where they occurred." *Bronson*, 14 F. Supp. 3d

at 414. This Court went on to "reject[] Defendants' contention that compliance with one state's

exemption requirements is sufficient for federal exemption purposes." *Id.* at 415.  *See also, SEC*

*v. Kahlon,* No. 4:12-cv-517, 2015 WL 5813239, at * 3, (E.D. Tex. Sept. 30, 2015) (adopting this

Court's analysis that Rule 504(b)(1)(iii) requires compliance with state-law exemptions in each

state where the offers and sales occurred and rejecting defendant's argument that Texas law

applied because corporation registered to do business, and bought a parcel of land, in Texas,

where there was no evidence the securities transactions occurred in Texas).

It is undisputable that every act Defendants undertook to further their scheme happened

in New York. From New York, they solicited the Issuers; sent and received transactional

documents; signed the Subscription Agreements that constituted binding offers to buy the

securities; received the Stock Certificates; and resold the securities. In addition, none of the

Issuers transacted with Defendants from Delaware. Indeed, the 63 Issuers were located in

numerous states across the United States and Canada, and Defendants have not and cannot cite

qualifying state law exemptions in each of these states. *See* Sections II(C) & (D), *supra.*

Nevertheless, Defendants will likely argue that because E-Lionheart was incorporated in

Delaware and leased a virtual and then physical office there, Delaware law applies. In

17

accordance with the plain language of Rule 504(b)(1)(iii), however, the relevant state laws are the laws of the states where the offers and sales took place, not where either the Issuer or the purchaser is incorporated. And this Court has stated, "the case law is clear that incorporation alone is not a sufficient nexus to trigger application of Delaware's Securities Act." *Bronson*, 14 F. Supp. 3d at 416-17 (citing cases). Moreover, that E-Lionheart leased office space in Delaware is irrelevant as Defendants concede that they neither conducted business from, nor even visited, that office space (or the entire state of Delaware for that matter). *See Singer v. Magnavox Co.,* 380 A.2d 969, 981 (Del. 1977) (Delaware Securities Act did not apply because "[p]laintiffs [were] residents of Pennsylvania and were not solicited [in Delaware]. Nor [did] it appear that the contract was made in Delaware nor that any part of the 'sale' occurred [there]."), *overruled on other grounds by Weinberger v. OUP, Inc.* 457 A.2d 701, 715 (Del. 1983); *Dofflemeyer v. W.F. Hall Printing Co.*, 558 F. Supp. 372, 377 (D. Del. 1983) (Delaware Securities Act inapplicable where negotiation, solicitation, and sale occurred outside of Delaware).

In sum, there is no evidence that any offer to buy securities, offer to sell securities, or sale of securities to Defendants, or by Defendants, occurred in Delaware. Thus, Delaware law is irrelevant.

c.  <u>Defendants Must Establish That E-Lionheart was an Accredited Investor</u>

Rule 504(b)(1)(iii) limits sales to "accredited investors" as defined in Rule 501(a) of Regulation D. *See* 17 C.F.R. § 230.504(b)(1)(iii). Defendants claim that E-Lionheart was an accredited investor under Rule 501(a)(8) because Bronson, its sole managing member, was an accredited investor. Bronson claims to be an accredited investor under Rule 501(a)(5) and (6): a "natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000," or a "natural person who had an individual income in excess of $200,000 in each of

18

the two most recent years or joint income with that person's spouse in excess of $300,000 in each

of those years and has a reasonable expectation of reaching the same income level in the current

year." Defs.' Mem. of Law in Supp. of Mot. to Dismiss, at 10 n.5 (Dkt. No. 18) (citing 17 C.F.R.

§ 230.501(a)(5)-(6)).

