# Exhibit A

Page 1

1                    YITZCHOK KLUG
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -----------------------------------------X
    SECURITIES AND EXCHANGE COMMISSION,
4
                        Plaintiff,
5
                            No. 12-CV-6421 (KMK-JCM)
6                v.
7   EDWARD BRONSON and E-LIONHEART
    ASSOCIATES, LLC, d/b/a FAIRHILLS
8   CAPITAL,
9                    Defendants,
10                and
11  FAIRHILLS CAPITAL, INC.,
12                    Relief Defendant.
    -----------------------------------------X
13
14
15              DEPOSITION OF YITZCHOK KLUG
16                   New York, New York
17                Tuesday, March 1, 2016
18
19
20
21  REPORTED BY:  BARBARA R. ZELTMAN
                 Professional Stenographic Reporter
22
23  Job Number:  104177
24
25

Page 6

1          YITZCHOK KLUG
2      Q    Is there any reason today why your
3   deposition shouldn't go forward?
4      A    No.
5      Q    I'm just going to start by asking
6   you a few questions about your background.
7          Can you tell me a little bit about
8   your education starting post high school?
9      A    Post high school I went to Pace
10  University -- I'm sorry. First I went to
11  Brooklyn College and I earned a Bachelor of
12  Arts. I think it was in economics.
13         Then I went to Pace University,
14  earned an MBA in corporate financial
15  management, and then I went to Brooklyn Law
16  School and earned a JD.
17     Q    Can you just briefly for each of
18  your three degrees tell me when you
19  graduated?
20         So for Brooklyn College, do you
21  recall when you graduated?
22     A    My guess is --
23     Q    Best approximation.
24     A    1985.
25     Q    How about Pace?

Page 7

1          YITZCHOK KLUG
2      A    1988 or '89.
3      Q    Did you take any time off between
4   Brooklyn College and Pace?
5      A    I don't believe so.
6      Q    Did you work between Brooklyn
7   College and Pace?
8      A    I think I worked while I was at
9   Pace. I worked during the day and I went to
10  night school.
11     Q    You said from Pace you went to
12  Brooklyn Law School?
13     A    Not directly.
14     Q    What you did you do between Pace
15  and law school?
16     A    Various jobs. Nothing in the
17  financial industries. I worked in real
18  estate, real estate management, sales,
19  wholesale and retail.
20     Q    And so I think you said you
21  graduated the Pace MBA program in about 1988
22  or '89, give or take?
23     A    That's correct.
24     Q    And how many years did you work
25  before going to Brooklyn Law School?

Page 8

1          YITZCHOK KLUG
2      A    I think I started law school around
3   '96.
4      Q    When did you graduate from Brooklyn
5   Law School?
6      A    2001.
7      Q    What was your employment post law
8   school, right after law school?
9      A    I came directly to the SEC.
10     Q    What were you hired to do at the
11  SEC?
12     A    My position was law clerk. I can't
13  tell you that I remember specifically what I
14  was hired to do.
15     Q    And I would just remind you to keep
16  your voice up so the court reporter makes
17  sure she gets everything you are saying.
18         So you joined the SEC in 2001 as a
19  law clerk?
20     A    I believe that was the title. This
21  is prior to being admitted to the Bar. So
22  whatever the title is, not sure that I
23  remember that correctly.
24     Q    I'm going to ask you questions
25  about maybe some of your positions at the

Page 9

1          YITZCHOK KLUG
2   SEC over the years, but before I do that,
3   since you joined the SEC after graduating
4   law school, have you had any other
5   employers?
6      A    No, I have not.
7      Q    You've worked for the SEC from
8   2001, approximately, to the present?
9      A    That's correct.
10     Q    Can you briefly -- withdrawn.
11         Can you describe for me your
12  positions and responsibilities over the
13  years at the SEC?
14     A    I went from being a law clerk to
15  being a staff attorney to being senior
16  counsel.
17         My responsibilities --
18     Q    I'd like to just break that down.
19         You were a staff attorney during
20  what period? Years?
21     A    Probably about 2002/2003 until 2013
22  or so.
23     Q    Okay.
24         And in 2013 you became senior
25  counsel?

Page 10

1          YITZCHOK KLUG
2      A    Correct.
3      Q    And is that what your current title
4  is, senior counsel?
5      A    Yes, it is.
6      Q    What's the difference between staff
7  attorney and senior counsel?
8      A    There's a grade difference. I
9  don't perceive that there is a great
10  difference in the responsibilities. I'm not
11  doing anything much different than I used
12  to.
13     Q    Can you describe for me your
14  general roles and responsibilities as staff
15  attorney at the SEC?
16     A    Sure. I'm assigned cases to work
17  on by my supervisor. I work on those cases,
18  investigating them.
19         And in general, if something should
20  come from those cases, they would be or
21  could be an enforcement action.
22     Q    Would you work on the enforcement
23  action?
24     A    I could.
25     Q    Have you --

Page 11

1          YITZCHOK KLUG
2      A    I'm currently working on an
3  enforcement action, yes.
4      Q    How many other -- in your tenure at
5  the SEC, 2011 through now, approximately how
6  many enforcement actions have you worked on?
7          THE WITNESS: May I ask my
8  counsel something?
9          (Pause.)
10  BY MR. FISCHER:
11     Q    Sorry, did you want to clarify
12  something?
13     A    Yes. I have worked on four or five
14  enforcement actions.
15     Q    I may come back to that, but have
16  any of those enforcement actions involved
17  microcap securities?
18     A    Yes, they have.
19     Q    How many of them?
20     A    Three or four.
21     Q    Just some questions about just
22  understanding a little bit about the
23  structure of your position.
24         And I know you testified that you
25  are a staff attorney and sometimes you'll

Page 12

1          YITZCHOK KLUG
2  work on enforcement proceedings.
3          Is there a particular division at
4  the SEC that you have worked under or have
5  worked for?
6      A    I work for the Enforcement
7  Division.
8      Q    And you've worked for Enforcement
9  during your entire tenure?
10     A    Correct.
11     Q    Got it.
12         Would you say that over the 15 or
13  so years you've been at the SEC that your
14  work tends to primarily be focused on
15  investigations rather than enforcement
16  action?
17     A    I think it's fair to say that.
18     Q    Okay.
19         I may ask you a series of -- I'm
20  going to ask you some questions today that
21  focus on a certain time period, probably the
22  2007 to 2012 time period, give or take.
23         We'll see some e-mails on that
24  later.
25         During that time period, 2007 to

Page 13

1          YITZCHOK KLUG
2  2012 time period, can you identify for me
3  who your supervisor was?
4      A    I had two supervisors and I'm not
5  sure what dates I switched.
6      Q    Two supervisors during your
7  15-year --
8      A    Actually, let me take that back.
9  There were three supervisors.
10     Q    During your 15-year tenure?
11     A    I assume you are asking about my
12  direct supervisors.
13     Q    I am asking about your direct
14  supervisors, correct.
15     A    Three supervisors.
16     Q    Okay. Who are they?
17     A    The first is Elizabeth Goot,
18  G-O-O-T.
19     Q    What time period was she your
20  supervisor, if you remember?
21     A    She was my supervisor from 2001
22  forward. I don't remember specifically when
23  that changed, but I can tell you who the
24  next supervisor was.
25     Q    Before we get to that, do you

Page 14

```
1              YITZCHOK KLUG
2    recall what her title was, Ms. Goot?
3       A    Ms. Goot was a branch chief.
4       Q    And who was your supervisor after
5    Ms. Goot?
6       A    George Stepaniuk.
7       Q    What years was he your supervisor?
8       A    I don't really remember the time
9    frame.
10      Q    How about your third?
11      A    Michael Paley.
12      Q    What year was he your supervisor?
13      A    He's currently my supervisor and I
14   think he's been my supervisor for four,
15   maybe five years.
16      Q    So when you became senior counsel
17   in 2013, your supervisor remained the same?
18      A    Yes, it was Michael Paley.
19      Q    I'm sorry if I asked you this.
20   Michael Paley's title was?  What was his
21   title?
22      A    I think it's assistant regional
23   director, but I'm not certain.
24      Q    I don't think I asked you for
25   Mr. Stepaniuk, his title?
```

Page 15

```
1              YITZCHOK KLUG
2       A    He's the same title.  If I'm
3    correct, it's assistant regional director.
4       Q    Mr. Klug, have you ever been
5    deposed before?
6       A    Yes.  Once many years ago.
7       Q    Can you just briefly describe the
8    circumstances of that for me?
9       A    It happened a very long time ago.
10   I believe I was working as a real
11   estate manager and someone was injured at a
12   building, and I was, as a management agent,
13   deposed.
14      Q    Unrelated to your work at the SEC?
15      A    Completely unrelated.
16      Q    Okay.
17   During your time at the SEC, have
18   you ever been a part of any task forces or
19   working groups?
20      A    Yes.
21      Q    Can you tell me about that, please.
22      A    I've been part of the Microcap Task
23   Force.
24      Q    Any other task force?
25      A    Not that I can recall, no.
```

Page 16

```
1              YITZCHOK KLUG
2       Q    Any working groups?
3       A    There is another working group that
4    I'm part of.  I don't remember the exact
5    name, but it's also microcap related.
6       Q    Does the Microcap Fraud Working
7    Group ring a bell?
8       A    That could be it.
9       Q    And you identified yourself as
10   being part of something called the Microcap
11   Task Force?
12      A    Right.
13      Q    Have you ever heard of something
14   called Microcap Fraud Task Force?
15      A    I have not.
16      Q    Do you recall the years that you
17   were a member of the Microcap Task Force?
18      A    It's been several years but I don't
19   remember exactly when it started, no.
20      Q    Are you still a member?
21      A    I am.
22      Q    We're going to get into later some
23   conversations you had by e-mail, maybe
24   otherwise, with the Delaware securities
25   commissioner Peter Jamison.
```

