# Exhibit H

Page 1

```
1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF NEW YORK
3

    SECURITIES AND EXCHANGE        )
4   COMMISSION,                    )
                                   )
5            Plaintiff,            )   CASE ACTION NO:
                                   )   12-CV-2641-KMK-JCM
6    vs.                           )
                                   )
7   EDWARD BRONSON and             )
    E-LIONHEART ASSOCIATES,        )
8   LLC, d/b/a FAIRHILLS           )
    CAPITAL,                       )
9                                  )
             Defendants.           )
10   _____ )
11
12
13                DEPOSITION OF JOSLYN CLAIBORNE
14             30(b)(6) OF PACIFIC STOCK TRANSFER
15                    LAS VEGAS, NEVADA
16                  FRIDAY, MARCH 11, 2016
17
18
19
20
21
22
23
24   REPORTED BY:  BRITTANY J. CASTREJON, CCR NO. 926
25                 JOB NO.:  104763
```

Page 6

JOSLYN CLAIBORNE

1    JOSLYN CLAIBORNE
2    if you could just remember to do that, that would be very
3    helpful.
4        Do you understand that?
5    A. Yes.
6    Q. Great.
7        If there's a question I ask that you don't
8    understand, please ask me to rephrase it for you. I'm
9    happy to do that. Sometimes I do ask questions that are
10   not immediately understandable. So if you need me to
11   rephrase, I will.
12       I would ask that, you know, while a question is
13   pending -- let me take a step back.
14       If you need to take a break for any reason,
15   please let me know, and we will definitely accommodate
16   that.
17   A. Thank you.
18   Q. Okay. Is there any reason that you can't
19   competently testify today?
20   A. No.
21   Q. Are you under --
22       Are you taking any medications that would affect
23   your ability to testify today?
24   A. No.
25   Q. Do you have any medical issues that would prevent

Page 7

1    JOSLYN CLAIBORNE
2    you from testifying competently today?
3    A. No.
4    Q. Okay. Let's state appearances for the record.
5        MR. DUNNIGAN: On behalf of the Securities
6    and Exchange Commission, Christopher Dunnigan.
7        MR. FISCHER: And, Ms. Claiborne, are you
8    represented by counsel here today?
9        THE WITNESS: Yes.
10       MR. FISCHER: And, Counsel, can you identify
11   yourself for the record?
12       MR. MACPHAIL: Sure. Mike MacPhail with
13   Faegre Barker Daniels in Denver.
14       MR. DOBBINS: Chris Dobbins. I'm president
15   and general counsel of Pacific Stock Transfer company
16   here in Las Vegas.
17       MR. DUNNIGAN: And just for the record, at
18   certain points I may say "objection to form." That
19   doesn't mean you can't answer the question. I'm just
20   preserving certain objections for the record, and you
21   should listen to your own lawyer.
22       Is that okay.
23       THE WITNESS: Yes.
24       MR. FISCHER: And that's right. If you
25   understand not -- he may -- he may jump in with an

Page 8

1    JOSLYN CLAIBORNE
2    objection. That may sound unnatural to you if someone
3    is objecting to my question. But if you understand my
4    question, you should still answer it.
5        Does that make sense?
6        THE WITNESS: Yes.
7        MR. FISCHER: Great.
8    BY MR. FISCHER:
9    Q. Ms. Claiborne, can you just briefly describe your
10   educational background for me?
11   A. I have a high school education and some college.
12   Q. Where did you go to college?
13   A. University of Maryland, Asian Branch.
14   Q. And when did you graduate from high school?
15   A. 1978.
16   Q. When did you take your college classes?
17   A. Between 1987 and 1999.
18   Q. Are you an attorney?
19   A. No.
20   Q. Do you have any --
21       Do you hold any professional licenses?
22   A. No.
23   Q. Are you a CPA?
24   A. No.
25   Q. Are you a member of any professional

Page 9

1    JOSLYN CLAIBORNE
2    organizations?
3    A. No.
4    Q. Who is your current employer?
5    A. Pacific Stock Transfer.
6    Q. Do you know whether that's the actual name of
7    your employer or whether there's another corporate
8    entity that employs you?
9    A. Pacific Stock Transfer is who I interviewed with
10   and who hired me.
11   Q. And how long have you been an employee of
12   Pacific?
13   A. Since August of 2009.
14   Q. Prior to August 2009, had you been employed at
15   all in the securities industry?
16   A. No.
17   Q. Prior to August 2009, had you done any work on
18   behalf of a stock transfer company?
19   A. No.
20   Q. Can you briefly describe -- and I don't want to
21   get into details, but can you briefly describe for me
22   the work you did prior to 2009?
23   A. Yes. I was a personal assistant to a
24   professional athlete.
25   Q. To a professional athlete?

Page 10

JOSLYN CLAIBORNE

1  
2  A. Yes.
3  Q. And in connection with your work as a personal
4  assistant to that athlete, did you do any work related
5  to securities?
6  A. No.
7  Q. Okay. Thank you.
8     I really want to focus today on your time at
9  Pacific. So that's really going to be the focus of the
10  questions that I ask you today.
11     You said you joined Pacific in August of 2009?
12  A. Yes.
13  Q. Okay. And what did --
14     What position did you join Pacific in at that
15  time?
16  A. Executive administrative assistant.
17  Q. Did your position change over time?
18  A. Yes.
19  Q. Can you briefly describe for me how your position
20  changed and when it changed?
21  A. My position changed in August of -- not August;
22  I'm sorry -- October of 2009 when the company determined
23  that they didn't need an administrative assistant, and I
24  was then reassigned as a transfer agent.
25  Q. And that happened in October 2009?

Page 11

JOSLYN CLAIBORNE

1  
2  A. Yes.
3  Q. After that, did your title change at all at
4  Pacific?
5  A. After 2009?
6  Q. After you became a transfer agent in October of
7  2009?
8  A. Yes.
9  Q. Your title changed again?
10  A. My title changed again in maybe 2012 or 2013 as
11  senior transfer agent, and I believe in 2014 sometime as
12  director of securities.
13     MR. FISCHER: Off the record.
14     (A brief discussion was held off the record.)
15  BY MR. FISCHER:
16  Q. So I just want to now ask you a couple questions
17  about the different jobs that you've had at Pacific, the
18  three or four that you've identified.
19     You testified that from August to October 2009,
20  you were executive administrative assistant?
21  A. Yes.
22  Q. Can you just tell me very briefly what your role
23  and responsibilities were at the company during that
24  period?
25  A. Yes.

Page 12

JOSLYN CLAIBORNE

1  
2  Answering the phone, making various copies,
3  picking up mail, pretty much whatever the general
4  manager wanted me to do in an administrative capacity,
5  photocopying, typing letters. That's pretty much it.
6  Q. Who was your supervisor at that time?
7  A. Jamie Soule.
8  Q. How do you spell that last name?
9  A. S-O-U-L-E with a hyphen.
10  Q. And is that a male or female?
11  A. A female.
12  Q. And then you said in October 2009 you became a
13  transfer agent?
14  A. That is correct.
15  Q. Can you tell me what your roles and
16  responsibilities were in your position as transfer
17  agent?
18  A. Training was my first role.
19  Q. Training?
20  A. Training.
21     So I would log in the incoming mail items. I
22  would write them on a log sheet to include the FedEx
23  account number and where the item came from.
24  Q. Any other responsibilities?
25  A. Then I would give the items to my supervisor who

Page 13

JOSLYN CLAIBORNE

1  
2  would distribute the items for processing to the
3  transfer agents.
4  Q. When you say who would distribute the items to
5  the transfer agents, do you mean --
6     When you use that phrase "transfer agents" there,
7  what do you mean by that?
8  A. There were other transfer agents in the company
9  besides myself.
10  Q. Here at Pacific?
11  A. Yes.
12  Q. So we're not talking about --
13     I don't want to focus on any outside companies
14  right now like any issuers. We'll get to that stuff
15  later. But here at Pacific there were other transfer
16  agents?
17  A. Yes.
18  Q. Okay. And when you said you would log in mail
19  items on a log sheet to include a FedEx account, what
20  kind of items were you logging in?
21  A. At the time I didn't know because I never had
22  seen any of those things before, and so that was part of
23  my training process to log in the transfers but to
24  identify where they came from, the FedEx account number,
25  who the issuer was, and who the shareholder was.


Page 18

JOSLYN CLAIBORNE

1
2  Q. Can you --
3     You tell me what you mean.  You'll do a better
4  job.
5     A.  What I mean is that when you're changing the name
6  of the registered shareholder, that would be a transfer.
7     Q.  I see.
8     A.  And when you're changing the name from one
9  registered shareholder to another, the proper
10 documentation needs to be presented, and all the time
11 that is not.
12    So therefore, it becomes a difficult transfer
13 because you have to follow up with the presenter to
14 acquire the required instructions and documentation to
15 change the name from one shareholder to another.
16    Q.  Thank you.
17    Anything else that you can recall about how the
18 transfers when you were a senior transfer agent were more
19 difficult than when you were a transfer agent?
20    A.  I learned how to transfer and remove restricted
21 legends from restricted securities.
22    Q.  Had you done that at all when you were a transfer
23 agent from October 2009 to 2012 or '13?
24    A.  No.
25    Q.  And who taught you how to remove the restrictive

Page 19

JOSLYN CLAIBORNE

1
2  legends?
3     A.  Joanna DiBella.
4     Q.  Is Ms. DiBella still with the company?
5     A.  No.
6     Q.  And I don't think I asked you this question, and
7  I'm sorry if I did.  But during the 2012 and '13 time
8  period when you were a senior transfer agent, can you
9  tell me who your supervisor was?
10    A.  Joanna DiBella.
11    Q.  What was her role?
12    A.  Supervisor.
13    Q.  Did she have a title?
14    A.  Supervisor.
15    Q.  Supervisor.
16       Supervisor of?
17    A.  Securities.  And I believe she became director of
18 securities, but I don't know when her title changed.
19    Q.  And during --
20    I think you testified in 2014 you became director
21 of securities?
22    A.  I believe around that time.
23    Q.  And can you tell me what your roles and
24 responsibilities are as director of securities?
25    A.  I manage other transfer agents now.

Page 20

JOSLYN CLAIBORNE

1
2  Q.  How many people report to you?
3     A.  Four.
4     Q.  Do you also manage senior transfer agents?
5     A.  Yes.
6     Q.  Do you do any training?
7     A.  Yes.
8     Q.  Who do you report to?
9     A.  Matthew Smith.
10    Q.  What's his role?
11    A.  Office of general counsel.
12    Q.  Does he work for Mr. Dobbins?
13    A.  Yes.
14    Q.  And you said you manage other transfer agents
15 now?
16    A.  Yes.
17    Q.  Can you just briefly describe for me what that
18 entails?  Sort of talk to me about --
19    Tell me what your responsibilities are as a -- as
20 the director of securities.
21    A.  I distribute their work items.  I answer any
22 questions that they may have regarding the items that
23 they have.  I sign their time sheets.  I approve their
24 leave, and I provide training.
25    Q.  Anything else you can think of?

Page 21

JOSLYN CLAIBORNE

1
2     A.  I will answer difficult shareholders or
3  investors.  If they're having a problem acquiring
4  information, they can bring that to me.  I ensure that
5  they are comfortable, happy and that they produce what
6  is presented within the same day when applicable.
7     Q.  And when you say you answer difficult questions
8  presented by shareholders or investors, when you refer
9  to shareholders or investors, are you --
10    I'm going to ask you a specific question.
11    Are you referring to your clients, or are you
12 referring to pert -- you know, entities that will
13 receive the transferred shares?
14    A.  Both.
15    Q.  Okay.  And can you describe for me who your
16 clients are?
17    A.  Our issuers.
18    Q.  Got it.
19    A.  And their shareholders.
20    Q.  Thank you.
21    And your current position today is director of
22 securities; correct?
23    A.  Correct.
24    Q.  And I didn't ask you this.  Who do you currently
25 report to?

TSG Reporting - Worldwide    877-702-9580

Page 42

JOSLYN CLAIBORNE

1    sick, I know one person had resigned. I came back;
2    another person had been hired in Virginia, another
3    person had been hired here in the Las Vegas office.
4         So I would have to write it down to give you
5    a more approximate since staff has changed.
6         MR. FISCHER: And I'm really just looking
7    for an approximation, understanding that roles and
8    employees may come and go over time. I'm not --
9         I don't need to pin you down to an exact
10   number, just an approximation if you can give it. And
11   if you can't give it, that's okay.
12        THE WITNESS: Okay. I need to write down
13   what I know.
14        MR. FISCHER: Take a moment. Take a moment.
15        MR. MACPHAIL: Okay.
16        (Pause in proceedings.)
17        THE WITNESS: I believe 16.
18   BY MR. FISCHER:
19   Q. 16 individuals are located where?
20   A. Eight in each office.
21   Q. I see. That's helpful. Thank you.
22        And has that been roughly the same during your
23   tenure at Pacific?
24   A. Yes.

Page 43

JOSLYN CLAIBORNE

1    Q. You spoke briefly this morning, you mentioned
2    that Pacific has a general counsel; is that right?
3    A. Yes.
4    Q. And you mentioned that there was another
5    individual in the legal department; is that correct?
6    A. No. I just said the office of general counsel.
7    Q. Can you just tell me briefly about Pacific
8    Counsel's internal legal structure? I think I said
9    Pacific -- Pacific Stock's internal legal structure.
10        MR. MACPHAIL: Object to the form.
11        THE WITNESS: We have an office of general
12   counsel which consists of our president Chris Dobbins
13   and my immediate supervisor Matthew Smith.
14   BY MR. FISCHER:
15   Q. And is Matthew Smith a lawyer?
16   A. Yes.
17   Q. And Mr. Dobbins is a lawyer as well; right?
18   A. Yes.
19   Q. And were both of those individuals at the company
20   from the 2009 to 2012 time frame?
21   A. No.
22   Q. Can you tell me who was in the office of general
23   counsel during that time frame?
24   A. Chris Dobbins and Matt Smith was hired later on.

Page 44

JOSLYN CLAIBORNE

1    I don't know exactly what year he came aboard.
2    Q. Okay. Is there anyone else that you remember
3    being in the office of general counsel during that
4    period of time?
5    A. No.
6    Q. Does the Virginia office have a separate office
7    of general counsel?
8    A. No. That is the office of general counsel.
9    That's our headquarters.
10   Q. Your headquarters is Las Vegas?
11   A. No. Our headquarters is Warrenton, Virginia.
12   Las Vegas is the operational office.
13   Q. Okay. I'd like to ask you a little bit, Ms.
14   Claiborne, just about Pacific's business.
15        Can you tell me very generally what Pacific Stock
16   Transfer does?
17   A. We are a transfer agency.
18   Q. What does that mean?
19   A. That means that we transfer stock.
20   Q. From whom to whom?
21   A. From one entity to another.
22   Q. And does Pacific have distinct business lines?
23        MR. DUNNIGAN: Objection to form.
24        MR. MACPHAIL: Object to the form.

Page 45

JOSLYN CLAIBORNE

1        THE WITNESS: Please explain.
2    BY MR. FISCHER:
3    Q. I'm just trying to get a little bit of a better
4    understanding of the kinds of services Pacific provides
5    to its clients. If you could give me a sense of the
6    kinds of services Pacific provides to its clients?
7    A. We transfer shares. We issue shares. We onboard
8    new companies. We do mailings.
9    Q. Is it fair to say that the primary function of
10   Pacific Stock is to transfer stock from one entity to
11   another?
12        MR. DUNNIGAN: Objection to form.
13        MR. MACPHAIL: Object to the form.
14        THE WITNESS: We are the record keepers of
15   issuers who are companies that are in need of someone to
16   maintain their books and records, and if that includes
17   transferring or issuing shares.
18   BY MR. FISCHER:
19   Q. And would you describe that as the primary
20   function of Pacific?
21   A. Yes.
22        MR. MACPHAIL: May I interject a clarifying
23   question?
24        MR. FISCHER: Yes.

12  (Pages 42 to 45)

Page 46

JOSLYN CLAIBORNE
1
2  MR. MACPHAIL: It might be helpful, Joslyn,
3  if you could briefly describe the main categories of
4  transactions that you're familiar with through your work
5  here that are presented for processing to the transfer
6  agent.
7      Are you able to answer that question?
8      THE WITNESS: Yes.
9      My main items are transferring. I remove
10 restricted legend, removals, restrictive shares. I
11 issue restrictive or free-trading shares. I resend
12 shares if an issuer or shareholder agreed to send shares
13 back to the authorized. We confirm the issued and
14 outstanding for issuers and shareholders alike. We also
15 provide shareholder list records to the issuers as to
16 who their clients and active shareholders are. And we
17 also will do that for brokers transferring shares and
18 shareholders.
19     MR. FISCHER: The last phrase was "and
20 shareholders"?
21     THE WITNESS: Yes.
22 BY MR. FISCHER:
23 Q. You mentioned in your answer the concept of
24 restricted -- restricted and free-trading shares?
25 A. That is correct.

Page 47

JOSLYN CLAIBORNE
1
2  Q. What is the difference between a restricted and
3  free-trading share?
4      A. A restricted share is not registered with the
5  SEC, and free-trading shares have met a certain holding
6  period to allow them to be unrestricted and to become
7  free trading.
8      Q. How do you know if a restricted share is a
9  restricted share?
10     A. When I issue them, the issuer provides me
11 instructions on how the shares are to be issued.
12     Q. Is there anything on the face of the share itself
13 that would suggest that a share is a restricted share?
14     A. If it is in the certificate form, the certificate
15 is marked restricted.
16     Q. And is there anything that would need to be done
17 to that form itself to make it a free-trading share?
18     A. Yes.
19     Q. Can you describe that for me?
20         MR. MACPHAIL: Ben, just to clarify, are you
21 talking about a share certificate that has the
22 restricted legend on it?
23         MR. FISCHER: Yes.
24         MR. MACPHAIL: What needs to be done to
25 remove the legend?

Page 48

JOSLYN CLAIBORNE
1
2  MR. FISCHER: Yes.
3  MR. MACPHAIL: Okay.
4  MR. FISCHER: Better question, yes.
5      THE WITNESS: There is certain criteria that
6  needs to be presented by whomever is requesting that the
7  restriction be removed.
8  BY MR. FISCHER:
9      Q. Can you tell me what those criteria are?
10     A. A legal opinion, a corporate resolution, a
11 statement of non-affiliation, and any other supporting
12 documentation that may be mentioned in the opinion
13 letter that supports the legend can be removed.
14     MR. MACPHAIL: Joslyn, what you just said
15 does that apply to 144 legend removals?
16     THE WITNESS: Yes.
17     MR. MACPHAIL: That's important.
18     THE WITNESS: This is a 144.
19     MR. FISCHER: That's helpful, and thank you
20 for the clarification.
21 BY MR. FISCHER:
22     Q. This case involves the issuance of shares
23 pursuant to a rule called Rule 504, 504(b)(1)(iii) of
24 Regulation D. And I think you testified earlier that
25 you're familiar with Rule 504?

