UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

        -v-

EDWARD BRONSON and
E-LIONHEART ASSOCIATES, LLC,
d/b/a FAIRHILLS CAPITAL,

                                        Defendants,

        -and-

FAIRHILLS CAPITAL, INC.,

                                        Relief Defendant.

---

No. 12-CV-6421 (KMK)

OPINION & ORDER

Appearances:

Kevin P. McGrath, Esq.
Haimavathi V. Marlier, Esq.
Christopher J. Dunnigan, Esq.
Securities and Exchange Commission
New York, NY
*Attorneys for Plaintiff*

William A. Rome, Esq.
Michael A. Eisenberg, Esq.
Robinson Brog Leinwand Greene Genovese & Gluck P.C.
New York, NY
*Attorneys for Defendants*
*Edward Bronson, E-Lionheart Associates, LLC, and Fairhills Capital, Inc.*[1]

KENNETH M. KARAS, District Judge:

        Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Plaintiff")

filed a Complaint against Edward Bronson ("Bronson") and E-Lionheart Associates, LLC ("E-

---

[1] On October 20, 2016, Robinson Brog Leinwand Greene Genovese & Gluck P.C. filed a
motion to withdraw as counsel, after briefing the instant Motion.  (Dkt. No. 169.)  The Court
granted the motion to withdraw on January 11, 2017.  (Dkt. No. 177.)

Lionheart" and, with Bronson, "Defendants") alleging violations of securities registration requirements under §§ 5(a) and 5(c) of the Securities Act of 1933 ("the Act"), 15 U.S.C. §§ 77e(a) and 77e(c).  The SEC also asserts a claim for unjust enrichment against Relief Defendant Fairhills Capital, Inc. ("FCI" or "Relief Defendant").  Before the Court is the SEC's Motion for Summary Judgment (the "Motion").  (Dkt. No. 146.)  For the reasons to follow, the Motion is granted.

## I.  Background

### A.  Factual Background

#### 1.  The Parties

Defendant Bronson, a resident of Ossining, New York, is the sole managing member of E-Lionheart, a Delaware limited liability company formed in 2005 for the purpose of engaging in financing activities and reverse mergers.  (*See* Pl. SEC's Local Rule 56.1 Statement of Undisputed Material Facts ("SEC's 56.1") ¶¶ 1–2, 4, 16 (Dkt. No. 148); Defs.' Resp. to Pl. SEC's Local Rule 56.1 Statement and Statement of Additional Undisputed Material Facts ("Defs.' 56.1") ¶¶ 1–2, 4, 16 (Dkt. No. 154).)[2]  In April 2005, Bronson registered E-Lionheart as a foreign limited liability company with the State of New York.  (*See* SEC's 56.1 ¶ 5; Defs.' 56.1 ¶ 5.)  The listed address was Bronson's apartment at the time, located in Manhattan.  (*See* SEC's 56.1 ¶ 21; Defs.' 56.1 ¶ 21.)  From 2005 to 2007, E-Lionheart's office was located in Manhattan, at various locations, (*see* SEC's 56.1 ¶ 22; Defs.' 56.1 ¶ 22), and beginning in September 2007,

---

[2] Bronson received a degree in business administration from The George Washington University and received a law degree from New York Law School.  (*See* SEC's 56.1 ¶¶ 7–8; Defs.' 56.1 ¶¶ 7–8.)  Bronson is admitted to practice law in the State of New York and maintains an active New York bar membership.  (*See* SEC's 56.1 ¶ 9; Defs.' 56.1 ¶ 9.)

E-Lionheart operated solely out of Bronson's residence in Ossining, New York, (*see* SEC's 56.1 ¶ 23; Defs.' 56.1 ¶ 23).  From May 2009 to January 2010, E-Lionheart maintained an office at 151 East Post Road, White Plains, New York, (*see* SEC's 56.1 ¶ 24; Defs.' 56.1 ¶ 24), and beginning in January 2010, E-Lionheart maintained an office at 245 Main Street, White Plains, New York, (*see* SEC's 56.1 ¶ 25; Defs.' 56.1 ¶ 25).

Beginning in 2008 or 2009, E-Lionheart began doing business as "Fairhills Capital." (*See* SEC's 56.1 ¶¶ 17, 20; Defs.' 56.1 ¶¶ 17, 20.)  In 2009, Bronson hired Mark Grober as an employee of E-Lionheart.  (*See* SEC's 56.1 ¶ 19; Defs.' 56.1 ¶ 19.)  Up until that point, Bronson had been E-Lionheart's sole employee.  (*See* SEC's 56.1 ¶ 19; Defs.' 56.1 ¶ 19.)

For the years 2005 to 2011, E-Lionheart filed federal and New York State tax returns. (*See* SEC's 56.1 ¶¶ 26–27; Defs.' 56.1 ¶¶ 26–27.)  For the years 2009, 2010, and 2011, E-Lionheart did not file tax returns in Delaware.  (*See* SEC's 56.1 ¶ 28; Defs.' 56.1 ¶ 28.)  Starting in September 2007, E-Lionheart maintained a checking and savings account at JPMorgan Chase Bank, NA ("Chase") in Millwood, New York, and on July 2, 2009, E-Lionheart opened a savings account at a Chase branch in White Plains, New York.  (*See* SEC's 56.1 ¶¶ 29–30; Defs.' 56.1 ¶¶ 29–30.)

In 2002, Bronson founded Fairhills Capital Management ("FCM"), a limited liability corporation incorporated in Delaware.  (*See* SEC's 56.1 ¶¶ 11–12; Defs.' 56.1 ¶¶ 11–12.) Bronson was the sole owner of FCM.  (*See* SEC's 56.1 ¶ 11; Defs.' 56.1 ¶ 11.)  FCM specialized in the small and micro-cap sectors, performing advisory assignments and financing thousands of

3

transactions.  (*See* SEC's 56.1 ¶ 13; Defs.' 56.1 ¶ 13.)[3]  FCM purchased and sold securities that were not registered, including those that were issued in reliance on exemptions from registration under Regulation D and Rule 144 of the Securities Act.  (*See* SEC's 56.1 ¶ 15; Defs.' 56.1 ¶ 15.) Bronson is also the President and owner of Relief Defendant FCI, a Delaware corporation formed in September 2010, with a business address in Ossining, New York.  (*See* SEC's 56.1 ¶¶ 6, 31; Defs.' 56.1 ¶¶ 6, 31.)

### 2.  E-Lionheart's Transactions

E-Lionheart's typical purchase pattern was as follows: employees operating from E-Lionheart's White Plains offices called a company to inquire whether it was interested in obtaining capital.  (*See* SEC's 56.1 ¶ 56; Defs.' 56.1 ¶ 56.)  If the company was interested, E-Lionheart employees offered options, including offering to buy the company's securities at a price that was discounted from the then-prevailing market price.  (*See* SEC's 56.1 ¶¶ 56–57; Defs.' 56.1 ¶¶ 56–57.)[4]  Bronson instructed E-Lionheart employees to seek a purchase price for securities that was typically 50 percent of the trading price over the prior 10 to 20 days, though the discount ranged from 10 to 90 percent.  (*See* SEC's 56.1 ¶¶ 58–59; Defs.' 56.1 ¶¶ 58–59.) Bronson ultimately determined the amount E-Lionheart would spend on an issuer's stock.  (*See* SEC's 56.1 ¶ 61; Defs.' 56.1 ¶ 61.)

---

[3] FCM is not a party to this Action.

[4] While Defendants do not dispute the factual assertions in the above statements, they do dispute "that the scope of the claim at issue in this action involves 63 issuers and 353 transactions and that the requirements of Rule 56(c)(1) and (c)(2) have been satisfied."  (*See, e.g.*, Defs.' 56.1 ¶¶ 33–34, 36–41, 48–87, 89–98, 100–80, 183–221, 225–27.)