Bronson's tax returns, however, raise a serious question whether Bronson was an

accredited investor during the relevant period. In addition, it is undisputed that both outside

investors and E-Lionheart employees co-funded many of the transactions. *See* Summary of the

Transactions Section I, *supra.* Thus, these co-funders were at least *de facto* equity owners of the

securities such that Defendants should be required to establish their accredited investor status to

qualify for Rule 504(b)(1)(iii). Moreover, Delaware Rule 510(c) provides "[t]he offer or sale of

securities is not exempt under Section 7309(b)(8) or this rule if the institutional buyer is in fact

acting only as an agent for another purchaser that is not an institutional buyer or financial

institution listed in Section 7309(b)(8)." Thus, because co-funders were not institutional

investors, these co-funded transactions would be disqualified from the Section 7309(b)(8)

exemption in any event.

### B.    The Court Should Order the Relief the SEC Seeks Against Defendants

#### 1.    Defendants Should be Permanently Enjoined From Violating Section 5

Section 20(b) of the Securities Act authorizes the Commission to seek permanent

injunctive relief upon showing "a substantial likelihood of future violations of illegal securities

conduct." *See SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir.1998). To determine whether the

SEC has made this showing, a court considers the following factors:

> the fact that the defendant has been found liable for illegal conduct; the
> degree of scienter involved; whether the infraction is an "isolated
> occurrence;" whether defendant continues to maintain that his past
> conduct was blameless; and whether, because of his professional

19

> occupation, the defendant might be in a position where future violations
> could be anticipated.

*Id.* (quoting *SEC v. Commonwealth Chem. Secs., Inc.,* 574 F.2d 90, 100 (2d Cir. 1978)). A

permanent injunction is "particularly within the court's discretion where a violation was founded

on systematic wrongdoing, rather than an isolated occurrence." *SEC v. Tavella,* 77 F. Supp. 3d

353, 359 (S.D.N.Y. 2015) (granting permanent injunction for sale of unregistered securities)

(quoting *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1477 (2d Cir.1996)).

    Here, all factors strongly argue in favor of a permanent injunction. First, there is

undisputed evidence that Defendants violated Section 5. Second, although scienter is not an

element of a Section 5 claim, the undisputed evidence shows that Defendants Section 5

violations were egregious and deliberate (or at the very least reckless). Bronson was an attorney

and sophisticated investor with extensive experience dealing in financing transactions under

various provisions of Regulation D. He read Rule 504 and the claimed qualifying exemption

under Delaware.  He therefore knew or should have known that Delaware Section 7309(b)(8) did

not meet the requirements of Rule 504(b)(1)(iii) because it certainly did not explicitly permit

general solicitation and general advertising, and on its face it exempted from registration certain

offers and sales only to a limited number of institutional investors. Yet, despite this, Bronson did

not question the conclusory, unsupported assertion in the Opinion Letters that Section 7309(b)(8)

permitted general solicitation and general advertising.

    Defendants' registration violations were vast in scope, amassing them quick profits of

over $9.6 million over the course of three years at the expense of the investing public. It is

undisputed that Defendants purchased unregistered securities from the Issuers at steeply

discounted prices as part of a plan to promptly resell them to the investing public at a substantial

profit, thereby depriving the public of the intended protections registration provides. Defendants

misrepresented that E-Lionheart "maintain[ed] its principal place of business" in Delaware in an attempt to utilize an alleged Delaware registration when in fact they had no employees or business operations in Delaware. They created the appearance of having a place of business in Delaware, through the Regus virtual office leases, to support their false statements about their principal place of business to attorneys, Issuers, and transfer agents. Defendants also misrepresented in transactional documents that E-Lionheart would "not engage in any activity that would constitute a distribution" of the securities when, in reality, E-Lionheart purchased the shares with the specific intent to immediately resell them to the market. *See* Summary of the Transactions Section E, *supra.*