Page 17

```
1              YITZCHOK KLUG
2       A    Okay.
3       Q    Do you recall those -- very
4    generally, do you recall those?
5       A    I do.
6       Q    Do you recall whether you were a
7    member of the Microcap Task Force at the
8    time you had those communications with
9    Mr. Jamison?
10      A    I don't.  I don't remember when the
11   Microcap Task Force came into being, so I
12   can't tell you.
13      Q    Okay.
14   Do you recall whether prior to the
15   Microcap Task Force coming into being there
16   may have been different iterations of it,
17   whether it was called something else?  Do
18   you have a memory of that?
19      A    I don't.
20      Q    What is the Microcap Task Force?
21      A    It's a group that's primarily
22   focused on microcap cases.
23      Q    What does that mean?  Can you give
24   me some context what that means?
25      A    I haven't worked on any accounting
```

Page 18

YITZCHOK KLUG

1   YITZCHOK KLUG
2   fraud cases. I haven't worked on anything
3   outside of microcap since I joined that
4   group.
5   Q   What's a microcap case? What would
6   that mean, in your mind?
7   A   In my mind, a microcap case would
8   be a case involving a microcap company.
9   Q   We're going to get into what a
10  microcap company is. We'll come back to
11  that.
12      But was there a head, someone who
13  led the Microcap Task Force?
14  A   There are coheads. Michael Paley
15  is one of the coheads.
16  Q   Who is the other cohead?
17  A   It's changed. It used to be Elisha
18  Frank, and it's now Jason Berkowitz.
19  Q   When did that change happen?
20  A   Within the last several months.
21  Q   Are there any internal policies or
22  manuals that relate to the Microcap Task
23  Force and the work that is done there?
24      MR. McGRATH: Just yes or no.
25  A   No.

Page 19

1   YITZCHOK KLUG
2   Q   There are not?
3   A   Not that I recall.
4   Q   About how many attorneys are part
5   of the Microcap Task Force?
6   A   I'm not sure. I would only be
7   guessing.
8   Q   More than 50?
9   A   No.
10  Q   Fewer than 50?
11  A   I believe so.
12  Q   Is the Microcap Task Force
13  comprised of SEC attorneys nationally, or is
14  it limited to the New York regional office?
15  A   There are task force members in
16  other cities other than in the New York
17  regional office.
18  Q   Okay.
19      How did it come to be that you
20  joined the Microcap Task Force?
21  A   Michael Paley was my supervisor
22  prior to the inception of the task force and
23  I just joined up.
24  Q   Do you understand why the Microcap
25  Task Force was formed?

Page 20

1   YITZCHOK KLUG
2       MR. McGRATH: Yes or no?
3   A   Yes.
4   Q   Why was it formed?
5       MR. McGRATH: Objection.
6   Privileged.
7       MR. FISCHER: It may not be
8   privileged, though.
9       MR. McGRATH: You are asking
10  him why somebody else within the SEC
11  decided to form a task force.
12      MR. FISCHER: Well, to the
13  extent that that information may --
14  that the SEC may have commented on
15  that information in the public
16  sphere, it may not be privileged.
17      MR. McGRATH: Well, all right.
18      To the extent that you are aware of
19  any public printouts regarding the reason
20  why the task force was formed, you can
21  answer it.
22      But if your knowledge is based on
23  internal discussions with other SEC
24  staff, I'm going to assert the
25  attorney/client, work product privilege?

Page 21

1   YITZCHOK KLUG
2   A   Best I can tell you is there may
3   have been some sort of release issued at the
4   time that the task force was formed. I'm
5   not sure that there was, but you could check
6   that.
7   Q   Mr. Klug, other than the Microcap
8   Task Force, are you aware of any other
9   internal SEC task forces or working groups
10  that focus on microcap issues?
11  A   I believe you mentioned one other.
12  Q   The Microcap Fraud Working Group.
13  A   I think that's right.
14  Q   I want to make sure we have a clear
15  record.
16      Do you understand what the
17  differences are, if any, between the
18  Microcap Task Force and the Microcap Fraud
19  Working Group?
20  A   I can't say that I do, no.
21  Q   Is it your understanding that the
22  Microcap Fraud Working Group is still in
23  existence?
24  A   It is. That's my understanding.
25  Q   Is your understanding that the

Page 26

YITZCHOK KLUG

1
2     But you can answer if you
3   understand it.
4     A    There's nothing specific that I
5   know. I would be speculating. I'm not
6   telling you something that I know happened.
7   I can only tell you what I think might
8   happen.
9     Q    Okay. Based on your review of this
10  document?
11    A    Well, just based on seeing their
12  names there.
13    Q    Sure.
14    A    If there's analysis to be done on
15  trading of a particular stock, they would be
16  helpful in investigation.
17    Q    You mentioned also that there
18  were -- you identified some -- I think you
19  used the term "contractors."
20    A    Yes. In recent years at the SEC,
21  I've seen staff that have the title of
22  "contractor." I've seen some of their names
23  on this sheet.
24    Q    Do you know what the title of
25  contractor means?

Page 27

YITZCHOK KLUG

1
2     A    I'm not sure what it means, no.
3     Q    Mr. Klug, I'm just going to direct
4   you to the first page of Exhibit 1.
5     A    Okay.
6     Q    And I'll read it aloud, the body of
7   the letter.
8        "Pursuant to your request, enclosed
9   please find a list of current and former
10  members of the Microcap Fraud Task Force and
11  Microcap Fraud Working Group."
12       Does this document refresh your
13  recollection that the task force you are a
14  part of is actually called the Microcap
15  Fraud Task Force?
16    A    Yes.
17    Q    And does this document --
18    A    Actually, if I may.
19    Q    Yeah.
20    A    Perhaps it has two names. I was
21  always under the impression I was part of
22  the Microcap Task Force. I'm not sure if
23  the fraud task force is the same thing.
24    Q    But you are listed here as a person
25  on one of these task forces, correct?

Page 28

YITZCHOK KLUG

1
2     A    That is correct.
3     Q    So for purposes of this deposition
4   and your testimony, you're not disputing the
5   fact you are part of the Microcap Task
6   Force, whether it's called Microcap Fraud
7   Task Force or --
8     A    I'm not.
9        MR. FISCHER: I'm going to mark
10  two documents as exhibits. Although
11  I may not ask questions about them
12  right away, I just want to have them
13  handy.
14       This is going to be Klug Exhibit 2.
15       (Klug Exhibit 2, Complaint,
16  was marked for Identification.)
17       (Klug Exhibit 3, Letter dated
18  May 6, 2011, no Bates numbers, was
19  marked for Identification.)
20  BY MR. FISCHER:
21    Q    Mr. Klug, before I ask you
22  questions about those -- put those off to
23  the side for a second. I'm not going to ask
24  you any specific questions about those right
25  away, but I would like for you to have them

Page 29

YITZCHOK KLUG

1
2   handy in case I refer to them.
3        I've asked you some questions
4   generally about microcap securities.
5        Can you tell me what a microcap
6   security is?
7     A    I can't give you an exact
8   definition of what a microcap security is.
9        In general, I think of it as a
10  security selling at a very small price and a
11  very low price.
12    Q    A small price and did you say a low
13  price?
14    A    Instead of a small price, a low
15  price.
16    Q    Any other factors that you think of
17  when thinking about whether a security is a
18  microcap security or not?
19    A    Not that come to mind, no.
20    Q    In considering whether a security
21  is a microcap, do you consider the
22  capitalization of the company at all?
23       MR. McGRATH: I'm going to
24  object to the question as privileged.
25  You are asking for his thought

Page 34

YITZCHOK KLUG
1
2    that you've seen a microcap security listed
3    on the New York Stock Exchange?
4        A    Has not.
5        Q    You defined a microcap earlier as a
6    security that may be selling at a low price.
7    Okay?
8        A    Okay.
9        Q    Right. You said that?
10       A    I did.
11       Q    There are securities from time to
12   time on various national exchanges, whether
13   it's the New York Stock Exchange or another
14   stock exchange, that may be selling at a low
15   price?
16       A    What would be a low price in your
17   mind?
18       Q    You defined a microcap security as
19   a security selling at a low price.
20           So can you give me a sense of what
21   a low price would be to have a security
22   characterized as a microcap security?
23       A    My view, my personal view is if I
24   see a stock selling for pennies, that would
25   be a microcap security.

Page 35

1        YITZCHOK KLUG
2            If I see a stock selling -- I
3    believe the New York Stock Exchange has
4    rules as to how low the price of the stock
5    can go before it can be listed. I can't
6    imagine anything ever selling for pennies on
7    the New York Stock Exchange. I don't recall
8    that I have.
9        Q    That's helpful.
10           Have you used term -- with air
11   quotes around it -- "penny stock"?
12       A    I have.
13       Q    Do you draw any distinction -- what
14   is a penny stock? Is there a definition you
15   use when thinking about a penny stock?
16       A    There is no definition, no. I
17   would think that penny stocks and microcap
18   stocks are the same thing.
19       Q    Do you draw any distinction in your
20   mind between a penny stock and a microcap
21   stock?
22       A    In my mind, penny stocks are
23   microcap stocks.
24       Q    Okay. Are microcap stocks penny
25   stocks? They don't have to be?