Page 49

JOSLYN CLAIBORNE
1
2  A. I know what it is.
3      MR. DUNNIGAN: Objection to form.
4  BY MR. FISCHER:
5      Q. You know what it is.
6      Do you know what the criteria --
7      Do you know what Pacific needs -- withdrawn.
8      Do you know the documents that Pacific requires
9  in connection with a Rule 504 transfer?
10     MR. MACPHAIL: Object to the form and lack
11 of foundation.
12     MR. DUNNIGAN: Same objection.
13 BY MR. FISCHER:
14     Q. Does Pacific require documents in order to issue
15 or transfer shares pursuant to Rule 504?
16     A. Yes.
17     Q. Do you know what those documents are?
18     A. I know what the criteria is based on the
19 checklist that supports what needs to come in.
20     Q. Okay. And we're going to look at that checklist
21 in a moment.
22     MR. MACPHAIL: May I clarify because there's
23 a really important timing issue here that hadn't been
24 covered.
25     Pacific no longer processes 504 requests;

|     | Page 50 |     | Page 51 |
|-----|---------|-----|---------|
| 1   | JOSLYN CLAIBORNE | 1   | JOSLYN CLAIBORNE |
| 2   | right, Joslyn? | 2   | Are you aware of whether Pacific has any |
| 3   | THE WITNESS: That is correct. | 3   | compliance officers? |
| 4   | MR. FISCHER: And we'll get there. | 4   | A. That is our office of general counsel. |
| 5   | MR. MACPHAIL: Because your questions were | 5   | Q. That would fall under that? |
| 6   | in the present tense. I just want to make it clear that | 6   | A. Yes. |
| 7   | I think she testified that that stopped in about 2012 to | 7   | Q. Under that office? |
| 8   | the best of her knowledge. | 8   | A. If there was a question of compliance. |
| 9   | Is that accurate, Joslyn. | 9   | Q. Okay. Does Pacific have any compliance manuals |
| 10  | THE WITNESS: Yes. | 10  | that you're aware of? |
| 11  | MR. MACPHAIL: Okay. | 11  | A. I don't know what the office of general counsel |
| 12  | MR. FISCHER: Okay. And I'm going to ask | 12  | uses as reference or how they determine their situations |
| 13  | you some questions about that a little bit later. | 13  | with what's in compliance or not. |
| 14  | BY MR. FISCHER: | 14  | Q. Have you ever seen a compliance manual? |
| 15  | Q. But basically the documents and the checklist | 15  | A. I have not had a need to see it. Anything that I |
| 16  | those -- | 16  | had a question on regarding compliance, I took to our |
| 17  | Those were issues that were -- withdrawn. | 17  | office of general counsel. |
| 18  | The documents and the checklists were operative | 18  | Q. You testified earlier that Pacific's client base |
| 19  | prior to 2012; correct? | 19  | is issuers; is that right? |
| 20  | MR. MACPHAIL: Object to the form. | 20  | MR. DUNNIGAN: Objection to form. |
| 21  | THE WITNESS: Correct. | 21  | THE WITNESS: Yes. |
| 22  | BY MR. FISCHER: | 22  | BY MR. FISCHER: |
| 23  | Q. Just some more general questions before we get | 23  | Q. Any other clients that you could think of that |
| 24  | into specifics. I talked a little bit about in-house | 24  | wouldn't be issuers? |
| 25  | counsel and the legal department. | 25  | A. No. |

|     | Page 52 |     | Page 53 |
|-----|---------|-----|---------|
| 1   | JOSLYN CLAIBORNE | 1   | JOSLYN CLAIBORNE |
| 2   | Q. Do you know offhand whether there's a state that | 2   | companies that might not apply to non-penny stock |
| 3   | Pacific's clients are typically incorporated in? | 3   | companies? |
| 4   | MR. DUNNIGAN: Objection to form. | 4   | MR. DUNNIGAN: Objection to form. |
| 5   | MR. MACPHAIL: Same objection. | 5   | MR. MACPHAIL: Same objection. |
| 6   | THE WITNESS: No. | 6   | THE WITNESS: No. |
| 7   | BY MR. FISCHER: | 7   | BY MR. FISCHER: |
| 8   | Q. You don't know? | 8   | Q. Do you have any understanding of how Pacific |
| 9   | A. Our clients are all over the world. | 9   | markets itself to its client base? |
| 10  | Q. International clients as well as domestic | 10  | MR. MACPHAIL: Object to the form. |
| 11  | clients? | 11  | MR. FISCHER: I'll withdraw it. |
| 12  | A. Yes. | 12  | MR. MACPHAIL: May I? |
| 13  | Q. Do you know what a micro cap company? | 13  | MR. FISCHER: Please. |
| 14  | A. Not offhand, no. | 14  | MR. MACPHAIL: Do you know how Pacific goes |
| 15  | Q. Do you know what a penny stock company is? | 15  | about attracting new business? What does Pacific do to |
| 16  | A. Our client, our issuers. | 16  | get new clients? Is that what you're getting at, Ben? |
| 17  | Q. Your issuers are penny stock clients? | 17  | MR. FISCHER: Absolutely. |
| 18  | A. Yes. | 18  | THE WITNESS: Yes, we have a marketing |
| 19  | Q. All of them? | 19  | director in Virginia. |
| 20  | A. Yes. | 20  | BY MR. FISCHER: |
| 21  | Q. What's your understanding of a penny stock | 21  | Q. And how does Pacific market itself? |
| 22  | company? | 22  | A. I don't fully know all of our marketing, but on |
| 23  | A. That they trade in pennies. | 23  | occasions usually once a month, we do have different |
| 24  | Q. Do you have any understanding as to whether there | 24  | dinners at different venues to market clients. |
| 25  | are any specific rules that apply to penny stock | 25  | Q. Do you know how Pacific goes about locating |

14  (Pages 50 to 53)

Page 62

JOSLYN CLAIBORNE

1    JOSLYN CLAIBORNE
2        MR. MACPHAIL: Sure.
3    BY MR. FISCHER:
4        Q. Do you know if Pacific is registered with
5    something called the OTC?
6        MR. MACPHAIL: Object to the form.
7        MR. DUNNIGAN: Same objection.
8        THE WITNESS: I don't know. But I believe
9    so.
10   BY MR. FISCHER:
11       Q. And do you know if the OTC conducts any reviews
12   or examinations of Pacific's business?
13       A. I don't know.
14       Q. Do you know whether Pacific --
15       We talked about registration with the SEC and
16   some other regulatory bodies.
17       Do you know if Pacific maintains any registration
18   with any state securities regulators?
19       A. I don't know.
20       Q. Okay. Why don't we take a break.
21       MR. MACPHAIL: Thanks.
22       MR. FISCHER: Yep.
23       (A break was taken from 9:28 a.m. through
24       9:42 a.m.)
25   BY MR. FISCHER:

Page 63

1    JOSLYN CLAIBORNE
2        Q. We spoke very briefly before the break about Rule
3    504. If I use the term Rule 504, will you have an
4    understanding of what that means?
5        A. I know what the rule is.
6        Q. What is the rule?
7        A. It is an exemption for accredited investors under
8    state law.
9        Q. And do you know whether Pacific issued securities
10   on behalf of its clients pursuant to Rule 504? Before
11   you answer that question, I just used the word "issued
12   securities." I want to make sure I have the right words
13   when I'm asking you the questions.
14       So I -- you know, Pacific may not issue
15   securities. Pacific transfers securities --
16       Does Pacific transfer securities?
17       MR. DUNNIGAN: Objection to form.
18       THE WITNESS: Pacific issues shares and
19   transfers shares.
20       MR. MACPHAIL: It does both; right, Joslyn?
21       THE WITNESS: Yes.
22   BY MR. FISCHER:
23       Q. So are you aware of whether during the 2009 to
24   2012 time frame Pacific issued and transferred shares
25   pursuant to Rule 504?

Page 64

1    JOSLYN CLAIBORNE
2        MR. DUNNIGAN: Objection. Form.
3        MR. MACPHAIL: Same objection.
4        THE WITNESS: Pacific issued shares and
5    transferred shares.
6    BY MR. FISCHER:
7        Q. Pursuant to Rule 504?
8        A. Yes.
9        Q. Are you aware of when Pacific started doing that?
10       A. Not exactly since I came on board in 2009. So I
11   don't know when it was started.
12       Q. Do you recall the first time you knew that
13   Pacific was issuing shares pursuant to -- issuing and
14   transferring shares pursuant to Rule 504?
15       MR. DUNNIGAN: Objection to form.
16       THE WITNESS: No.
17       MR. FISCHER: You don't recall.
18       I'm going to show you a document I'm going
19   to mark as Exhibit 2.
20       (Exhibit 2 was marked for identification.)
21       MR. FISCHER: Mike, do you want to clarify
22   something or are you good?
23       MR. MACPHAIL: No. We're good.
24   BY MR. FISCHER:
25       Q. And, Ms. Claiborne, this is an email from

Page 65

1    JOSLYN CLAIBORNE
2    Virginia Sourlis to Pacific Stock Transfer (Joanna) and
3    Pacific Stock Transfer (Stacey) along with some
4    additional addressees who are CC'd. The subject matter
5    is October 21, 2009, 504 legal opinion, Russell
6    Industries and attached to the email and following it is
7    a legal opinion addressing Rule 504.
8        Do you see that?
9        A. Yes.
10       Q. Does this document refresh your recollection that
11   Pacific was involved in Rule 504 transfers as of October
12   2009?
13       MR. DUNNIGAN: Objection to form.
14       MR. MACPHAIL: Same objection and lack of
15   foundation.
16   BY MR. FISCHER:
17       Q. Does this document --
18       Well, you said --
19       I think you testified that you don't recall when
20   Pacific started becoming engaged in Rule 504 transfers
21   and issuances; right?
22       A. That is correct. I don't know.
23       Q. Does this document refresh your recollection that
24   Pacific was involved in Rule 504 transfers as of October
25   of 2009?

17  (Pages 62 to 65)

Page 66

JOSLYN CLAIBORNE

1
2   A. This document does state that they were doing it
3   in October of 2009.
4           MR. DUNNIGAN: Object to the form of the
5   question.
6           MR. MACPHAIL: May I clarify?
7           MR. FISCHER: Sure.
8           MR. MACPHAIL: Even though you may have
9   never seen this before today, you have no reason to
10  disbelieve that it is what it looks like it is, and that
11  therefore, there was 504 transactions going on as of
12  this date.
13          Is that fair to say?
14          THE WITNESS: That is fair to say.
15          MR. FISCHER: Thank you, Mike. Helpful.
16  BY MR. FISCHER:
17  Q. Were there any employees at Pacific who had
18  specific responsibility as to Rule 504 transactions?
19          MR. DUNNIGAN: Objection to form.
20          MR. FISCHER: Do you have any understanding
21  of that?
22          THE WITNESS: From what you're showing me,
23  it's Joanna, and from what I've reviewed, Joanna and
24  Leslie worked on these types of transactions.
25  BY MR. FISCHER:

Page 67

JOSLYN CLAIBORNE

1
2   Q. Anyone else?
3   A. Not that I'm aware of.
4   Q. Are you aware of whether Joanna and Leslie had
5   any specific training as to Rule 504 transactions?
6   A. No.
7           MR. MACPHAIL: May I interject a clarifying
8   comment here?
9           MR. FISCHER: Sure.
10          MR. MACPHAIL: We've been using Rule 504 I
11  think in a very specific way to talk about the state law
12  exemption component of Rule 504. There are obviously
13  other types of issuances under 504 that would not
14  implicate the state law exemption. Ben, if you agree
15  with that, I think we can all agree that the way we're
16  using the rule is limited to this particular state
17  exemption issue.
18          Would you mind agreeing to that going
19  forward?
20          MR. FISCHER: I do agree with that, and I
21  should have clarified that earlier.
22          The Rule 504 exemption to which I'm
23  referring to is Rule 504(b)(1)(iii).
24          MR. MACPHAIL: Thank you.
25          MR. FISCHER: And there may be times when I

Page 68

JOSLYN CLAIBORNE

1
2   in a shorthanded way refer to the rule as Rule 504. The
3   record should reflect that what I'm focused on is Rule
4   504(b)(1)(iii) because that's my understanding as to the
5   basis for the securities issuance and transfers by
6   Pacific.
7           My goal was to not get anyone bogged down in
8   sort of specific legal sections, but that is -- that's
9   exactly what I'm referring to. So I'd like the record
10  to reflect that. And thank you for the clarification.
11  BY MR. FISCHER:
12  Q. Are you aware of whether during the 2009 to 2012
13  time period, Pacific had any procedures regarding the
14  issuance and transfer of shares pursuant to Rule
15  504(b)(1)(iii)?
16  A. There was a checklist of criteria that I am
17  aware.
18  Q. I'm going to show you that checklist right now.
19  I'm going to mark this as Exhibit 3.
20          (Exhibit 3 was marked for identification.)
21  BY MR. FISCHER:
22  Q. Let me know when you have it in front of you?
23  A. I have it in front of me.
24  Q. Ms. Claiborne, Exhibit 3 is a document entitled
25  "Treasury Issuance Checklist."

Page 69

JOSLYN CLAIBORNE

1
2   Do you see that?
3   A. Yes.
4   Q. Have you seen this document before?
5   A. Yes.
6   Q. Are you familiar with it?
7   A. Yes.
8   Q. What is it?
9   A. A checklist of documentation provided that needs
10  to accompany treasury issuances.
11  Q. Do you know when it was created?
12  A. No, I do not.
13  Q. Do you know whether it was -- withdrawn.
14          Are you aware of whether this document was
15  operative during the -- sometime during the 2009 to 2012
16  time frame?
17          MR. DUNNIGAN: Objection to the form.
18          MR. MACPHAIL: Object to form.
19          THE WITNESS: Could you repeat that please?
20  BY MR. FISCHER:
21  Q. Do you know whether this document was created
22  sometime during the 2009 to 2012 time frame?
23  A. No, I don't know.
24  Q. Let me ask a different question.
25          Do you know if it was in use by Pacific during

18  (Pages 66 to 69)

Page 70

```
 1              JOSLYN CLAIBORNE
 2   the 2009 to 2012 time frame?
 3       A. Yes.
 4       Q. Okay. I'm going to direct your attention to the
 5   heading on the bottom left-hand corner of the page which
 6   says "504 shares (free trading with a notation)."
 7       A. Okay.
 8       Q. All right. Do you see that?
 9       A. Yes.
10       Q. You testified earlier that --
11       Well, let me ask you this: Is this what you were
12   referring to when you testified that there was a
13   checklist that reflected the procedures relating to Rule
14   504?
15       A. Yes.
16       Q. Were there any other procedures that you know of
17   that related to Rule 504 other than what you -- other
18   than this document?
19       A. No.
20       Q. Again, Rule 504(b)(1)(iii).
21       And I just want you to look at this document. It
22   has several boxes. It has several I'll call them bullet
23   points under the 504 shares heading.
24       Can you take a look at that and let me know
25   whether you think that encompasses all the procedures
```

Page 71

```
 1              JOSLYN CLAIBORNE
 2   with respect to Rule 504 --
 3              MR. DUNNIGAN: Object to form.
 4              MR. FISCHER: That Pacific had?
 5              THE WITNESS: I don't know.
 6              MR. MACPHAIL: May I ask a clarifying
 7   question, Ben?
 8              MR. FISCHER: Sure.
 9              MR. MACPHAIL: Based on your preparation
10   yesterday, Joslyn, would you agree that the procedures
11   would either be reflected, you know, as indicated in
12   this form, or one could look at the actual supporting
13   documents for 504 transactions to determine what the
14   procedures were?
15       Would you agree with that?
16              THE WITNESS: I would agree with that.
17   BY MR. FISCHER:
18       Q. And to the extent there are supporting documents
19   that may reflect additional procedures, do you know what
20   supporting documents one would look at to determine
21   those additional procedures?
22       A. That would be on a case-by-case basis, which is
23   why I said I didn't know.
24       Q. Did you see anything yesterday that --
25       Did you see any supporting documents yesterday
```

Page 72

```
 1              JOSLYN CLAIBORNE
 2   that reflected procedures set forth in them?
 3       A. Yes. Everything that I reviewed yesterday
 4   appeared to be within these bullet points.
 5       Q. I see.
 6       So are you saying that there are documents
 7   that --
 8       I'm just trying to get a sense of what you're
 9   referring to.
10       Are you saying that Pacific actually obtained the
11   documents that they had -- that are reflected in these
12   bullet points?
13       A. They had to.
14       Q. They had to?
15       A. Because that's why the bullet points are there.
16       Q. Okay. Can we walk through the bullet points?
17       A. Yes.
18       Q. Okay. The first bullet point says, "All, which
19   is bolded and underlined, requests need to be approved
20   by Jaclin before we can proceed."
21       Do you see that?
22       A. Yes.
23       Q. What's your understanding of that bullet point?
24       A. That all requests need to be approved by outside
25   counsel Anslow & Jaclin before they were to be
```

Page 73

```
 1              JOSLYN CLAIBORNE
 2   processed.
 3       Q. Do you know how that requirement came into
 4   existence?
 5              MR. DUNNIGAN: Objection to form.
 6              THE WITNESS: I didn't write the
 7   requirements.
 8   BY MR. FISCHER:
 9       Q. Do you know who did write the requirements?
10       A. I believe it was the previous director of
11   securities. So I don't know what criteria these bullets
12   were based on.
13       Q. Do you know if the previous director of
14   securities worked at all with internal counsel to come
15   up with these bullet points and criteria?
16       A. She would have because she is not a lawyer. And
17   if these things needed to be approved by outside
18   counsel, then she would have to have had assistance.
19       Q. Do you know whether these items, these
20   procedures, were also -- withdrawn.
21       Do you know whether Pacific got input from
22   external counsel in drafting these procedures?
23       A. I don't know. I would assume they would, but
24   again, I wasn't there when this was authored.
25       Q. You mentioned the firm Anslow & Jaclin. I think
```

19  (Pages 70 to 73)

Page 94

1      JOSLYN CLAIBORNE
2  saw it, would be the issuer, the amount of shares, and
3  the dollar amount each time that it was presented to
4  calculate to reach that point.
5  BY MR. FISCHER:
6      Q. We spoke --
7      You mentioned a little bit earlier and said it
8  much better than I'm about to say it right now, but that
9  Rule 504 is an exemption that also relies on a states
10 securities registration exemption, Rule 504(b)(1)(iii)
11 does.
12     Do you recall just generally that comment?
13     A. Yes.
14     Q. Okay. Would you have expected that the
15 spreadsheet would have identified the state in which the
16 issuer and purchaser were relying on the exemption?
17         MR. DUNNIGAN: Objection to form.
18         MR. FISCHER: The applicable state exemption
19 relied upon?
20         MR. MACPHAIL: Same objection and lack of
21 foundation.
22         THE WITNESS: I don't know.
23 BY MR. FISCHER:
24     Q. Focusing on --
25     I want to focus just for a couple minutes on the

Page 95

1  attorney opinion letters provided by the issuer to
2  Pacific. So I think we already marked an exhibit from
3  Ms. Sourlis. It was Exhibit 2, I believe. I'm going to
4  focus just your attention on this document generally.
5      I know you testified earlier that having an
6  opinion letter from the issuer, the purchaser, was a
7  requirement in connection with the transaction, but do
8  you have any understanding as to why it was required.
9          MR. DUNNIGAN: Objection to form.
10         THE WITNESS: To determine how the shares
11 were acquired.
12 BY MR. FISCHER:
13     Q. Do you have any understanding of whether there's
14 any legal requirement that Pacific obtain an attorney
15 opinion letter in connection with a Rule 504(b)(1)(iii)
16 transaction?
17         MR. DUNNIGAN: Objection to form.
18         THE WITNESS: I don't know.
19 BY MR. FISCHER:
20     Q. Did -- bear with me one second.
21     Are there any security --
22     Are there any security issuances that Pacific
23 would issue or transfer without an attorney opinion
24 letter?
25

Page 96

1      JOSLYN CLAIBORNE
2          MR. DUNNIGAN: Objection to form.
3          THE WITNESS: Can you be more specific?
4          MR. FISCHER: Let me rephrase it.
5  BY MR. FISCHER:
6      Q. Would an attorney opinion letter be required for
7  every share, issuance, or transfer by Pacific?
8      A. Again, that's still not being specific enough.
9          MR. MACPHAIL: Can I try?
10         MR. FISCHER: Please.
11         THE WITNESS: Sure.
12         MR. MACPHAIL: Currently you do -- or you're
13 responsible for 144 legend removals; is that correct?
14         THE WITNESS: That is correct.
15         MR. MACPHAIL: And your staff is responsible
16 for that, and you know, Joslyn, that a legal opinion is
17 required for that?
18         THE WITNESS: Correct.
19         MR. MACPHAIL: For a 144; right?
20         I think --
21         As of right now, are you aware of any other
22 types of transactions for which a legal opinion is
23 required?
24         THE WITNESS: No.
25         MR. MACPHAIL: Besides the 144.