After an issuer expressed interest in selling securities to E-Lionheart, E-Lionheart employees Mark Grober and Richard Stilitino would send the issuer a set of documents, including an Entity Subscription Agreement (the "Agreement") and an Opinion Letter advising that the transaction was exempt from registration.  (*See* SEC's 56.1 ¶¶ 63, 65; Defs.' 56.1 ¶¶ 63, 65.)  The Agreement typically listed E-Lionheart's address as 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801 and stated that the stock certificates should be issued in the name of E-Lionheart and listed the mailing address as either "Fairhills Capital, 151 East Post Road, Suite 114, White Plains, New York 10601" or "Fairhills Capital, 245 Main Street, Suite 390, White Plains, New York 10601."  (SEC's 56.1 ¶¶ 68–69; Defs.' 56.1 ¶¶ 68–69.)[5]

> Section 2 of the Agreement provided
>
> Notwithstanding anything in this Subscription Agreement (the "Agreement") to the contrary, THE COMPANY shall have no obligation to issue Shares to any person who is a resident of a jurisdiction in which the issuance of the Shares to it would constitute a violation of the securities, "blue sky" or other similar laws of such jurisdiction . . . .  It is intended that the Shares will only be issued to entities formed pursuant to the laws of the State of Delaware that maintain its principal place of business within the State of Delaware.

(SEC's 56.1 ¶ 91; Defs.' 56.1 ¶ 91; Decl. of Kevin P. McGrath, Esq. ("McGrath Decl.") Ex. 3, at DEFS-191909 (Dkt. No. 151).)  Section 5.1(b) of the Agreement stated

> The undersigned is an entity formed pursuant to the laws of the State of Delaware and maintains its principal place of business within the State of Delaware and/or the undersigned is an "accredited investor" as defined under Rule 501 of Regulation D and/or the Subscriber is an "institutional investor" as defined under [§]

---

[5] While Defendants concede that "[t]he factual assertions from the referenced Subscription Agreement concerning in what name the stock certificates should be issued under is not in dispute," Defendants assert that "the SEC has not produced all of the Subscription Agreements in order for Defendants to concede (or not) what is typically provided in Subscription Agreements."  (Defs.' 56.1 ¶ 69.)

7309(b)(8) of the Delaware Securities Act and [§] 501(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

(SEC's 56.1 ¶ 93; Defs.' 56.1 ¶ 93; McGrath Decl. Ex. 3, at DEFS-191909.)  Bronson represented that "[e]ach owner or member of the undersigned is an 'accredited investor' as such term is defined in the rules of the Securities Act of 1933," (SEC's 56.1 ¶ 95; Defs.' 56.1 ¶ 95 (some internal quotation marks omitted)), and that "[t]he undersigned is an 'accredited investor,' as such term is defined in . . . the rules to the Securities Act of 1933," (SEC's 56.1 ¶ 96; Defs.' 56.1 ¶ 96 (some internal quotation marks omitted)).  Bronson also represented that "[t]he undersigned has not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares."  (SEC's 56.1 ¶ 98; Defs.' 56.1 ¶ 98 (internal quotation marks omitted).)

Once an issuer indicated interest in selling shares to E-Lionheart, E-Lionheart then introduced the issuer to an attorney who would issue an Opinion Letter stating that the securities being sold to E-Lionheart qualified for an exemption from registration under Rule 504(b)(1)(iii) and Delaware law.  (*See* SEC's 56.1 ¶ 119; Defs.' 56.1 ¶ 119.)  Virginia Sourlis ("Sourlis") issued the majority of the Opinion Letters at issue in this Action.  (*See* SEC's 56.1 ¶¶ 64, 119, 124; Defs.' 56.1 ¶¶ 64, 119, 124.)  Sourlis, who was only admitted to practice law in New Jersey at the time she issued the Opinion Letters, had a retainer agreement with E-Lionheart.  (*See* SEC's 56.1 ¶¶ 120–21; Defs.' 56.1 ¶¶ 120–21.)[6]

---

[6] In a Summary Order issued July 8, 2016, the Second Circuit affirmed a ruling of the district court granting a summary judgment motion by the SEC, holding Sourlis "an attorney who wrote [an opinion letter] relating to one of the offerings [at issue]—liable for violating § 5 of the Securities Act . . . ; violating § 10(b) of the Securities Exchange Act of 1934 . . . , and Rule 10b-5 . . . ; and aiding and abetting violations of § 10(b) and Rule 10b-5, in violation of § 20(e) of the Exchange Act . . . ."  *SEC v. Frohling*, 654 F. App'x 523, 525 (2d Cir. 2016).  Sourlis was

Most Sourlis Opinion Letters provided

> The Purchaser [E-Lionheart] . . . qualifies for the exemption from registration set forth in the Securities Act pursuant to Rule 504 of Regulation D, [§] 7309(b)(8) of the Delaware Securities Act [now § 73-207(b)(8)] and [§] 510(a)(1) of Part E under the Rules and Regulations Pursuant to the Delaware Securities Act.

(*See* SEC's 56.1 ¶ 125; Defs.' 56.1 ¶ 125; McGrath Decl. Ex. 3, at TAR 0004583.)[7]

Additionally, most of the Opinion Letters drafted by Sourlis stated that "[§] 7309(b)(8) of the Delaware Securities Act [now § 73-207(b)(8)] satisfied the requirements of [§] 504(b)(1)(iii)." (SEC's 56.1 ¶ 126; Defs.' 56.1 ¶ 126; McGrath Decl. Ex. 3, at TAR 0004583.)  Additional attorneys provided Opinion Letters to issuers, none of which was admitted to practice in Delaware at the time each Opinion Letter was issued.  (*See* SEC's 56.1 ¶¶ 156–69; Defs.' 56.1 ¶¶ 156–69.)

The issuer would then sign the Agreement and return it to E-Lionheart's offices in New York, where Bronson signed it.  (*See* SEC's 56.1 ¶ 71; Defs.' 56.1 ¶ 71.)  After receiving Bronson's signature, E-Lionheart employees would wire the purchase funds to an escrow account, where they were held until the transfer agent issued stock certificates or E-Lionheart received confirmation that the shares had been electronically transferred to E-Lionheart's account.  (*See* SEC's 56.1 ¶ 74; Defs.' 56.1 ¶ 74.)  Transfer agents were generally instructed to send the physical stock certificates to E-Lionheart's offices in White Plains, New York or to

---

ordered "to pay a total of $57,284.83 as a civil penalty, disgorgement, and prejudgment interest, and [was] permanently bar[red] . . . from participating in so-called 'penny stock' offerings."  *Id.*

[7] Defendants object that "the SEC has not produced in its submission the vast majority of [O]pinion [L]etters issued by Virginia Sourlis in order for Defendants to concede (or not) what 'most' of her opinions provide."  (Defs.' 56.1 ¶ 125.)

brokerage firms where E-Lionheart maintained an account.  (*See* SEC's 56.1 ¶ 79; Defs.' 56.1 ¶ 79.)[8]  None of the addresses provided by the transfer agents was a Delaware address.  (*See* SEC's 56.1 ¶ 80; Defs.' 56.1 ¶ 80.)  E-Lionheart would then instruct the escrow agent to release the funds to the issuer.  (*See* SEC's 56.1 ¶ 75; Defs.' 56.1 ¶ 75.)

After purchasing securities from an issuer, E-Lionheart typically would immediately resell the stock after it was cleared for trading.  (*See* SEC's 56.1 ¶ 62; Defs.' 56.1 ¶ 62.)  Bronson made the decision when to sell the shares until 2011, when Bronson hired Greg Regan and Joseph Sansobrino to make trading decisions on behalf of E-Lionheart.  (*See* SEC's 56.1 ¶ 89; Defs.' 56.1 ¶ 89.)