Third, Defendants' violations were recurrent. Between August 2009 and September 2011, Defendants bought and resold at least 353 tranches of unregistered offerings for 63 microcap issuers. *See* Summary of the Transactions Section B, *supra.* Fourth, to the SEC's knowledge, Bronson has made no statements recognizing the wrongful nature of his conduct. To the contrary, Bronson not only continues to assert that his massive Section 5 scheme was above board, but even after the SEC filed this action he continued to engage in at least nineteen additional transactions claiming the same inapplicable Rule 504(b)(1)(iii) Delaware law exemption, through other entities he formed. *See* Summary of the Transactions Section J, *supra.* Fifth, Bronson is in his prime earning years and has demonstrated a persistent affinity for conducting unregistered offerings. For all these reasons, Defendants should be permanently enjoined from violating Section 5.

21

2.      Defendants Should be Ordered to Disgorge, with Prejudgment Interest
        Thereon, Their Ill-Gotten Gains

When the SEC prevails on its Section 5 claims, courts routinely order defendants to disgorge

the gains from their illegal trades. *See, e.g.*, *SEC v. ConnectAJet.com, Inc.*, No. 3:09-cv-1742-B,

2011 WL 5509896, at *7-8 (N.D. Tex. Nov. 9, 2011) (ordering disgorgement where unregistered

offerings did not comply with Rule 504(b)(1)(iii)). Disgorgement deters future violations by

"forcing a defendant to give up the amount by which he was unjustly enriched." *See SEC v.*

*Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (citing *SEC v. Comm. Chem. Sec., Inc.*, 74F.2d 90,

102 (2d Cir. 1978)). The amount of disgorgement ordered is discretionary, and "need only be a

reasonable approximation of profits causally connected to the violation." *Id.* (citing *First Jersey*,

101 F.3d at 1475). Any risk of uncertainty should fall on the wrongdoer whose illegal conduct

caused the uncertainty. *See id.*

Based on Defendants' brokerage records and transactional documents, SEC Staff

Accountant Doreen Rodriguez determined that Defendants garnered $9,601,446.93 in illegal net

profits from their unlawful resale scheme. As Bronson was E-Lionheart's sole managing member

and responsible for all trading decisions, Defendants should be jointly and severally liable for

disgorgement. Similarly, FCI should be ordered to disgorge the $610,000 in ill-gotten gains that

it received from E-Lionheart without consideration, as well as the value of the automobile whose

title Bronson transferred to FCI without consideration.

Further, the Court may, at its discretion, award prejudgment interest. *First Jersey*, 101

F.3d at 1476. "Requiring payment of interest prevents a defendant from obtaining the benefit of

what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944

F. Supp. 286, 295 (S.D.N.Y. 1996). Prejudgment interest is generally calculated according to the

IRS underpayment rate, which courts typically use in connection with disgorgement in SEC cases.

*See id.* (citing cases).  As of June 10, 2016, measured from the last date Defendants sold each Issuer's stock to the public, prejudgment interest amounts to $1,761,541.14. Rodriguez Decl. ¶ 9 & Ex. 5.

### 3.   The Court Should Impose Civil Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), authorizes district courts to assess civil penalties against persons who violate the Act. The statute states that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances." For each violation, there are three increasing tiers of penalties, or a penalty of up to the gross amount of pecuniary gain, whichever is greater. The first tier requires a showing of a Securities Act violation. The second tier additionally requires that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." The third tier adds the requirement that the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d). All three tiers set forth a maximum penalty based on the greater of a specified amount per violation (differing for individuals and entities) or the gross amount of pecuniary gain to such defendant as a result of the violation. Here, each of the 353 tranches of unregistered securities bought and resold by E-Lionheart represents a separate violation of Section 5. For violations occurring after March 3, 2009 and before March 5, 2013, as is relevant here, the following amounts are the statutory maximum penalty per violation applicable for individuals and entities:

|             | Individuals | Entities  |
|-------------|-------------|-----------|
| First Tier  | $7,500      | $75,000   |
| Second Tier | $75,000     | $375,000  |
| Third Tier  | $150,000    | $725,000  |

*See* 17 C.F.R. § 201, subpart E, Table IV. Defendants' aggregate pecuniary gain from their violations was $9,632,646.93. *See* Rodriguez Decl. Ex. 1 (calculation of net profits).