Page 36

1        YITZCHOK KLUG
2            MR. McGRATH: In your mind.
3        A    I'd have to think about that.
4            Not necessarily. I've seen
5    microcap stocks that are selling for more
6    than 1, 2, 3, 4 cents. I've seen microcap
7    stocks that are selling closer to a dollar.
8        Q    Mr. Klug, I'm sorry, I just want to
9    make sure I understand.
10           So I think I understand what you
11   are saying. There may be microcap stocks
12   that are not penny stocks because they're
13   trading at a higher level than a penny stock
14   may ordinarily trade.
15           Is that generally correct?
16           MR. McGRATH: Again, just
17   object to the form.
18           Just so it's clear, he's asking you
19   your understanding of the term as you use
20   it.
21           Right? And to the extent you are
22   not, if you are asking his understanding
23   of what the SEC's internal views are,
24   I'll object to that.
25           But for purposes of use of terms in

Page 37

1        YITZCHOK KLUG
2    deposition, to the extent he's asking you
3    when you use that phrase what do you mean
4    by it, I'm not objecting.
5            MR. FISCHER: I think that's
6    right. Although I may -- I don't
7    know that -- it seems to me that even
8    from before, Mr. Klug doesn't -- that
9    there isn't sort of a broader
10   definition that he would use on
11   behalf of the agency. I thought I
12   asked him that.
13           MR. McGRATH: Well, I don't
14   remember you asking him anything
15   about what he uses on behalf of the
16   agency, but you asked him what his
17   understanding of the term was.
18           MR. FISCHER: I can clean that
19   up a little bit.
20           MR. McGRATH: Just so it's
21   clear, to the extent he's asking you
22   your personal understanding of a term
23   that you use regarding penny stock
24   and microcap, I'm not objecting.
25           If it gets into your understanding

Page 58

1           YITZCHOK KLUG
2    three or four things in there that I
3    would factually disagree with.  But
4    the bottom line is --
5         MR. FISCHER:  You have more
6    information than I do.
7         MR. McGRATH:  -- whatever their
8    motivation was for asking or sending
9    e-mail, I'm going to assert a
10   privilege on because that's getting
11   into the mental thought processes of
12   the attorney who's working on an
13   enforcement --
14       MR. FISCHER:  Well, I don't
15   think we're there yet, but at a
16   minimum I'm entitled -- I don't know
17   whether we should be having this
18   discussion in front of the witness.
19   But I would object.  I believe I am
20   entitled to ask him questions about
21   the relevant exemptions and his
22   understandings of that.  I've asked
23   him questions this morning about his
24   understanding of other things.  The
25   case involves communications

Page 59

1           YITZCHOK KLUG
2    regarding the meaning of the relevant
3    registration expectations.  He was
4    communicating with Jamison about the
5    relevant registration exemptions.  I
6    have to ask him what his baseline
7    understanding is of them.
8         MR. McGRATH:  And I disagree.
9    I think we have a fundamental
10   disagreement.
11       MR. FISCHER:  So you are going
12   to assert privilege, so the record is
13   clear, over any questions regarding
14   Mr. Klug's understanding of rule --
15   understanding of securities
16   registration exemptions?
17       MR. McGRATH:  Yes.
18      (Pause.)
19       MR. McGRATH:  So I think I had
20   just said yes and then we got cut
21   off.
22     And I just want to add for the
23   reasons I mentioned previously, which is
24   that Mr. Klug has not been designated as
25   an expert by either side.  He's not been

Page 60

1           YITZCHOK KLUG
2    designated as a 30(b)(6) witness.
3       He's already testified that he's a
4    staff attorney with the Enforcement
5    Division.  He works on investigations in
6    Enforcement actions.
7       And to the extent you are going to
8    ask him questions about his mental
9    thought processes, about his
10   understanding of the law or his
11   motivation for why he did something or
12   didn't do something, I'm going to object
13   on privilege grounds for those reasons.
14       MR. FISCHER:  I'm going to take
15   issue with the objection.  I want the
16   record to reflect that we are here to
17   discuss Mr. Klug's communications
18   about Rule 504, and for him to
19   prohibit me to go into Mr. Klug's
20   understanding into Rule 504, his
21   knowledge of it prior to and after he
22   had communications with Delaware
23   securities regulators, I'm completely
24   hindered in my ability to fully
25   understand the meaning and nature of

Page 61

1           YITZCHOK KLUG
2    the communications.
3       I may try to ask some additional
4    questions, Kevin, about this issue and
5    you can object or not.
6         MR. McGRATH:  Uh-huh.
7   BY MR. FISCHER:
8     Q   You had testified, Mr. Klug, about
9    microcap -- you gave some testimony about
10   registered microcap securities.
11       Do you know what Rule 504 is?
12       MR. McGRATH:  Just answer yes
13   or no.
14     A   I was familiar with Rule 504
15   several years ago.  I'm not familiar with it
16   now.
17     Q   What period of time were you
18   familiar with Rule 504?
19     A   The 2010 range.
20     Q   And you're not familiar with it now
21   such that you can offer testimony on it?
22     A   I've not looked at Rule 504 in at
23   least five years.  I wouldn't want to offer
24   any testimony on it, no.
25     Q   You wouldn't want to or you are

Page 70

YITZCHOK KLUG

1  YITZCHOK KLUG
2  don't understand what that means.
3      A    You asked me for the name of the
4  case.
5      Q    Right.
6      A    That's what I told you I think the
7  name of the case was, one of those two. I
8  didn't check the name of the case before I
9  came here today. But I'm sure that's
10 information I can get from Kevin after
11 today.
12     Q    If you look in the left-hand side
13 of this document, it says "In the Matter of
14 Virginia Sourlis."
15         Do you see that?
16     A    Yes.
17     Q    Is this the case that you were
18 referring to earlier?
19     A    No.
20     Q    It's not?
21     A    No.
22     Q    Did the case that you were
23 referring to earlier, was an action filed
24 against Virginia Sourlis?
25     A    No.

Page 71

1  YITZCHOK KLUG
2      Q    Can you tell me what that
3  investigation involved?
4          MR. McGRATH: Just generally.
5      A    It involved opinion letters that
6  Ms. Sourlis had written.
7      Q    What kind of opinion letters?
8          MR. McGRATH: Can I just -- I
9  just want to get some clarification
10 before I assert privilege or not. So
11 can I ask him a question?
12         MR. FISCHER: Ask him a
13 question?
14         MR. McGRATH: Yeah.
15         Well, if not, then I would say to
16 the extent that he's asking you about an
17 investigation that did not become an
18 enforcement action, I'll object on
19 privilege grounds, law enforcement
20 privilege.
21         But if that's not the case, then
22 you can answer the question.
23         THE WITNESS: Can you repeat
24 the question, please.
25         MR. FISCHER: Can I have the

Page 72

1  YITZCHOK KLUG
2  question read back, please.
3          (Requested portion of record read:
4          "Question: What kind of opinion
5  letters?")
6          (End of read-back.)
7      A    The kind of opinion letter that I
8  sent to Mr. Jamison in that e-mail that
9  we've heard about.
10         MR. McGRATH: There's no
11 question pending. I just want to
12 have a minute off the record.
13         (Pause.)
14 BY MR. FISCHER:
15     Q    Mr. Klug, I'm just going to try to
16 do some clarifying for the record.
17         So you said that you were involved
18 in an investigation relating to Ms. Sourlis
19 that related to the kinds of opinion letters
20 that were attached to your e-mail that we
21 will review later today to Mr. Jamison in
22 2010, correct?
23     A    Correct.
24     Q    Were you involved in any other SEC
25 investigations as to Ms. Sourlis?

Page 73

1  YITZCHOK KLUG
2      A    I'm aware of the investigation or
3  of the cases that you showed me in Exhibit 6
4  and 7. I did not work on them.
5      Q    Okay. And I think you already
6  testified to this -- and if you did, your
7  excellent attorney will appropriately object
8  as asked and answered -- but the
9  investigation that you were involved in with
10 respect to Ms. Sourlis did not result in an
11 enforcement action, correct?
12     A    Correct.
13     Q    Did it result in an administrative
14 proceeding against her?
15     A    No.
16     Q    It did not. Okay.
17         Mr. Klug, did you have any role in
18 the investigation of an individual named
19 Danny Garber?
20     A    No.
21     Q    Did you have any role in the
22 investigation of an individual named Michael
23 Manis, M-A-N-I-S?
24     A    No.
25     Q    Did you have any role in the

Page 74

1      YITZCHOK KLUG
2    investigation of an individual named Kenneth
3    Yellin, Y-E-L-L-I-N?
4       A    No.
5       Q    Did you have any role in an
6    investigation of an individual named Jordan
7    Feinstein?
8       A    No.
9          MR. FISCHER: I'm just going to
10   mark this as Exhibit 8.
11         (Klug Exhibit 8, Protective
12   Order, was marked for
13   Identification.)
14   BY MR. FISCHER:
15      Q    I just want you to look at the
16   caption of that case, Mr. Klug.
17         Take a look at the entities and
18   individuals that are named as defendants and
19   if you can tell me whether you've had any
20   involvement in any of the investigations of
21   any of those defendants.
22      A    No.
23      Q    Mr. Klug, do you recall having
24   worked on any investigations relating to
25   allegations that a party did not properly

Page 75

1      YITZCHOK KLUG
2    rely on Rule 504?
3       A    The investigation that I worked on?
4    My Virginia Sourlis case? I believe those
5    were some of the allegations we saw in that
6    case.
7       Q    Okay.
8       A    Actually, let me restate that.
9          What I was looking at in that
10   case --
11         MR. McGRATH: I'm going to
12   object to what you were looking at.
13         He's asking you what investigations
14   you worked on. To the extent that
15   they're public, you can testify or to the
16   extent they're nonpublic you can identify
17   generally what they are, but what you
18   were looking at specifically is attorney
19   work product and I will object.
20         So if you can give a general answer
21   to the question, I have no objection.
22         MR. FISCHER: And maybe I'll
23   rephrase the question a little bit.
24   BY MR. FISCHER:
25      Q    Apart from the investigation of

Page 76

1      YITZCHOK KLUG
2    Virginia Sourlis, were you involved in any
3    other investigations that examined a party's
4    reliance on Rule 504?
5       A    No.
6       Q    Apart from Virginia Sourlis, were
7    you involved in any investigations that
8    examined a party's reliance on a state
9    securities registration exemption?
10      A    No.
11      Q    And I would say for the record,
12   Mr. Klug, just in rule of depositions, while
13   a question is pending we ask that you not
14   take a break, you not consult with your
15   attorney. If at any point today you do want
16   to take a break while a question is not
17   pending for any question, just let me know
18   or let your counsel know and we'll be more
19   than likely accommodate that.
20         But while a question is pending, we
21   need the answer to the question. Okay?
22      A    Sure.
23         MR. FISCHER: I think we're
24   going to mark Exhibit 9.
25         (Klug Exhibit 9, Exemptions,

Page 77

1      YITZCHOK KLUG
2    6 Delaware Code Section 73-207, was
3    marked for Identification.)
4    BY MR. FISCHER:
5       Q    Mr. Klug, directing you to
6    Exhibit 9 which is entitled 6 Delaware Code
7    Section 73-207.
8          I'm just going to ask you whether
9    you recognize that document.
10      A    I don't.
11         (Klug Exhibit 10, E-mail dated
12   Wednesday, November 10, 2010,
13   6:08 p.m., Bates Numbers
14   SEC-SEC-0007773 through
15   SEC-SEC-0007777, was marked for
16   Identification.)
17   BY MR. FISCHER:
18      Q    Mr. Klug, whenever you're ready.
19         Whenever you are ready.
20      A    Would you like me to read this
21   first?
22      Q    Whenever you are comfortable
23   starting.
24      A    Go ahead.
25      Q    Do you recognize this document?