Page 97

1      JOSLYN CLAIBORNE
2          THE WITNESS: Just the 144s.
3          MR. MACPHAIL: So it appears to be somewhat
4  unusual to require an opinion just based on because
5  there's other types of transactions that don't require
6  an opinion; right?
7          THE WITNESS: That is correct.
8          MR. MACPHAIL: So would you agree that back
9  when Pacific was processing Rule 504, the fact that
10 there were opinion letters needed was, you know,
11 indicated that this was somewhat of an unusual type of
12 transaction as well?
13         THE WITNESS: Correct.
14         MR. MACPHAIL: Okay. Does that get you what
15 you needed?
16         MR. FISCHER: It does. Thank you, Mike.
17 BY MR. FISCHER:
18     Q. Focusing back on Ms. Sourlis' opinion letter. Do
19 you know whether anyone at Pacific would review these
20 opinion letters, review this kind of an opinion letter
21 in connection with a Rule 504 transaction?
22         MR. DUNNIGAN: Objection to form.
23         THE WITNESS: Yes.
24 BY MR. FISCHER:
25     Q. Who would do that?

25  (Pages 94 to 97)

JOSLYN CLAIBORNE

A. Joanna or Leslie.

Q. Now, do you know whether someone would be reviewing the opinion to just make sure that an opinion was obtained, or was the review done to look at certain things within the opinion letter?

MR. MACPHAIL: Object to the form.

MR. DUNNIGAN: Same.

THE WITNESS: From the checklist, it seemed that they need to be obtained so they could forward it to counsel for further review.

BY MR. FISCHER:

Q. And do you know whether --

I guess my question is: Do you know whether anyone internally at Pacific was looking at the substance of this opinion letter?

MR. MACPHAIL: Objection to form.

THE WITNESS: They're not lawyers, so I assume that's why they sent it to counsel to look at the substance before processing.

MR. FISCHER: Okay.

MR. MACPHAIL: May I?

MR. FISCHER: Please.

MR. MACPHAIL: You look at legal opinions nowadays on 144 requests; is that correct?

JOSLYN CLAIBORNE

THE WITNESS: Yes.

MR. MACPHAIL: And you do have personal knowledge about what you do when you look at one of those opinions and when your staff does it; right?

THE WITNESS: Yes.

MR. MACPHAIL: By way of example, would you please tell them what is the purpose or what do people do when they're reviewing the 144 opinion?

THE WITNESS: When I'm reviewing a 144 opinion, I'm looking for the correct date, I'm looking for it to be addressed to Pacific Stock Transfer, and I'm looking for it to have elements pertaining to Rule 144 covered within that to show that the issuer and the shareholder have done all the things required to remove the legend.

BY MR. FISCHER:

Q. And so would you have --

I know you weren't responsible for the Rule 504 transactions, but would you have expected someone in the position of reviewing these to have reviewed them for similar issues that you're reviewing 144 transactions for now?

MR. DUNNIGAN: Objection to form.

MR. FISCHER: If you know?

JOSLYN CLAIBORNE

THE WITNESS: I don't know.

BY MR. FISCHER:

Q. What would you -- what do you think?

MR. DUNNIGAN: Objection to form.

MR. MACPHAIL: Same objection.

THE WITNESS: What I think is there may have been some criteria such as address to Pacific Stock Transfer, a current date, and maybe some other thing that's general and common that didn't require a lawyer to review it beforehand, and then sending it to the lawyer for final review.

MR. FISCHER: Okay.

MR. MACPHAIL: Could I ask just one final question on this topic?

MR. FISCHER: Sure.

MR. MACPHAIL: If you ever saw a legal opinion that appeared to be obviously wrong, would Pacific allow that transaction to proceed?

THE WITNESS: No.

MR. MACPHAIL: Okay. What would you do if you saw a legal opinion that for whatever reason appeared to be obviously wrong?

THE WITNESS: I would forward it to our office of general counsel.

JOSLYN CLAIBORNE

MR. FISCHER: Okay.

BY MR. FISCHER:

Q. So obviously Pacific has an interest in obtaining legal opinions that are right?

A. Correct.

MR. DUNNIGAN: Objection to form.

BY MR. FISCHER:

Q. And letters that are right as a factual matter; correct?

A. Correct.

Q. And letters that are right as a legal matter; correct?

A. Correct.

Q. And would Pacific have issued or transferred shares pursuant to Rule 504(b)(1)(iii) without an attorney opinion letter like the one authored by Ms. Sourlis in Exhibit 2?

A. They would not have issued shares without an opinion letter period.

Q. Okay. We've talked a little bit about --

We've shown you a document from Virginia Sourlis, and that's just an example.

Are you aware of other attorneys who wrote Rule 504(b)(1)(iii) opinion letters to Pacific during the 2009

Page 102

JOSLYN CLAIBORNE

1
2 to 2012 time frame?
3     MR. DUNNIGAN: Objection to form.
4     THE WITNESS: In my review of the
5 documentation, I saw several lawyers who provided
6 opinion letters.
7 BY MR. FISCHER:
8 Q. In your role --
9     I think you testified earlier that generally it's
10 the issuers that are your clients; correct?
11 A. The issuers, brokers, shareholders.
12 Q. Would Pacific have any interaction with the
13 purchasers of the shares in a Rule 504(b)(1)(iii)
14 transaction?
15 A. The purchaser being?
16 Q. The person or entity to whom the shares are being
17 transferred?
18     MR. MACPHAIL: The shareholder.
19     THE WITNESS: That's a possibility, yes.
20 BY MR. FISCHER:
21 Q. So when you say shareholder, is that who you're
22 referring to, the ultimate transferee?
23 A. Yes. That's the shareholder.
24 Q. That's a helpful clarification.
25     And when you're referring to broker, who are you

Page 103

JOSLYN CLAIBORNE

1
2 referring to?
3 A. Merrill Lynch, Scott Trade, TD Ameritrade.
4 Q. And I'm going to ask a leading question, but is a
5 broker someone who may take custody of the shares on
6 behalf of a shareholder?
7 A. Yes.
8     MR. DUNNIGAN: Objection to form.
9     MR. FISCHER: Off the record.
10     (A brief discussion was held off the record.)
11 BY MR. FISCHER:
12 Q. Okay. Just give me one second, guys.
13     We spoke about the checklist and the requirement
14 that all 504 requests need to be approved by Jaclin
15 before we can proceed.
16     Do you remember that issue that we discussed a
17 little while ago?
18 A. Briefly.
19 Q. I'm going to focus on some questions now relating
20 to the review of 504 transactions by external counsel
21 for Pacific. Okay?
22 A. Okay.
23 Q. Okay. And you had mentioned the law firm of
24 Anslow & Jaclin?
25 A. Correct.

Page 104

JOSLYN CLAIBORNE

1
2 Q. And you understood that they were reviewing
3 transactions or shares that were issued or transferred
4 pursuant to Rule 504(b)(1)(iii); correct?
5     MR. DUNNIGAN: Objection to form.
6     THE WITNESS: 1 understand that they
7 reviewed all requests.
8 BY MR. FISCHER:
9 Q. What is a request?
10 A. For shares to be issued.
11 Q. So what does the term requests mean in that
12 context?
13 A. This package right here is a request before it
14 went into final (indicating).
15 Q. And so what documents would Jaclin have available
16 to it if it reviewed a request?
17 A. The board resolution, the opinion letter, the
18 subscription agreement, the officer's cert, the
19 statement of non affiliation, and a corporate
20 resolution.
21 Q. So all, all of the required documentation?
22 A. Yes.
23 Q. And do you have any understanding of whether that
24 requirement that all requests needed to be approved by
25 Jaclin -- withdrawn. I'm going to withdraw that.

Page 105

JOSLYN CLAIBORNE

1
2     You mentioned the law firm Anslow & Jaclin. Are
3 you aware of whether Pacific employed any other external
4 lawyers to approve requests before proceeding in a Rule
5 504(b)(1)(iii) transaction?
6 A. I don't know.
7 Q. Exhibit 4 says all requests to be approved by
8 Jaclin.
9     Are you familiar with anyone by the last name of
10 Jaclin? Let me withdraw that. It's a terrible question.
11     Are you aware of the individual attorneys at the
12 law firm of Anslow & Jaclin who did work relating to
13 approving requests in 504(b)(1)(iii) transactions?
14 A. No.
15 Q. Have you ever heard the name Gregg Jaclin?
16 A. Yes.
17 Q. Is that someone who you think did work relating
18 to approving requests in Rule 504(b)(1)(iii)
19 transactions?
20     MR. DUNNIGAN: Objection to form.
21     THE WITNESS: I don't know.
22 BY MR. FISCHER:
23 Q. Have you ever heard the name -- bear with me --
24 Ron Ben-Bassat?
25 A. No.

27 (Pages 102 to 105)

| | Page 110 | | Page 111 |
|---|---|---|---|

**Page 110**

1         JOSLYN CLAIBORNE
2   BY MR. FISCHER:
3     Q. Before I ask you questions about that document,
4   let me ask you a general question.
5     Based on either your own personal knowledge or
6   documents reviewed yesterday, are you aware of any kinds
7   of materials or information that outside counsel
8   ultimately requested that the issuer or client provide
9   in connection with a Rule 504 transaction?
10       MR. DUNNIGAN: Objection to form.
11       THE WITNESS: I saw a lot of documents
12   yesterday. I didn't have time to read each and every
13   email.
14       MR. FISCHER: Okay.
15   BY MR. FISCHER:
16     Q. Why don't you take a look at this email here,
17   which is an email -- Exhibit 7, which is an email from
18   Leslie Eldridge of Pacific Stock to Richard Stilitino
19   regarding King Resources, Inc.
20     Ms. Eldridge writes, "Good morning. After review
21   by outside counsel, he is requesting an BOD, all
22   capitals, resolution that authorizes the issuance of
23   stock."
24     Does that give you a sense of -- withdrawn.
25     Does that give you any understanding as to the

**Page 111**

1         JOSLYN CLAIBORNE
2   type of information outside counsel was requesting?
3       MR. DUNNIGAN: Objection to form.
4       THE WITNESS: Outside counsel was requesting
5   what was on the checklist, a board resolution and an
6   officer certificate.
7     So apparently, this person didn't send it.
8       MR. FISCHER: Got it.
9   BY MR. FISCHER:
10     Q. They wanted to make sure they had all the
11   relevant documents?
12       MR. DUNNIGAN: Objection to form.
13       THE WITNESS: That is correct.
14   BY MR. FISCHER:
15     Q. Again, I want --
16     We talked a little bit about it earlier, but I
17   want to focus a little bit now on questions relating to
18   state law, state registration exemptions, as they apply
19   to Rule 504(b)(1)(iii). So I'm going to ask you some
20   questions about state registration exemptions. Okay?
21     A. Okay.
22     Q. Do you have any understanding as to the most
23   common state registration exemption that was relied on
24   by Pacific's clients in connection with Rule 504
25   transactions?

**Page 112**

1         JOSLYN CLAIBORNE
2       MR. DUNNIGAN: Object to the form.
3       MR. MACPHAIL: Object to the form.
4       THE WITNESS: I don't know.
5   BY MR. FISCHER:
6     Q. You don't know which state was relied on more
7   than others, if at all?
8       MR. DUNNIGAN: Objection to form.
9       THE WITNESS: I don't know.
10   BY MR. FISCHER:
11     Q. Do you think that would be reflected on the Rule
12   504 spreadsheet that is identified in the checklist?
13       MR. DUNNIGAN: Objection to form.
14       THE WITNESS: Why would it?
15   BY MR. FISCHER:
16     Q. Do you think it would? The state registration
17   exemption that the transaction was relying on the issue
18   of the shares?
19       MR. DUNNIGAN: Objection. Form.
20       MR. MACPHAIL: Calls for speculation.
21       THE WITNESS: I don't know.
22       MR. FISCHER: Okay. Fair enough.
23   BY MR. FISCHER:
24     Q. Are you aware of any procedure in which Pacific
25   was attempting to determine whether the state law, the

**Page 113**

1         JOSLYN CLAIBORNE
2   state registration exemption, relied upon was actually
3   applicable?
4       MR. DUNNIGAN: Objection. Form.
5       THE WITNESS: Based on the spreadsheet, I
6   don't know. This is the criteria --
7       MR. MACPHAIL: The checklist you mean?
8       THE WITNESS: The checklist. I'm sorry.
9   This is the criteria we were looking for.
10       MR. FISCHER: Okay.
11   BY MR. FISCHER:
12     Q. I'm just going to have you take a look again at
13   Exhibit 2, second page of that document, which is the
14   opinion letter from Virginia Sourlis addressed to
15   Pacific Stock Transfer.
16     Do you see that?
17     A. Yes.
18     Q. Can you tell from this opinion letter what state
19   securities registration exemption this transaction is
20   relying on?
21     A. Delaware.
22     Q. Do you know whether anyone at Pacific, internal,
23   had any communications with any Delaware regulators
24   about the meaning of the Delaware registration exemption
25   cited in Ms. Sourlis's letter?

Page 118

JOSLYN CLAIBORNE

1  JOSLYN CLAIBORNE
2  Establishing An Exemption and Notice Filing Requirement
3  For Offerings Qualifying For Exemption Under SEC Rules
4  504 and 505."
5      Do you see that?
6  A. Yes.
7  Q. Do you know whether or not that's the order
8  that's referenced in Ms. Eldridge's July 21, 2011,
9  email?
10 A. No.
11 Q. You don't know?
12 A. No, I don't know.
13 Q. Have you ever seen that order before?
14 A. Not that I can recall, no.
15 Q. Did you see it in your preparation session with
16 your counsel?
17 A. I can't recall.
18     MR. MACPHAIL: Can I ask a clarifying
19 question?
20     MR. FISCHER: Absolutely.
21     MR. MACPHAIL: If this was included in the
22 documents that you looked at, is it possible that you
23 reviewed this among other documents, Joslyn?
24     THE WITNESS: Yes.
25     MR. MACPHAIL: Okay.

Page 119

JOSLYN CLAIBORNE

1  JOSLYN CLAIBORNE
2      MR. FISCHER: I'm going to ask you to put
3  that off to the side.
4  BY MR. FISCHER:
5  Q. I'm going to ask you to turn back to Exhibit 5,
6  which is the MHTN-PGI Energy, Inc., Certificate
7  Transaction Journal. And I'm going to ask you to turn
8  to page -- again, there's some numbers at the bottom of
9  the right-hand side of the page. The last three numbers
10 I want you to focus on are 155.
11     MR. DUNNIGAN: That's the Bates stamp?
12     MR. FISCHER: Yes.
13 BY MR. FISCHER:
14 Q. Do you see that document? The title of it
15 "Issuance Correspondence Sheet."
16     Do you see that?
17 A. Yes.
18 Q. What's an issuance correspondence sheet?
19 A. It is a note pad.
20 Q. What is it intended to reflect?
21 A. Notes for this transaction.
22 Q. So looking at this document, it says date
23 received, 4/5, the issuer is PGI Energy, and then
24 there's some dates followed with some entries.
25     Do you see that?

Page 120

JOSLYN CLAIBORNE

1  JOSLYN CLAIBORNE
2  A. Yes.
3  Q. By the way, do you recognize the handwriting on
4  this document?
5  A. Yes.
6  Q. Whose is it?
7  A. It appears to be Leslie's.
8  Q. And do you know what Leslie was trying to reflect
9  in filling out this issuance correspondence sheet?
10     MR. DUNNIGAN: Objection to form.
11     MR. MACPHAIL: Same objection.
12     THE WITNESS: It appears that she was
13 following up.
14 BY MR. FISCHER:
15 Q. Do you ever fill out issuance correspondence
16 sheets, or have you ever filled out issuance
17 correspondence sheets here at Pacific?
18 A. Yes.
19 Q. And when you filled them out, what are you
20 intending -- why are you filling them out?
21 A. As a record of who you corresponded with. It's a
22 method of keeping notes to know what was done and what
23 is needed to move forward. In case she didn't complete
24 this transaction, the next person would be able to.
25 Q. Let's just go through the dates and the follow

Page 121

JOSLYN CLAIBORNE

1  JOSLYN CLAIBORNE
2  ups.
3      So there's a column entitled "Date" and there's a
4  column entitled "Follow-up."
5      Do you see that?
6  A. Yes.
7  Q. The first row says date, April 5th. Follow-up,
8  need statement on non-afill from shareholder; received
9  4/5.
10     Do you see that?
11 A. Yes.
12 Q. Any understanding what that means?
13 A. It appears that there was a statement of non
14 affiliation needed from a shareholder.
15 Q. And?
16 A. And she requested it, and she received it on that
17 date.
18 Q. And then the next entry is at 2:31 p.m., the same
19 date April 5th. Forwarded to Jaclin and Ron for
20 approval.
21     Do you see that?
22 A. Yes.
23 Q. And do you believe that that's the same Jaclin
24 that's referenced in the checklist as identified as
25 outside counsel?

31 (Pages 118 to 121)

Page 126

JOSLYN CLAIBORNE

1
2  Q. But letters of instruction would be required as
3  part of a Rule 504(b)(1)(iii) transaction?
4  A. It is not here on the checklist, but normally the
5  instructions are within the corporate resolution and the
6  officer statement and the board resolution.
7  Q. Okay. So this may relate to what we discussed
8  earlier this morning, and I think we failed to talk
9  about some extra documents that I forgot exactly how he
10  put it, but some documents that, you know, may not be on
11  the checklist. But as part of your review, you've seen
12  them, and they were used in connection with Rule
13  504(b)(1)(iii) transactions; is that right?
14         MR. DUNNIGAN: Objection to form.
15         MR. MACPHAIL: Same objection
16         THE WITNESS: Correct.
17  BY MR. FISCHER:
18  Q. Then I want to focus on page 136. Document is
19  entitled "Entity Subscription Agreement-Common Shares."
20         Is this a document that was required under the
21  procedures relating to Rule 504(b)(1)(iii) transactions?
22  A. Yes.
23  Q. It's a subscription agreement?
24  A. Yes.
25  Q. And then I'd like you to focus on page 141.

Page 127

JOSLYN CLAIBORNE

1
2  There's a document entitled "Unanimous Written Consent
3  In Lieu of a Meeting of The Board of Directors of PGI
4  Energy."
5         Do you see that?
6  A. Yes.
7  Q. What is this document?
8  A. A board resolution.
9  Q. Is this the board -- kind of document that would
10  be required --
11  A. Yes.
12  Q. -- under Exhibit 3?
13  A. Yes.
14  Q. Focusing you now on page 143. It's a letter from
15  Thomas E. Boccieri, Esq., to Pacific Stock Transfer
16  dated April 4, 2011.
17         Do you see that?
18  A. Yes.
19  Q. What is this document?
20  A. A legal opinion.
21  Q. Is this a document that was required under
22  Pacific Stock's procedures for Rule 504(b)(1)(iii)
23  transactions?
24  A. Yes.
25  Q. I want you to focus on page 148. A letter to Mr.

Page 128

JOSLYN CLAIBORNE

1
2  Boccieri and Pacific Stock from Edward Bronson, the sole
3  managing member of E-Lionheart Associates, dated --
4         MR. DUNNIGAN: I'm sorry. What Bates?
5         MR. FISCHER: 148.
6  BY MR. FISCHER:
7  Q. Dated April 5, 2011. It says, "This is in
8  connection with the (on or about) April 5, 2011, sale of
9  44,000,000 shares of common stock," and I'm going to
10  skip some lines. "The undersigned hereby confirms to
11  you that E-Lionheart Associates, LLC, is not now and has
12  not been during the preceding 90 days, an officer,
13  director, 10 percent or more shareholder of the company
14  or in any other way an "affiliate" of the company."
15         Do you see that?
16  A. Yes.
17  Q. What is this document?
18  A. A statement of non affiliation.
19  Q. Was this required under the procedures for Rule
20  504(b)(1)(iii)?
21  A. Yes.
22  Q. Okay. And then focusing you on page 152.
23         What is this document?
24  A. Officer's certificate.
25  Q. Is it something that was required under the

Page 129

JOSLYN CLAIBORNE

1
2  procedures for issuing and transferring securities under
3  Rule 504(b)(1)(iii)?
4  A. According to the checklist, yes.
5  Q. In connection with your work here at Pacific,
6  have you ever heard the term Nexis?
7         MR. DUNNIGAN: Objection to form.
8         MR. FISCHER: I can ask a different question
9  or differently phrased question.
10  BY MR. FISCHER:
11  Q. In connection with your work here at Pacific,
12  have you ever heard the term Nexis as it relates to a
13  securities issuance?
14  A. I don't know what that is.
15  Q. Put this off to the side. Actually, I'm sorry.
16  I'm going to ask you to take it back out again. It's
17  Exhibit -- we were just on Exhibit 5; right?
18  A. (Nods head.)
19  Q. If you look at Exhibit 5, can you just look at
20  the first page and kind of summarize sort of what's on
21  there, what's happening?
22  A. Page 126?
23  Q. You got it. You're an expert in Bates numbers
24  now.
25  A. This is a single transaction journal.