### 3.  Location of the Transactions

E-Lionheart employees who took actions in connection with the Rule 504(b)(1)(iii) transactions were located in New York, with the exception of Naton Wells, who worked for E-Lionheart remotely from Florida.  (*See* SEC's 56.1 ¶ 101; Defs.' 56.1 ¶ 101.)  On July 16, 2009, FCI entered into a contract with the Regus Group for a one-year lease on virtual office space in Wilmington, Delaware, running from August 1, 2009 to July 31, 2010.  (*See* SEC's 56.1 ¶ 111; Defs.' 56.1 ¶ 111.)  The lease provided FCI with a Delaware mailing address, telephone number, voicemail and answering service, mail forwarding, and the right to use the Regus Group's Delaware office space two days per month.  (*See* SEC's 56.1 ¶ 112; Defs.' 56.1 ¶ 112.)  The Regus Group forwarded mail addressed to E-Lionheart to a White Plains, New York address and forwarded faxes to a New York fax number on a daily basis.  (*See* SEC's 56.1 ¶ 114; Defs.' 56.1

---

[8] While Defendants do not dispute these factual assertions, Defendants object to the scope of the claim at issue and additionally note that the SEC "has not even located all of the alleged instruction letters."  (Defs.' 56.1 ¶ 79.)

¶ 114.)  Prior to August 1, 2009, neither E-Lionheart nor FCI owned or leased office space in Delaware.  (*See* SEC's 56.1 ¶ 110; Defs.' 56.1 ¶ 110.)  The lease with the Regus Group was renewed automatically 90 days before its expiration.  (*See* SEC's 56.1 ¶ 115; Defs.' 56.1 ¶ 115.)

On May 3, 2011, E-Lionheart and Fairhills Capital Offshore, Ltd. entered into contracts with the Regus Group to lease full-time office spaces in Wilmington, Delaware.  (*See* SEC's 56.1 ¶¶ 116–17; Defs.' 56.1 ¶¶ 116–17.)[9]  No E-Lionheart employee worked from or visited the rented office space in Delaware, (*see* SEC's 56.1 ¶ 118; Defs.' 56.1 ¶ 118), and neither E-Lionheart, nor any FCI entity had any employees in an office in Delaware in 2009, 2010, or 2011, (*see* SEC's 56.1 ¶ 185; Defs.' 56.1 ¶ 185).

### 4.  Plaintiff's Claims

The SEC alleges that Defendants violated §§ 5(a) and 5(c) of the Securities Act of 1933 and that Relief Defendant FCI has been unjustly enriched by Defendants' unlawful conduct.  (*See* Compl. ¶¶ 37–41 (Dkt. No. 1).)

### B.  Procedural History

The SEC filed the Complaint on August 22, 2012.  (Dkt. No. 1.)  On February 1, 2013, Defendants filed a Motion To Dismiss, (Dkt. No. 17), which was denied in an Order & Opinion ("Opinion") on March 31, 2014, (Dkt. No. 21).

On May 1, 2014, Defendants' then-counsel, Nixon Peabody LLP, made a motion to withdraw as counsel, (Dkt. Nos. 27–28), which the Court granted on May 6, 2014, (Dkt. No. 30).  Morvillo Abramowitz Grand Iason & Anello P.C. ("Morvillo") appeared as new counsel for Defendants on June 13, 2014.  (Dkt. Nos. 33–34, 39.)

---

[9] Fairhills Capital Offshore, Ltd. is not a party to this Action.

Defendants filed an Answer to the Complaint on September 5, 2014, (Dkt. No. 41), and filed an Amended Answer on October 5, 2015, (Dkt. No. 116).

On April 11, 2016, Morvillo filed a motion to withdraw as counsel, (Dkt. Nos. 140–41), which the Court granted, (Dkt. No. 142).  In a subsequent Order, the Court instructed Defendants E-Lionheart and FCI to appear with new counsel and ordered that an attorney for Bronson appear or that Bronson inform the Court that he wished to proceed pro se.  (Dkt. No. 143.)  Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog") appeared on behalf of Defendants on May 15, 2016.  (Dkt. Nos. 144–45.)

On June 10, 2016, the SEC filed the instant Motion for Summary Judgment and accompanying papers, (Dkt. Nos. 146–51), and Defendants filed their opposition and accompanying papers on July 22, 2016, (Dkt. Nos. 154–56).  On August 19, 2016, the SEC filed its papers in reply.  (Dkt. Nos. 159–61.)

On October 20, 2016, Robinson Brog filed a motion to withdraw as counsel for Defendants and requested a stay of the proceedings pursuant to the motion.  (Dkt. Nos. 169–70.) On October 24, 2016, the SEC filed an opposition, agreeing to the withdrawal of Defendants' counsel, but opposing the proposed stay of the proceedings.  (Dkt. No. 172.)  Robinson Brog replied on November 1, 2016.  (Dkt. No. 173.)

On November 1, 2016, Bronson filed a Notice of Bankruptcy Filing and Enforcement of Automatic Stay, informing the Court that he had filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, and that pursuant to § 362 of the Bankruptcy Code, such filing "automatically operates as a stay preventing the commencement or continuance of any actions or proceedings against . . . Defendant."  (Dkt. No. 174.)  On November 3, 2016,

the SEC filed an opposition to Bronson's Notice of Bankruptcy Filing and Enforcement of Automatic Stay.  (Dkt. No. 175.)  Despite the Court's instruction to respond to the SEC's opposition, Defendants declined to do so.  (Dkt. No. 176.)  In an Order dated January 11, 2017, the Court granted Robinson Brog's motion to withdraw, and denied Defendants' application for a stay as neither the withdrawal of counsel nor the bankruptcy filing warranted a delay of the Action.  (Dkt. No. 177.)  Defendants were instructed to appear with new counsel within 30 days of the date of the Order, (*id.* at 7), but as of the date of this Opinion & Order, have yet to do so, (*see* Dkt.).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on

11

the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech.*

12

*Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

      <u>B.  Analysis</u>

As the Court's prior Opinion provides an overview of the legal landscape and applicable securities laws, the Court does not reiterate the history and purpose of the registration requirements or state "blue sky laws" here.  (*See* Op. & Order ("Opinion") 8–11 (Dkt. No. 21).)

      <u>1.  Section 5 of the Securities Act</u>

Section 5 of the Securities Act of 1933 requires that securities be registered with the SEC before any person may offer or sell such securities.  *See* 15 U.S.C. § 77e.  This requirement "protect[s] investors by promoting full disclosure of information thought necessary to informed investment decisions."  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  "Section 5 'imposes strict liability on offerors and sellers of unregistered securities' regardless of any degree of fault, negligence or intent on the seller's part."  *SEC. v. StratoComm Corp.*, 2 F. Supp. 3d 240, 263–64 (N.D.N.Y. Feb. 19, 2014) (quoting *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)), *aff'd*, 652 F. App'x 35 (2d Cir. 2016).  Therefore, "[o]nce a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption."  *SEC v. Cavanaugh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *see also SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011) (same).

To state a cause of action under § 5 of the Securities Act, the SEC must show "(1) lack of registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and mails in connection with the offer or sale."  *Cavanagh*, 445 F.3d at 111 n.13 (internal quotations and citations omitted).

It is undisputed that no registration statements were filed or in effect with respect to the securities that E-Lionheart purchased or resold.  (*See* SEC's 56.1 ¶¶ 36–38; Defs.' 56.1 ¶¶ 36–38.)  Nor do Defendants dispute the offer or sale of the securities and the use of interstate transportation or communication and mails in connection with the offer or sale.  (*See* SEC's 56.1 ¶¶ 39–40; Defs.' 56.1 ¶¶ 39–40.)  While Defendants concede that the SEC has established a prima facie case as to "the [10] issuers identified in the Complaint," Defendants contend that the SEC has failed to do so for the remaining 53 issuers.  (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n") 1 (Dkt. No. 156).)  Defendants assert that "[t]he identification at summary judgment of dozens of issuers not set forth in the Complaint, or thereafter, . . . constitutes a new claim necessitating amendment of the pleading."  (*Id.* at 1–2.)[10] Defendants offer no case law in support of their contention that the SEC's instant Motion for Summary Judgment offers a new legal claim as to the remaining 53 issuers.