23

Civil penalties are appropriate in the Section 5 context. *See, e.g., SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (affirming civil penalties ordered by district court). Civil penalties serve a dual purpose: to punish the individual violator for his past violations and deter future violations of the securities laws. *Razmilovic*, 738 F.3d at 38 (affirming third-tier civil penalties). In determining whether civil penalties are appropriate, courts consider the egregiousness of defendant's conduct; the degree of scienter; whether the conduct was isolated or recurrent; whether it caused substantial losses or risk of losses to others; and the defendant's financial condition. *SEC v. Opulentica,* 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). As discussed in the context of a permanent injunction above, each of these factors weighs heavily in favor of imposing civil penalties against Defendants, given the egregiousness and vast scope of Defendants' scheme to illegally and repeatedly flood the markets with unregistered securities over at least a three-year period, and their recurrent misrepresentations to facilitate the scheme. The SEC respectfully requests that the Court impose civil penalties against Defendants in the amounts it deems appropriate.

### 4.   The Court Should Impose a Permanent Penny Stock Bar on Defendants

Under Section 20(g) of the Securities Act, a penny stock bar is appropriate "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock." The stock of each of the Issuers meets the definition of a penny stock under Section 3(a)(51) of the Exchange Act and Rule 3a51-1.[13] Defendants' recurrent scheme of reselling billions of shares of penny stock to the public without the important benefits of registration (or an

---

[13] The Issuers' stock qualified as "penny stock" because it did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. Among other things, the securities were equity securities: (1) that were not an "NMS stock," as defined in 17 C.F.R. § 242.600(b)(47); (2) traded below five dollars per share during the relevant period and (3) did not meet any of the other exceptions from the definition of "penny stock" contained in Rule 3a51-1 under the Exchange Act. *See also* n.5, *supra.*

exemption)—and their continued involvement in illegal Rule 504(b)(1)(iii) transactions *even after* the SEC filed the instant litigation—strongly support imposition of a permanent penny stock bar to protect the public.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter summary judgment against all Defendants and Relief Defendant on all claims and impose the requested relief.

Dated:  New York, NY
         June 10, 2016

Respectfully submitted,

*/s/ Kevin P. McGrath*
_____
Kevin P. McGrath
Haimavathi V. Marlier
Christopher J. Dunnigan
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1100
mcgrathk@sec.gov (McGrath)
marlierh@sec.gov (Marlier)
dunniganc@sec.gov (Dunnigan)

## CERTIFICATE OF SERVICE

I hereby certify that, on June 10, 2016, I sent by overnight mail a copy of the Notice of

Motion of Plaintiff Securities and Exchange Commission's Motion for Summary Judgment

Against Defendants and Relief Defendant; Plaintiff Securities and Exchange Commission's

Memorandum in Law in Support of its Motion for Summary Judgment Against Defendants and

Relief Defendant; Plaintiff Securities and Exchange Commission's Local Rule 56.1 Statement of

Undisputed Material Facts; and the Declaration of Doreen Rodriguez dated June 9, 2016;

Declaration of Gregorie Sylvester dated June 10, 2016; and Declaration of Kevin P. McGrath

dated June 10, 2016, and all exhibits thereto:

William A. Rome, Esq.
Michael A. Eisenberg, Esq.
Robinson Brog Leinwand Greene
Genovese & Gluck, P.C.
875 Third Avenue
New York, NY 10022
(212) 603-6300
war@robinsonbrog.com
ame@robinsonbrog.com


*Counsel for Defendants and Relief Defendant*


/s/ Kevin P. McGrath_____
  Kevin P. McGrath

26