Page 78

YITZCHOK KLUG
1    YITZCHOK KLUG
2    A    Yes.
3    Q    What is this document?
4    A    It is an e-mail from myself to
5    Peter Jamison.
6    Q    Who is Peter Jamison?
7    A    I believe he was one of the
8    securities regulators in Delaware or in the
9    Delaware department of securities, whatever
10   that would be called.
11   Q    How did it come to be that you sent
12   an e-mail to Mr. Jamison?
13        MR. McGRATH: Objection.
14   Privileged. Calls for his attorney
15   work product and his process why he
16   did something.
17        MR. FISCHER: I'll withdraw the
18   question.
19   Q    Who is Michael Paley? I think you
20   mentioned his name earlier today.
21   A    He's my supervisor.
22   Q    Was he your supervisor at the time
23   you sent this e-mail?
24   A    Yes.
25   Q    Did you discuss -- prior to sending

Page 79

1    YITZCHOK KLUG
2    this e-mail, did you discuss with Mr. Paley
3    the reasons for sending the e-mail?
4         MR. McGRATH: Objection.
5         MR. FISCHER: Yes or no.
6         MR. McGRATH: I'm going to
7    object even whether or not there was
8    a discussion about it.
9         MR. FISCHER: That's
10   privileged?
11        MR. McGRATH: Yes. The steps
12   that he took or didn't take before he
13   engaged in any Enforcement activity
14   is privileged. So whether he took a
15   step or didn't take a step is
16   privileged.
17        MR. FISCHER: We disagree with
18   that.
19   BY MR. FISCHER:
20   Q    Why don't we walk through the
21   e-mail.
22        By the way, you said that
23   Mr. Jamison had a role at the Delaware
24   Securities Commission?
25   A    If that's what it's called. I

Page 80

1    YITZCHOK KLUG
2    don't remember the exact name.
3    Q    Do you remember what his role was?
4    A    I don't.
5    Q    Do you know what his
6    responsibilities were?
7    A    No. But if I sent him a letter, my
8    assumption is that he was the right person
9    to speak with or one of the right people to
10   speak with.
11   Q    Where did you get that assumption
12   from?
13   A    I don't recall.
14   Q    Mr. Paley?
15        MR. McGRATH: Objection.
16   Privileged. Communications with
17   another staff member in terms of
18   attorney work product.
19   Q    Do you know whether anyone at the
20   SEC had ever sought advice from Mr. Jamison
21   prior to you reaching out to him, as a yes
22   or no?
23        MR. McGRATH: Objection.
24   Privileged. Work product.
25   BY MR. FISCHER:

Page 81

1    YITZCHOK KLUG
2    Q    Prior to this communication on
3    November 10, 2010, had you ever communicated
4    with Mr. Jamison?
5    A    The very first words in the first
6    paragraph are "as we discussed on the
7    phone," so I presume we did, although I
8    don't specifically remember.
9    Q    Apart from that communication on
10   the phone, had you ever communicated with
11   Mr. Jamison?
12   A    Not that I can recall.
13   Q    Do you recall how you got his phone
14   number?
15   A    No.
16   Q    Do you recall whether you e-mailed
17   him -- had ever e-mailed him prior to this
18   call?
19   A    I don't.
20   Q    You don't recall or you don't know?
21   A    I don't recall if I did or didn't.
22   Q    So let's look at the body of the
23   e-mail that you wrote, Mr. Klug.
24        The first paragraph says, "Peter,
25   as we discussed on the phone, I am attaching

Page 86

1       YITZCHOK KLUG
2   with anyone from the Delaware Securities
3   Commission?
4       A    No.
5       Q    So we're still talking about those
6   first five or six words "as we discussed on
7   the phone" and the phone conversation that
8   was prior to this e-mail.
9           Had you ever spoken, prior to that
10  phone conversation, to Mr. Jamison?
11      A    Not that I recall.
12      Q    Is it possible that you did?
13      A    Anything is possible.  I don't
14  know.
15      Q    Do you think you did?
16      A    I don't think I did.
17      Q    What did you discuss with
18  Mr. Jamison on that phone call?
19      A    I don't recall.
20      Q    You've no recollection?
21      A    No.
22      Q    Do your notes summarize what was
23  discussed on that call?
24      A    Presumably.
25      Q    And you've reviewed those notes a

Page 87

1       YITZCHOK KLUG
2   couple months ago?
3       A    I think I said four or five months
4   ago.
5       Q    And you have no -- that did not
6   refresh your recollection as to what you
7   discussed with him on the phone?
8       A    Correct.
9       Q    Do you recall whether you were
10  reaching out to Mr. Jamison in connection
11  with a specific investigation?
12      A    It would have been the
13  investigation that I was working on, the
14  Virginia Sourlis investigation.
15      Q    So you say "as we discussed on the
16  phone" and then you go on to say you are
17  attaching an opinion letter authored by
18  Virginia Sourlis.
19          And if you flip the page over, what
20  you'll see is a letter from Virginia Sourlis
21  to Manhattan Transfer Registrar Company
22  regarding goIP Global.
23          Do you see that?
24      A    I do.
25      Q    Mr. Klug, where did you -- at the

Page 88

1       YITZCHOK KLUG
2   time that you had this e-mail communication
3   with Mr. Jamison, where did you get this
4   letter?
5           MR. McGRATH:  Objection.
6           Privileged.  Attorney work product.
7   BY MR. FISCHER:
8       Q    Well, did you receive the letter
9   pursuant to a Subpoena?
10      A    I don't recall.
11      Q    Getting back to your discussion
12  with Mr. Jamison on the phone, did you have
13  any communication with him about why you
14  were reaching out to him?
15      A    I don't remember what our
16  discussion was about.  Presumably my notes
17  would say that.
18      Q    Do you recall whether, in addition
19  to this letter from Virginia Sourlis, you
20  sent any additional information to
21  Mr. Jamison in connection with your
22  communications with him?
23      A    I don't recall.
24      Q    Do you recall sending him anything
25  by mail?

Page 89

1       YITZCHOK KLUG
2       A    I don't recall.
3       Q    Were you asked as part of this
4   case, SEC versus Edward Bronson, to review
5   your e-mails in connection with your
6   communications with Mr. Jamison?
7       A    There was a point where I was
8   reviewing my e-mails.  I imagine it was for
9   this case, but I'm not sure.
10      Q    Is that within the last year?
11      A    I'm not sure.
12      Q    Do you recall when it was?
13      A    I don't specifically but, you know,
14  I would say it's within the last two years.
15      Q    And who asked you to do that?
16      A    I don't remember.
17      Q    I'm just going to have you take a
18  look at the first page of the attached
19  letter from Virginia Sourlis.  Actually,
20  it's from her law firm, the Sourlis law
21  firm, to the Manhattan Transfer Registrar
22  Company.
23          Just looking at it very generally,
24  does this letter refresh your recollection
25  as to what Rule 504 is?

Page 122

1       YITZCHOK KLUG
2    were produced to us -- is the e-mail that we
3    were just talking about, the November 10,
4    2010 e-mail between you and Mr. Jamison
5    which cc'ed Michael Paley. We just asked a
6    lot of questions on it.
7         Do you see that? On the bottom of
8    the first page and continues on to the
9    second page.
10       A    I do.
11       Q    And then going up from there,
12   there's additional correspondence.
13        Do you see that?
14       A    Yes.
15       Q    I'd like to now ask you questions
16   about that additional correspondence. So
17   I'm just trying to orient you to exactly
18   what I want to talk about.
19       A    Okay.
20       Q    So orienting you to the middle of
21   the page which is an e-mail from Peter
22   Jamison to you dated Friday,
23   November 19th, 2010 at 9:27 a.m.
24        And the e-mail reads as follows:
25   "Yitz, I had reviewed Ms. Sourlis' letter of

Page 123

1       YITZCHOK KLUG
2    August 23, 2010 to the Manhattan Transfer
3    Registrar Company and it does appear that
4    Ms. Sourlis' interpretation of
5    6 Del.C.7309(b)(8) and Section 510 of the
6    rules and regulations pursuant to the
7    Delaware Securities Act is correct."
8         Do you see that?
9        A    I do.
10       Q    Before I get into those words, nine
11   days elapse between your e-mail to Peter
12   Jamison and Mr. Jamison's e-mail to you.
13        Do you see that?
14       A    Yes.
15       Q    Did you have any oral
16   communications with Mr. Jamison during that
17   period?
18       A    Not that I recall.
19       Q    Did you have any e-mails with
20   Mr. Jamison during that period?
21       A    No.
22       Q    Do you recall whether you called
23   him up and asked him to follow up on this
24   issue because you hadn't heard from him in
25   nine days prior to this?