33 (Pages 126 to 129)

# Joslyn Claiborne Deposition Exhibit 2

| From: | Virginia Sourlis [Virginia@SourlisLaw.com] |
|---|---|
| Sent: | Wednesday, October 21, 2009 8:53 PM |
| To: | Pacific Stock Transfer (Joanna); Pacific Stock Transfer (Stacey) |
| Cc: | Rusind@aol.com; Mark Grober |
| Subject: | October 21, 2009 - 504 legal opinion - Russell Industries |
| Attachments: | October 21, 2009 RIND -Sourlis Law firm 504 Delaware Legal Opinion.pdf |

Please find attached our October 21, 2009 Legal Opinion for RIND.

Kindly process accordingly.

Thank you.

*Warmest Regards,*
Virginia K. Sourlis, Esq.

# The Sourlis Law Firm
Securities and Corporate Attorneys

.
The Sourlis Law Firm
Virginia K. Sourlis, Esq.
214 Broad Street
Red Bank, New Jersey 07701
Phone: (732) 530-9007
Cell: (732) 610-5582
Fax: (732) 530-9008
Email: Virginia@SourlisLaw.com
Website: www.SourlisLaw.com

*Credit Cards Accepted*:
**VISA   MASTERCARD   AMEX**

CONFIDENTIALITY NOTICE: E-mail may contain confidential information that is legally privileged, attorney work product or exempt from disclosure under applicable law.  Do not read this e-mail if you are not the intended recipient.  This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged.  If you are not intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail, by forwarding this to Virginia@SourlisLaw.com or by telephone at (732) 530-9007, and destroy the original transmission and its attachments without reading or saving in any manner. Thank you.
††††††††††††††††††††††††††††††††††††††††††††††††††

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.423 / Virus Database: 270.14.25/2450 - Release Date: 10/21/09 16:44:00





# THE SOURLIS LAW FIRM
### Securities and Corporate Attorneys

Virginia K. Sourlis, Esq., MBA*
Philip Magri, Esq.+
Joseph M. Patricola, Esq.*+#

* Licensed in NJ
+ Licensed in NY
# Licensed in DC

214 Broad Street
Red Bank, New Jersey 07701
(732) 530-9007  Fax (732) 530-9008
www.SourlisLaw.com
Virginia@SourlisLaw.com

October 21, 2009

Pacific Stock Transfer
500 East Warm Springs Road
Suite 240
Las Vegas, NV 89119

> **Re:** **Russell Industries, Inc. (the "Company" or "Issuer")**
> **Delaware Legal Opinion for the Issuance of 504 Shares of Common Stock**
> **93,000,000 shares of *free*-trading shares**

Dear Sir or Madam:

We have been requested to provide you with a legal opinion as Securities Counsel for the Company with respect to the Company's sale and issuance of **93,000,000** *free*-trading common shares of the Company (the "Shares") to **E-Lionheart Associates, LLC** (the "Purchaser"), a company formed and authorized to transact business within the State of Delaware, in an offering exempt from registration under the Securities Act of 1933 ( the "Securities Act") pursuant to Rule 504 of Regulation D promulgated thereunder, Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

In connection with this opinion, we have reviewed applicable federal and state laws, rules and regulations and have made such investigations and examined such documents and material related to the Company and the Purchaser as we have deemed necessary and appropriate under the circumstances, including, but not limited to, the following:

1.  SEC Regulation D, especially Rules 501, 502, 503 and 504 thereunder.
2.  Section 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.
3.  Articles of Incorporation of the Company as filed with the State of Delaware and Bylaws adopted by the Company.
4.  Various corporate books and records, including minutes of directors meetings and resolutions of the Company's Board of Directors related to the authorization and issuances of the Shares;
5.  A certificate of the Company's president stating that the Company:

      a.  is not a reporting company under the 1934 Securities Exchange Act;

      b.  is an operating company with a specific business plan; and

      c.  has not sold securities pursuant to exemption under Rule 504 within the past twelve (12) calendar months in an aggregate dollar amount that would preclude the contemplated sales of Shares under that rule.

6.     Subscription Agreement executed by the Purchaser, including various representations of the parties therein.

## The Law

*Rule 504 Exemption.*

Section 5 of the Securities Act requires with certain exceptions, that all securities involved in an original distribution by the issuer must be registered. Regulation D promulgated under Section 3(b) of the Securities Act provides several means by which an issuer which is not subject to the reporting requirements of Section 13 and 15(d) of the Securities Exchange Act and is neither an investment company nor a blank check company may make an offer and sale of securities without registration upon satisfaction of certain requirements.

Rule 504 is available to any company that, at the time of the offering:

1. is not a "reporting company";

2. is not a development stage company that either had no specific business plan or purpose or had indicated that its business plan was to engage in a merger or acquisition with an unidentified company or entity;

3. if the issuer has utilized Rule 504 within the last twelve calendar months, the dollar amount of the offering may not have exceeded $1,000,000;

4. each investor is a bona fide resident of the state(s) where the offering is made; and

5. the investor was not, prior to, nor would be subsequent to, the offering an "affiliate" of the issuer.

On April 7, 1999, revisions to Rule 504 went into effect that prohibit general solicitation and general advertising of the offering by the issuer and which provide that securities issued under the Rule will be restricted, unless certain specified conditions are met.  These conditions are:

1. the shares issued pursuant to the offering are issued under a state law exemption requiring public filing and delivery of a disclosure statement (often termed Offering Materials) prior to offer and sale; or

2. the shares issued pursuant to the offering are issued under a state law exemption that permits general solicitation and general advertising, available in only a minority of the states (including Delaware), when the offer is limited to only accredited investors as defined in Rule 501(a) of Regulation D.

2

DEFS-182472

If either state standard is met, consistent with Rule 504, the shares issued pursuant to the offering are not restricted and are freely tradable on any secondary market.

Consequently, the shares issued pursuant to such an offering may be issued by the Company without affixing to the associated stock certificate a restrictive legend as to resale, may be delivered to the Purchaser upon full payment of the associated purchase price and may be freely traded unless the Purchaser were to become an affiliate of the Company (perhaps through later purchases or their principals were to be become an officer or director of the Company).

Rule 504 of Regulation D requires a filing within 15 days of the date of commencement of a given offering period. While there is no penalty for a late filing, the Company will need to file a Form D with regard to this new offering period.

*Delaware Exemption.*

Section7309(b)(8) of the Delaware Securities Act provides for an exemption from the registration and notice filing requirements set forth in Sections 7304, 7309A, and 7312 of the Delaware Securities Act where the transaction involves any offer or sale to an institutional buyer.

Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act defines "Institutional Buyer" to include an "accredited investor" as defined in SEC Rule 501(a)(1)-(4), (7) and (8), excluding, however, any self-directed employee benefit plan with investment decisions made solely by persons that are "accredited investors" as defined by Rule 501(a)(5)-(6) . Pursuant to SEC Rule 501(a)(8), an entity in which all of the equity owners are "accredited" (as defined in Rule 501(a)(5)-(6)) comes within the definition of "accredited investor".

Therefore, the Delaware Securities Act provides for an exemption from the registration and notice filing requirements as set forth in Section 7304, 7309A, and 7312 of the Delaware Securities Act where the investor is a validly formed business entity in which all of its equity owners are accredited in accordance with Rule 501(a)(5)-(6)). Not exempted under this provision are sales to individuals who are accredited investors under SEC Rule 501(a) (5) and (6).

No filings are required and there is no restriction prohibiting general advertising or general solicitation or requiring investment intent.

## Legal Opinion

Based on the foregoing, and subject to the qualifications set forth herein, it is our opinion that:

The Company is not a reporting company under the 1934 Securities Exchange Act., and intends to make an offering for purchased securities for its own account, which, if aggregated with all securities sold during the preceding 12 months, will not exceed $1,000,000.

The Purchaser is (i) an accredited investor as defined in Rule 501(a) of Regulation D of the Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act (ii) an "institutional buyer" as set forth in Section7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act, (iii) is purchasing the Shares for its own account and

3

was not formed for the specific purpose of acquiring the Shares, and therefore has complied with applicable federal and state law and qualifies for the exemption from registration set forth in the Securities Act pursuant to Rule 504 of Regulation D, Section7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act

Further, the Purchaser is **not** (i) the Issuer, (ii) an underwriter of the Issuer with respect to the Shares (within the meaning of Section 2(11) of the Securities Act) (iii) an affiliate of the Issuer (within the meaning of Rule 144(a)(1) under the Securities Act, (iv) acting in concert within the meaning of Rule 144(e)(3)(vi) nor will they be acting in concert between the Purchasers and any affiliates of the Company or any other persons involving public sales of the Company's unregistered common shares under Rule 144, (v) in common ownership with any of the Purchasers of the respective companies in this offering, nor has any affiliation with any officers or affiliates of the Company, accordingly, the Shares may be issued and delivered to the Purchaser upon full payment of the associated purchase price **without a restrictive legend** under the Securities Act of 1933, as amended.

As to matters of fact, we have relied on information obtained from public officials, officers of the Company, and other sources, and we represent that all such sources were believed to be reliable. We have relied upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser has a legitimate investment intent in purchasing the Shares, and the Purchaser's representations as to its net worth and investment intent. The undersigned is licensed only in the State of New Jersey and this opinion covers, in part, Delaware statutory law, where the undersigned is not licensed.

We have made no independent attempt to verify facts provided us and set forth herein and that all signatures, documents or copies submitted to us are genuine and authentic. This opinion is limited to and conditioned upon, the facts as stated herein as of the date hereof. I disclaim any undertaking to advise you if changes in law or fact which may affect the continued correctness of any of my opinions occur as of a later date.

This opinion is solely for the use of the Company and its transfer agent, and may not be published or provided to any other person or entity without written permission from the undersigned.

Very truly yours,

The Sourlis Law Firm

*Virginia K. Sourlis*

Virginia K. Sourlis, Esq.

4

# Joslyn Claiborne Deposition Exhibit 3

## Treasury Issuance Checklist

**DOCUMENTS**

- ❏ Check A/R report OR Payment Arrangement List
- ❏ Board of Director's Resolution/Minutes of the meeting/Secretary's certificate authorizing the issuance
- ❏ Resolution/instructions should state whether the stock is restricted or free trading
- ❏ Name, address and Tax ID of shareholders
- ❏ Shipping instructions (Cannot ship to PO Boxes)
- ❏ Confirmation the shares are fully paid and non-assessable (this may be stated either in the resolution/letter/email)
- ❏ We need to know if we are to use the standard legend or a special legend.
- ❏ Affiliate Status of shareholders
- ❏ Cost Basis information (price per share and date acquired)
- ❏ When issuing certificate make sure restriction is correct (i.e. R, RSL etc)

**S-8 STOCK & S-1 STOCK (free trading)**

- ❏ Need all of the above with a letter/email from counsel that states the shares are validly issued pursuant to the registration statement. S-1 has all holders listed.
- ❏ Use Reservation for S8s. (can be obtained from STMS cap for shares left).
- ❏ These shares are free of restrictive legend.

**144 FREE TRADING STOCK**

- ❏ Need all of the above with the documentation to support a free trading issuance, such as a legal opinion and the associated documents used by counsel to write the opinion etc.
- ❏ If there is a convertible note, agreement etc, you need a notice of conversion. If the shares are being transferred from the note holder to a new holder, you will need a stock power/stock purchase agreement etc.
- ❏ Statement of Non-Affiliation from note holders and any shareholders receiving the shares.
- ❏ Corporate Resolution that states that the individual that signed documents submitted is authorized to sign, sell and transfer securities on behalf of that Company. It also must include a signature specimen of that individual.
- ❏ These shares are free of restrictive legend.
- ❏ Update ITAI spreadsheet (if applicable)

**504 SHARES (free trading w/ a notation)**

- ❏ **All** requests need to be approved by Jaclin before we can proceed
- ❏ We need the board resolution, the opinion, subscription agreement, the officer's cert, (states they are not a shell etc) statement of non affiliation from the shareholder, and a Corp Resolution from the shareholder, if applicable.

- ❏ These shares are free of restrictive legend but should either be flagged as a 504 in stock track
- ❏ The 504 NOTATION should be on the back and the 504 stamp on the front.
- ❏ Additional fee of $300 or more for each 504
- ❏ If DE exemption, officers cert needs to confirm form D-1 was filed w. Commissioner w/in 15 days
- ❏ Update 504 spreadsheet.

## Completed Issuance Checklist

**CERTIFICATE**

- ❏ Make sure preferred shares are preferred and common shares are common.
- ❏ Process issuance as requested by the issuer (correct denominations and registrations).
- ❏ Check Control list for certificates with 1,000,000 shares or more.
- ❏ Certificate number printed on the certificate matches the pre-printed number.
- ❏ The certificate is formatted properly.
- ❏ Certificate is countersigned by an authorized transfer agent.
- ❏ The new certificate is stamped with the appropriate RESTRICTION STAMP (if applicable).
- ❏ OFAC check **ALL** new accounts you open, check off in Stock Track and stamp the instructions with the OFAC stamp

**SHIPPING**

- ❏ Certificates are sent to the individual or corporation specified in the SHIPPING instructions.
- ❏ Shipping address is correct.
- ❏ We charge the recipient (unless they sent supply a FedEx account number)
- ❏ Shipment specifies an **adult signature is required** and should be sent **PRIORITY** overnight.
- ❏ Receipt is printed.

**WORK ORDER**

- ❏ Single Transaction Journal is printed and attached (Stock Track) Invoice printed with your name on it (STMS).
- ❏ Work order is accurately filled out and includes the name of the transfer agent.

**ISSUANCE DOCUMENTS**

- ❏ Single Transaction Journal is printed
- ❏ Receipt for shipment is attached to backup paperwork.
- ❏ Transaction is MADE AVAILABLE with the date the certificate is shipped out at 4:00pm.
- ❏ Shipping information is accurately reflected in the MADE AVAILABLE

**\*\*\*If you have any questions or are unsure of any instructions, restrictions or additional paperwork please ask Joanna! It's better to be safe than sorry.**

EXHIBIT
3
Claiborne

# Joslyn Claiborne Deposition Exhibit 5

504

# MHTN - PGI ENERGY INC
**Certificate Transaction Journal**
**Transaction Number 654 Stock Class CS1**
**Control ID:**                          **New Issue**

04/07/2011  2:16 pm
Page 1 of 1

**Transaction Date 04/07/11**

| Registration | Certif. No | | Canceled | Issued |
|---|---|---|---|---|
| E-LIONHEART ASSOCIATES LLC<br>1000 N W ST STE 1200<br>WILMINGTON, DE 19801 | CS1 | 1830 | | 44,000,000 |
| | | | 0 | 44,000,000 |



**CONFIDENTIAL**              **PSTBRONSON000126**

# Log Sheet

Printed 04/07/11
2:19 pm

**Issue:** MHTN-PGI ENERGY INC

Received: 4/5/2011     How Received: EMAIL

From: PGI ENERGY                          ID/SCL#:

Tracking Number In: N/A

Contents:

Control Ticket:                            Transaction No: 654

SEC Item Count: 0

Completed: 4/7/2011     How Sent: FEDEX

Tracking Number Out:    7946 2624 7014

Sent To:        FAIRHILLS CAPITAL
                245 MAIN ST STE 390
                WHITE PLAINS, NY 10601
Certificate(s) sent:      CS1-1830
(or book entries confirmed)

Comments:

**CONFIDENTIAL**          **PSTBRONSON000127**

**FedEx**

Shipment Receipt
**Address Information**

**Ship to:**
FAIRHILLS CAPITAL

245 MAIN ST STE 390

WHITE PLAINS, NY
106012425
US
7023613033

**Ship from:**
   TRANSFER AGENT
PACIFIC STOCK
TRANSFER COMPANY
4045 S SPENCER ST #403

LAS VEGAS, NV
89119
US
702.361.3033

**Shipping Information**
Tracking number: 794626247014
Ship date: 04/07/2011
Estimated shipping charges: 18.26

**Package Information**
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 1LBS
Declared value: 0.00USD
Special Services: Adult signature required
Pickup/Drop-off: Use an already scheduled pickup at my location

**Billing Information**
Bill transportation to: PSTC-266
Your reference: MHTN-654
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

**Please Note**
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits. Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated

**CONFIDENTIAL**

**PSTBRONSON000128**

# MHTN - PGI ENERGY INC
## Stock Transfer - Final

04/07/11 02:15:54 PM
Page 1

Control Ticket Number:

Type of Stock being Transferred: CS1
Number of paper certificates being Transferred from: 0
Number of paper certificates being Transferred to: 1
Sale Amt. (per share) : $0.00000
Received 04/05/11 at 10:00
Item Count: 0

----- Transfer From -----

Transaction Number:   654

Transfer Date: 04/07/11
Total Shares: 44,000,000
Received From: PGI ENERGY

Tran Type: Not an Item
How Rcvd.: EMAIL

----- Transfer To -----

| Line # | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | Number of New Certifs | Shares per Certif |
|---|---|---|---|---|---|---|---|
| | | | | 1 | 514 E-LIONHEART ASSOCIATES LLC | 1 | 44,000,000 |

**CONFIDENTIAL**        **PSTBRONSON000129**



# PacificStockTransfer

## Proudly Serving Clients Since 1983

Work O

Date:     7-Apr

Transfer Department

STOCK TRACK

Check #:                              Amount:                 Transfer Agent:      LESLIE

Issuer ID:   MHTN              Transaction #: 654

**Bill To:   PGI ENERGY**

| Qty | Description | Rate | | Unit Price | |
|---|---|---|---|---|---|
| 1.00 | Certificates Issued | $ | 25.00 | $ | 25.00 |
| 0.00 | Certificates Cancelled (after 5) | $ | 2.00 | $ | . |
| 1.00 | FedEx Shipping Domestic | $ | 30.00 | $ | 30.00 |
| 0.00 | FedEx Shipping Canada | $ | 45.00 | $ | . |
| 0.00 | FedEx Shipping International | $ | 65.00 | $ | . |
| 0.00 | Legend Removal | $ | 50.00 | $ | . |
| 0.00 | Reject Fee | $ | 25.00 | $ | . |
| 0.00 | Rush Fee | $ | 100.00 | $ | . |
| 1.00 | Legal/Compliance fee (504) | $ | 300.00 | $ | 300.00 |
| 0.00 | Bond / Replacement Fee | $ | 50.00 | $ | . |
| 0.00 | Rescission of Shares | $ | 25.00 | $ | . |

**Total:        $355.00**

**CONFIDENTIAL**              **PSTBRONSON000130**

# ISSUANCE RESOLUTION

**CORPORATE RESOLUTION AUTHORIZING ISSUANCE OF NEW SHARES FROM NEW STOCK**

### PGI ENERGY, INC.
### COMPANY NAME (SECURITIES NAME)

### SHARES OF COMMON STOCK

Resolved, that the Company's Transfer Agent for the above class of stock for the above Company, is authorized by the Company to issue the shares described below and increase the outstanding shares on the books of the Company.