To the extent that Defendants' assertion that the "identification at summary judgment of dozens of issuers not set forth in the Complaint" suggests that Defendants were not on notice of the scope of Plaintiff's claims, (Defs.' Opp'n 1), such a statement is belied by the record.  First, the SEC's Complaint put Defendants on notice of the types of transactions at issue in this Action and made clear that those transactions specifically identified were illustrative.  (*See, e.g.*, Compl. ¶ 10 (Dkt. No. 1) ("The Defendants in this case obtained and illegally resold the stock of

---

[10] In its reply to Defendants' opposition, the SEC clarifies that the Complaint actually identifies 11 "illustrative issuers."  (Pl. SEC's Reply in Supp. of its Mot. for Summ. J. Against Defs. and Relief Def. 1, 7–10 (Dkt. No. 158).)  The Court notes that in addition to the 10 issuers listed in the table at ¶ 30 of the Complaint, the SEC details the resales of the stock of ICBS, Ltd. in ¶¶ 25–29.  (*See* Compl. ¶¶ 25–30.)  Accordingly, the Court agrees that the SEC identified 11 issuers by name in the Complaint.

approximately 100 companies."); *id.* ¶ 18 ("Bronson and E-Lionheart repeated this pattern with approximately 100 issuers, often purchasing and unlawfully reselling multiple 'tranches' of securities from any given issuer"); *id.* ¶ 30 ("Since August 2009, Defendants have engaged in similar illegal resales of the stock of over [100] . . . companies.").)

Second, throughout discovery, the SEC gave Defendants abundant information on the additional transactions at issue.  (*See, e.g.*, Reply Decl. of Kevin P. McGrath ("McGrath Reply Decl.") Ex. 2, at 5 (Dkt. No. 161) (noting in its Initial Disclosures that "discovery is likely to reveal that Defendants have received proceeds from illegal Rule 504 Transactions concerning additional publicly traded companies beyond the specific examples mentioned in the Complaint" and "Plaintiff may seek disgorgement . . . resulting from illegal Rule 504 Transactions involving the stock of the Illustrative Issuers and any other company"); McGrath Reply Decl. Ex. 5, at 28 (noting at a discovery conference that the SEC was seeking discovery in connection with "a broader category . . . [of] 60 to 70 additional issuers"); *id.* at 31 (referencing Plaintiff's document requests and stating Defendants will "provide documents showing that [Defendants] entered into the transactions, and how much [Defendants] entered into—the quantity and the amount"); McGrath Reply Decl. Ex. 6 ¶¶ J, 1 (defining "Previously Specified Issuers" in the SEC's first request for documents as "the [15] issuers specified in the Investigative Subpoenas" and requesting "[a]ll documents concerning Rule 504 Transactions in the stock of any issuer other than a Previously Specified Issuer").)  Indeed, shortly before the close of discovery, the SEC produced a draft disgorgement chart to Defendants.  (McGrath Reply Decl. Ex. 9.)  These disclosures are sufficient.  *See SEC v. Payton*, No. 14-CV-4644, 2016 WL 3023151, at *3 (S.D.N.Y. May 15, 2016) (finding "the SEC was not required to identify in its complaint the

15

precise amount of disgorgement that it sought" and that "[t]he SEC's pretrial disclosures, exhibit list, and summary exhibits further signaled to [the defendant] that all of his . . . trading was at issue"); *SEC v. Zwick*, No. 03-CV-2742, 2007 WL 831812, at *24 (S.D.N.Y. Mar. 16, 2007) ("The SEC was not required to list all of the trades in the complaint, and it was clear from the report of the SEC's expert, produced in advance of trial, what trades were [at issue]."), *aff'd*, 317 F. App'x 34 (2d Cir. 2008).

Thus, Defendants' conclusory assertion that they are "inherently prejudiced by the [SEC's] attempt to inject at the last-minute, dozens of issuers absent from the Complaint or identified in written discovery" is both unsubstantiated and untrue. (Defs.' Opp'n 3.) Accordingly, the Court finds that the transactions with all 63 issuers are relevant to the instant Motion and that Plaintiff has established its prima facie case. The Court therefore turns to whether Defendants have established a registration exemption.

### 2. Federal Law Exemptions to Registration

As detailed in the Court's prior Opinion, "[r]egistered securities offerings can be expensive, time consuming, and burdensome, especially for smaller companies." (Opinion 11.) Thus, "for certain emerging companies, a registered offering is not an option for them. That leaves . . . offerings conducted in compliance with exemptions from registration." (*Id.* (citation and internal quotation marks omitted).) "The most commonly relied-on exemption for stock offerings by emerging companies are those provided by Regulation D . . . ." (*Id.* (citation and internal quotation marks omitted).) Regulation D was designed "to streamline and coordinate the limited offering and nonpublic exemptions under [§§] 3(b) and 4(2) of the Securities Act in order to provide a more coherent pattern of exemptive relief . . . and to achieve uniformity between

16

state and federal exemptions . . . ."  Bryn Vaaler, *Financing a Small Business in Mississippi: A Practitioner's Guide to Federal and State Securities Exemptions Part I*, 63 Miss. L.J. 129, 142 (1993).  "Regulation D provides exemptions from Securities Act registration for securities offerings under three separate rules: Rules 504, 505, and 506."  Revision of Rule 504 of Regulation D, the "Seed Capital" Exemption, 64 Fed. Reg. 11,090, 11,090 (Mar. 8, 1999) (to be codified at 17 C.F.R. pt. 230).  Only Rule 504 is relevant here.

Rule 504, known as the "seed capital" exemption, is limited to offerings by non-reporting companies that do not exceed an aggregate annual amount of $1 million, *see* Revisions of Limited Offering Exemptions in Regulation D, 72 Fed. Reg. at 45,116, 45,133 (proposed Aug. 10, 2007) (to be codified at 17 C.F.R. pts. 200, 230, 239), and places "substantial reliance upon state securities laws," Revision of Rule 504 of Regulation D, 64 Fed. Reg. at 11,090.  "Rule 504 sets forth the requirements for four separate exemptions from the registration requirements of the Securities Act."  Revisions of Limited Offering Exemptions in Regulation D, 75 Fed. Reg. at 45,133.  "Among these is Rule 504(b)(1)(iii), which provides an exemption from registration for offers and sales of securities that are conducted 'according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "accredited investors" as defined in [Rule 501(a)].'"  *Id.* (alteration in original) (footnote omitted); *see also* 17 C.F.R. § 230.504(b)(1)(iii).[11]  Thus, there are three requirements for

---

[11] An "accredited investor" is defined as a person or entity that falls within one of several categories under 17 C.F.R. § 230.501(a).  Relevant to the instant case are those exceptions for "[a]ny natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000," *id.* § 230.501(a)(5), and "[a]ny natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year," *id.* § 230.501(a)(6).  A more fulsome

application of a Rule 504(b)(1)(iii) exemption: (a) a security sale or offer must be made exclusively according to state-law exemptions from registration; (b) these state-law exemptions must permit general solicitation and general advertising; and (c) the purchasers of the securities must be "accredited investors."  "Securities sold without registration in reliance on this provision are not subject to the limitations on resale established in Rule 502(d) and, as such, are not 'restricted securities . . . .'"  75 Fed. Reg. 45,133; *see also* 17 C.F.R. § 230.504(b)(1) (providing an exemption for transactions that meet the requirements of Rule 504(b)(1)(i)–(iii) from the resale restrictions imposed by 17 C.F.R. § 230.502(d)).[12]  However, in considering the scope of the Rule 504 exemption, it is worth remembering that "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *Cavanaugh*, 445 F.3d at 115.