Page 124

1       YITZCHOK KLUG
2        A    I don't recall.
3        Q    Were you under any time pressure to
4    get an opinion from Mr. Jamison?
5        A    I don't recall.
6        Q    Focusing on the first sentence of
7    Mr. Jamison's e-mail to you, "Yitz, I had
8    reviewed Ms. Sourlis' letter of August 23,
9    2010 to the Manhattan Transfer Registrar
10   Company and it does appear that her
11   interpretation of the rules" that I stated
12   earlier -- that's me talking -- "is
13   correct."
14        Do you see that?
15       A    Yes.
16       Q    Did you have any discussions with
17   Mr. Jamison about what he meant by that?
18       A    Not that I recall.
19       Q    After this e-mail.
20       A    I don't recall.
21       Q    Did you pick up the phone after you
22   received this e-mail and discuss this issue
23   with Mr. Jamison?
24       A    I don't recall.
25       Q    If you had picked up the phone and

Page 125

1       YITZCHOK KLUG
2    discussed this issue with Mr. Jamison, would
3    you have taken -- would it have been your
4    practice to have taken notes during that
5    phone conversation?
6        A    If I had picked up the phone to
7    him?
8        Q    Yes.
9        A    Yes.
10       Q    Had you undertaken to examine
11   whether those notes exist?
12       A    I have not found any notes.
13       Q    You looked for them?
14       A    I did.
15       Q    Looked for a note of a conversation
16   with -- what exactly did you look for?
17       A    I looked for notes of any
18   conversations with Mr. Jamison.
19       Q    Did you locate any notes?
20       A    I think we talked about notes
21   earlier that I have of a call with
22   Mr. Jamison.
23       Q    Apart from those notes, did you
24   locate any additional notes?
25       A    Of a call between myself and

| | Page 126 | | Page 127 |
|---|---|---|---|

**Page 126**

1         YITZCHOK KLUG
2   Mr. Jamison?
3     Q   Any communications -- any notes
4   memorializing communications with
5   Mr. Jamison.
6     A   Yes.
7       There was another call with
8   Mr. Jamison later on in time that I
9   participated in.
10     Q   Was that in 2011?
11     A   I don't remember.
12     Q   When you say "later on in time" --
13     A   It was probably in 2011 because
14   this is November 2010.  But I'm not sure.
15     Q   Apart from those notes and the ones
16   that we discussed earlier this morning, any
17   other notes memorializing communications or
18   contact that you had with Mr. Jamison?
19     A   No.
20     Q   When Mr. Jamison says that -- and
21   I'm paraphrasing -- it does appear that
22   Ms. Sourlis' interpretation of Delaware law
23   is correct, do you have any confusion as to
24   what he was talking about then?
25       MR. McGRATH:  Objection.

**Page 127**

1         YITZCHOK KLUG
2   Privileged.  You are asking an
3   Enforcement attorney for his mental
4   thought processes during the course
5   of an investigation, so I'm going to
6   object on the grounds as privileged
7   work product.
8   BY MR. FISCHER:
9     Q   Did you articulate any confusion to
10   Mr. Jamison as to what he meant by that?
11     A   Not that I recall.
12     Q   I'm not asking you for the
13   substance of the conversations, but
14   Mr. Jamison's opinion that Ms. Sourlis'
15   interpretation of Delaware law was correct,
16   did you communicate that to anyone at the
17   SEC?  Yes or no?
18     A   I probably told Michael Paley or
19   let him know in some way.
20     Q   Did you forward this e-mail that
21   you received from Peter Jamison to Michael
22   Paley?
23     A   I don't recall.
24     Q   Have you looked in your e-mails to
25   determine whether you forwarded this e-mail

| | Page 128 | | Page 129 |
|---|---|---|---|

**Page 128**

1         YITZCHOK KLUG
2   to Michael Paley?
3     A   I don't think so.
4       MR. FISCHER:  Kevin, I would
5   make a request that you take a look
6   to see whether this e-mail was
7   forwarded to Michael Paley or anyone
8   at the SEC.
9       (Request made.)
10   BY MR. FISCHER:
11     Q   Mr. Jamison goes on to state in his
12   e-mail to you on 9:27 a.m.:
13       "That being said, if the SEC
14   believes that the use of the Delaware
15   exemption at Section 7309(b)(8) in this
16   particular case is contrary to the public
17   interest, please let me know.  Delaware does
18   have a procedure that authorizes the
19   commissioner to withdraw an exemption on a
20   general or case-by-case basis."
21       Do you see that?
22     A   I do.
23     Q   Did you ever have a communication
24   with Mr. Jamison that the use of
25   Section 730(b)8 as described was contrary to

**Page 129**

1         YITZCHOK KLUG
2   the public interest?
3     A   Not that I recall.
4     Q   Did you ever ask Mr. Jamison to
5   invoke the procedure that authorizes the
6   commissioner to withdraw an exemption on a
7   general or a case-by-case basis?
8     A   Not that I recall.
9     Q   Do you have any understanding of
10   whether Delaware -- the Delaware Securities
11   Commission has an -- withdraw the question.
12       Do you have any understanding of
13   whether the Delaware Securities Commissioner
14   has a mechanism to enforce what he or she
15   may think is noncompliance with
16   Section 730(b)8 of the Delaware securities
17   code?
18     A   I don't.
19     Q   Did you ever have any discussions
20   with Mr. Jamison about that?
21     A   Not that I recall.
22     Q   Are you aware of whether Delaware
23   has ever withdrawn its exemption on a
24   general basis?
25     A   I'm not.

Page 174

YITZCHOK KLUG

1
2    Q    At or around this time, August 2011
3    when Ms. Yeu e-mails Mr. Jamison, did you
4    have any telephone discussions with
5    Mr. Jamison?
6    A    From the August 8th e-mail, I
7    seemed to have been included on a phone
8    call.
9    Q    And we'll get to that.
10   A    So you are speaking about something
11   else?
12   Q    Do you recall any conversations you
13   had with Mr. Jamison in or around the
14   August 2011 time period?
15   A    Outside of what I just mentioned,
16   no.
17   Q    Apart from that August 8th call
18   that we'll talk about, you don't remember
19   anything else?
20   A    No.
21   Q    If you look up from where we're
22   looking right now, on the same page
23   Mr. Jamison responds a few days later on
24   August 5, 2011 at 11:08 a.m. and says,
25   "Ms. Yeu, I will be available most of next

Page 175

YITZCHOK KLUG

1
2    week (except Thursdays) to talk with you.
3    Please let me know what would be convenient
4    for you."
5        Do you see that?
6    A    I do.
7    Q    Have you ever seen that portion of
8    this e-mail before?
9    A    No.
10   Q    Flip to the prior page, Bates
11   Number 7796. She responds, "Thank you. I'm
12   available Monday morning. How is 10 a.m.?"
13       Have you ever seen this e-mail
14   before?
15   A    No.
16   Q    Mr. Jamison responds on Friday,
17   August 5th at 11:29 a.m., "That will be
18   fine. Please call me then."
19       Have you ever seen that portion of
20   the e-mail?
21   A    No.
22   Q    And then looking up, there's an
23   e-mail from Laura Yeu to Peter Jamison on
24   Monday, August 8, 2011 at 9:57 a.m.
25       And it reads as follows: "Good

Page 176

YITZCHOK KLUG

1
2    morning, Peter. I will be joined on the
3    call this morning with my colleagues,
4    Michael Paley, assistant regional director,
5    Yitzchok Klug, attorney, and possibly a few
6    others including Joe Dever, senior counsel."
7        Dever is D-E-V-E-R.
8        "My colleagues and I have different
9    cases that all involve similar issues under
10   Delaware law. I will be rounding up the
11   group in a few minutes and will call you at
12   the number below. I look forward to
13   speaking with you. Best, Laura."
14       Do you see that?
15   A    I do.
16   Q    Do you have any recollection of
17   ever seeing that e-mail?
18   A    No.
19   Q    The e-mail, Mr. Klug, references
20   the fact that you, among others, will be
21   joining Laura Yeu and Peter Jamison on a
22   call on August 8, 2011.
23       Do you see that?
24   A    Yes.
25   Q    Did that happen? Did you

Page 177

YITZCHOK KLUG

1
2    participate in a call on August 8, 2011?
3    A    I did.
4    Q    What do you remember about that?
5    A    I don't remember anything about the
6    call. However, I did find that I took some
7    notes on that call. So that's how I know
8    outside of this e-mail that I was present.
9    Q    Do the notes -- did you review the
10   notes?
11   A    Not for the last several months,
12   no. It was about four or five months ago.
13   Q    At the same time you were reading
14   notes, you were discussing -- (sic/ph)
15   A    Yes.
16   Q    And did the notes refresh your
17   recollection as to anything that was
18   discussed during the call?
19   A    No.
20   Q    The e-mail says that Ms. Yeu would
21   be joined on the call this morning with
22   Michael Paley, you and possibly a few others
23   including Joe Dever.
24       Do you recall who was ultimately on
25   the call?

Page 182

YITZCHOK KLUG

1
2    Q    Do you recall whether -- so we've
3    seen this e-mail communication chain back
4    and forth, right. And it's not reflected in
5    this e-mail, but in your first e-mail
6    exchange with him, there was a Virginia
7    Sourlis letter.
8    A    Yes.
9    Q    That we talked about this morning
10   at length.
11        Do you recall whether that letter
12   was discussed during this call with
13   Mr. Jamison?
14   A    I don't.
15   Q    Do you recall during the call with
16   Mr. Jamison whether the issue of whether
17   Delaware law permits general solicitation
18   and advertising was raised? Do you recall?
19   A    I don't.
20   Q    Do you recall whether the issue
21   of -- withdrawn.
22        Do you recall whether there were
23   any -- do you recall whether during the call
24   with Mr. Jamison any questions were --
25   withdraw that as well.