**ISSUANCE INSTRUCTIONS**

| REGISTERED NAME & ADDRESS | NUMBER OF SHARES | CERTIFICATE DATE | RESTRICTED OR FREE TRADING |
|---|---|---|---|
| E-LIONHEART ASSOCIATES, LLC Fairhills Capital 245 Main Street Suite 390 White Plains, NY 10601 | 44,000,000 | | FREE TRADING – RULE 504 |

I, THE UNDERSIGNED, A QUALIFIED DIRECTOR OF THE ABOVE NAMED COMPANY, DO HEREBY INDEMNIFY THE TRANSFER AGENT AND THEIR EMPLOYEES AGAINST ANY AND ALL ACTIONS TAKEN BY THE ABOVE COMPANY, AND CERTIFY THAT THIS IS A TRUE COPY OF A RESOLUTION, SET FORTH AND ADOPTED ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE, AND EFFECT.

X _____
DIRECTOR SIGNATURE

_MARCELLOUS McZEAL_
DIRECTOR'S NAME PRINTED

_4 · 4 · 11_
DATE

## MAILING INSTRUCTIONS

| COMPANY NAME / ATTENTION MAILING ADDRESS TELEPHONE NUMBER | EXPRESS OR MAIL INSTRUCTIONS | EXPRESS NUMBER (IF APPLICABLE) |
|---|---|---|
| Fairhills Capital 245 Main Street Suite 390 White Plains, NY 10601 | EXPRESS | |

**CONFIDENTIAL**          PSTBRONSON000131

## DISBURSEMENT REQUEST

**PGI Energy, Inc.,** and **E-Lionheart Associates, LLC** hereby request disbursement of funds in the amount and manner described below.

**Please disburse to:**  PGI Energy, Inc.
  Amount to disburse:  $100,000
  Form of distribution:  Wire
  Payee:

    Name:  PGI Energy Inc.
          7322 Southwest Frwy 2700 Post Oak Blvd.. 1700
          Suite 1100
          Houston, TX 77071 77056

    Bank Name:  Wells Fargo
    Bank Address:  1300 Post Oak Blvd. ste 100
    Bank Phone #:  713 626 8919
    Bank Fax #:  713 599 .7855
    ABA:  121000248
    Account #:  9246232483

  Amount to disburse:  $10,000
    Name:  BL Clark Holdings
    Bank Name:  _____
    Bank Address:  _____
    Bank Phone #:  _____
    Bank Fax #:  _____
    ABA:  _____
    Account #:  _____

**Total: $110,000**

PGiEnergy.Inc
~~Tensas, Inc.~~

By: _____  Dated: April 4, 2011
  Name: Marcellous S. McZeal
  Title: CEO

**E-Lionheart Associates, LLC**

By: _____  Dated: April 1, 2011
  Edward Bronson
  Sole Member and Manager

**CONFIDENTIAL**        **PSTBRONSON000132**

PGI Energy, Inc.
7322 Southwest Frwy, Suite 1100
Houston, TX 77074

April $\not{6}$, 2011

**VIA ELECTRONIC MAIL**

Pacific Stock Transfer Co
4045 South Spencer St, Suite 403
Las Vegas, NV 89119

      **Re:    PGI Energy Inc. (the "Company")**

Dear Sir:

      This letter authorizes you to issue a certificate representing 44,000,000 shares (the "Common Shares") of the Company to the party set forth on Schedule I attached hereto.

      The Common Shares to be issued have been duly authorized and validly issued and are fully paid and non-assessable.

      Please note that the certificate should **NOT** bear the standard 1933 Act legend.

      Please deliver the certificate to the party at its address set forth on Schedule I via overnight service.

      Please feel free to call us with any questions.

                   Sincerely,

                   Marcellous S. McZeal
                   CEO

**CONFIDENTIAL**          **PSTBRONSON000133**

## SCHEDULE I

| Name | Instruction | SS# or Tax ID # | No. of Shares |
|---|---|---|---|
| E-Lionheart Associates, LLC | Mail Instructions: Fairhills Capital 245 Main Street Suite 390 White Plains, NY 10601 | 202286364 | 44,000,000 |
|  |  |  |  |

**CONFIDENTIAL**        **PSTBRONSON000134**

April 5, 2011- INVESTOR GRID – RULE 504 OFFERING

## PGI ENERGY, INC.
### (a Delaware corporation)

| Name of Investor | State | Fed. ID No. | Amount To be paid | Total # Of FREE Shares |
|---|---|---|---|---|
| E-Lionheart Associates, LLC, a Delaware corporation 1000 N. West Street Suite 1200 Wilmington, DE 19801 **Issue Stock in the name of:** E-Lionheart Associates, LLC **Mail Instructions:** Fairhills Capital 245 Main Street Suite 390 White Plains, NY 10601 | DE | 202286364 | $50,000 | 44,000,000 |

PGI Energy, Inc.

By: _____
Marcellous S. McZeal
CEO

E-Lionheart Associates, LLC

By: _____
Edward Bronson
Managing Member

**CONFIDENTIAL**

PSTBRONSON000135

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE.

THE ACQUISITION OF THE SECURITIES OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.

## ENTITY SUBSCRIPTION AGREEMENT – COMMON SHARES

Ladies and Gentlemen:

The undersigned (the "Shareholder") acknowledges that PGI Energy Inc., a Delaware corporation (the "COMPANY") is offering for sale 44,000,000 shares of Common Shares ("Shares") and a S57,500 Promissory Note(s) ("Notes") for an aggregate purchase price of $110,000.00 (the Shares are referred to as the "Securities"). The undersigned further acknowledges that the issuance of the Shares is part of a private offering up to $818,500 Dollars by THE COMPANY (the "Offering") that is being made without registration of the Shares under the Securities Act of 1933, as amended (the "Securities Act"), and is being made only to "accredited investors." (as such term is defined in the rules to the Securities Act of 1933, as amended) pursuant to Regulation D, Rule 504 and Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

1        Subscription. Subject to the terms and conditions hereof, the undersigned hereby subscribes to the Shares in the amount set forth on the signature page hereof, which amount is payable as described in Section 4 hereof.

2.        Acceptance of Subscription and Issuance of Shares. It is understood and agreed that THE COMPANY shall have the sole right, at its complete discretion, to accept or reject this subscription, in whole or in part, for any reason and that the same shall be deemed to be accepted by THE COMPANY only when it is signed by a duly authorized officer of THE COMPANY, and delivered to the undersigned. Subscriptions need not be accepted in the order received, and the Shares may be allocated among subscribers. Notwithstanding anything in this Subscription Agreement (the "Agreement") to the contrary, THE COMPANY shall have no obligation to issue Shares to any person who is a resident of a jurisdiction in which the issuance of the Shares to it would constitute a violation of the securities, "blue sky" or other similar laws of such jurisdiction (collectively referred to as the "State Securities Laws"). It is intended that the Shares will only be issued to entities formed pursuant to the laws of the State of Delaware that maintain its principal place of business within the State of Delaware.

3.        The Closing. The closing of the issuance of each of the Shares sold shall take place at the discretion of THE COMPANY and at such other time and place as THE COMPANY shall designate by notice to the undersigned (each, a "Closing")

4.        Payment and Issuance of Shares. Payment for the Shares shall be received by THE COMPANY from the escrow agent by wire transfer of immediately available funds upon confirmation by the Company's Transfer Agent of the Shares availability by DWAC to the PURCHASER, or delivery of a physical stock certificate to the PURCHASER, in an amount of and as set forth on the signature page hereof. The COMPANY shall immediately instruct the transfer agent to issue the Shares upon the COMPANY's receipt of the following: (i) fully signed transaction documents (ii) escrow agent's confirmation of receipt of available funds and (iii) a legal opinion as to the offering and sale of the Shares from the COMPANY to the PURCHASER in reliance upon an exemption from the federal securities registration requirements.

5.        Representations, Warranties and Covenants of the PURCHASER and COMPANY.

5.1        Information Concerning the PURCHASER. The Purchaser hereby represents, warrants and covenants the following:

(a)        The Purchaser has all requisite authority to enter into this Agreement and to perform all the obligations required to be performed by the Purchaser.

(b)        The Purchaser is an entity formed pursuant to the laws of the State of Delaware and maintains its principal place of business within the State of Delaware.

**CONFIDENTIAL**                    **PSTBRONSON000136**

(c)     The Purchaser is an "accredited investor" as defined under Rule 501 of Regulation D.

(d)     The Purchaser is an "institutional investor" as defined under Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations pursuant to the Delaware Securities Act.

(e)     Each owner or member of the Purchaser is an "accredited investor" as such term is defined in the rules to the Securities Act of 1933, as amended.

(f)     The Purchaser will not engage in any activity that will constitute a distribution of the Shares and will not violate Regulation M or any other federal or state securities laws.

(g)     The Purchaser is experienced in such matters and understands the applicable laws and regulations.

(h)     The Purchaser will not engage in shorting the stock of the COMPANY.

(i)     The Purchaser is currently not an affiliate of the Company as that term is defined under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, and has not been an affiliate of the Company within the preceding 90 days. Furthermore, the acquisition of the securities referred to herein will not cause the undersigned to become an affiliate of the Company.

5.2     Information Concerning THE COMPANY. The COMPANY hereby represents, warrants and covenants the following:

(a)     The COMPANY understands that no federal or state agency has passed upon the Shares or made any finding or determination concerning the fairness or advisability of this investment.

(b)     The COMPANY, as of the date of this Agreement:

(i) is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Act of 1934, as amended (the "1934 Act"),

(ii) is not an investment company or a developmental stage company that either has no specific business plan or purpose,

(iii) has not sold securities pursuant to exemption under Rule 504 within the past twelve (12) calendar months in an aggregate dollar amount that would preclude the contemplated sales of Shares under that rule,

(iv) is otherwise in compliance with the requirements of Rule 504 of Regulation D with respect to the offerings contemplated hereby, and

(v) is able to and does hereby offer and sell the Shares only to "accredited investors" in accordance with the provisions of Rule 504 and applicable state law.

6.      Conditions to Obligations of the Undersigned and THE COMPANY. The obligations of the PURCHASER to purchase and pay for the Shares specified on the signature page hereof and of THE COMPANY to issue the Shares are subject to the satisfaction at or prior to the Closing of the sale of each Share of the following conditions precedent: (i) the representations, warranties and certifications of the PURCHASER and COMPANY contained in Section 5 hereof, shall be true and correct on and as of the Closing in all respects with the same effect as though such representations and warranties had been made on and as of the Closing; and (ii) the PURCHASER shall complete, execute and deliver this Agreement and all documents contemplated hereby and provided for herein and (iii) the PURCHASER shall have deposited the full purchase price for the Shares with the escrow agent to be released to the Company in accordance with Section 4 above.

7.      Brokers or Finder's Fees. Neither the undersigned nor THE COMPANY has entered into any agreement to pay any broker's or finder's fee to any third party with respect to this Agreement or the transactions contemplated hereby. The undersigned and THE COMPANY shall indemnify and hold each other harmless against any losses, claims, damages, liabilities or actions to which the other may become subject arising out of or based upon any broker's or finder's fees which are not the fault of such other party.

8.      Waiver; Amendment. Neither this Agreement nor any provisions hereof shall be modified, amended, discharged or terminated except by an instrument in writing, signed by the party against whom any modification, amendment, discharge or termination is sought. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set

2

forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same on any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

9.    Assignability.   Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by THE COMPANY (except to a subsidiary or parent entity of THE COMPANY) or the undersigned without the prior written consent of the other parties to this Agreement.

10.    Governing Law.   THIS AGREEMENT SHALL BE CONSTRUED, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER DETERMINED, IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE RIGHTS AND DUTIES OF THE PARTIES; PROVIDED, HOWEVER, THAT ALL LAWS PERTAINING OR RELATING TO CORPORATE GOVERNANCE OF THE COMPANY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE CORPORATE GOVERNANCE OF THE COMPANY

11.    Section and Other Headings.   The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.    Counterparts.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

13.    Notices.   All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the Company and the undersigned, to them at the addresses set forth on the signature page hereto; or at such other address as either party shall have specified by notice in writing to the other.

14.    Binding Effect.   The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

15.    Survival.   All representations, warranties and covenants contained in this Agreement shall survive (i) the acceptance of the subscription by THE COMPANY, (ii) changes in the transactions, documents and instruments described herein which are not material or which are to the benefit of the undersigned, and (iii) the death or disability of the undersigned.

16.    Notification of Changes.   The undersigned hereby covenants and agrees to notify THE COMPANY upon the occurrence of any event prior to the Closing pursuant to this Agreement which would cause any representation, warranty, or covenant of the undersigned contained in this Agreement to be false or incorrect.

17    Entire Agreement.   This Agreement, including any appendices attached hereto, supersede all prior discussions and agreements among the parties hereto with respect to the subject matter hereof and thereof and contain the and entire agreement among the parties hereto with respect to the subject matter hereof and thereof.

18.    Expenses; Attorneys Fees.   Except as otherwise expressly set forth herein, each party shall pay all expenses incurred by it or on its behalf in connection with this Agreement or any transaction contemplated hereby.

19.    Further Assurances.   Each party hereto shall execute and deliver such additional documents as may be necessary or desirable to consummate the transactions contemplated by this Agreement.

20.    Severability.   Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

5

IN WITNESS WHEREOF, the undersigned has executed this Agreement this 4th day of April, 2011.

## NAME OF INVESTOR:

E-Lionheart Associates, LLC
A Delaware LLC
1000 N. West Street
Suite 1200
Wilmington, DE 19801

**EIN# of Company:**     **202286364**

---

Investment Amount:     $50,000

# Free-trading Shares:   44,000,000

Convertible 504 Promissory: $57,500.00

---

**Stock Issued to:** E-Lionheart Associates, LLC

**Mailing Address for Stock Certificate:**
Fairhills Capital
245 Main Street
Suite 390
White Plains, NY 10601

**IN WITNESS WHEREOF, the undersigned has executed this Agreement this 4th day of April, 2011.**

E-LIONHEART ASSOCIATES, LLC

By: _____
    Edward Bronson
    Managing Member

---------------------------------------------------------------------------------------

**Accepted by:**

PGI ENERGY, INC.

By: _____
    Marcellous S. McZeal
    Chief Executive Officer

Accepted: this 4th day of April, 2011

4

**CONFIDENTIAL**          **PSTBRONSON000139**

UNANIMOUS WRITTEN CONSENT
IN LIEU OF A MEETING
OF
THE BOARD OF DIRECTORS
OF

## PGI ENERGY, INC.

### RESOLUTION TO *AUTHORIZE* THE 504 OFFERING

The undersigned, being all of the Board of Directors of the above entitled entity (the "Corporation"), in accordance with the Delaware Revised Statutes, hereby adopt the following resolutions with the same force and effect as if presented to and adopted at a meeting of the Board, duly called and held on April 4, 2011:

WHEREAS, the corporation desires to obtain funds to enable it to develop and expand its business, and to issue and sell in a Rule 504 private placement, securities as described in the attached Subscription Agreement(s); and

WHEREAS, certain investors are prepared to furnish and supply such funds to the corporation by subscribing for and purchasing its securities; and

WHEREAS, the corporation's officers have presented to the board of directors for its approval form of Subscription Agreement to issue and sell the shares of the Corporation's common stock (the "Securities") in connection with the proposed Rule 504 offering; and

WHEREAS, the Corporation's board of directors deems it desirable and in the best interests of the corporation for it to enter into the Agreements providing for the issuance and sale of Securities in exchange for such funds.

NOW, THEREFORE, it is hereby:

RESOLVED, that the form, terms and provisions of the Subscription Agreement to issue and sell the Securities that have been submitted to the Board of Directors for its review and approval at this meeting be and the same hereby are approved, with whatever changes, additions and deletions the Board of Directors has suggested or the appropriate officers of the Corporation may approve; and

FURTHER RESOLVED, that the Corporation is hereby authorized to issue and sell in a Rule 504 private placement the Securities as described in the Subscription Agreement; and

FURTHER RESOLVED, that the appropriate officers of the corporation be and hereby are authorized and directed to complete, execute and deliver, for and on behalf of the corporation, all documents, instruments and certificates required or necessary, and to do or take, or cause to be done or taken, all acts and actions required or appropriate, to enable the corporation to enter into the agreement to issue and sell shares of the Securities to such investors in connection with the proposed offering.

FURTHER RESOLVED, that the Securities be, and they hereby are, duly authorized for issuance; and, when issued and delivered in accordance with the terms and conditions of the Rule 504 private placement, shall be fully paid and non-assessable shares of Common Stock of the Corporation.

This Written Consent shall be added to the corporate records of this Corporation and made a part thereof, and the resolutions set forth above shall have the same force and effect as if adopted at a meeting duly noticed and held by the Board of Directors of this Corporation. This Written Consent may be executed in counterparts and with facsimile signatures with the effect as if all parties hereto had executed the same document. All counterparts shall be construed together and shall constitute a single Written Consent. Telecopied or email (via PDF) signatures shall be deemed to have the same effect as an original.

IN WITNESS WHEREOF, we have executed this Consent as of the 4th day of April, 2011.

MARCELLOUS McZEAL -CHAIRMAN

UNANIMOUS WRITTEN CONSENT
IN LIEU OF A MEETING
OF
THE BOARD OF DIRECTORS
OF

## PGI ENERGY, INC.

### RESOLUTION TO *APPROVE* THE ISSUANCE AND SALE OF SECURITIES

The undersigned, being all of the Board of Directors of the above entitled company (the "Corporation"), in accordance with the Delaware Revised Statutes, hereby adopt the following resolutions with the same force and effect as if presented to and adopted at a meeting of the Board, duly called and held on April 4_, 2011:

RESOLVED, that the Board of Directors hereby ratifies, approves and confirms the Corporation's offer and sale of securities as described in the attached Subscription Agreement(s) (the "Offering"); and

FURTHER RESOLVED, that the Board of Directors hereby ratifies, approves and confirms the preparation, execution and filing, in the name of and on behalf of the Corporation, of any and all documents, instruments and papers with state "blue sky" authorities and other such regulatory authorities in connection with the Offering; and that the Board of Directors hereby ratifies, approves and confirms the taking of all necessary steps in connection with the Offering; and

FURTHER RESOLVED, that the Board of Directors hereby ratifies, approves and confirms the acceptance of subscriptions to participate in the Offering from the individual(s) whose names are set forth in the attached Investor Grids; and that the Board of Directors hereby ratifies, approves and confirms the issuance as of the date set forth in the Investor Grids, of certificates representing the number of Shares set forth opposite each individual's name, in connection with each such individual's participation in the Offering; and

FURTHER RESOLVED, that the proper officers of the Corporation be, and each of them hereby is, authorized and empowered, in the name of and on behalf of the Corporation, to execute all such further documents, certificates or instruments, and to take all such further action, as any such officer may deem necessary, proper, convenient or desirable in order to carry out each of the foregoing resolutions and in order to carry out each of the intents thereof, and that all such actions taken by the officers of the Corporation to date, in connection with the foregoing resolutions, are hereby in all respects confirmed, ratified and approved.

This Written Consent shall be added to the corporate records of this Corporation and made a part thereof, and the resolutions set forth above shall have the same force and effect as if adopted at a meeting duly noticed and held by the Board of Directors of this Corporation. This Written Consent may be executed in counterparts and with facsimile signatures with the effect as if all parties hereto had executed the same resolution. All counterparts shall be construed together and shall constitute a single Written Consent. Telecopied or email (via PDF) signatures shall be deemed to have the same effect as an original.

IN WITNESS WHEREOF, we have executed this Consent as of the 4_ᵗʰ day of April, 2011.

MARCELLOUS MCZEAL -CHAIRMAN

## **Corporate Resolution**

The undersigned(s) do hereby certify that a majority of the Board of Directors of **PGI Energy, Inc.**, a Delaware corporation, adopted the following resolution, with the same force and effect as if presented to and adopted at a meeting of the Board, duly called and held, and is now in full force and effect:

**RESOLVED,**
That the President, Vice-President, Treasurer, Director, or any TWO of such officers hereby certify that the certificate specified is validly issued as indicated on its face, there are no adverse claims pertaining to this certificate and the shares are free trading and will not be retracted at a later date.