### 3.  Applicability of Delaware Security Act § 73-207(b)(8)

As noted *supra*, Rule 504(b)(1)(iii) requires that offers and sales of securities be "made exclusively according to state law exemptions from registration."  Defendants assert that the securities at issue satisfy the conditions for exemption under Rule 504(b)(1)(iii) and the relevant state-law exemption, Delaware Securities Act § 73-207(b)(8).[13]  (*See generally* Defs.' Opp'n 8–19.)  Section 73-207(b)(8) exempts from registration "[a]ny offer or sale to a bank, savings

---

discussion of "accredited investor" status, is provided in the Court's prior Opinion.  (*See* Opinion 14–16.)

[12] For a brief history of the addition of Rule 504(b)(1)(iii) as a new exemption introduced in 1999, see the Court's prior Opinion.  (*See* Opinion 13–14.)

[13] Section § 73-207(b)(8) was previously codified at § 7309(b)(8) of the Delaware Code. 78 Del. Laws ch. 175 (2011).  The Court will refer to the law by its current codification.

institution, trust company, insurance company, investment company . . . , pension or profit-sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in some fiduciary capacity."  Del. Code. Ann. tit. 6, § 73-207(b)(8).

While the Parties dispute whether § 73-207(b)(8) satisfies Rule 504(b)(1)(iii) because it "does not permit general solicitation or general advertising as required by Rule 504(b)(1)(iii)," (Pl. SEC's Mem. in Law in Supp. of its Mot. for Summ. J. Against Defs.' and Relief Def. ("SEC's Mem.") 14 (Dkt. No. 147)), the Court must first determine whether the state-law exemption Defendants invoke applies to the transactions at issue, 17 C.F.R. § 230.504(b)(1) (requiring that offers and sales of securities be made "[e]xclusively according to state law exemptions from registration").  In its prior Opinion, the Court concluded that "the language of Rule 504(b)(1)(iii) requires compliance with those state-law exemptions where the securities are offered or sold."  (Opinion 22.)  The Delaware Securities Act applies only where "there is a sufficient nexus between Delaware and the transaction at issue."  *Vichi v. Koninklijke Philips Elecs. N.V.*, No. 2578-VCP, 2009 WL 4345724, at *19 (Del. Ch. Dec. 1, 2009).  As the Court has previously observed, "the case law is clear that incorporation alone is not a sufficient nexus to trigger application of Delaware's Securities Act."  (Opinion 25 (collecting cases).)  In their opposition to Plaintiff's Motion, Defendants concede that the Court ruled as such, but argue that "as the Court had decided earlier in the decision to deny the motion to dismiss on other grounds, that part of the decision discussing nexus was not necessary to the decision, and should not be considered binding."  (Defs.' Opp'n 11.)  While Defendants are correct that such dicta is not

19

binding on the Court, contrary to Defendants' contention, the "law of the case" doctrine is not applicable only where a party has had an opportunity to appeal the decision.  (*Id.* at 11 n.12.)

"The law-of-the-case doctrine has several branches; one deals with decisions of a lower court that have been ruled on on appeal, and another deals with decisions that have not been ruled on on appeal."  *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir. 1991).  "Under the first branch of the doctrine," not relevant here, "the trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals."  *Id*.  "The court's exercise of its power to reconsider and modify its prior *interlocutory rulings* is informed by the second branch of the law-of-the-case doctrine.  That principle is that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *Id.* at 758 (emphasis added) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).  This second branch of the doctrine, applicable here, "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)).

Defendants contend that "fresh evidence," along with additional case law warrants reconsideration of the Court's conclusions regarding the nexus requirement.  (Defs.' Opp'n 11.) Defendants highlight the opinion of then-Delaware Securities Commissioner Peter O. Jamison, III (the "Jamison Opinion") concurring with the conclusions in Sourlis' Opinion Letter as

evidence that a sufficient nexus was present where E-Lionheart purchased securities from GoIP

Global, Inc., a Nevada corporation, based in New York.  (*See id*. at 11–12.)[14]

Defendants do not offer any authority—and the Court is aware of none—holding that the

opinion of, let alone a three sentence email from, a Securities Commissioner is binding.[15]  The

same is true for the SEC's proffered evidence of the Opinion from the Investor Protection Unit of

the Delaware Department of Justice (the "Strong Opinion"), and the SEC admits as such.  (*See*

Pl. SEC's Reply in Supp. of its Mot. for Summ. J. Against Defs. and Relief Def. 6 (Dkt. No. 159)

(noting the email from then-Commissioner Jamison is not binding legal authority and "[t]he

Interpretive Opinion of . . . Commissioner Strong is also not binding").)[16]  Thus, the Court

---

[14] The Court notes that although Defendants offer the Jamison Opinion as evidence that
"the Delaware Securities Commissioner agreed that sufficient nexus was present where [E-
Lionheart] purchased securities from GoIP Global, Inc.," (Defs.' Opp'n 11), Defendants do not
offer any argument as to the application of the Jamison Opinion to any other Opinion Letters,
even those drafted by Sourlis, issued in connection with other issuers or transactions.
Defendants thus offer the Jamison Opinion as a blanket acceptance of § 73-207(b)(8)'s
application to all transactions.  Indeed, Defendants do so despite their contention that "the SEC
has not produced in its submission the vast majority of [O]pinion [L]etters issued by Virginia
Sourlis in order for Defendants to concede (or not) what 'most' of her opinions provide."  (Defs.'
56.1 ¶ 125.)

[15] The email from then-Commissioner Jamison states:

> I have reviewed Ms. Sourlis' [Opinion Letter], and it does appear that Ms. Sourlis'
> interpretation of 6 Del. C. [§] 7309(b)(8) and [§] 510 of the Rules and Regulations
> Pursuant to the Delaware Securities Act is correct.  That being said, if the SEC
> believes that the use of the Delaware exemption at [§] 7309(b)(8) in this particular
> case is contrary to the public interest, please let me know.  Delaware does have a
> procedure that authorizes the Commissioner to withdraw an exemption on a general
> or case-by-case basis.

(Aff'n of William A. Rome Ex. A, at SEC-SEC-0007800 (Dkt. No. 155).)

[16] Despite the fact that neither Opinion is binding authority, the Court notes that the
Strong Opinion is the far more reasoned of the two.  The Strong Opinion addresses two specific

declines to consider either Opinion as binding authority and therefore, need not adjudicate the merits of these conflicting Opinions.

Defendants also contend that "[E-Lionheart]'s incorporation in Delaware is not its sole contact with the state."  (Defs.' Opp'n 12.)  In particular, Defendants argue that the maintenance of a virtual office, payment of franchise taxes, and elected choice-of-law in its Agreements are "*collectively* sufficient contact with Delaware."  (*Id.* (emphasis added).)[17]

Defendants also assert that "it is an open question whether a virtual office in Delaware constitutes sufficient nexus by itself to invoke Delaware Securities Law" and that the Court "may so find" it sufficient.  (*Id.*)  However, Defendants fail to offer *any* case law in which a court has so found a nexus under such circumstances, let alone in combination with the other factors present.  Indeed, one district court has described Regus as "an entity that apparently provides [state] mailing addresses and phone numbers for numerous out of state businesses that wish to appear as if they have a place of business in [that state]."  *Nedgam Prods., LLC v. Bizparentz*

---

questions posed by the SEC, (McGrath Reply Decl. Ex. 11, at 1, 3), analyzes the relevant provisions of Delaware law, and provides the reasoning underlying the answers given.  The Jamison Opinion does none of this.