Page 183

YITZCHOK KLUG

1
2        Do you recall whether during the
3    call with Mr. Jamison there was a discussion
4    about transactions having a certain nexus to
5    Delaware?
6    A    I don't.
7    Q    I'm going to ask you to flip to the
8    first page of the document.
9        It's a communication from
10   Mr. Jamison to Laura Yeu also dated Monday,
11   August 8, 2011 at 1:37 p.m.
12        It says, "Laura, the citation for
13   the Delaware Supreme Court case that I
14   mentioned to you is Singer versus Magnavox
15   Co., 380A.2d 969."
16        Take a moment to take a look at
17   this e-mail.
18        Have you ever seen this e-mail
19   before?
20   A    I don't believe so.
21   Q    Have you ever seen it in preparing
22   for your testimony today?
23   A    No.
24   Q    Does that e-mail refresh your
25   recollection as to anything that was

Page 184

YITZCHOK KLUG

1
2    discussed during the call?
3    A    No.
4    Q    Do you recall any discussion on the
5    call of the Singer versus Magnavox case
6    cited in Mr. Jamison's e-mail?
7    A    I don't.
8    Q    Do you have any recollection of
9    whether -- I know you just testified that
10   you don't recall the Singer versus Magnavox
11   case being raised during the call.
12        To the extent it was raised, do you
13   think it would have been raised by the SEC
14   or the Delaware Securities Commissioner?
15        MR. McGRATH: I'm going to
16   object to this. It's a hypothetical
17   question. He's here as a fact
18   witness.
19        MR. FISCHER: No, I understand.
20   I'll withdraw the question.
21        MR. McGRATH: Thank you.
22   BY MR. FISCHER:
23   Q    Earlier this morning we took a look
24   at some e-mails between you and Peter
25   Jamison in which he said -- and I'm

Page 185

YITZCHOK KLUG

1
2    paraphrasing -- that Ms. Sourlis' view of
3    certain provisions of Delaware law was
4    correct.
5        Do you remember those generally?
6    A    I do.
7    Q    Do you recall whether Mr. Jamison
8    said anything during the August 8, 2011 call
9    to suggest that Ms. Sourlis' opinion was not
10   correct?
11   A    I don't.
12   Q    Do you recall any discussions with
13   Mr. Jamison about whether Rule 504 was an
14   issuer exemption?
15   A    I don't.
16   Q    Was there any discussion with
17   Mr. Jamison about who it was that the SEC
18   was considering pursuing in connection with
19   its investigations?
20   A    I don't remember.
21   Q    In other words, we saw some e-mails
22   this morning about Virginia Sourlis.
23        Do you recall, when you had those
24   discussions with Mr. Jamison, it was made
25   clear to Mr. Jamison that you were

Page 186

YITZCHOK KLUG

investigating Ms. Sourlis?

A    I'm not sure I understand the
question.

Q    So the e-mails this morning that
you sent -- that we discussed -- the e-mails
we discussed this morning that involved you
and Mr. Jamison in which you forwarded an
opinion letter to Mr. Jamison, I think you
testified earlier that that was done in
connection with an investigation you were
working on with respect to Virginia Sourlis.

A    Correct.

Q    Did you make clear to Mr. Jamison
that you were working on an investigation
with respect to Virginia Sourlis?

A    I don't remember.

Q    I hesitate to use the word
"subject" because I don't think the SEC
likes to use the word "subject," but I'll
use it colloquially.

       Do you know whether you
communicated to him an understanding that
Ms. Sourlis was the subject of an SEC
investigation?

Page 187

YITZCHOK KLUG

A    I don't remember.

Q    Sitting here today having reviewed
some of the e-mails and thinking about this
issue, do you know whether any of the
attorneys that were involved in the
investigation of Edward Bronson and
E-Lionheart, whether any of those attorneys
were ever on a phone call with Mr. Jamison?

A    I don't.

Q    You don't know?

A    I don't know.

Q    Do you know who those individuals
were who investigated E-Lionheart and Edward
Bronson?

A    No.

Q    Did you ever ask Ms. Sourlis --
withdrawn.

       Did Ms. Sourlis ever prepare a
Wells submission relating to the
investigation that you were working on with
respect to her?

A    No.

Q    Was she ever asked to prepare one?

A    No.

Page 188

YITZCHOK KLUG

Q    A few open-ended questions and then
we'll come back to the document.

       In connection with your work
generally and Rule 504, do you have any
understanding of whether the SEC brought
actions, administrative or otherwise,
against any attorney for providing attorney
opinion letters in connection with a
Rule 504 transaction?

A    Nothing clear, no.

Q    Nothing clear?

A    I can't think of one, although I
may have heard in the office or read a
release that comes across a computer that
there was some action.

Q    Against an attorney?

A    Possibly.

Q    Not something you worked on?

A    Not something I worked on, no.

Q    Are you aware of any actions,
administrative or otherwise, that were
brought against any issuers of securities
who issued their securities pursuant to a
Rule 504 exemption?

Page 189

YITZCHOK KLUG

A    I'm not.

Q    Are you aware of any actions,
administrative or otherwise, that were
brought against any transfer agents --

A    I'm not.

Q    And the last question along this
topic.

       Are you aware of any actions,
administrative or otherwise, that the SEC
brought in connection or against any brokers
who were handling these types of securities
that were issued pursuant to an exemption
under Rule 504?

A    I'm not.

Q    In connection with your
investigation of Ms. Sourlis, we saw this
morning an opinion letter relating to an
opinion she gave as to an entity that was
purchasing securities.

       I'm going to withdraw the question.
It's a terrible question.

       The opinion letter we looked at
this morning involved a transaction -- are
you aware whether the opinion letter we

Page 190

YITZCHOK KLUG

1  YITZCHOK KLUG
2  looked at this morning involved a
3  transaction relating to one of Mr. Bronson's
4  companies?
5     A   I am not.
6     Q   Turning back to the e-mail,
7  Exhibit 12. At the top of the page, Laura
8  Yeu writes on Monday, August 8, 1:39 p.m.,
9  "Thank you, Peter, for your time and
10 assistance. You've been quite helpful and
11 we do appreciate it. Best regards, Laura."
12     Mr. Klug, after this e-mail, do you
13 recall having any additional conversations
14 over e-mail or telephone or any other way
15 with Mr. Jamison?
16     A   Not that I recall.
17     Q   Do you recall having any additional
18 communications -- withdrawn.
19     Do you recall having any
20 communications with anyone else affiliated
21 with the Delaware Securities Commission?
22     A   No.
23     Q   Or anyone else from Delaware, even
24 if they weren't affiliated with the Delaware
25 Securities Commission, who was contacted to

Page 191

YITZCHOK KLUG

1  YITZCHOK KLUG
2  provide guidance on the meaning of Delaware
3  securities registration exemptions?
4     A   Not that I recall.
5        MR. FISCHER: Can we go off the
6  record a second.
7        (Pause.)
8        (Klug Exhibit 13, Plaintiff
9  Securities & Exchange Commission's
10 Responses and Objections to First
11 Set of Interrogatories of the
12 Defendants Edward Bronson and
13 E-Lionheart Associates, was marked
14 for Identification.)
15 BY MR. FISCHER:
16     Q   I'm showing you Exhibit 13 which is
17 a document entitled Plaintiff Securities and
18 Exchange Commission's Responses and
19 Objections to the First Set of
20 Interrogatories of the Defendants Edward
21 Bronson and E-Lionheart Associates and
22 Relief Defendant Fairhills Capital.
23        And it's dated January 26, 2015.
24        Do you see that, Mr. Klug?
25     A   Yes.

Page 192

YITZCHOK KLUG

1  YITZCHOK KLUG
2     Q   Directing your attention to Page 3.
3     A   Okay.
4     Q   There is an Interrogatory Number 1
5  which states, "Identify all persons with
6  knowledge or information concerning the
7  subject matter of this action."
8        And then it says, "For each person
9  identified, state the specific subject
10 matter the person has knowledge or
11 information of."
12        And then if you look down not at
13 the next paragraph but the paragraph after
14 that, the second sentence says, "The
15 Commission also identifies Owen Lefkon,
16 Securities Commissioner, Delaware Department
17 of Justice; Gregory Strong, former
18 Securities Commissioner, Delaware Department
19 of Justice."
20        Do you see that?
21     A   Yes.
22     Q   Goes on to also identify Peter
23 Jamison, III.
24        Mr. Klug, did you have any
25 communications with Owen Lefkon?

Page 193

YITZCHOK KLUG

1  YITZCHOK KLUG
2     A   Not that I recall.
3     Q   Have you ever heard the name Owen
4  Lefkon?
5     A   Not that I recall.
6     Q   Were you aware whether anyone at
7  the Securities and Exchange Commission had
8  communications with Owen Lefkon?
9     A   I'm not.
10     Q   Are you familiar -- have you ever
11 had any communications with Gregory Strong?
12     A   Not that I recall.
13     Q   Have you ever heard the name
14 Gregory Strong?
15     A   Not that I recall.
16     Q   Are you aware of whether anyone
17 from the SEC has had communications with
18 Gregory Strong?
19     A   I'm not.
20     Q   I think you can put that off to the
21 side.
22        Are you aware with respect to
23 Rule 504 whether the SEC engages in any
24 dialogue with the investigating public about
25 Rule 504?

# Yitzchok Klug Deposition Exhibit 10

**Jamison, Peter (DOJ)**

| | |
|---|---|
| **From:** | Klug, Yitzchok [KLUGY@SEC.GOV] |
| **Sent:** | Wednesday, November 10, 2010 6:08 PM |
| **To:** | Jamison, Peter (DOJ) |
| **Cc:** | Paley, Michael D. |
| **Subject:** | Delaware Exemption From Securities Registration |
| **Attachments:** | Delaware Opinion Letter.PDF |

Peter,

As we discussed on the phone, I am attaching an opinion letter authored by Virginia Sourlis which cites various sections of the Delaware Securities Act in support of her contention that the purchaser, E-Lionheart Associates, LLC may purchase unrestricted shares of stock from issuer GoIP Global, Inc. without the shares being registered.

Rule 504 of Regulation D provides an exemption from the registration requirements of the federal securities laws for some companies if they follow certain rules. The exemption provides that general solicitation is permitted by the issuer and the purchaser may acquire freely transferable securities when the securities are issued under a state law exemption that permits general solicitation and general advertising as long as the sales are made to "accredited investors" as defined in Regulation D.

I suspect that this is only the first of many letters SEC staff will see citing Delaware state law. My colleagues and I would be grateful if you would render an opinion as to the justification of Ms. Sourlis in citing the Delaware Securities Act in her opinion letter.

Please contact me with any questions you might have.