E-Lionheart Associates, LLC
Certificate Holder of Record                    Certificate CUSIP number

44,000,000
Number of Shares                                 Certificate Number

I further certify that the following is a true and correct list of officers of this Corporation as the present date.

OFFICERS (List names):                    OFFICE HOLD:

In witness whereof, I have hereunto set my hand this 4th day of April, 2011.

AUTHORIZED SIGNATURES

Name:
CEO/Chariman

Name:
President   CFO

**THOMAS E. BOCCIERI, ESQ.**
**561 Schaefer Avenue**
**Oradell, New Jersey 07649**
**(Office) 201-983-2024(Fax) 201-265-4729**

April 4, 2011

Pacific Stock Transfer
4045 South Spencer Street, Suite 409
Las Vegas, NV 89119

<u>**VIA ELECTRONIC MAIL**</u>
<u>**TO**</u>
joanna@pacificstocktransfer.com

**Attention Joanna DiBella**

**RE:   PGI ENERGY, INC.**

To Whom It May Concern:

I have been requested to provide you with a legal opinion on behalf of PGI Energy, Inc.,  A Delaware corporation (the "Company" or "Issuer"), located at 7322 Southwest Parkway, Suite 100, Houston, TX 77074 with respect to the Company's April 4, 20111, sale based on the subscription agreement of the same date, for approximately 44,000,000 shares of its common stock and a certain April 4, 2011, $57,500 (Convertible) Promissory Note for a total of $110,000.00 executed on April 4, 2011, (the "Securities"),  to E-Lionheart Associates, LLC, a Delaware LLC, located at 1000 North West Street, Suite 1200, Wilmington, DE 19801, that is authorized to transact business within the State of Delaware (the "Purchaser"), in an offering exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") pursuant to Rule 504 of Regulation D promulgated thereunder, and Section 7309(b)(8) of the Delaware Securities Act, in conjunction with Section 510 (a) (1) of Part E under the Rules and Regulations of Delaware Securities Act.

In connection with this opinion, I have reviewed applicable federal and state laws, rules and regulations and have made such investigations and examined such documents and material related to the Company and the Purchaser as I have deemed necessary and appropriate under the circumstances, including, but not limited to, the following:

1. SEC Regulation D, especially Rules 501, 502, 503 and 504 thereunder.
2. Section 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.
3 Various corporate books and records, including minutes of directors meetings and resolutions of the Company's Board of Directors related to the authorization and issuances of the Securities;
4. A April 4, 2011, Executive Officer's Certificate stating that the Company:
    a. is not a reporting company under the 1934 Securities Exchange Act;
    b. is an operating company (not an investment company) with a specific business plan; and

Pacific Stock Transfer
April 4, 2011
Page 2 of 5

> c. the Company has raised (including the subject transaction) less than $1,000,000 in
> the last 12 months under Rule 504 (and/or Rule 505 of Regulation D and/or,
> generally, Section 3 of the Securities Act or in violation of Section 5(a) of the
> Securities Act); and
>
> d. a Form D covering the subject transaction has been or will be electronically and timely
> filed with the SEC;
>
> 5. A current U.S. Accredited and Qualified Delaware Institutional Investor
> Certificate; and
>
> 6. An April 4, 2011, Subscription Agreement executed by the Purchaser, including
> various representations of the parties therein.

In my examination, I have assumed and have not verified, (i) the genuineness of all signatures, (ii) the
authenticity of all documents submitted to me as originals, if any (iii) the conformity with the originals of all
documents supplied to me as copies, (iv) the accuracy and completeness of all corporate records and documents
and of all certificates and statements of fact given or made available to me by the Company or the Purchaser, and
(v) that the Securities will have been fully paid for and will be validly issued by the Company and transferred to
the Purchaser in accordance with applicable state and federal law and held by the Purchaser free and clear of all
liens or encumbrances and that the Purchaser has the right to effect the transfer of ownership of the Securities to
a third party subject to applicable securities laws.

**The Law**

*Rule 504 Exemption.*

Section 5 of the Securities Act requires with certain exceptions, that all securities involved in an original
distribution by the issuer must be registered. Regulation D promulgated under Section 3(b) of the Securities Act
provides several means by which an issuer which is not subject to the reporting requirements of Section 13 and
15(d) of the Securities Exchange Act and is neither an investment company nor a blank check company may
make an offer and sale of securities without registration upon satisfaction of certain requirements.

Rule 504 is available to any company that, at the time of the offering:

> 1. is not a "reporting company";

> 2. is not a development stage company that either had no specific business plan or purpose or
had indicated that its business plan was to engage in a merger or acquisition with an unidentified company or
entity;

> 3. if the issuer has utilized Rule 504 within the last twelve calendar months, the dollar amount
of the offering may not have exceeded $1,000,000;

> 4. each investor is a bona fide resident of the state(s) where the offering is made; and

> 5. the investor was not, prior to, nor would be subsequent to, the offering an "affiliate" of the
issuer.

Pacific Stock Transfer
April 4, 2011
Page 3 of 5

On April 7, 1999, revisions to Rule 504 went into effect that prohibit general solicitation and general advertising of the offering by the issuer and which provide that securities issued under the Rule will be restricted, unless certain specified conditions are met. These conditions are:

1. the shares issued pursuant to the offering are issued under a state law exemption requiring public filing and delivery of a disclosure statement (often termed Offering Materials) prior to offer and sale; or

2. the shares issued pursuant to the offering are issued under a state law exemption that permits general solicitation and general advertising, available in only a minority of the states (including Delaware), when the offer is limited to only accredited investors as defined in Rule 501(a) of Regulation D.

If either state standard is met, consistent with Rule 504, the shares issued pursuant to the offering are not restricted and are freely tradable on any secondary market.

3. if the issuer has utilized Rule 504 within the last twelve calendar months, the dollar amount of the offering may not have exceeded $1,000,000;

4. each investor is a bona fide resident of the state(s) where the offering is made; and

5. the investor was not, prior to, nor would be subsequent to, the offering an "affiliate" of the issuer.

On April 7, 1999, revisions to Rule 504 went into effect that prohibit general solicitation and general advertising of the offering by the issuer and which provide that securities issued under the Rule will be restricted, unless certain specified conditions are met. These conditions are:

1. the shares issued pursuant to the offering are issued under a state law exemption requiring public filing and delivery of a disclosure statement (often termed Offering Materials) prior to offer and sale; or

2. the shares issued pursuant to the offering are issued under a state law exemption that permits general solicitation and general advertising, available in only a minority of the states (including Delaware), when the offer is limited to only accredited investors as defined in Rule 501(a) of Regulation D.

If either state standard is met, consistent with Rule 504, the shares issued pursuant to the offering are not restricted and are freely tradable on any secondary market.

Consequently, the shares issued pursuant to such an offering may be issued by the Company without affixing to the associated stock certificate a restrictive legend as to resale, may be delivered to the Purchaser upon full payment of the associated purchase price and may be freely traded unless the Purchaser were to become an affiliate of the Company (perhaps through later purchases or their principals were to be become an officer or director of the Company).

**CONFIDENTIAL**          **PSTBRONSON000145**

Pacific Stock Transfer
April 4, 2011
Page 4 of 5

Rule 504 of Regulation D requires a filing within 15 days of the date of commencement of a given offering period.  While there is no penalty for a late filing, the Company will need to file a Form D with regard to this new offering period.

*Delaware Exemption.*

Section7309(b)(8) of the Delaware Securities Act provides for an exemption from the registration and notice filing requirements set forth in Sections 7304, 7309A, and 7312 of the Delaware Securities Act where the transaction involves any offer or sale to an institutional buyer.

Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act defines "Institutional Buyer" to include an "accredited investor" as defined in SEC Rule 501(a)(1)-(4), (7) and (8), excluding, however, any self-directed employee benefit plan with investment decisions made solely by persons that are "accredited investors" as defined by Rule 501(a)(5)-(6) . Pursuant to SEC Rule 501(a)(8), an entity in which all of the equity owners are "accredited" (as defined in Rule 501(a)(5)-(6)) comes within the definition of "accredited investor".

Therefore, the Delaware Securities Act provides for an exemption from the registration and notice filing requirements as set forth in Section 7304, 7309A, and 7312 of the Delaware Securities Act where the investor is a validly formed business entity in which all of its equity owners are accredited in accordance with Rule 501(a)(5)-(6)). Not exempted under this provision are sales to individuals who are accredited investors under SEC Rule 501(a) (5) and (6).

No filings are required and there is no restriction prohibiting general advertising or general solicitation or requiring investment intent.

**Legal Opinion**

Based on the foregoing, and subject to the qualifications set forth herein, it is our opinion that:

The Company is not a reporting company under the 1934 Securities Exchange Act., and intends to make an offering for purchased securities for its own account, which, if aggregated with all securities sold during the preceding 12 months, will not exceed $1,000,000.

The Purchaser is (i) an accredited investor as defined in Rule 501(a) of Regulation D of the Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act (ii) an "institutional buyer" as set forth in Section7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act, (iii) is purchasing the Securities for its own account and was not formed for the specific purpose of acquiring the Securities, and therefore has complied with applicable federal and state law and qualifies for the exemption from registration set forth in the Securities Act pursuant to Rule 504 of Regulation D, Section7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and Regulations pursuant to the Delaware Securities Act.

Further, the Purchaser is **not** (i) the Issuer, (ii) an underwriter of the Issuer with respect to the Securities (within the meaning of Section 2(11) of the Securities Act) (iii) an affiliate of the Issuer (within the meaning of Rule

**CONFIDENTIAL**          **PSTBRONSON000146**

Pacific Stock Transfer
April 4, 2011
Page 5 of 5

144(a)(1) under the Securities Act, (iv) acting in concert within the meaning of Rule 144(e)(3)(vi) nor will they be acting in concert between the Purchasers and any affiliates of the Company or any other persons involving public sales of the Company's unregistered common shares under Rule 144, (v) in common ownership with any of the Purchasers of the respective companies in this offering, nor has any affiliation with any officers or affiliates of the Company, accordingly, the Securities may be issued and delivered to the Purchaser upon full payment of the associated purchase price without a restrictive legend under the Securities Act of 1933, as amended.

As to matters of fact, I have relied upon information obtained from public officials, officers of the Company and Purchaser, and/or other sources, and I represent that all such sources were believed to be reliable. I have relied upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser has a legitimate investment intent in purchasing the Securities, and relied upon the Purchaser's representations as to its own net worth and investment intent in purchasing the Securities.

I have made no independent attempt to verify facts as provided to me and set forth herein and this opinion is limited to and conditioned upon, the facts as stated herein

This letter is being delivered solely for the benefit of the person to whom it is addressed. Accordingly, it may not be quoted, filed with any governmental authority or other regulatory agency or otherwise circulated or utilized for any other purpose without our prior written consent.

I am qualified to practice law in the State of New Jersey and I express no opinion as to the laws of any jurisdictions except for those of New Jersey and the securities laws of Delaware referred to herein and the United States of America referred to herein. Furthermore, for the purposes of rendering this opinion, I have assumed that if a court applies the laws of a jurisdiction other than the laws of New Jersey, the laws of such other jurisdiction are identical in all material respects to the comparable laws of the State of New Jersey. I am an not an expert in Delaware law and base this opinion on a literal reading and my understanding of the relevant provisions of Delaware law cited herein and not on any local regulatory agency interpretations or opinions, formal or otherwise.

The opinions set forth herein are expressed as of the date hereof and remain valid so long as the documents, instruments, records and certificates I have examined and relied upon as noted above, are unchanged and the assumptions I have made, as noted above, are valid.

Very truly yours,

*Thomas E. Boccieri*

Thomas E. Boccieri

TEB:bt

**CONFIDENTIAL**           **PSTBRONSON000147**

April 5, 2011

Thomas E. Boccieri, Esq.
561 Schaefer Avenue
Oradell, NJ 07649

Pacific Stock Transfer Co
4045 South Spencer St, Suite 403
Las Vegas, NV 89119

To whom it may concern:

This is in connection with the (on or about) April 5, 2011 sale of 44,000,000 shares of common
stock (the "Securities") of PGI Energy Inc. (the "Company") for a total of $50,000 to E-
Lionheart Associates, LLC (the "Investor') pursuant to and evidenced by the (on or about) April
4, 2011 subscription agreement between the parties (the "Agreement"). The undersigned hereby
confirms to you that E-Lionheart Associates,LLC is not now and has not been during the
preceding 90 days, an officer, director, 10% or more shareholder of the company or in any other way
an "affiliate" of the Company (as that term is defined in Rule 144(a)(l) of the Securities Act of 1933).
This letter further confirms that the above referenced acquisition of the Securities will not cause
E-Lionheart Associates, LLC to become an "affiliate" of the company.

Sincerely,

E-Lionheart Associates, LLC

_____
Name: Edward Bronson
Title: Sole Managing Member

**CONFIDENTIAL**              **PSTBRONSON000148**

Case 7:12-cv-06421-KMK Document 155-8 Filed 07/22/16 Page 51 of 83

TO: THOMAS E. BOCCIERI, ESQ.

The Subscriber (E-Lionheart Associates, LLC) understands and agrees that the Securities that it intend to acquire pursuant to Rule 504 of Regulation D under the U.S. Securities Act, Section 7309 (b) 8 of the Delaware Securities Act and Section 510 (a)(1) Part E of the Rules and Regulations of the Delaware Securities Act (i.e. Transactional Exemption for Certain Institutional Buyers) have not been and will not be registered under the United States *Securities Act of 1933*, as amended (the "U.S. Securities Act"), or applicable state securities laws.

The undersigned (the **"Subscriber"**) represents, warrants and covenants (which representations, warranties and covenants shall survive any applicable Closing) to Thomas E. Boccieri, Esq. that:

(a) it is an entity formed in the State of Delaware that has a legal presence and is authorized to do business therein and is purchasing the Securities for its own account, for investment purposes only and not with a view to resale or distribution and, in particular, neither it nor any Beneficial Purchaser for whose account it is purchasing the Securities has any intention to distribute either directly or indirectly any of the Securities in the United States or to U.S. Persons; **provided, however, that this paragraph shall not restrict the Subscriber from selling or otherwise disposing of any of the Securities pursuant to registration thereof pursuant to the U.S. Securities Act and any applicable state securities laws or under an exemption from such registration requirements;**

(b) it is a U.S. Accredited Investor that satisfies one or more of the categories of U.S. Accredited Investor indicated below. Specifically, it is an "accredited investor" as defined in SEC Rule 501(a)(1)-(4), (7) and (8), 17 C.F.R. §230.501(a)(1)-(4), (7), (8), excluding, however, any self-directed employee benefit plan with investment decisions made solely by persons that are "accredited investors" as defined in Rule 501(a)(5)-(6); **(the Subscriber must initial on the appropriate line(s)):**

_____ Category 1.   Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of

**U.S. Accredited and Qualified Delaware Institutional Investor Certificate**

**CONFIDENTIAL**          **PSTBRONSON000149**

Thomas E. Boccieri, Esq.
March 31, 2011
Page 2 of 3

its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors; or

\_\_ \_\_\_ Category 2.    Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940; or

\_\_ \_ \_ Category 3.    Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; or

\_\_\_\_\_ Category 4.    Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer; or

N/A  Category 5.    Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000; or

N/A  Category 6.    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

\_\_\_\_\_ Category 7.    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); or

X-EB  Category 8.    Any entity in which all of the equity owners are accredited investors;

**CONFIDENTIAL**            **PSTBRONSON000150**

U.S. Accredited and Qualified Delaware Institutional Investor Certificate
Thomas E. Boccieri, Esq.
March 31, 2011

Page 3 of 3

The Subscriber acknowledges that the representations, warranties and covenants contained in this Certificate are made by it with the intent that they may be relied upon by the Issuer in determining its eligibility or the eligibility of others on whose behalf it is contracting thereunder to purchase Securities. It agrees that by accepting Securities it shall be representing and warranting that the representations and warranties above are true as at the Closing with the same force and effect as if they had been made by it at the Closing and that they shall survive the purchase by it of Securities and shall continue in full force and effect notwithstanding any subsequent disposition by it of such securities.

THE SUBSCRIBER UNDERTAKES TO NOTIFY THOMAS E. BOCCIERI, ESQ. IMMEDIATELY IN WRITING OF ANY CHANGE IN ANY REPRESENTATION, WARRANTY OR OTHER INFORMATION RELATING TO THE SUBSCRIBER OR ANY BENEFICIAL PURCHASER SET FORTH HEREIN, WHICH CHANGE WOULD RESULT IN THE SUBSCRIBER NOT QUALIFYING AS U.S. ACCREDITED AND QUALIFIED DELAWARE INSTITUTIONAL INVESTOR CERTIFICATE.

Dated this 31 day of March , 2011

E-Lionheart Associates, LLC (Subscriber)
1000 North West Street
Suite 1200
Wilmington, DE 19801

20-2286364 _____ _____ (EIN)

LLC_____
Type of Entity (Corporation, LLC, etc.)

_____
Signature of Authorized Principal

Edward Bronson, Managing Member
Print or Type Name and Title

**CONFIDENTIAL**          **PSTBRONSON000151**

# PGI ENERGY, INC.

## Executive Officer's Certificate

I hereby certify that I am the duly elected, qualified and incumbent Chairman of the undersigned Company, that I am authorized by the Company to make, execute and deliver this Certificate and that I am personally familiar with the following facts. On behalf of the Company in my capacity set forth above, I hereby certify to the Company's securities counsel and the Company's transfer agent, the following:

1. The Company is a corporation organized under the laws of the state of its incorporation and is in good standing therein.

2. The Company is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "'34 Act"); is not an investment company; and is not a development stage company as referred to in Rule 504(a)(3) of Regulation D, under the Securities Act of 1933, as amended (the "'33 Act").

3. In the past 12 months from the date hereof, the Company sold 43,556,952 shares (the "Subject Shares") of Common Stock in a transaction exempt from the registration requirements of the '33 Act, under Rule 504 of Regulation D promulgated under the '33 Act (and/or Rule 505 of Regulation D and/or generally, Section 3 of the '33 Act or in violation of Section 5(a) of the '33 Act).

4. There are a total of 808,968,983 number of shares of common stock issued and outstanding of the Company as of the date of this Officer's Certificate.

5. The Company has not sold securities in the twelve months previous to the date of this Certificate under Rule 504 of Regulation D under the '33 Act (and/or Rule 505 of Regulation D and/or generally, Section 3 of the '33 Act or in violation of Section 5(a) of the '33 Act) in excess of one million ($1,000,000) and the dollar value of any securities issued by the Company in the previous 12 months was $ _____ .

6. With the exception of the Subject Shares or pursuant to the provisions of its outstanding securities, the Company has no agreements or understandings with any party relating to the issuance of its Common Stock.

7. The Company is not making and does not currently propose to make a public offering of its Common Stock.

8. The Company agrees not to authorize and/or issue any Securities until the funds for the shares of Common Stock being issued pursuant to the Subscription Agreement dated the same date herewith (the "Shares") have been disbursed to the Company.

**CONFIDENTIAL**           **PSTBRONSON000152**

9. The statements made in this certificate are true and correct, and made with the knowledge that the Company's securities counsel will be relying on this Certificate.

10. The shares of Common Stock being issued pursuant to the Subscription Agreement dated the same date herewith (the "Shares") are fully paid and non-assessable.

11. The Company has ELECTRONICALLY (or manually, if such format is appropriate) filed or will timely file with the SEC a Form D under Regulation D covering the subject transaction.

12. The Company has made no sales of the Shares in states other than Delaware..

13. To the best of my knowledge and belief, neither the Company nor any of its predecessors is (a) subject to any order, judgment, or decree of any court restraining or enjoining the Company from engaging in any conduct or practice in connection with the purchase or sale of any security; or (b) subject to a United States Postal Service false representation order within the past five (5) years.