Additionally, Defendants' contention that the SEC improperly withheld the Jamison Opinion is unfounded.  The SEC had no obligation to disclose this informal communication; as the Court has already explained, it is not binding authority on this Court.

The SEC also timely sought and disclosed the Strong Opinion.  As it explains in its reply brief, the SEC requested the Opinion before the close of discovery for strategic reasons and immediately produced it to Defendants upon receipt.  Defendants did not make an objection to its timeliness until their opposition to the instant Motion.

[17] Defendants fail to explain the relevance of the payment of a Delaware franchise tax, (*see* Defs.' Opp'n 12), and as the SEC identifies, it appears that as of June 1, 2015, E-Lionheart's incorporation status was cancelled for failure to pay that tax, (*see* Aff'n of William A. Rome Ex. O (Dkt. No. 155)).

*Found.*, No. 09-CV-500, 2010 WL 3257909, at *6 (D. Conn. Apr. 29, 2010).  Here, Defendants

concede that E-Lionheart's offices were located in White Plains, New York, (*see* Defs.' 56.1

¶¶ 22–25), E-Lionheart employees solicited issuers and sent transactional documents from their

New York offices, (*see id.* ¶¶ 56, 63), transfer agents were typically instructed to send stock

certificates to E-Lionheart's New York offices or New York brokerage firms, (*see id.* ¶¶ 79, 84),

Defendants did not send any proceeds of sales to addresses in Delaware, (*see id.* ¶ 55), and no E-

Lionheart employee worked from or visited the rented office space in Delaware, (*see id.* ¶ 118).

Accordingly, nothing in the record or Defendants' briefing supports the contention that the

leasing of virtual office space weighs in favor of finding a nexus sufficient to invoke Delaware

Securities Laws.  *See Nedgam Prods.*, 2010 WL 3257909, at *6 (finding that the plaintiff did not

have a "usual place of business" in Connecticut, even though it claimed to have a virtual office

there, because the record showed that its employees operated in a different state).

    Rather than identify potentially applicable exemptions in states (aside from Delaware)

where the transactions occurred, Defendants instead contend that "parties may choose the law

governing their transactions, including securities transactions, to the exclusion of other state

securities laws," (Defs.' Opp'n 12), and that "[t]he choice of law provisions in the respective

subscription agreements between [E-Lionheart] and issuers directs the application of Delaware

law to these transactions," (*id.* at 13).  As the Court previously noted, this claim "that the

Delaware Securities Act could be chosen by issuers to govern securities that were not offered or

sold to or from Delaware might raise serious Commerce Clause questions."  (Opinion 25 n.10.)

    In any event, the Court agrees with the SEC that the "broad authority" Defendants invoke

to show that choice-of-law provisions in the E-Lionheart subscription agreements can satisfy the

nexus requirement is unavailing.  (Defs.' Opp'n 13.)  The provisions at issue in the cited cases

pertain to either private contract or fraud claims and do not support the proposition that "parties

may choose the law governing their . . . securities transactions" in the context of registration

exemptions.  (*Id.* at 12.)  *See, e.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 224 n.28

(3d Cir. 2006) (finding that New York law applied to the plaintiff's *common law fraud claim* and

the Pennsylvania Securities Act was inapplicable because "the [a]greement, which contain[ed] a

choice of law clause . . . [was] governed solely by New York law" (emphasis added)); *Organ v.

Byron*, 435 F. Supp. 2d 388, 390, 393 (D. Del. 2006) (finding "Delaware courts will generally

recognize a valid choice of law provision in a contract, as long as the jurisdiction *bears some

material relationship to the transaction*" and "Delaware Securities Law provisions are

essentially identical to the [other state's] provisions" (emphasis added) (internal quotation marks

omitted)); *Chase Manhattan Mortg. Corp. v. Advanta Corp.*, No. 01-CV-507, 2005 WL

2234608, at *12 (D. Del. Sept. 8, 2005) (finding *in the context of fraud and misrepresentation

claims* "the law of the state with the most significant relationship to the transaction applies");

*Mallon Res. Corp. v. Midland Bank PLC*, No. 96-CV-7458, 1997 WL 403450, at *2–3 (S.D.N.Y.

July 17, 1997) (finding a provision stating that "loan documents shall be deemed contracts and

instruments made under the laws of the state of New York" and that borrowers and lenders

"acknowledge that it . . . will be neither inconvenient nor unfair *to litigate or otherwise resolve

any disputes* or claims in a court sitting in such state" was "broad enough to include statutory

fraud claims" (alteration in original) (emphasis added)); *Boss v. Am. Express Fin. Advisors, Inc.*,

791 N.Y.S.2d 12, 14 (App. Div. 2005) (finding a forum-selection and choice-of-law clause valid

in an employment contract because "[t]he parties here agreed to the jurisdiction of the Minnesota

courts *to resolve any controversy* and agreed that Minnesota law would apply" (emphasis

added)), *aff'd*, 844 N.E.2d 1142 (N.Y. 2006). Put differently, Defendants cannot artificially

select a particular state's security laws for the purpose of evading the registration requirements of

the federal securities laws where the transactions at issue have no connection to that state. And

because Delaware law is the only state law Defendants cite to justify the non-registration of the

securities at issue, Defendants have failed to rebut the SEC's prima facie case that Defendants

violated § 5. Therefore, the SEC's Motion for Summary Judgment is granted.[18]

### 4. Requested Relief

"Once the district court has found federal securities law violations, it has broad equitable

power to fashion appropriate remedies . . . ." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474

(2d Cir. 1996). In the instant Motion, the SEC seeks relief in the form of a permanent injunction

barring Defendants from violating § 5 of the Securities Act, disgorgement of profits with

prejudgment interest, imposition of civil penalties, and a permanent penny stock bar. (*See* SEC's

Mem. 19–25.) In response, Defendants contend that the SEC has not properly calculated

damages and has not offered sufficient evidence to substantiate these calculations. (*See* Defs.'

Opp'n 21–22.) Defendants additionally argue that they are entitled to an offset for their

expenses—such as brokerage commissions, legal costs, and fees paid to transfer agents—and

---

[18] While it need not address the question of whether § 73-207(b)(8) permits general solicitation and advertising or whether Bronson or E-Lionheart are "accredited investors" under Rule 504(b)(1)(iii), the Court notes that the SEC's arguments on both issues are more persuasive than those of Bronson. Reading Rule 504(b)(1)(iii) in conjunction with Rule 510(c), and considering the contributions of E-Lionheart employees and outside investors to the company, the Court has serious doubts as to E-Lionheart's status as an accredited investor.

that Defendants' good faith reliance upon the advice of counsel warrants the imposition of minimal or zero civil penalties.  (*Id.* at 22–25.)

### a.  Section 5 Injunction and Penny Stock Bar[19]

Injunctive relief is expressly authorized by Congress to prohibit future violations of federal securities laws.  *See* 15 U.S.C. § 78u(d)(1) ("Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, . . . it may in its discretion bring an action . . . to enjoin such acts or practices . . . .").  "The SEC must demonstrate that there is a substantial likelihood of future violations of illegal securities conduct."  *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998).  The following factors are relevant in determining the propriety of an injunction:

> the fact that [the] defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether [the] defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) (citation and internal quotation marks omitted); *see also Cavanaugh*, 155 F.3d at 135 (same).  Additionally, "in assessing the strength of the showing concerning likelihood of future violations, the [C]ourt

---

[19] As defined in the Court's previous Opinion, "penny stocks" are securities issued by small companies that trade at less than $5 per share.  *See Penny Stock Rules*, U.S. Sec. and Exch. Comm'n, (May 9, 2013), https://www.sec.gov/fast-answers/answerspennyhtm.html (last visited Mar. 20, 2017).  Penny stocks are not typically sold on securities exchanges, but rather are traded in an over-the-counter market.  *See SEC v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402, 2009 WL 875997, at *4 (E.D.N.Y. Mar. 27, 2009) (noting that penny stocks are "generally sold in the over-the-counter . . . market and generally not listed on an exchange" (alteration in original) (internal quotation marks omitted)).

should consider the specific nature of the injunctive relief sought." *SEC v. Lipkin*, No. 99-CV-7357, 2006 WL 435035, at *1 (E.D.N.Y. Jan. 9, 2006). "[T]he more onerous are the burdens of the injunction [the SEC] seeks," the "more persuasive [its] showing of its entitlement to a preliminary injunction" must be. *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990).