Thank you,
Yitz Klug

---

Yitzchok Klug
Staff Attorney
U.S. Securities and Exchange Commission
New York Regional Office
3 World Financial Center
Suite 400
New York, New York 10281
(212) 336-0112



1

Prod01-DEDOJ-0000001

Confidential



# THE SOURLIS LAW FIRM

Securities and Corporate Attorneys

Virginia K. Sourlis, Esq., MBA*
Philip Magri, Esq.⁺
Joseph M. Patricola, Esq.*⁺#

* Licensed in NJ
⁺ Licensed in NY
# Licensed in DC

214 Broad Street
Red Bank, New Jersey 07701
(732) 530-9007  Fax (732) 530-9008
www.SourlisLaw.com
Virginia@SourlisLaw.com

August 23, 2010

Manhattan Transfer Registrar Co.
57 Eastwood Road
Miller Place, NY 17764

> Re:  GoIP Global, Inc. (the "Company" or "Issuer")
> Delaware Legal Opinion for the Issuance of 504 Shares of Common Stock
> 11,000,000 shares of *free*-trading shares

Dear Sir or Madam:

We have been requested to provide you with a legal opinion as Corporate and Securities Counsel for the Company with respect to the issuance of **11,000,000** *free*-trading shares of the Company's common stock (the "Shares") to **E-Lionheart Associates, LLC** (the "Purchaser"). The Purchaser is formed and authorized to transact business within the State of Delaware in an offering exempt from registration under the Securities Act of 1933 (the "Securities Act") pursuant to Rule 504 of Regulation D promulgated thereunder, Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

In connection with this opinion, we have reviewed applicable federal and state laws, rules and regulations and have made such investigations and examined such documents and material related to the Company and the Purchaser as we have deemed necessary and appropriate under the circumstances, including, but not limited to, the following:

1.  SEC Regulation D, especially Rules 501, 502, 503 and 504 thereunder.
2.  Section 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.
3.  Articles of Incorporation of the Company as filed with the State of Delaware and Bylaws adopted by the Company.
4.  Various corporate books and records, including minutes of directors meetings and resolutions of the Company's Board of Directors related to the authorization and issuances of the Shares;
5.  A certificate of the Company's president stating that the Company:

Prod01-DEDOJ-0000002

Confidential

SEC-SEC-0007774

a. is not a reporting company under the 1934 Securities Exchange Act;

b. is an operating company with a specific business plan; and

c. has not sold securities pursuant to exemption under Rule 504 within the past twelve (12) calendar months in an aggregate dollar amount that would preclude the contemplated sales of Shares under that rule.

6. Subscription Agreement executed by the Purchaser, including various representations of the parties therein.

## The Law

### Rule 504 Exemption.

Section 5 of the Securities Act requires with certain exceptions, that all securities involved in an original distribution by the issuer must be registered. Regulation D promulgated under Section 3(b) of the Securities Act provides several means by which an issuer which is not subject to the reporting requirements of Section 13 and 15(d) of the Securities Exchange Act and is neither an investment company nor a blank check company may make an offer and sale of securities without registration upon satisfaction of certain requirements.

Rule 504 is available to any company that, at the time of the offering:

1. is not a "reporting company";

2. is not a development stage company that either had no specific business plan or purpose or had indicated that its business plan was to engage in a merger or acquisition with an unidentified company or entity;

3. if the issuer has utilized Rule 504 within the last twelve calendar months, the dollar amount of the offering may not have exceeded $1,000,000;

4. each investor is a bona fide resident of the state(s) where the offering is made; and

5. the investor was not, prior to, nor would be subsequent to, the offering an "affiliate" of the issuer.

On April 7, 1999, revisions to Rule 504 went into effect that prohibit general solicitation and general advertising of the offering by the issuer and which provide that securities issued under the Rule will be restricted, unless certain specified conditions are met. These conditions are:

1. the shares issued pursuant to the offering are issued under a state law exemption requiring public filing and delivery of a disclosure statement (often termed Offering Materials) prior to offer and sale; or

2. the shares issued pursuant to the offering are issued under a state law exemption that permits general solicitation and general advertising, available in only a minority of the states (including Delaware), when the offer is limited to only accredited investors as defined in Rule 501(a) of Regulation D.

2

Prod01-DEDOJ-0000003

Confidential

SEC-SEC-0007775

If either state standard is met, consistent with Rule 504, the shares issued pursuant to the offering are not restricted and are freely tradable on any secondary market.

Consequently, the shares issued pursuant to such an offering may be issued by the Company without affixing to the associated stock certificate a restrictive legend as to resale, may be delivered to the Purchaser upon full payment of the associated purchase price and may be freely traded unless the Purchaser were to become an affiliate of the Company (perhaps through later purchases or their principals were to be become an officer or director of the Company).

Rule 504 of Regulation D requires a filing within 15 days of the date of commencement of a given offering period. While there is no penalty for a late filing, the Company will need to file a Form D with regard to this new offering period.

*Delaware Exemption.*

Section7309(b)(8) of the Delaware Securities Act provides for an exemption from the registration and notice filing requirements set forth in Sections 7304, 7309A, and 7312 of the Delaware Securities Act where the transaction involves any offer or sale to an institutional buyer.

Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act defines "Institutional Buyer" to include an "accredited investor" as defined in SEC Rule 501(a)(1)-(4), (7) and (8), excluding, however, any self-directed employee benefit plan with investment decisions made solely by persons that are "accredited investors" as defined by Rule 501(a)(5)-(6) . Pursuant to SEC Rule 501(a)(8), an entity in which all of the equity owners are "accredited" (as defined in Rule 501(a)(5)-(6)) comes within the definition of "accredited investor".

The Delaware applicable exemption does not prohibit general advertising or general solicitation and therefore, the exemption allows general advertising and general solicitation.

Therefore, the Delaware Securities Act provides for an exemption from the registration and notice filing requirements as set forth in Section 7304, 7309A, and 7312 of the Delaware Securities Act where the investor is a validly formed business entity in which all of its equity owners are accredited in accordance with Rule 501(a)(5)-(6)). Not exempted under this provision are sales to individuals who are accredited investors under SEC Rule 501(a) (5) and (6).

No filings are required and there is no restriction prohibiting general advertising or general solicitation or requiring investment intent.

## Legal Opinion

Based on the foregoing, and subject to the qualifications set forth herein, it is our opinion that:

The Company is not a reporting company under the 1934 Securities Exchange Act, and intends to make an offering for purchased securities for its own account, which, if aggregated with all securities sold during the preceding 12 months, will not exceed $1,000,000.

The Purchaser is (i) an accredited investor as defined in Rule 501(a) of Regulation D of the Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the

3

Confidential

SEC-SEC-0007776

Delaware Securities Act (ii) an "institutional buyer" as set forth in Section7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act, (iii) is purchasing the Shares for its own account and was not formed for the specific purpose of acquiring the Shares, and therefore has complied with applicable federal and state law and qualifies for the exemption from registration set forth in the Securities Act pursuant to Rule 504 of Regulation D, Section7309(b)(8) of the Delaware . Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act

Further, the Purchaser is not (i) the Issuer, (ii) an underwriter of the Issuer with respect to the Shares (within the meaning of Section 2(11) of the Securities Act) (iii) an affiliate of the Issuer (within the meaning of Rule 144(a)(1) under the Securities Act, (iv) acting in concert within the meaning of Rule 144(e)(3)(vi) nor will they be acting in concert between the Purchasers and any affiliates of the Company or any other persons involving public sales of the Company's unregistered common shares under Rule 144, (v) in common ownership with any of the Purchasers of the respective companies in this offering, nor has any affiliation with any officers or affiliates of the Company, accordingly, the Shares may be issued and delivered to the Purchaser upon full payment of the associated purchase price without a restrictive legend under the Securities Act of 1933, as amended.

As to matters of fact, we have relied on information obtained from public officials, officers of the Company, and other sources, and we represent that all such sources were believed to be reliable. We have relied upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser has a legitimate investment intent in purchasing the Shares, and the Purchaser's representations as to its net worth and investment intent. The undersigned is licensed only in the State of New Jersey and this opinion covers, in part, Delaware statutory law, where the undersigned is not licensed.

We have made no independent attempt to verify facts provided us and set forth herein and that all signatures, documents or copies submitted to us are genuine and authentic. This opinion is limited to and conditioned upon, the facts as stated herein as of the date hereof. I disclaim any undertaking to advise you if changes in law or fact which may affect the continued correctness of any of my opinions occur as of a later date.

This opinion is solely for the use of the Company and its transfer agent, and may not be published or provided to any other person or entity without written permission from the undersigned.

Very truly yours,

The Sourlis Law Firm

*Virginia K Sourlis*

Virginia K. Sourlis, Esq.

4

Confidential

# Yitzchok Klug Deposition Exhibit 11



## Jamison, Peter (DOJ)

**From:** Klug, Yitzchok [KLUGY@SEC.GOV]
**Sent:** Friday, November 19, 2010 1:31 PM
**To:** Jamison, Peter (DOJ)
**Subject:** RE: Delaware Exemption From Securities Registration

Peter,

Thank you for you review and opinion. I will discuss this internally with my colleagues and contact you sometime next week.

Thank you,
Yitz Klug

---

**From:** Jamison Peter (DOJ) [mailto:Peter.Jamison@state.de.us]
**Sent:** Friday, November 19, 2010 9:27 AM
**To:** Klug, Yitzchok
**Subject:** RE: Delaware Exemption From Securities Registration

Yitz, I have reviewed Ms. Sourlis' letter of August 23, 2010 to the Manhattan Transfer Registrar Company, and it does appear that Ms. Sourlis' interpretation of 6 Del. C. sec. 7309(b)(8) and section 510 of the Rules and Regulations Pursuant to the Delaware Securities Act is correct. That being said, if the SEC believes that the use of the Delaware exemption at section 7309(b)(8) in this particular case is contrary to the public interest, please let me know. Delaware does have a procedure that authorizes the Commissioner to withdraw an exemption on a general or case-by-case basis.

Thanks.