14. To the best of my knowledge and belief, no officer or director of the Company or owner of more than ten percent (10%) or more of the Company's Common Stock has been convicted within the previous ten (10) years of any felony in connection with the purchase or sale of any security, nor has any such officer, director or owner of securities been subject to a United States Postal Service false representation order within the past five (5) years.

15. The Company is an operating company with a specific business plan

IN WITNESS WHEREOF, the undersigned authorized officer of the Company has executed this Certificate.

> PGI Energy, Inc.
> A Delaware Company

By: _____

Name: Marcellous S. McZeal
Title: CEO

Dated: this $\underline{4}$ th day of April, 2011

Witness:

_____

Name:
Title:

## Leslie Eldridge

| | |
|---|---|
| **From:** | Ron Ben-Bassat [rbenbassat@anslowlaw.com] |
| **Sent:** | Thursday, April 07, 2011 1:04 PM |
| **To:** | Leslie Eldridge; Gregg Jaclin |
| **Cc:** | Joanna DiBella; Chris Dobbins |
| **Subject:** | RE: Status of 504 REQ's |

Hi Leslie:

For CAVU - We need a representation from the company that it has never been a shell. Additionally, since this a Texas 504 opinion, our prior concerns regarding the need for some type of legend regarding investment intent remain. Otherwise, this is fine.

For PGI – I received and reviewed the documents you provided me this morning. This one is fine.

Sorry for the delay.

Thanks,

Ron

**From:** Leslie Eldridge [mailto:Leslie@pacificstocktransfer.com]
**Sent:** Thursday, April 07, 2011 3:57 PM
**To:** Ron Ben-Bassat; Gregg Jaclin
**Cc:** Joanna DiBella; Chris Dobbins
**Subject:** Status of 504 REQ's

Hi Ron,

Would you happen to have a status for the following:

- PGI Energy 504 request sent 4/5 and requested docs sent to you this morning
- CAVU 504 sent 4/5

Thank you!


Respectfully,

**Leslie Eldridge**
Transfer Agent


**PacificStockTransfer**
*Proudly Serving Clients Since 1983*

**Main Office**
Pacific Stock Transfer Company
4045 S. Spencer Street, Suite 403

**CONFIDENTIAL**          **PSTBRONSON000154**

504

## Issuance Correspondence Sheet

**Date RCVD:** 4/5       **Issuer:** Pb1, Energy

| Date | Follow-up |
|------|-----------|
| 4/5 | Nud: Statement on non-affil from Shareholder. RCVD 4/5 |
| 2:31p.m 4/5 | Forwarded to Jaclin & Ron for approval. |
| 4/6 | Nud to Fill In Executive officers Certificate & US accredited Doc. |
| 4/7 | Rcvd & forwarded to Jaclin 9:45 am |
| 4/7 | OL to proceed |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CONFIDENTIAL      PSTBRONSON000155

$$\text{SD4}$$

## MHTN - PGI ENERGY INC
### Certificate Transaction Journal
### Transaction Number 651 Stock Class CS1
**Control ID:**                               **New Issue**

**Transaction Date 03/29/11**

| Registration | Certif. No | | Canceled | Issued |
|---|---|---|---|---|
| E-LIONHEART ASSOCIATES LLC<br>1000 N W ST STE 1200<br>WILMINGTON, DE 19801 | CS1 | 1827 | | 9,099,617 |
| | | | 0 | 9,099,617 |

PSTBRONSON000156

| | | Printed | 03/29/11 |
|---|---|---|---|
| **Log Sheet** | | | 1:47 pm |

Issue:     **MHTN-PGI ENERGY INC**

Received: 3/29/2011     How Received: EMAIL

From: PGI ENERGY INC                                      ID/SCL#:

Cost Basis ID:

Broker or CBRS ID:   -

Tracking Number In:

Contents:

Control Ticket:                                Transaction No: 651

SEC Item Count: 0

Completed: 3/29/2011     How Sent:  FEDEX

Tracking Number Out:   7945 8914 5841

Sent To:               **FAIRHILLS CAPITAL**
                       **245 MAIN ST STE 390**
                       **WHITE PLAINS,NY 10601**

Certificate(s) sent:        CS1-1827
(or book entries confirmed)

Comments: _____

_____

_____

_____

**FedEx**

Shipment Receipt
**Address Information**

**Ship to:**
FAIRHILLS CAPITAL

245 MAIN ST STE 390

WHITE PLAINS, NY
106012425
US
7023613033

**Ship from:**
TRANSFER AGENT
PACIFIC STOCK
TRANSFER COMPANY
4045 S SPENCER ST #403

LAS VEGAS, NV
89119
US
702.361.3033

**Shipping Information**
Tracking number: 794589145845
Ship date: 03/29/2011
Estimated shipping charges: 18.01

**Package Information**
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 1LBS
Declared value: 0.00USD
Special Services: Adult signature required
Pickup/Drop-off: Use an already scheduled pickup at my location

**Billing Information**
Bill transportation to: PSTC-266
Your reference: MHTN-651
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with Fedex ShipManager at fedex.com.

**Please Note**
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits. Consult the applicable FedEx Service Guide for details. The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

https://www.fedex.com/shipping/html/en//PrintIFrame.html

CONFIDENTIAL

**PSTBRONSON000158**

3/29/2011

# MHTN - PGI ENERGY INC
## Stock Transfer - Final

Control Ticket Number:

Type of Stock being Transferred: CS1
Number of paper certificates being Transferred from: 0
Number of paper certificates being Transferred to: 1
Sale Amt. (per share) : $0.00000
Received 03/29/11 at 13:42
Item Count: 0

----- Transfer From -----

Transaction Number: 651

Transfer Date: 03/29/11
Total Shares: 9,099,617
Received From:

Tran Type: Not an Item
How Rcvd.: EMAIL

----- Transfer To -----

| Line # | Shareholder | Certificate Number | Number of Shares | Line # | Shareholder | Number of New Certifs | Shares per Certif |
|---|---|---|---|---|---|---|---|
| | | | | 1 | 514 E-LIONHEART ASSOCIATES LLC | 1 | 9,099,617 |



**PacificStockTransfer**

*Proudly Serving Clients Since 1983*

Work Order

Date:       29-Mar

**Transfer Department**

STOCK TRACK

Check #:                     Amount:

Issuer ID:   **MHTN**            Transaction #:  **651**

**Transfer Agent:      LESLIE**

| Bill To: | PGI ENERGY |
|----------|------------|

| Qty | Description | | Rate | | Ext. Price |
|-----|-------------|---|------|---|-----------|
| 1.00 | Certificates Issued | $ | 25.00 | $ | 25.00 |
| 0.00 | Certificates Cancelled (after 5) | $ | 2.00 | $ | - |
| 1.00 | FedEx Shipping Domestic | $ | 30.00 | $ | 30.00 |
| 0.00 | FedEx Shipping Canada | $ | 45.00 | $ | - |
| 0.00 | FedEx Shipping International | $ | 65.00 | $ | - |
| 0.00 | Legend Removal | $ | 50.00 | $ | - |
| 0.00 | Reject Fee | $ | 25.00 | $ | - |
| 0.00 | Rush Fee | $ | 100.00 | $ | - |
| 1.00 | Legal/Compliance fee (504) | $ | 300.00 | $ | 300.00 |
| 0.00 | Bond / Replacement Fee | $ | 50.00 | $ | - |
| 0.00 | Rescission of Shares | $ | 25.00 | $ | - |

**Total:          $355.00**

**CONFIDENTIAL**          **PSTBRONSON000160**

# ISSUANCE RESOLUTION

CORPORATE RESOLUTION AUTHORIZING ISSUANCE OF NEW SHARES FROM NEW STOCK

## PGI ENERGY, INC.
### COMPANY NAME (SECURITIES NAME)

### SHARES OF COMMON STOCK

Resolved, that the Company's Transfer Agent for the above class of stock for the above Company, is authorized by the Company to issue the shares described below and increase the outstanding shares on the books of the Company.

#### ISSUANCE INSTRUCTIONS

| REGISTERED NAME & ADDRESS | NUMBER OF SHARES | CERTIFICATE DATE | RESTRICTED OR FREE TRADING |
|---|---|---|---|
| E-LIONHEART ASSOCIATES, LLC<br>Fairhills Capital<br>245 Main Street<br>Suite 390<br>White Plains, NY 10601 | 9,099,617 | | FREE TRADING – RULE 504 |

I, THE UNDERSIGNED, A QUALIFIED DIRECTOR OF THE ABOVE NAMED COMPANY, DO HEREBY INDEMNIFY THE TRANSFER AGENT AND THEIR EMPLOYEES AGAINST ANY AND ALL ACTIONS TAKEN BY THE ABOVE COMPANY, AND CERTIFY THAT THIS IS A TRUE COPY OF A RESOLUTION, SET FORTH AND ADOPTED ON THE BELOW DATE, AND THAT THE SAID RESOLUTION HAS NOT BEEN IN ANY WAY RESCINDED, ANNULLED, OR REVOKED BUT THE SAME IS STILL IN FULL FORCE, AND EFFECT.

X _____
DIRECTOR SIGNATURE

3·25·2011
DATE

Marcellous S. Mc Zeal
DIRECTOR'S NAME PRINTED

## MAILING INSTRUCTIONS

| COMPANY NAME / ATTENTION MAILING ADDRESS TELEPHONE NUMBER | EXPRESS OR MAIL INSTRUCTIONS | EXPRESS NUMBER (IF APPLICABLE) |
|---|---|---|
| Fairhills Capital<br>245 Main Street<br>Suite 390<br>White Plains, NY 10601 | EXPRESS | |

**CONFIDENTIAL**  **PSTBRONSON000161**

## EXHIBIT A

### NOTICE OF HOLDER CONVERSION – March 11, 2011 Note
(To be Executed by the Registered Holder in order to Convert the Note)

The undersigned hereby elects to convert the attached Convertible Note into *free* trading shares of common stock (the "Common Stock"), of **PGI Energy Inc.** (the "Company") according to the conditions hereof, as of the date written below. No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.

Conversion request:

March 24, 2011
Date to Effect Conversion

9,099,617
Number of *FREE*-trading shares of Common Stock to be Issued

$47,500
Principal Amount Converted

.00522
Applicable Conversion Price

**EIN# of E-Lionheart Associates, LLC:**        202286364

**WE HEREIN CERTIFY that E-Lionheart Associates, LLC does not *and* will not own more than (9.99%) or more of the Company's Common Stock after the above conversion.**

E-Lionheart Associates, LLC

By: _____
        Edward Bronson
        Managing Member

**Mailing Address for Stock Certificate:**
Fairhills Capital
245 Main Street
Suite 390
White Plains, NY 10601

March 24, 2011

Thomas E. Boccieri, Esq.
561 Schaefer Avenue
Oradell, NJ 07649

Pacific Stock Transfer Co
4045 South Spencer St, Suite 403
Las Vegas, NV 89119

To whom it may concern:

This is in connection with the (on or about) March 24, 2011 Notice of Conversion directing the issuance of 9,099,617 shares of common stock (the "Securities") of PGI Energy, Inc. (the "Company") for an underlying conversion of a 504 Promissory Note in the amount of $47,500 to E-Lionheart Associates, LLC (the "Investor') pursuant to and evidenced by the (on or about) March 11, 2011 subscription agreement between the parties (the "Agreement"). The undersigned hereby confirms to you that E-Lionheart Associates, LLC is not now and has not been during the preceding 90 days, an officer, director, 10% or more shareholder of the company or in any other way an "affiliate" of the Company (as that term is defined in Rule 144(a)(l) of the Securities Act of 1933). This letter further confirms that the above referenced acquisition of the Securities will not cause E-Lionheart Associates, LLC to become an "affiliate" of the company.

Sincerely,

E-Lionheart Associates, LLC

Name: Edward Bronson
Title: Sole Managing Member

# THOMAS E. BOCCIERI, ESQ.
## 561 Schaefer Avenue
## Oradell, New Jersey 07649
### (Office) 201-983-2024(Fax) 201-265-4729

March 24, 2011

Pacific Stock Transfer
4045 South Spencer Street, Suite 409
Las Vegas, NV 89119

<u>**VIA ELECTRONIC MAIL
TO**</u>
joanna@pacificstocktransfer.com

**Attention:     Ms. Joanna DiBella**

**RE:     PGI ENERGY, INC**

To Whom It May Concern:

I have been requested to provide you with a legal opinion on behalf of PGI Energy, Inc, A Delaware corporation (the "Company" or "Issuer"), located at 7322 Southwest Parkway, Suite 100, Houston, TX 77074, with respect to the conversion of $47,500 of the Company's March 11, 2011, $47,500 Convertible Promissory Note (the "Note") (remaining balance - $-0-) into 9,099,617 shares of the Company's common stock (the "Shares") by E-Lionheart Associates, LLC, a Delaware LLC, located at 1000 North West Street, Suite 1200, Wilmington, DE, that is authorized to transact business within the State of Delaware (the "Purchaser" also the holder and lender on the Note)). The Note was originally issued to the Purchaser on or about March 11, 2011, in an offering (that also included shares of the Company's common stock) (the "Offering") exempt from registration under the Securities Act of 1933, as amended (the "Securities Act") pursuant to Rule 504 of Regulation D promulgated thereunder, and Section 7309(b)(8) of the Delaware Securities Act, in conjunction with Section 510 (a) (1) of Part E under the Rules and Regulations of Delaware Securities Act (the "Offering"). I have reviewed a copy of the March 24, 2011, conversion notice and have assumed it is an accurate and authentic copy of the original. In addition, the Purchaser has provided an updated non-affiliate letter as of March 22, 2011 wherein it represents that it is not now nor has been during the prior 90 days an affiliate of the Company.

Reference is made to my March 11, 2011, legal opinion letter addressed to you as the Company's transfer agent regarding the Offering and is incorporated by reference herein and may be relied upon in its entirety (i.e. as to facts, law, application of the law and legal conclusion) in issuing the Shares without restrictive legend.

<u>Based on the foregoing, and subject to the qualifications set forth herein, it is my opinion that:</u>

(1) The Shares may be issued to the Purchaser pursuant to aforementioned state and federal exemptions from registration.

(2) The Company is not a reporting company under the 1934 Securities Exchange Act., and intends to make an

**CONFIDENTIAL**          **PSTBRONSON000164**

offering for purchased securities for its own account, which, if aggregated with all securities sold preceding 12
12 months, will not exceed $1,000,000.

(3) The Purchaser is (i) an accredited investor as defined in Rule 501(a) of Regulation D of the Act and Section
510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act (ii) an "institutional
buyer" as set forth in Section 7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the
Rules and Regulations Pursuant to the Delaware Securities Act, (iii) is purchasing the Securities for its own
account and was not formed for the specific purpose of acquiring the Securities, and therefore has complied with
applicable federal and state law and qualifies for the exemption from registration set forth in the Securities Act
pursuant to Rule 504 of Regulation D, Section 7309(b)(8) of the Delaware Securities Act and Section 510(a)(1)
of Part E under the Rules and Regulations pursuant to the Delaware Securities Act.

(4) Further, the Purchaser is **not** (i) the Issuer, (ii) an underwriter of the Issuer with respect to the Securities
(within the meaning of Section 2(11) of the Securities Act) (iii) an affiliate of the Issuer (within the meaning of
Rule 144(a)(1) under the Securities Act, (iv) acting in concert within the meaning of Rule 144(e)(3)(vi) nor will
they be acting in concert between the Purchasers and any affiliates of the Company or any other persons
involving public sales of the Company's unregistered common shares under Rule 144, (v) in common ownership
with any of the Purchasers of the respective companies in this offering, nor has any affiliation with any officers
or affiliates of the Company, accordingly, the Securities may be issued and delivered to the Purchaser upon full
payment of the associated purchase price pursuant to Rule 504 of Regulation D of the Securities Act and
Section 7309(b)(8) of the Delaware Securities Act and Section 510(a)(1) of Part E under the Rules and
Regulations pursuant to the Delaware Securities Act.

As to matters of fact, I have relied upon information obtained from public officials, officers of the Company and
Purchaser, and/or other sources, and I represent that all such sources were believed to be reliable. I have relied
upon the Company's assurances that it shall make reasonable inquiry to determine that the prospective Purchaser
has a legitimate investment intent in purchasing the Securities, and relied upon the Purchaser's representations as
to its own net worth and investment intent in purchasing the Securities.

I have made no independent attempt to verify facts as provided to me and set forth herein and this opinion is
limited to and conditioned upon, the facts as stated herein

This letter is being delivered solely for the benefit of the person to whom it is addressed. Accordingly, it may
not be quoted, filed with any governmental authority or other regulatory agency or otherwise circulated or
utilized for any other purpose without our prior written consent.

I am qualified to practice law in the State of New Jersey and I express no opinion as to the laws of any
jurisdictions except for those of New Jersey and the securities laws of Delaware referred to herein and the United
States of America referred to herein. Furthermore, for the purposes of rendering this opinion, I have assumed
that if a court applies the laws of a jurisdiction other than the laws of New Jersey, the laws of such other
jurisdiction are identical in all material respects to the comparable laws of the State of New Jersey. I am an not
an expert in Delaware law and base this opinion on a literal reading and my understanding of the relevant
provisions of Delaware law cited herein and not on any local regulatory agency interpretations or opinions,
formal or otherwise.

**CONFIDENTIAL**          **PSTBRONSON000165**

Pacific Stock Transfer
March 24, 2011
Page 3 of 3

The opinions set forth herein are expressed as of the date hereof and remain valid  so long as the documents, instruments, records and certificates I have examined and relied upon as noted above or my incorporated herein and relied upon November 29, 2010, legal opinion letter, are unchanged and the assumptions I have made, as noted above, are valid.

Very truly yours,

*Thomas E. Boccieri*

Thomas E. Boccieri

TEB:bt

March 24, 2011

Thomas E. Boccieri, Esq.
561 Schaefer Avenue
Oradell, NJ 07649

Pacific Stock Transfer Co
4045 South Spencer St, Suite 403
Las Vegas, NV 89119

To whom it may concern:

This is in connection with the (on or about) March 24, 2011 Notice of Conversion directing the issuance of 9,099,617 shares of common stock (the "Securities") of PGI Energy, Inc. (the "Company") for an underlying conversion of a 504 Promissory Note in the amount of $47,500 to E-Lionheart Associates, LLC (the "Investor') pursuant to and evidenced by the (on or about) March 11, 2011 subscription agreement between the parties (the "Agreement"). The undersigned hereby confirms to you that E-Lionheart Associates,LLC is not now and has not been during the preceding 90 days, an officer, director, 10% or more shareholder of the company or in any other way an "affiliate" of the Company (as that term is defined in Rule 144(a)(l) of the Securities Act of 1933). This letter further confirms that the above referenced acquisition of the Securities will not cause E-Lionheart Associates, LLC to become an "affiliate" of the company.

Sincerely,

E-Lionheart Associates, LLC

Name: Edward Bronson
Title: Sole Managing Member

## EXHIBIT A

### NOTICE OF HOLDER CONVERSION – March 11, 2011 Note
(To be Executed by the Registered Holder in order to Convert the Note)

The undersigned hereby elects to convert the attached Convertible Note into *free* trading shares of common stock (the "Common Stock"), of **PGI Energy Inc.** (the "Company") according to the conditions hereof, as of the date written below. No fee will be charged to the holder for any conversion, except for such transfer taxes, if any.

Conversion request:

March 24, 2011
Date to Effect Conversion

9,099,617
Number of *FREE*-trading shares of Common Stock to be Issued

$47,500
Principal Amount Converted

.00522
Applicable Conversion Price

**EIN# of E-Lionheart Associates, LLC:**          202286364

**WE HEREIN CERTIFY that E-Lionheart Associates, LLC does not *and* will not own more than (9.99%) or more of the Company's Common Stock after the above conversion.**

E-Lionheart Associates, LLC

By: _____
     Edward Bronson
     Managing Member

**Mailing Address for Stock Certificate:**
Fairhills Capital
245 Main Street
Suite 390
White Plains, NY 10601

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR THE SECURITIES LAWS OF ANY STATE.