Here, the Court finds several factors weigh in favor of a permanent injunction. Defendants' violations of § 5 were not isolated, but continuous and systematic over a period of more than three years. Despite representations that Defendants had "not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares," (SEC's 56.1 ¶ 98; Defs.' 56.1 ¶ 98 (internal quotation marks omitted)), Defendants admitted that E-Lionheart's "typical practice" was to do just that and "immediately resell the stock after it was cleared for trading," (SEC's 56.1 ¶ 62; Defs.' 56.1 ¶ 62; McGrath Decl. Ex. 2, at 1B005-1B005 MISC 008-000124). Indeed, Bronson testified that the above representation "may appear" inconsistent with E-Lionheart's conduct. (McGrath Decl. Ex. 3, at 154–55.)[20] Remarkably, Defendants continued to engage in transactions supposedly pursuant to Rule 504(b)(1)(iii) through other entities after the SEC filed the instant Action, exhibiting obvious disregard for the seriousness of the allegations; indeed, "[Defendants] have yet to acknowledge their culpability." *Lipkin*, 2006 WL 435035, at *1.

As the SEC notes in its Motion, Bronson was a knowledgeable investor (and attorney) with extensive experience in the securities industry and conceded that he was familiar with the relevant securities law provisions. Bronson's career in trading has been largely focused on

---

[20] On at least one occasion, an issuer complained to Defendants that "Fairhill[s] Capital [was] driving [the stock's] price down on purpose to get more shares and a lower price." (McGrath Decl. Ex. 3, at 1B005-1B005 MISC 008-000124.)

transacting in unregistered securities.  This, combined with the fact that Bronson could continue working for many years, suggests a potential for future violations.

Taking into account all the applicable factors, the Court concludes that the requested injunction is appropriate.  Injunctive relief is "particularly within the [C]ourt's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, . . . and where the court views the defendant's degree of culpability and continued protestations of innocence as indications that injunctive relief is warranted."  *First Jersey Sec., Inc.*, 101 F.3d at 1477 (internal quotation marks omitted).  Furthermore, "the injunction[] that will be imposed [is] not onerous.  [It] simply require[s] that [Defendants] not break the law, an obligation that they are supposed to observe in any event."  *Lipkin*, 2006 WL 435035, at *1.  In fact, Defendants do not specifically oppose the SEC's request for injunctive relief.  (*See generally* Defs.' Opp'n.)  And "since persistent refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid such violations of the securities laws in the future in the absence of an injunction," *First Jersey Sec., Inc.*, 101 F.3d at 1477 (alterations in original) (internal quotation marks omitted), the Court finds a permanent injunction is warranted.

The Court similarly finds that imposition of a permanent penny stock bar against Defendants is appropriate.  The Court may order a penny stock bar "conditionally or unconditionally, and permanently or for such period of time as the court shall determine."  15 U.S.C. § 77t(g)(1).  The repeat nature of Defendants violationS, as well as the lack of acknowledgment of wrongdoing, weigh in favor of ordering such relief.  *See, e.g.*, *SEC v. Becker*, No. 09-CV-5707, 2010 WL 2710613, at *2 (S.D.N.Y. July 8, 2010) (granting the SEC's motion for a permanent penny stock bar, among other reasons, because the defendants were

"repeat offenders," were "in their forties and thus [had] the opportunity to engage in similar penny stock frauds in the future," and had not "accepted any responsibility for [their] conduct"); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) (finding imposition of a penny stock bar appropriate where the "defendant's professional position and apparent refusal to acknowledge the types of conduct that violate securities laws raise[d] serious concerns that he [would] engage in such misconduct in the future"), *aff'd*, 300 F. App'x 70 (2d Cir. 2008). Accordingly, Defendants are permanently barred from transacting in penny stocks.

### b.  Disgorgement of Profits

"The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *First Jersey Sec., Inc.*, 101 F.3d at 1474.  A court may award prejudgment interest on disgorged sums in order to fully compensate the wronged party for damages suffered.  *Id.* at 1476.

The SEC seeks disgorgement of $9,601,446.93, its calculation of E-Lionheart's net profits associated with 353 tranches of securities purchased from 63 issuers.  (*See* SEC's Mem. 22.)  The SEC additionally seeks $610,000 and the value of automobiles from Relief Defendant FCI because E-Lionheart transferred these assets without consideration.  (*See id.*; *see also* SEC's 56.1 ¶¶ 225–27; Defs.' 56.1 ¶¶ 225–27.)  In addition, the SEC contends that an award of prejudgment interest is appropriate, in the amount of $1,761,541.14.  (*See* SEC's Mem. 23.)[21]  In response, Defendants do not dispute that disgorgement is an appropriate remedy, but rather argue that "the basis of any damages must be limited only to [the 10] issuers" "identified in the

---

[21] This amount is measured from the date of June 10, 2016.  (*See* SEC's Mem. 23.)

Complaint and subsequent written discovery." (Defs.' Opp'n 21.) Defendants further argue that "[s]hould the Court in its discretion look beyond the pleadings and accept and consider the evidence offered in the SEC's supporting declarations, then the damages assessed should be limited only to such evidence actually presented . . . , i.e. the 63 individual tranches." (*Id.*)

As noted *supra*, the proper scope of Plaintiff's claims are the stock of 63 issuers, and not merely the 11 identified by name in the Complaint. As previously discussed, the Complaint put Defendants on notice of the scope of the SEC's claims and the information exchanged during discovery further clarified the issuers and transactions at issue. Specifically, the SEC provided Defendants with a disgorgement chart prior to the close of discovery. (*See* McGrath Reply Decl. Ex. 9.)

The Court agrees with the SEC that the summary chart of the shares purchased and sold and the corresponding purchase price, (*see* Decl. of Doreen Rodriguez Ex. 1 (Dkt. No. 150)), is an appropriate "summary to prove content" pursuant to the Federal Rules of Evidence, *see* Fed. R. Evid. 1006 ("The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."). Defendants do not contend that the "underlying documentary evidence," (Defs.' Opp'n 21), was not made available to Defendants, as the rule requires, *see* Fed. R. Evid. 1006 ("The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."), but rather suggest that the failure to submit such documentation *to the Court* precludes consideration of the SEC's calculation. No such requirement exists, particularly when Defendants do not dispute the *accuracy* of the SEC's calculation based on the 353 tranches.

Additionally, the Court finds that the imposition of prejudgment interest is appropriate. "[D]isgorgement and prejudgment interest flow from the principle that, as between one who has broken the law and the authorities charged with enforcing it, the lawbreaker should not be able to retain the fruits of the violation." *SEC v. Elliott*, No. 09-CV-7594, 2011 WL 3586454, at *12 (S.D.N.Y. Aug. 11, 2011). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). "The interest rate generally used to calculate disgorgement interest is the IRS's underpayment rate," *SEC v. Shehyn*, No. 04-CV-2003, 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010), as the SEC proposes here, (*see* SEC's Mem. 22).