Peter O. Jamison, III
Securities Commissioner
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8940
(302) 577-6987 (fax)

Confidentiality Notice: This electronic message and any attachment(s) are confidential and may be subject to the attorney/client privilege and/or work product immunity. This e-mail is only for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail, then delete this message and any attachment(s) from your system. Any unintended transmission expressly shall not waive the attorney/client privilege or any other privilege.

---

**From:** Klug, Yitzchok [mailto:KLUGY@SEC.GOV]
**Sent:** Wednesday, November 10, 2010 6:08 PM
**To:** Jamison Peter (DOJ)
**Cc:** Paley, Michael D.
**Subject:** Delaware Exemption From Securities Registration

Peter,

As we discussed on the phone, I am attaching an opinion letter authored by Virginia Sourlis which cites various sections of the Delaware Securities Act in support of her contention that the purchaser, E-Lionheart Associates, LLC may purchase unrestricted shares of stock from issuer GoIP Global, Inc. without the shares being registered.

20

**Prod01-DEDOJ-0000028**

Rule 504 of Regulation D provides an exemption from the registration requirements of the federal securities laws for some companies if they follow certain rules. The exemption provices that general solicitation is permitted by the issuer and the purchaser may acquire freely transferable securities when the securities are issued under a state law exemption that permits general solicitation and general advertising as long as the sales are made to "accredited investors" as defined in Regulation D.

I suspect that this is only the first of many letters SEC staff will see citing Delaware state law. My colleagues and I would be grateful if you would render an opinion as to the justification of Ms. Sourlis in citing the Delaware Securities Act in her opinion letter

Please contact me with any questions you might have.

Thank you,
Yitz Klug

---

Yitzchok Klug
Staff Attorney
U.S. Securities and Exchange Commission
New York Regional Office
3 World Financial Center
Suite 400
New York, New York 10281
(212) 336-0112

21

Confidential

SEC-SEC-0007801

# Yitzchok Klug Deposition Exhibit 12

### Jamison, Peter (DOJ)

| | |
|---|---|
| From: | Yeu, Laura V [YeuL@SEC GOV] |
| Sent: | Monday, August 08, 2011 1:39 PM |
| To: | Jamison, Peter (DOJ) |
| Subject: | RE: Delaware Exemption From Securities Registration |

Thank you Peter for your time and assistance. You have been quite helpful and we do appreciate it.

Best regards,
Laura

### Laura Yeu
**Senior Counsel**
U.S. Securities and Exchange Commission
Division of Enforcement
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
Direct: (212) 336-0187
e-mail: YeuL@sec.gov

**From:** Jamison Peter (DOJ) [mailto:Peter.Jamison@state.de.us]
**Sent:** Monday, August 08, 2011 1:37 PM
**To:** Yeu, Laura V
**Subject:** RE: Delaware Exemption From Securities Registration

Laura, the citation for the Delaware Supreme Court case that I mentioned to you is: *Singer v. Magnavox Co.*, 380 A.2d 969 (Del. 1977). In *Singer*, the Court held:

"we do not read the Act [the Delaware Securities Act] as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered here. Of course, a Delaware corporation is bound by the Act, if it is otherwise applicable. But it is not bound simply because the company is incorporated here."

Although there are a couple of holdings in *Singer* that have been overturned, this particular holding is still intact and is good law in Delaware. If you have any further questions regarding his matter, please do not hesitate to contact me.

Peter O. Jamison, III
Securities Commissioner
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8940
(302) 577-6987 (fax)



EXHIBIT
KlvQ 12
3/1/16

15

Prod01-DEDOJ-0000023

Confidential

SEC-SEC-0007795

Confidentiality Notice: This electronic message and any attachment(s) are confidential and may be subject to the attorney/client privilege and/or work product immunity. This e-mail is only for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail, then delete this message and any attachment(s) from your system. Any unintended transmission expressly shall not waive the attorney/client privilege or any other privilege.

**From:** Yeu, Laura V [mailto:YeuL@SEC.GOV]
**Sent:** Monday, August 08, 2011 9:57 AM
**To:** Jamison Peter (DOJ)
**Subject:** RE: Delaware Exemption From Securities Registration

Good morning Peter. I will be joined on the call this morning with my colleagues Michael Paley, Assistant Regional Director, Yitz Klug, attorney, and possibly a few others including Joe Dever, Senior Trial Counsel. My colleagues and I have different cases that all involve similar issues under Delaware law.

I will be rounding up the group in a few minutes and we will call you at the number below. We look forward to speaking with you.

Best,
Laura

**From:** Jamison Peter (DOJ) [mailto:Peter.Jamison@state.de.us]
**Sent:** Friday, August 05, 2011 11:29 AM
**To:** Yeu, Laura V
**Subject:** RE: Delaware Exemption From Securities Registration

That would be fine. Please call me then.

Peter O. Jamison, III
Securities Commissioner
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8940
(302) 577-6987 (fax)

Confidentiality Notice: This electronic message and any attachment(s) are confidential and may be subject to the attorney/client privilege and/or work product immunity. This e-mail is only for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail, then delete this message and any attachment(s) from your system. Any unintended transmission expressly shall not waive the attorney/client privilege or any other privilege

**From:** Yeu, Laura V [mailto:YeuL@SEC.GOV]
**Sent:** Friday, August 05, 2011 11:12 AM
**To:** Jamison Peter (DOJ)
**Cc:** Paley, Michael D.
**Subject:** Re: Delaware Exemption From Securities Registration

Thank you. I am available Monday morning. How is 10 am?

Regards,

16

**Prod01-DEDOJ-0000024**

Confidential

Laura Yeu

**From:** Jamison Peter (DOJ) [mailto:Peter.Jamison@state.de.us]
**Sent:** Friday, August 05, 2011 11:08 AM
**To:** Yeu, Laura V
**Subject:** RE: Delaware Exemption From Securities Registration

Ms. Yeu, I would be available most of next week (except Thursday) to talk with you. Please let me know what would be convenient for you.


Peter O. Jamison, III
Securities Commissioner
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8940
(302) 577-6987 (fax)


Confidentiality Notice: This electronic message and any attachment(s) are confidential and may be subject to the attorney/client privilege and/or work product immunity. This e-mail is only for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail, then delete this message and any attachment(s) from your system. Any unintended transmission expressly shall not waive the attorney/client privilege or any other privilege

**From:** Yeu, Laura V [mailto:YeuL@SEC.GOV]
**Sent:** Monday, August 01, 2011 8:37 AM
**To:** Jamison Peter (DOJ)
**Subject:** FW: Delaware Exemption From Securities Registration

Peter,

I am following up on the below e-mail from my colleague, Yitz Klug, regarding Rule 504 of Regulation D and Section 7309(b)(8) of the Delaware Securities Act. I have attached the letter that Yitz previously forwarded to you. I would appreciate the opportunity to speak with you or someone else on your staff concerning this matter. Anytime today before 1 pm works for me. Please let me know your availability.

Thank you.

Regards,
Laura Yeu


Laura Yeu
**Senior Counsel**
U.S. Securities and Exchange Commission
Division of Enforcement
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
Direct. (212) 336-0187
e-mail: YeuL@sec.gov

17

**Prod01-DEDOJ-0000025**

SEC-SEC-0007797

**From:** Jamison Peter (DOJ) [mailto:Peter.Jamison@state.de.us]
**Sent:** Friday, November 19, 2010 9:27 AM
**To:** Klug, Yitzchok
**Subject:** RE: Delaware Exemption From Securities Registration

Yitz, I have reviewed Ms. Sourlis' letter of August 23, 2010 to the Manhattan Transfer Registrar Company, and it does appear that Ms. Sourlis' interpretation of 6 Del. C. sec. 7309(b)(8) and section 510 of the Rules and Regulations Pursuant to the Delaware Securities Act is correct. That being said, if the SEC believes that the use of the Delaware exemption at section 7309(b)(8) in this particular case is contrary to the public interest, please let me know. Delaware does have a procedure that authorizes the Commissioner to withdraw an exemption on a general or case-by-case basis.

Thanks.

Peter O. Jamison, III
Securities Commissioner
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8940
(302) 577-6987 (fax)

Confidentiality Notice: This electronic message and any attachment(s) are confidential and may be subject to the attorney/client privilege and/or work product immunity. This e-mail is only for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately by replying to this e-mail, then delete this message and any attachment(s) from your system. Any unintended transmission expressly shall not waive the attorney/client privilege or any other privilege.

**From:** Klug, Yitzchok [mailto:KLUGY@SEC.GOV]
**Sent:** Wednesday, November 10, 2010 6:08 PM
**To:** Jamison Peter (DOJ)
**Cc:** Paley, Michael D.
**Subject:** Delaware Exemption From Securities Registration

Peter,

As we discussed on the phone, I am attaching an opinion letter authored by Virginia Sourlis which cites various sections of the Delaware Securities Act in support of her contention that the purchaser, E Lionheart Associates, LLC may purchase unrestricted shares of stock from issuer GolP Global, Inc. without the shares being registered.

Rule 504 of Regulation D provides an exemption from the registration requirements of the federal securities laws for some companies if they follow certain rules. The exemption provides that general solicitation is permitted by the issuer and the purchaser may acquire freely transferable securities when the securities are issued under a state law exemption that permits general solicitation and general advertising as long as the sales are made to "accredited investors" as defined in Regulation D.

I suspect that this is only the first of many letters SEC staff will see citing Delaware state law. My colleagues and I would be grateful if you would render an opinion as to the justification of Ms. Sourlis in citing the Delaware Securities Act in her opinion letter.

Please contact me with any questions you might have

18

**Prod01-DEDOJ-0000026**

**Confidential**

SEC-SEC-0007798

Thank you,
Yitz Klug

---------------------------------------------------------

Yitzchok Klug
Staff Attorney
U.S. Securities and Exchange Commission
New York Regional Office
3 World Financial Center
Suite 400
New York, New York 10281
(212) 336-0112

15

Prod01-DEDOJ-0000027

Confidential

SEC-SEC-0007799