THE ACQUISITION OF THE SECURITIES OFFERED HEREBY INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE RISK OF THE LOSS OF THEIR ENTIRE INVESTMENT.

### ENTITY SUBSCRIPTION AGREEMENT – COMMON SHARES

Ladies and Gentlemen:

The undersigned (the "Shareholder") acknowledges that PGI Energy Inc., a Delaware corporation (the "COMPANY") is offering for sale 8,000,000 shares of Common Shares ("Shares") and a $47,500 Promissory Note(s) ("Notes") for an aggregate purchase price of $107,500.00 (the Shares are referred to as the "Securities"). The undersigned further acknowledges that the issuance of the Shares is part of a private offering up to $928,500 Dollars by THE COMPANY (the "Offering") that is being made without registration of the Shares under the Securities Act of 1933, as amended (the "Securities Act"), and is being made only to "accredited investors." (as such term is defined in as defined in the rules to the Securities Act of 1933, as amended) pursuant to Regulation D, Rule 504 and Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(n)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

1.      Subscription. Subject to the terms and conditions hereof, the undersigned hereby subscribes to the Shares in the amount set forth on the signature page hereof, which amount is payable as described in Section 4 hereof.

2.      Acceptance of Subscription and Issuance of Shares. It is understood and agreed that THE COMPANY shall have the sole right, at its complete discretion, to accept or reject this subscription, in whole or in part, for any reason and that the same shall be deemed to be accepted by THE COMPANY only when it is signed by a duly authorized officer of THE COMPANY, and delivered to the undersigned. Subscriptions need not be accepted in the order received, and the Shares may be allocated among subscribers. Notwithstanding anything in this Subscription Agreement (the "Agreement") to the contrary, THE COMPANY shall have no obligation to issue Shares to any person who is a resident of a jurisdiction in which the issuance of the Shares to it would constitute a violation of the securities, "blue sky" or other similar laws of such jurisdiction (collectively referred to as the "State Securities Laws"). It is intended that the Shares will only be issued to entities formed pursuant to the laws of the State of Delaware that maintain its principal place of business within the State of Delaware.

3.      The Closing. The closing of the issuance of each of the Shares sold shall take place at the discretion of THE COMPANY and at such other time and place as THE COMPANY shall designate by notice to the undersigned (each, a "Closing").

4.      Payment and Issuance of Shares. Payment for the Shares shall be received by THE COMPANY from the escrow agent by wire transfer of immediately available funds upon confirmation by the Company's Transfer Agent of the Shares availability by DWAC to the PURCHASER, or delivery of a physical stock certificate to the PURCHASER, in an amount of and as set forth on the signature page hereof.  The COMPANY shall immediately instruct the transfer agent to issue the Shares upon the COMPANY's receipt of the following: (i) fully signed transaction documents (ii) escrow agent's confirmation of receipt of available funds and (iii) a legal opinion as to the offering and sale of the Shares from the COMPANY to the PURCHASER in reliance upon an exemption from the federal securities registration requirements.

5.      Representations, Warranties and Covenants of the PURCHASER and COMPANY.

5.1     Information Concerning the PURCHASER. The Purchaser hereby represents, warrants and covenants the following.

        (a)     The Purchaser has all requisite authority to enter into this Agreement and to perform all the obligations required to be performed by the Purchaser.

        (b)     The Purchaser is an entity formed pursuant to the laws of the State of Delaware and maintains its principal place of business within the State of Delaware.

CONFIDENTIAL                    PSTBRONSON000169

(c)     The Purchaser is an "accredited investor" as defined under Rule 501 of Regulation D.

(d)     The Purchaser is an "institutional investor" as defined under Sections 7309(b)(8) of the Delaware Securities Act, and Section 510(a)(1) of Part E under the Rules and Regulations pursuant to the Delaware Securities Act.

(e)     Each owner or member of the Purchaser is an "accredited investor" as such term is defined in the rules to the Securities Act of 1933, as amended.

(f)     The Purchaser will not engage in any activity that will constitute a distribution of the Shares and will not violate Regulation M or any other federal or state securities laws.

(g)     The Purchaser is experienced in such matters and understands the applicable laws and regulations.

(h)     The Purchaser will not engage in shorting the stock of the COMPANY.

(i)     The Purchaser is currently not an affiliate of the Company as that term is defined under the Securities Act of 1933, as amended, and the rules and regulation promulgated thereunder, and has not been an affiliate of the Company within the preceding 90 days. Furthermore, the acquisition of the securities referred to herein will not cause the undersigned to become an affiliate of the Company.

5.2     Information Concerning THE COMPANY. The COMPANY hereby represents, warrants and covenants the following:

(a)     The COMPANY understands that no federal or state agency has passed upon the Shares or made any finding or determination concerning the fairness or advisability of this investment.

(b)     The COMPANY, as of the date of this Agreement:
         (i) is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Act of 1934, as amended (the "1934 Act"),
         (ii) is not an investment company or a developmental stage company that either has no specific business plan or purpose,
         (iii) has not sold securities pursuant to exemption under Rule 504 within the past twelve (12) calendar months in an aggregate dollar amount that would preclude the contemplated sales of Shares under that rule,
         (iv) is otherwise in compliance with the requirements of Rule 504 of Regulation D with respect to the offerings contemplated hereby, and
         (v) is able to and does hereby offer and sell the Shares only to "accredited investors" in accordance with the provisions of Rule 504 and applicable state law.

6.     Conditions to Obligations of the Undersigned and THE COMPANY. The obligations of the PURCHASER to purchase and pay for the Shares specified on the signature page hereof and of THE COMPANY to issue the Shares are subject to the satisfaction at or prior to the Closing of the sale of each Share of the following conditions precedent: (i) the representations, warranties and certifications of the PURCHASER and COMPANY contained in Section 5 hereof, shall be true and correct on and as of the Closing in all respects with the same effect as though such representations and warranties had been made on and as of the Closing; and (ii) the PURCHASER shall complete, execute and deliver this Agreement and all documents contemplated hereby and provided for herein and (iii) the PURCHASER shall have deposited the full purchase price for the Shares with the escrow agent to be released to the Company in accordance with Section 4 above.

7.     Brokers or Finder's Fees. Neither the undersigned nor THE COMPANY has entered into any agreement to pay any broker's or finder's fee to any third party with respect to this Agreement or the transactions contemplated hereby. The undersigned and THE COMPANY shall indemnify and hold each other harmless against any losses, claims, damages, liabilities or actions to which the other may become subject arising out of or based upon any broker's or finder's fees which are not the fault of such other party.

8.     Waiver; Amendment. Neither this Agreement nor any provisions hereof shall be modified, amended, discharged or terminated except by an instrument in writing, signed by the party against whom any modification, amendment, discharge or termination is sought. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set

2.

CONFIDENTIAL                    PSTBRONSON000170

forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same on any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

9.      Assignability. Neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by THE COMPANY (except to a subsidiary or parent entity of THE COMPANY) or the undersigned without the prior written consent of the other parties to this Agreement.

10.      Governing Law. THIS AGREEMENT SHALL BE CONSTRUED, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER DETERMINED, IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE RIGHTS AND DUTIES OF THE PARTIES; PROVIDED, HOWEVER, THAT ALL LAWS PERTAINING OR RELATING TO CORPORATE GOVERNANCE OF THE COMPANY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE INTERNAL LAWS OF THE STATE OF DELAWARE TO THE CORPORATE GOVERNANCE OF THE COMPANY.

11.      Section and Other Headings. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.      Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

13.      Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid to the Company and the undersigned, to them at the addresses set forth on the signature page hereto: or at such other address as either party shall have specified by notice in writing to the other.

14.      Binding Effect. The provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

15.      Survival. All representations, warranties and covenants contained in this Agreement shall survive (i) the acceptance of the subscription by THE COMPANY, (ii) changes in the transactions, documents and instruments described herein which are not material or which are to the benefit of the undersigned, and (iii) the death or disability of the undersigned.

16.      Notification of Changes. The undersigned hereby covenants and agrees to notify THE COMPANY upon the occurrence of any event prior to the Closing pursuant to this Agreement which would cause any representation, warranty, or covenant of the undersigned contained in this Agreement to be false or incorrect.

17.      Entire Agreement. This Agreement, including any appendices attached hereto, supersede all prior discussions and agreements among the parties hereto with respect to the subject matter hereof and thereof and contain the and entire agreement among the parties hereto with respect to the subject matter hereof and thereof.

18.      Expenses; Attorneys Fees. Except as otherwise expressly set forth herein, each party shall pay all expenses incurred by it or on its behalf in connection with this Agreement or any transaction contemplated hereby.

19.      Further Assurances. Each party hereto shall execute and deliver such additional documents as may be necessary or desirable to consummate the transactions contemplated by this Agreement.

20.      Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

5

CONFIDENTIAL                    PSTBRONSON000171

IN WITNESS WHEREOF, the undersigned has executed this Agreement this ___ᵗʰ day of March, 2011.

**NAME OF INVESTOR:**

E-Lionheart Associates, LLC
A Delaware LLC
1000 N. West Street
Suite 1200
Wilmington, DE 19801

**EIN# of Company:**   202286364

---

Investment Amount:   $60,000

· # Free-trading Shares:  8,000,000

Convertible 504 Promissory: $47,500.00

---

Stock Issued to: E-Lionheart Associates, LLC

**Mailing Address for Stock Certificate:**
Fairhills Capital
245 Main Street
Suite 390
White Plains, NY 10601

IN WITNESS WHEREOF, the undersigned has executed this Agreement this $\underline{14}$ ᵗʰ day of March, 2011.

E-LIONHEART ASSOCIATES, LLC

By: _____
    Edward Bronson
    Managing Member

---

**Accepted by:**

PGI ENERGY. INC.

By: _____
    Marcellous S. McZeal
    Chief Executive Officer

Accepted: this ___//___ᵗʰ day of March, 2011

## Leslie Eldridge

| | |
|---|---|
| **From:** | Gregg Jaclin [GJaclin@anslowlaw.com] |
| **Sent:** | Monday, March 28, 2011 4:58 PM |
| **To:** | Leslie Eldridge |
| **Cc:** | Chris Dobbins; Joanna DiBella; Ron Ben-Bassat |
| **Subject:** | RE: PGI ENERGY--PGIE: 3-24-11, Conversion opinion |

This is fine. Not sure why I missed it before.

Gregg E. Jaclin, Esq.
Anslow + Jaclin LLP
195 Route 9 South | Manalapan, NJ 07726
T 732 409 1212 x202| F 732 577 1188
gjaclin@anslowlaw.com | www.anslowlaw.com

**From:** Leslie Eldridge [mailto:Leslie@pacificstocktransfer.com]
**Sent:** Monday, March 28, 2011 7:48 PM
**To:** Gregg Jaclin
**Cc:** Chris Dobbins; Joanna DiBella; Ron Ben-Bassat
**Subject:** RE: PGI ENERGY--PGIE: 3-24-11, Conversion opinion

Hello Mr. Jaclin,

That was the first attachment in my last email. I have attached again for your reference.

Please let me know if this is not sufficient.

Thanks!

Respectfully,

## Leslie Eldridge
Transfer Agent


Pacific StockTransfer
*Proudly Serving Clients Since 1983*

**Main Office**
Pacific Stock Transfer Company
4045 S. Spencer Street, Suite 403
Las Vegas, NV 89119
Phone: 702-361-3033 Fax: 702-433-1979
leslie@pacificstocktransfer.com
www.pacificstocktransfer.com

**Accounting Office**
Pacific Stock Transfer Company
Billing Department
ATTN: Lisa Upham
173-3 Keith Street

**CONFIDENTIAL**          **PSTBRONSON000173**

# Joslyn Claiborne Deposition Exhibit 6

| From: | Joanna DiBella <Joanna@pacificstocktransfer.com> |
| --- | --- |
| Sent: | Tuesday, March 22, 2011 3:59 PM |
| To: | Anthony Welch; Leslie Eldridge |
| Cc: | Boman561@aol.com; Leib Schaeffer; Richard Stilitino; Mark Grober; larrybronson1 @gmail.com; esolomon@fairhillscapital.com |
| Subject: | RE: Global Technologies - GTLL--3-22-11, Rule 540 opinion letter |

Mr. Welch,

It is part of our process that EVERY 504 request is reviewed by counsel. We have to wait for outside counsel to review the request and advise if we can move forward.

It is our standard process to expedite all 504 requests and send them to counsel as quickly as possible and to issue the shares when approved in the same manner.

As soon as counsel responds, we will move forward.

Thank you,

**Joanna DiBella**
Securities Supervisor


Pacific StockTransfer
*Proudly Serving Clients Since 1983*

**Main Office**
Pacific Stock Transfer Company
4045 South Spencer Street, Suite 403
Las Vegas, NV 89119
Email: joanna@pacificstocktransfer.com
Telephone: 702-361-3033
Fax: 702-433-1979
Web: www.pacificstocktransfer.com

**Accounting Office**
Pacific Stock Transfer Company
Billing Department
ATTN: Lisa Upham
173-3 Keith Street
Warrenton, VA 20186
Phone: (571)-485-9998 Fax (540) 347-3075



The information contained in this electronic mail message is confidential information that may be covered by the Electronic Communications Privacy Act, 18 U.S.C Sections 2510-2521, intended only for the use of the individual or entity named above, and may be privileged, confidential or otherwise protected disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. Any further distribution of this message is strictly prohibited without the written consent of the sender. If you have received this communication in error, please immediately notify us by telephone (702-361-3033), and delete the original message. Thank you.

**From:** Anthony Welch [mailto:anthonykwelch@me.com]
**Sent:** Tuesday, March 22, 2011 12:56 PM
**To:** Leslie Eldridge

**Cc:** Boman561@aol.com; Leib Schaeffer; richard@fairhillscapital.com; Mark Grober; larrybronson1@gmail.com; esolomon@fairhillscapital.com; Joanna DiBella
**Subject:** Re: Global Technologies - GTLL--3-22-11, Rule 540 opinion letter

With respect, these transactions are extremely time sensitive. Our last transaction of this exact same type took nearly a week to complete, and frankly, almost failed due to the delay This transaction is 100% identical the prior one, except amounts.

Therefore, please insist we have an immediate turnaround on this due to this fact. (I.e. there isn't anything to 'review'. Everything is exactly the same as the prior)

On Mar 22, 2011, at 3:46 PM, Leslie Eldridge wrote:

Good Afternoon,

I have received the opinion letter for the 504 issuance. In order to forward this to counsel for review and approval, we will need the associated documents for this request.

Thank you!

Respectfully,

## Leslie Eldridge

Transfer Agent

<image001.jpg>

**Main Office**
Pacific Stock Transfer Company
4045 S. Spencer Street, Suite 403
Las Vegas, NV 89119
Phone: 702-361-3033 Fax: 702-433-1979
leslie@pacificstocktransfer.com
www.pacificstocktransfer.com

**Accounting Office**
Pacific Stock Transfer Company
Billing Department
ATTN: Lisa Upham
173-3 Keith Street
Warrenton, VA 20186
Phone: (571) 485-9998 Fax (540) 347-3075

*The information contained in this electronic mail message is confidential information that may be covered by the Electronic Communications Privacy Act, 18 U.S.C Sections 2510-2521, intended only for the use of the individual or entity named above, and may be privileged, confidential or otherwise protected disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. Any further distribution of this message is strictly prohibited without the written consent of the sender. If you have received this communication in error, please immediately notify us by telephone (702-361-3033), and delete the original message. Thank you.*

**CONFIDENTIAL**

**From:** Boman561@aol.com [mailto:Boman561@aol.com]
**Sent:** Tuesday, March 22, 2011 11:19 AM
**To:** Joanna DiBella
**Cc:** leib@fairhillscapital.com; esolomon@fairhillscapital.com; richard@fairhillscapital.com; anthonykwelch@me.com; mark@fairhillscapital.com;larrybronson1@gmail.com
**Subject:** Global Technologies - GTLL--3-22-11, Rule 540 opinion letter

Joanna,

Attached is a copy of the signed opinion.

Thanks,

Tom Boccieri

Regards,

*THOMAS E. BOCCIERI, ESQ.*
*561 Schaefer Avenue*
*Oradell, NJ 07649*
*201-983-2024*
*fax 201-265-6069*

*In a message dated 3/22/2011 1:35:09 P.M. Eastern Daylight Time, anthonykwelch@me.com writes:*

*Executed Set Attached.*

*On Mar 22, 2011, at 1:03 PM, Mark Grober wrote:*

*Attached are the documents for another funding.*

*<image001.jpg>*
*Mark Grober*
*p: 914.358.1930*
*f: 646.390.8433*
*Mark@Fairhillscapital.com*

*This e-mail (including attachments, if any) is intended only for the addressee(s) named above. This e-mail may contain confidential or privileged information. If you are not an intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this e-mail and any attachments is strictly prohibited. If you received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. The sender of this message does not accept liability for any errors or omissions in the contents of this message that arise as a result of e-mail transmission. This message is provided for informational purposes and does not constitute investment advice. This email and the information contained herein should not be construed as a solicitation or offer to buy or sell any securities. Circular 230 Notice: To ensure compliance with IRS requirements, we inform you that any U.S. federal tax advice contained in this message is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding federal tax penalties. You should seek advice tailored to your own particular circumstances from an independent tax advisor.*

**CONFIDENTIAL**

=

=

=

=

=

=

=

=

=

=

*<Subscription Agreement.doc><504 Issuance Resolution.doc><Corporate Resolution.doc><Disbursement Form.doc><Instruction Letter.doc><Investor Grid.doc><Officer Certificate.docx><Resolution authorize 504.doc><Resolution to Issue 504 stock.doc>*

=

**DEFS-214062**

# Joslyn Claiborne Deposition Exhibit 9

BEFORE THE SECURITIES COMMISSIONER

OF THE STATE OF DELAWARE

IN THE MATTER OF:                              )
                                               )
OFFERINGS QUALIFYING FOR          ) January 3, 2011
EXEMPTION UNDER                      )
SEC RULES 504 AND 505                )

## ORDER ESTABLISHING AN EXEMPTION AND
## NOTICE FILING REQUIREMENT FOR
## OFFERINGS QUALIFYING FOR EXEMPTION UNDER SEC RULES 504 AND 505

WHEREAS, it is in the public interest that an offer of securities in the State of

Delaware that qualifies for exemption under Rule 504 or Rule 505 of SEC Regulation D

(17 C.F.R. secs. 230.504 and 230.505) be exempt from registration in the State of

Delaware; and

WHEREAS, it is in the public interest that any issuer making such an offer in

Delaware file with the Securities Commissioner for the State of Delaware a notice of

such offering in Delaware; and

WHEREAS, 6 *Del. C.* sec. 7325 authorizes the Commissioner to "make...orders

to carry out and define the provisions" of the Delaware Securities Act; and

WHEREAS, 6 *Del. C.* sec. 7309(b)(9) provides that "the Commissioner may by

rule or order exempt transactions that are exempt under federal securities laws or

regulations;"

NOW THEREFORE, IT IS HEREBY ORDERED, this 3rd day of January, 2011,

as follows:

1.     An offer of securities in the State of Delaware that qualifies for exemption



**CONFIDENTIAL**          **PSTBRONSON000001**

under Rule 504 or Rule 505 of SEC Regulation D (17 C.F.R. secs. 230.504 and 230.505) shall, so long as the issuer of the security has complied with the notice requirement of paragraph 2 below, be exempt from the requirements of 6 *Del. C.* secs. 7304, 7309A and 7312.

2.  Any issuer offering a security in Delaware that qualifies for exemption under Rule 504 or Rule 505 of SEC Regulation D (17 C.F.R. secs. 230.504 and 230.505) shall file with the Commissioner a notice on Form D-1 ("Notice of Sale of Securities Pursuant to the Delaware Limited Offering Exemption") no later than 15 days after the first sale of such security in this state.

3.  This order shall be effective on January 14, 2011.

Peter O. Jamison, III
Securities Commissioner

**CONFIDENTIAL**                    **PSTBRONSON000002**