As to Defendants' contention that they are entitled to an offset for expenses, the Court agrees that such costs should be deducted from the disgorgement figure. (*See* Defs.' Opp'n 22–23.) The Court "may, in its discretion, deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit." *SEC v. McCaskey*, No. 98-CV-6153, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002) (report and recommendation) (citing cases where courts have offset broker commissions and fees from the disgorgement remedy); *see also SEC v. Rosenfeld*, No. 97-CV-1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001) (report and recommendation) (noting that "[a] court may in its discretion, deduct from the defendant's gross profits certain expenses incurred while garnering the illegal profits, including . . . transaction costs such as brokerage commissions"). "To require disgorgement of all fees and commissions without permitting a reduction for associate expenses and costs constitutes a penalty assessment and goes beyond the restitutionary purpose of the disgorgement doctrine." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 734

31

F. Supp. 1071, 1077 (S.D.N.Y. 1990).  Thus, Defendants are to provide the SEC with a calculation of their transaction expenses within seven days of the date of this Opinion & Order. The SEC is to submit a revised prejudgment interest calculation based on a newly calculated disgorgement figure within seven days thereafter.

c.  Civil Penalties

Upon a proper showing, § 20(d) of the Securities Act permits a court to impose civil penalties on a defendant who has violated the Act.  *See* 15 U.S.C. § 77t(d); *see also SEC v. Razmilovic*, 738 F.3d 14, 36 (2d Cir. 2013) ("[T]he [Securities Act of 1933] give[s] the court discretion to order a defendant who has violated those statutes to pay civil penalties.").  "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'"  *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (quoting *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).  "[W]hereas disgorgement merely restores the defendant to his original position without extracting a real penalty for his illegal behavior, the imposition of civil penalties is appropriate to accomplish the goal of punishment."  *Id.* (alteration, citation, and internal quotation marks omitted).

Section 20(d) of the Securities Act outlines three "tiers" of civil penalties, each establishing a maximum penalty per violation.  *See* 17 C.F.R. § 201, Subpt. E, Tbl. I.  The first tier, operates whenever "any person has violated any provision of [the Securities Act]."  15 U.S.C. § 78u(d)(3)(A).  The second tier requires "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," *id.* § 78u(d)(3)(B)(ii), and the third tier applies

when "such violation directly or indirectly resulted in substantial losses or created a significant

risk of substantial losses to other persons," *id.* § 78u(d)(3)(B)(iii)(bb).[22]  In the context of this

guidance, the amount of any civil penalty rests squarely in the discretion of the Court.  *See SEC*

*v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003) ("District courts have discretion in

determining the appropriate amount of any penalty."), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143

(2d Cir. 2005); *see also* 15 U.S.C. § 77t(d)(2) ("The amount of the penalty shall be determined

by the court in light of the facts and circumstances.").  In assessing the relevant facts and

circumstances, courts typically consider:

> (1) the egregiousness of the violations at issue; (2) [the] defendants' scienter; (3)
> the repeated nature of the violations; (4) [the] defendants' failure to admit their
> wrongdoing; (5) whether [the] defendants' conduct created substantial losses or the
> risk of substantial losses to other persons; (6) [the] defendants' lack of cooperation
> and honesty with authorities, if any; and (7) whether the penalty that would
> otherwise be appropriate should be reduced due to [the] defendants' demonstrated
> current and future financial condition.

*Lybrand*, 281 F. Supp. 2d at 730.  In light of the foregoing factors, and the Court's above

analysis, Defendants' conduct warrants imposition of a third-tier penalty.  "[The] repeated sales

of . . . unregistered securities . . . and [Defendants'] failure to take any steps to confirm the

legitimacy of these sales—even after being put on notice that the sales might not be lawful—

demonstrates a reckless disregard for the regulatory requirements governing the sale of

---

[22] The fine imposed varies per violation in each tier.  When Defendants' violations
occurred, the following maximum penalties applied:

Tier I: $7,500 for individuals; $75,000 for entities
Tier II: $75,000 for individuals; $375,000 for entities
Tier III: $150,000 for individuals; $725,000 for entities

*See* 17 C.F.R. § 201, Subpt. E, Tbl. I.

securities." *Universal Express, Inc.*, 646 F. Supp. 2d at 568.  Additionally, Defendants' statement that E-Lionheart had "not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares," (SEC's 56.1 ¶ 98; Defs.' 56.1 ¶ 98 (internal quotation marks omitted)), and subsequent contradictory actions of immediately reselling the stock, (*see* SEC's 56.1 ¶ 62; Defs.' 56.1 ¶ 62), resulted in the supplying of false information to issuers and created a significant risk of substantial loss to the investing public.  Defendants knew such information was misleading to issuers and "capitalized on the misinformation [Defendants] helped disseminate, reaping millions in profits over the course of several years." *Universal Express, Inc.*, 646 F. Supp. 2d at 568.

Defendants' argument that their good faith reliance on counsel warrants imposition of minimal or no civil penalties is unpersuasive.  (*See* Defs.' Opp'n 23–25.)  To rely on the advice of counsel as a defense to wrongdoing, a defendant must "show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith." *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir. 1994).  Here, Defendants' argument fails because his disclosure to Sourlis and other attorneys was not "complete." *Id.*  In a typical "Opinion Letter," Sourlis stated that "[i]n connection with this [O]pinion, [Sourlis] [has] reviewed . . . [the] Subscription Agreement executed by [E-Lionheart], including various representations of the parties therein."  (McGrath Decl. Ex. 2, at TAR 0004583–84.)  Section 5.1(b) of the Agreement stated that E-Lionheart "maintain[ed] its principal place of business within the State of Delaware" and § 5.4(a) provided that E-Lionheart "[had] not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares."  (McGrath Decl. Ex. 3, at DEFS-

191909–10; SEC's 56.1 ¶ 98; Defs.' 56.1 ¶ 98 (internal quotation marks omitted).)  The Opinion Letter further stated that "[a]s to matters of fact, [Sourlis] [has] relied on information obtained from . . . officers of [E-Lionheart]" and has "relied upon [E-Lionheart]'s assurances that it shall make reasonable inquiry to determine that [E-Lionheart] has a legitimate investment intent in purchasing the Shares."  (McGrath Decl. Ex. 2, at TAR 0004586.)  These statements as to E-Lionheart's principal place of business and investment intent were at best "incomplete," and more accurately, false.

Also, to the extent Defendants relied on the Jamison Opinion to determine their "actions were . . . in accord with the securities laws of the State of Delaware," (Defs.' Opp'n 23), this reliance is misplaced.  Jamison's Opinion spoke directly to that of Sourlis' Opinion Letter, which, as noted, was based upon Defendants' proffer of false information.

As to the appropriate amount of civil penalty, the Court also considers "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect."  *Universal Express, Inc.*, 646 F. Supp. 2d at 568.  Defendants will be required to pay multiple millions in disgorgement and prejudgment interest and have been permanently enjoined from engaging in further violations of § 5 of the Securities Act or trading in penny stocks.  These penalties "lessen the responsibility of the fine to provide a retributive and deterrent effect."  *SEC v. Credit Bancorp, Ltd.*, No. 99-CV-11395, 2002 WL 31422602, at *4 (S.D.N.Y. Oct. 29, 2002).  Bronson has also recently declared bankruptcy, suggesting that his ability to pay will be limited.  In light of these considerations, a civil penalty of $875,000—the minimum sum of a third-tier penalty for an individual and an entity—is appropriate.

### III. Conclusion

For the foregoing reasons, the Court grants the SEC's Motion for Summary Judgment. Accordingly, Defendants are hereby enjoined from committing further violations of § 5 of the Securities Exchange Act of 1933 and are barred from trading in penny stocks.

Defendants are hereby ordered to provide the SEC with a calculation of their transaction expenses for the purpose of calculating the disgorgement figure within seven days of the date of this Opinion & Order. The SEC is to submit a revised prejudgment interest calculation based on the revised disgorgement amount, and a proposed final judgment within seven days thereafter.

The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 146.)

SO ORDERED.

Dated:     March 27 , 2017
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE