UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-v-

EDWARD BRONSON and
E-LIONHEART ASSOCIATES, LLC,
d/b/a FAIRHILLS CAPITAL,

Defendants,

-and-

FAIRHILLS CAPITAL, INC.,

Relief Defendant.

ORDER

No. 12-CV-6421 (KMK)

KENNETH M. KARAS, District Judge:

On August 28, 2017, this Court entered an Amended Final Judgment finding Edward

Bronson ("Bronson") and his firm, E-Lionheart Associates, LLC d/b/a Fairhills Capital ("E-

Lionheart"; collectively, "Defendants") to have engaged in securities transactions that violated

the Securities Act of 1933 and ordering Defendants and Relief Defendant Fairhills Capital, Inc.

("FCI") to pay substantial sums in disgorgement and pre-judgment interest.  (Am. Final J.

("Judgment") 4 (Dkt. No. 193).)[1]  On February 19, 2020, Plaintiff Securities and Exchange

Commission ("SEC" or "Plaintiff") filed an Application for an Order to Show Cause Why

Defendant Edward Bronson Should Not Be Held in Contempt (the "Application"), alleging that

Bronson, despite "earning substantial income," has paid nothing toward the Court's Judgment.

---

[1] Bronson was the sole managing member of E-Lionheart, a Delaware limited liability
company that engaged in financing activities and reverse mergers.  (Op. & Order Granting Pl.'s
Mot. for Summ. J. ("Summ. J. Op.") 2 (Dkt. No. 178).)  Bronson also served as President and
owner of Relief Defendant FCI.  (*Id.* at 4.)

(Pl.'s Appl. for Order to Show Cause ("Pl.'s Appl.") 1 (Dkt. No. 202).)[2]  For the reasons stated

herein, the Application is granted.

## I.  Background

### A.  Factual History

#### 1.  Bronson's Penny Stock Scheme and Original SEC Action

On August 22, 2012, the SEC filed a Complaint alleging that Defendants had "engaged in

a scheme to purchase billions of shares of stock from small companies and illegally resell those

shares to the investing public" without complying with the securities registration requirements

under Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C.

§§ 77e(a) and 77e(c).  (Compl. ¶¶ 1–2 (Dkt. No. 1).)  The scheme, in essence, was to buy shares

of penny stocks at a discounted rate and quickly resell those shares to the public in violation of

applicable registration and resale restrictions.  (Op. & Order Denying Defs.' Mot. To Dismiss

("MTD Op.") 2 (Dkt. No. 21).)  To effectuate their scheme, Defendants would "cold call[]"

companies and offer to purchase their securities at a steep discount from the market rate.

(Compl. ¶ 15; Summ. J. Op. 4.)  If the company expressed interest in the offer, Defendants

would provide the company's transfer agent with an opinion letter stating that the securities were

exempt from registration under Regulation D of the Securities Act and Delaware state law.

(Summ. J. Op. 6; MTD Op. 3–4.)  This purported exemption allowed Defendants to bypass

restrictions on the resale of stock.  Thus, having acquired a company's stock at a discount,

Defendants would turn a profit by immediately reselling the stock to the public at the prevailing

market rate.  (Summ. J. Op. 8; MTD Op. 2–3, 4.)

---

[2] Although the SEC initially filed its Application on February 19, 2020, (see Dkt. No. 201), due to a filing error, the Application and supporting papers were re-filed on March 19, 2020, (see Dkt. No. 202).

In truth, the securities were not exempt from registration. On March 27, 2017, this Court granted the SEC's Motion for Summary Judgment, concluding that Defendants had not satisfied the requirements of the exemption they invoked. (*See* Summ. J. Op. 18–25.)[3] Although Defendants purported to rely on Rule 504(b)(1)(iii) of Regulation D, which requires in relevant part that offers or sales of securities be made "exclusively according to state law exemptions from registration," the state-law exemption on which Defendants relied—Delaware Securities Act § 73-207(b)(8)—applies "only where there is a sufficient nexus between Delaware and the transaction at issue." (Summ. J. Op. 19 (citation and internal quotation marks omitted).) The Court concluded that such a nexus was lacking, (*see id.* at 19–23), and, in response to Defendants' argument that "parties may choose the law governing their . . . securities transactions," the Court further concluded that "Defendants [could not] artificially select a particular state's security laws . . . [to] evad[e] the registration requirements of the federal securities laws where the transactions at issue have no connection to that state," (*id.* at 23, 25).

Accordingly, the Court entered an Amended Final Judgment against Defendants on August 28, 2017. (*See* Dkt. No. 193.) The Court enjoined Defendants from violating § 5 of the Securities Act and barred them from participating in any penny stock offering. (Judgment 4.) In addition, the Court imposed a joint and several obligation: (i) on Defendants to pay disgorgement of $9,355,271.79 and prejudgment interest thereon in the amount of $2,177,100.59; and (ii) on Defendants and Relief Defendant FCI to pay disgorgement of $645,000.00 and prejudgment interest thereon in the amount of $151,031.37. (*Id.*) Finally, the Court imposed a civil penalty of $150,000.00 on Bronson and $725,000.00 on E-Lionheart. (*Id.*) On November 19, 2018, the

---

[3] The Court had previously denied Defendants' Motion To Dismiss the Complaint on March 31, 2014. (*See* Dkt. No. 21.)

Court of Appeals for the Second Circuit affirmed both the grant of summary judgment and the disgorgement penalty. *See SEC v. Bronson*, 756 F. App'x 38, 39–40 (2d Cir. 2018).

### 2. SEC's Contempt Application

On February 19, 2020, the SEC filed the instant Application asking the Court to hold Bronson in civil contempt and order him to: (i) provide an accounting of assets and income belonging to him, his wife, and his wife's company; and (ii) make an immediate good-faith payment in an amount to be determined by the Court. (*See* Pl.'s Appl.; Pl.'s Mem. of Law in Supp. of Appl. for Order to Show Cause ("Pl.'s Mem.") 10 (Dkt. No. 203).)[4] Relying on bank records, emails, text messages, property assessments, deposition testimony, and other financial records, the SEC alleges that, in the years since the Court's Judgment, Bronson has been earning a sizeable income that he uses to maintain a "lavish lifestyle." (*See* Pl.'s Mem. 1, 3–4, 6; Decl. of Maureen Peyton King in Supp. of Pl.'s Appl. ("King Decl. I") ¶ 10 (Dkt. No. 205); Second Decl. of Maureen Peyton King in Supp. of Pl.'s Appl. ("King Decl. II") ¶ 4 (Dkt. No. 217).) Meanwhile, Bronson has yet to make a single payment toward the Court's Judgment. (Pl.'s Appl. 1; Pl.'s Mem. 1.) Instead of satisfying his obligation to this Court, Bronson has allegedly tried to conceal his earnings, shield his assets from the Government, and thwart further discovery efforts by the SEC. (Pl.'s Mem. 3, 4–5, 6.)

According to the SEC, Bronson has been earning income through a company called "Voice2IP, Inc." ("V2IP"). (Pl.'s Mem. 3–5.) Bronson avers that V2IP "is in the business of investing funds for its clients[,] usually in foreign companies," (Aff. of Edward Bronson in

---

[4] In a subsequent submission to the Court, the SEC requests that the Court order Bronson to make an immediate good-faith payment of $100,000, followed by monthly $40,000 payments until the disgorgement obligation is satisfied. (*See* Pl.'s Reply Mem. in Further Supp. of Pl.'s Appl. for Order to Show Cause ("Pl.'s Reply") 6 (Dkt. No. 216).)

Opp'n to Mot. for Contempt ("Bronson Aff. I") ¶ 28 (Dkt. No. 212)), a description that comports

with the SEC's allegations, (*see* Pl.'s Mem. 3, 5; Pl.'s Reply 3).  A 2017 joint tax return for

Bronson and his wife, Dawn Bronson, indicates that they earned approximately $932,000 in

income from V2IP in 2017.  (Pl.'s Mem. 2; King Decl. I Ex. 15, at 149 (Dkt. No. 205-1).)[5]

Although the Bronsons have not filed taxes since 2017, (Pl.'s Mem. 2 n.2), financial records

indicate that money has continued to flow into V2IP's accounts.  For example, bank records

show that between June 2017 and December 2018, an individual named Stuart Krost ("Krost")—

for whom Bronson apparently managed investments, (*see* Pl.'s Mem. 3, 4 n.4)—transferred

$964,000 to V2IP's Citibank account and $130,000 to its Wells Fargo account, (*id.* at 3; King

Decl. I ¶¶ 5–6 and Exs. 1–2).  Between November 2016 and March 2018, Krost also transferred

$800,000 to a Chase escrow account maintained by Bronson's attorney, Paul Rachmuth

("Rachmuth"), (Pl.'s Mem. 4; King Decl. I ¶ 7, Attach. C, and Ex. 3); Rachmuth, in turn,

transferred approximately $117,000 to V2IP's Citibank account, as well as $765,500 to a

Citibank account held by Dawn Bronson and Bronson's father-in-law, (Pl.'s Mem. 4 & n.5; King

Decl. I ¶¶ 8–9, Attachs. A–B, and Exs. 4–5).  More recently, V2IP's Wells Fargo account

indicates receipts of approximately $890,000 for 2019 and $118,000 for the first quarter of 2020.

(Pl.'s Reply 5; King Decl. II ¶ 6 and Exs. 32–33 (Dkt. Nos. 217-4, 217-5).)  Finally, the SEC

points to emails in which Bronson himself appears to acknowledge receiving funds, writing at

one point that "new funds [were] in," and, later, that "[o]ur wire just hit."  (Pl.'s Mem. 5; King

Decl. I Ex. 16, at 151; King Decl. I Ex. 20, at 166.)

---

[5] The SEC produced Exhibits 1–28 in a single document.  (*See* Dkt. No. 205-1.)  Page references to any of these Exhibits refer to the ECF stamp at the top of the page.

Bronson has consistently pointed out that V2IP is owned by his wife, not by him. (*See* Bronson Aff. I ¶ 23; Aff. of Edward Bronson in Further Opp'n to Mot. for Contempt ("Bronson Aff. II") ¶ 5 (Dkt. No. 220).) Indeed, in a November 2016 affidavit, Dawn Bronson represented that she is the "sole owner and officer" of V2IP. (Pl.'s Mem. 2; King Decl. I Ex. 12 ¶¶ 2, 4.) Bronson maintains that it is his wife, therefore, who controls V2IP. (*See* Bronson Aff. II ¶ 4 (asserting that he "do[es] not have control of [V2IP's] finances"); *id.* ¶¶ 5, 6 (stating that his wife has control over V2IP's bank accounts); *id.* ¶ 6 (challenging the SEC's "conclusion that V2IP is either owned or controlled by [him]").)

In reality, the SEC claims, Bronson is the central—if not the sole—operator behind V2IP. At an SEC deposition in January 2020, for example, Bronson's accountant, L.G. Nadler ("Nadler"), described Bronson as an officer of V2IP and testified that Bronson was his main point of contact at the company. (Pl. Mem. 3; King Decl. I Ex. 14 ("Nadler Tr."), at 145.)[6] Though Nadler stated that Bronson's wife is V2IP's "president," he could not describe her role in the company and stated that he interacts with her "very rarely." (Pl.'s Mem. 3; Nadler Tr. 136 ("I'm not sure exactly what her substantive role is.").) By contrast, Nadler had no difficulty describing Bronson's work for V2IP. (Pl.'s Mem. 3.) That work, according to Nadler, has included allocating funds for Krost—who, for a period of time, provided V2IP's "primary source of income"—and trying to develop a hotel and airport in the Turks and Caicos Islands, a project for which the SEC has also produced supporting email documentation and bank records. (Pl.'s Mem. 3, 5; *see* Nadler Tr. 128–29, 132–33, 135–36, 143–44; King Decl. I Exs. 16–19, 25.) For

---

[6] A document produced by Bronson's former law firm, Archer & Greiner, also identifies Bronson as V2IP's contact. (Pl.'s Reply 3; King Decl. II ¶ 8 and Ex. 34 (Dkt. No. 217-6).) The SEC notes that Archer & Greiner initially declined to provide the relevant documents until it consulted with Bronson's counsel, Rachmuth, "[f]urther suggesting that Bronson was the decision-maker." (Pl.'s Reply 3 n.1.)

his part, Bronson acknowledges working on this project, "as well as multiple other projects both domestically and internationally." (Bronson Aff. I ¶ 31.) As further evidence of Bronson's role in V2IP, the SEC points to Nadler's testimony that he consults with Bronson regarding how to categorize personal and business expenses charged to V2IP. (*See* Pl.'s Mem. 3 n.3; Pl.'s Reply 3; King Decl. I Ex. 14, at 139–40.) Finally, in a series of messages regarding wire transfers in September 2019, one of V2IP's clients appears to refer to Bronson and V2IP interchangeably, "effectively equat[ing]" Bronson with the company. (Pl.'s Reply 3–4; King Decl. II Exs. 29–30 (Dkt. Nos. 217-1, 217-2).) The messages also indicate that Bronson was responsible for making a "distribution" to one of V2IP's clients on December 26, 2019. (Pl.'s Reply 4; King Decl. II ¶ 4; King Decl. II Ex. 31, at 4 (Dkt. No. 217-3).) According to the SEC, this correspondence "further demonstrat[es] Bronson's control over V2IP." (Pl.'s Reply 4.)

Bronson has allegedly used the earnings generated through V2IP to maintain a "lavish lifestyle" for him and his family. (Pl.'s Mem. 6.) V2IP's Citibank account includes charges for "a high-end retail department store, salon, private school, pet care, groceries, restaurants[,] and iTunes." (Pl.'s Mem. 6; King Decl. I Exs. 5, 25.) Recent withdrawals from V2IP's Wells Fargo account include purchases for "tuition, limousines, high-end shopping, dining, cable payments referencing 'E Bronson' and a cell phone payment referencing 'Edward Bronson.'" (Pl.'s Reply 5; King Decl. II ¶ 7 and Ex. 32.) Indeed, in testimony given in connection with her husband's voluntary bankruptcy petition in 2016, Dawn Bronson acknowledged paying personal expenses through V2IP. (Pl.'s Mem. 6; King Decl. I Ex. 11, at 111–12.) Moreover, despite Bronson's disgorgement obligation, which exceeds $12 million, he and his family still live in a "tony, million-dollar . . . home on almost 10 acres in Westchester," (Pl.'s Mem. 6; King Decl. I Ex. 21, at 169); two of Bronson's children attend expensive private schools, (Pl.'s Mem. 6; King Decl. I

Exs. 22, 23); and, in January 2017, the Bronsons transferred a 2014 Range Rover—which required monthly lease payments of $1,395.00—to V2IP, (Pl.'s Mem. 6; King Decl. I Ex. 24, at 184).[7]

The SEC concludes that Bronson, although capable of making payments to the Court, has instead tried to conceal his income by working for V2IP, a company nominally controlled by his wife; transferring money through attorney escrow accounts; and even moving funds abroad. (*See* Pl.'s Mem. 3–5.) Finally, the SEC alleges that Bronson has "thwarted" post-judgment discovery and collection efforts by, for example, failing to produce documents from V2IP and providing less-than-truthful responses to the SEC. (*See id.* at 6.)

Bronson readily acknowledges that he performs work for V2IP. (*See* Pl.'s Mem. 2; King Decl. I Ex. 11, at 114 (stating that, prior to his voluntary bankruptcy petition, he spent "50, 60 percent" of his time working for V2IP); Bronson Aff. I ¶ 26 ("I have not hidden that I work for V2IP . . . ."); Bronson Aff. II ¶ 4 ("As an employee and its counsel, I do act on V2IP's behalf and am authorized to transact business in its name.").) He also concedes that V2IP supports his family's household spending. (Bronson Aff. I ¶ 26 ("I have not hidden . . . that my wife's income from V2IP supports our family."); Bronson Aff. II ¶ 6 ("The SEC identified expenses of our household that Dawn paid from V2IP. I have not denied such expenses were paid.").) But Bronson denies that any of V2IP's earnings can be attributed to him. He has long maintained, for example, that he receives no salary for his work at V2IP. (*See* Pl.'s Mem. 2; King Decl. I Ex. 11, at 113–14.) Likewise, in connection with Bronson's bankruptcy petition, his wife claimed that she—not Bronson—is the sole breadwinner for her household, which includes Bronson and

---

[7] Bronson contends that the value of his home, according to Zillow.com, "is $750,000, which is over $250,000 less than the amount of the mortgage on the house." (Bronson Aff. I ¶ 34.)

their four children.  (Pl.'s Mem. 2; King Decl. I Ex. 12 ¶¶ 2, 4.)[8]  Bronson asserts that because

V2IP is owned by his wife, any income therefrom does not belong to him, but to his wife.  (*See*

Bronson Aff. I ¶ 23 (denying that he "ha[s] access to [V2IP's] income" because "the company is

100% owned by [his] wife"); *id.* ¶ 26 (characterizing V2IP's earnings as "[his] wife's income,"

notwithstanding that "[he] work[s] for V2IP").)  As for the "over $1 million [that] passed

through V2IP's accounts," Bronson contends that "the funds sent to V2IP were not [his] and

were not V2IP's," but were investor funds that cannot be used to satisfy the Court's Judgment.

(Bronson Aff. I ¶¶ 27–28.)[9]  Finally, Bronson maintains that he and his wife have fully complied

with the SEC's discovery efforts.  (*See* Bronson Aff. I ¶¶ 12–22.)

    B.  Procedural History

    The SEC refiled the instant Application and supporting papers on March 19, 2020, (Dkt.

Nos. 202–05), after a previous filing error.  On March 22, 2020, the Court set a case schedule

and ordered Bronson to appear for a hearing on May 4, 2020.  (*See* Dkt. No. 206.)  On April 14,

2020, a day after Bronson's Opposition was due, (*see id.*), Bronson's attorney, Paul Rachmuth,

filed an Affirmation seeking a four-week extension to respond to Plaintiff's Application, citing

his recent retention by Bronson and the constraints posed by the Covid-19 pandemic, (*see* Aff'n

in Resp. to Mot. for Contempt ("Rachmuth Aff'n") (Dkt. No. 209)).  In his Affirmation,

Rachmuth also noted that he had recently "conveyed a bona fide offer to the SEC to settle the

amounts due under its judgment against [Defendants]."  (*Id.* ¶ 4(d).)  On April 16, 2020, counsel

---

    [8] It bears noting, however, that a declaration submitted by an attorney during Bronson's bankruptcy proceeding averred that Dawn Bronson was a "stay at home mom" who had "no independent source of income."  (Pl.'s Mem. 2 n.1; King Decl. I Ex. 26 ¶ 17.)

    [9] Bronson does concede, however, that some portion of this money constituted "fees" for V2IP.  (Bronson Aff. I ¶ 28.)

for the SEC filed a letter with the Court responding to certain representations in the Rachmuth Affirmation and seeking clarification regarding the procedures for the scheduled contempt hearing. (*See* Letter from Maureen Peyton King, Esq., to Court (Apr. 16, 2020) ("King Letter") (Dkt. No. 210).) On April 17, 2020, the Court moved back the case schedule by two weeks. (*See* Dkt. No. 211.) Bronson filed an Affidavit in Opposition to [Plaintiff's] Motion [sic] for Contempt on April 27, 2020. (*See* Dkt. No. 212.) At a status conference held on May 8, 2020, the Court directed the SEC to file its Reply by May 11, 2020, at which point the Court planned to determine whether a hearing and oral argument were necessary. (*See* Dkt. (minute entry for May 8, 2020).) After the SEC filed its Reply Memorandum and supporting papers on May 11, 2020, (*see* Dkt. Nos. 216–17), Bronson's attorney filed a letter on May 31, 2020, requesting that, in the event the Court were to proceed with a hearing, Bronson be allowed to present evidence and "be heard," (*see* Letter from Paul Rachmuth, Esq., to Court (May 31, 2020) 1 (Dkt. No. 218)). On June 4, 2020, the Court allowed Bronson to file a supplemental affirmation and memorandum by June 11, 2020 but indicated that it would reserve on whether to hold a hearing until it had reviewed all the papers. (*See* Dkt. No. 219.) On June 11, 2020, Bronson filed his Affidavit in Further Opposition to [Plaintiff's] Motion [sic] for Contempt. (*See* Dkt. No. 220.)

## II.  Discussion

### A.  Standard of Review

A court has "power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority," including "[d]isobedience or resistance" to its lawful orders. 18 U.S.C. § 401(3); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."). Unlike criminal contempt, civil contempt is remedial in nature, and "seeks

only to coerce the defendant to do what a court had previously ordered him to do." *Turner v. Rogers*, 564 U.S. 431, 441 (2011) (citation, alteration, and internal quotation marks omitted); *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (noting that "[a] civil contempt order is designed to be coercive rather than punitive"); *Shillitani*, 384 U.S. at 368 (observing that civil contemnors "carry the keys of their prison in their own pockets" (citation and internal quotation marks omitted)).  But despite its non-punitive nature, a civil contempt order is still a "potent weapon," and should be granted only where the movant can establish "by clear and convincing evidence that the alleged contemnor violated the district court's edict." *Latino Officers Ass'n City of N.Y., Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) (citations omitted); *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (admonishing district courts not to impose contempt sanctions "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct" (citation omitted)); *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 (S.D.N.Y. 2012) (same).  The "clear and convincing" standard is more demanding than the preponderance-of-the-evidence standard normally applied to civil cases. *Aquavit Pharm., Inc. v. U-Bio Med, Inc.*, No. 19-CV-3351, 2020 WL 1900502, at *5 (S.D.N.Y. Apr. 17, 2020) (citing *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1174 (2d Cir. 1996)).

A court may hold a party in civil contempt for disobeying a lawful order only if three elements are satisfied: "(1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 207 (S.D.N.Y. 2020) (quoting *CBS Broadcasting Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (reciting and applying the three-part test)); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655–56 (2d

Cir. 2004) (applying the three-part test and holding that the district court's finding of contempt was not an abuse of discretion where each element was satisfied); *Huber*, 51 F.3d at 10–11 (same). The movant bears the initial burden of establishing these elements. *See Latino Officers*, 558 F.3d at 164 ("[W]e underscore that it is the moving party . . . who bears the burden of establishing the three factors . . . ."); *see also King*, 65 F.3d at 1058 (placing burden on the movant). Each element must be satisfied before a court imposes a contempt sanction. *See Latino Officers*, 558 F.3d at 165 (upholding district court's denial of contempt motion where the movant failed to establish "clear and convincing" proof of noncompliance); *Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332, 2008 WL 1775410, at *8–13 (S.D.N.Y. Apr. 17, 2008) (declining to hold a party in contempt where the movant failed to establish a lack of reasonably diligent efforts toward compliance). However, the movant need not show that the alleged contemnor violated the court's orders willfully. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp.2d 594, 615 (S.D.N.Y. 2008); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, No. 03-CV-5562, 2006 WL 1206372, at *5 n.7 (S.D.N.Y. May 1, 2006) (finding a party in contempt without reaching the question of whether her noncompliance was willful).

If the movant has made a prima facie showing of contempt, "a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt." *Huber*, 51 F.3d at 10; *see also A.V. By Versace, Inc. v. Gianni Versace S.p.A.*, 446 F. Supp. 2d 252, 258 (S.D.N.Y. 2006) (same). Thus, once the movant has carried its burden and established the three elements necessary for a finding of contempt, the burden shifts to the alleged contemnor, who must produce evidence establishing a complete inability to pay. *See Schwarz v. ThinkStrategy Capital Mgmt. LLC*, Nos. 09-CV-9346,

11-CV-8094, 2015 WL 4040558, at *10 (S.D.N.Y. July 1, 2015) (noting burden shift); *SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008) (stating that a party who alleges he is unable to pay a judgment "'bears the burden of producing evidence of his inability to comply' with [a] disgorgement order" (quoting *Huber*, 51 F.3d at 10)); *SEC v. Zubkis*, No. 97-CV-8086, 2003 WL 22118978, at *4 (S.D.N.Y. Sept. 11, 2003) (noting, where "[t]he S.E.C. ha[d] . . . made a prima facie showing of civil contempt," that the defendant "[bore] the burden of proving that he [was] unable to comply with the disgorgement order" to avoid a contempt finding). To carry this burden and prevail on an inability-to-pay defense, the alleged contemnor must "establish his inability clearly, plainly, and unmistakably." *Kim v. Ji Sung Yoo*, No. 15-CV-3110, 2019 WL 3162128, at *3 (S.D.N.Y. May 17, 2019) (quoting *Huber*, 51 F.3d at 10); *see also SEC v. Musella*, 818 F. Supp. 600, 609 (S.D.N.Y. 1993) (observing that an alleged contemnor must establish his inability to pay "categorically and in detail" (citation omitted)).

B. Analysis

The Court now turns to consider whether the SEC has carried its initial burden in establishing that a contempt order is warranted.

1. Clear and Unambiguous Order

Bronson has not challenged the clarity of this Court's disgorgement Order. Even if he had lodged such a challenge, the Court would have no trouble concluding that its Order was clear and unambiguous. "A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (citations and internal quotation marks omitted); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) ("To ensure fair notice to the defendant, the decree underlying contempt must be

sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do."). Here, the Court's Judgment provided in relevant part that:

> 3. Defendants are jointly and severally liable for disgorgement of $9,355,271.79 and prejudgment interest thereon in the amount of $2,177,100.59;
>
> 4. Relief Defendant is liable for disgorgement of $645,000.00 and prejudgment interest thereon in the amount of $151,031.37, the obligation of which is joint and several with that of Defendants Bronson and E-Lionheart[.]

(Judgment 4.) The Court also instructed Defendants to "pay these amounts to the SEC within 14 days" of the Judgment. (*Id.* at 5.) Courts in the Second Circuit have consistently held disgorgement orders of this nature "clear and unambiguous." *See, e.g., SEC v. Durante*, No. 01-CV-9056, 2013 WL 6800226, at *6 (S.D.N.Y. Dec. 19, 2013) (concluding that disgorgement order was clear and unambiguous where "[t]he district court's judgment clearly stated (1) the total amount due, broken down by ill-gotten gains and pre-judgment interest; (2) when the payment must be made; and (3) to whom the payment was to be made"), *report and recommendation adopted*, 2014 WL 5041843 (S.D.N.Y. Sept. 25, 2014), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *Zubkis*, 2003 WL 22118978, at *3–4 (finding clear and unambiguous a final judgment ordering in part "that [the defendant] disgorge $12,544,313.25, representing the amounts received by him from the sale of securities . . . , together with prejudgment interest of $9,034,418.14"); *Musella*, 818 F. Supp. at 601, 605 (observing that the court's final judgment and order was clear and unambiguous where it had ordered the defendant "to disgorge . . . profit and prejudgment interest total[ing] $615,918.82"); *see also SEC v. Pittsford Capital Income Partners, LLC*, No. 06-CV-6353, 2010 WL 2025500, at *1, *4 (W.D.N.Y. May 20, 2010) (finding the court's final judgment and order clear and unambiguous where the court had ordered the defendants "jointly and severally liable for disgorgement of $11,725,294.92, plus prejudgment interest of $14,028,728.07").

### 2. Clear and Convincing Proof of Noncompliance

In the civil contempt context, "the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation and internal quotation marks omitted). Here, the SEC has declared under the penalty of perjury—and Bronson does not dispute—that Bronson has not made a single payment toward his disgorgement obligation. (*See* King Decl. I ¶ 4; King Decl. II ¶ 3.) Although Bronson does challenge the SEC's allegation that he has not fully complied with its post-Judgment discovery and collection efforts, (*see* Bronson Aff. I ¶¶ 4–22), this allegation is ancillary to the SEC's core assertion—namely, that Bronson has flouted the Court's disgorgement Order by failing to pay a penny. As stated, Bronson does not, and could not, assert that he has satisfied any portion of this Order. Thus, even if the Court were to credit Bronson's averments regarding post-Judgment discovery, Bronson's failure to comply with the Court's Order is not in dispute. And finally, even if this factor were in dispute, courts in this district have found clear and convincing proof of noncompliance even where contemnors have paid *some* portion of their disgorgement obligation. *See, e.g., Yimby, Inc. v. Fedak*, No. 17-CV-223, 2017 WL 2693719, at *3 (S.D.N.Y. June 22, 2017) (holding in civil contempt a party who had paid only $5,000 in satisfaction of an order to pay $30,000 in attorneys' fees); *Durante*, 2013 WL 6800226, at *6–7 (finding clear and convincing evidence of noncompliance where the defendant had made only three payments, totaling $14,339,346.47, toward a disgorgement obligation of $33,783,565.26). Accordingly, Bronson's failure to pay *any* portion of his disgorgement obligation is clear and convincing proof that he has failed to comply with the Court's Judgment.

### 3.  Failure of Reasonable Diligence in Attempting To Comply

Finally, to determine whether the SEC has established a prima facie showing of civil contempt, the Court "must determine whether [Bronson] ha[s] been reasonably diligent and energetic in attempting to accomplish what was ordered." *Aquavit Pharm.*, 2020 WL 1900502, at *7 (quoting *Medina v. Buther*, No. 15-CV-1955, 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019)). Courts have explained that the "reasonable diligence" standard requires, "at the very least, [that] a party . . . develop reasonably effective methods of compliance" with a court's order. *Zino Davidoff*, 2008 WL 1775410, at *8. Thus, "[a] defendant is not reasonably diligent when he or she ignores the order or takes only superficial actions that strain both the language and intent of the order." *Convergen Energy LLC v. Brooks*, No. 20-CV-3746, 2020 WL 5549039, at *23 (S.D.N.Y. Sept. 16, 2020) (internal quotation marks omitted) (quoting *Medina*, 2019 WL 581270, at *25); *see also SEC v. Bremont*, No. 96-CV-8771, 2003 WL 21398932, at *5 (S.D.N.Y. June 18, 2003) (observing that the reasonable diligence requirement is "strictly construed").

In the disgorgement context, reasonable diligence is not excused simply because a party cannot pay the entire amount by the court-imposed deadline. *See Musella*, 818 F. Supp. at 602 ("When an order requires a party to pay a sum certain, a mere showing that the party was unable to pay the entire amount by the date specified is insufficient to avoid a finding of contempt.") At the bare minimum, reasonable diligence requires a party to "pay what he or she can." *Id.* at 602, 609 (finding that a contemnor was not reasonably diligent in seeking to disgorge profits, despite his alleged inability "to pay the entire amount ordered," because he had not "paid that portion of the amount that he [was] able to pay," even if that meant "sending any small amounts into the Clerk of Court until the matter was resolved"); *see also, e.g., Bremont*, 2003 WL 21398932, at

*5 (noting that "a party seeking to avoid a finding of contempt must demonstrate that all reasonable avenues for raising funds have been explored and exhausted" (citation, alteration, and internal quotation marks omitted)).

In view of these principles, there is no question Bronson has failed to exercise reasonable diligence in complying with the Court's Judgment. As the Court will discuss in greater detail *infra*, the SEC has produced compelling evidence that Bronson has sufficient (if not substantial) resources to begin satisfying his disgorgement obligation. And yet Bronson, to this day, has not remitted a single payment. Courts in this district have found a lack of reasonable diligence even where a party has made *some* effort to satisfy a disgorgement obligation. *See, e.g., Durante*, 2013 WL 6800226, at *7 (concluding that the SEC had established a lack of reasonable diligence where the contemnor had made three payments, totaling over $14 million, toward his disgorgement obligation of more than $33 million); *Musella*, 818 F. Supp. at 602 (finding that a defendant's "compliance with [a magistrate judge's] interim order directing monthly payments of $1,500 cannot be characterized as a reasonably diligent and energetic attempt to comply" with the court's original order directing the defendant to disgorge over $615,000 in profits and prejudgment interest). A party's lack of reasonable diligence is even more evident where, as here, that party has paid *nothing* toward a judgment. *See Schwarz*, 2015 WL 4040558, at *10, *14 (finding that a defendant "ha[d] not diligently attempted to comply with the [c]ourt's orders" where, despite having access to funds, he "ha[d] not paid a penny toward" either of two judgments against him); *SEC v. Aragon Capital Advisors, LLC*, No. 07-CV-919, 2011 WL 3278907, at *5 (S.D.N.Y. July 26, 2011) (finding a lack of reasonable diligence where the defendant "ha[d] failed to make any payment to the [SEC] in an attempt to satisfy his obligations under the [court's] [f]inal [j]udgment"); *see also Pittsford Capital*, 2010 WL 2025500, at *5

("Here, the lack of any payment made by [the defendant] pursuant to the [f]inal [j]udgment, despite the evidence of his ability to pay at least a portion of the sums due is clear and convincing evidence that [the defendant] has not been 'diligent and energetic' in complying with the [c]ourt's order."). Finally, insofar as Bronson takes the position that his belated settlement offer to the SEC, (*see* Rachmuth Aff'n ¶ 4(d); Bronson Aff. I ¶¶ 26, 39)—proffered nearly *three years* after the Court's Judgment, and without any preceding payments in satisfaction thereof— exhibits his reasonable diligence, such arguments have been considered and rejected. *See Aragon*, 2011 WL 3278907, at *5 (concluding that the defendant's effort, five months after the court entered a final judgment, to set up a payment plan with the SEC could not "seriously be characterized as 'reasonably diligent'"); *Musella*, 818 F. Supp. at 602 (concluding that the defendant's "offer to the [SEC] to pay $50,000 over five years in full satisfaction of the [j]udgment . . . [could not] be characterized as a reasonably diligent and energetic attempt to comply").

In light of clear and convincing proof that Bronson has neither complied nor diligently attempted to comply with this Court's clear and unambiguous Order, the Court concludes that the SEC has made a prima facie showing of contempt. Thus, the Court now turns to consider whether Bronson has put forth sufficient proof of his complete inability to pay.

### 4. Inability-to-Pay Defense

As stated, "a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt." *Huber*, 51 F.3d at 10. To establish this defense, Bronson bears the burden of producing evidence that shows "clearly, plainly, and unmistakably" his inability to pay the Court's disgorgement Order. *Id.* In this respect, it is not enough to show that compliance would impose difficulty or

18

hardship; rather, Bronson must establish that compliance would be "literally impossible," and thus, that "any attempts at coercion are pointless." *Badgley v. Santacroce*, 800 F.2d 33, 37 (2d Cir. 1986); *see also Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 377 (S.D.N.Y. 2003) ("[C]ompliance must be beyond the realm of possibility, not just difficult to achieve, before a party will be exonerated in a contempt proceeding."). Bronson cannot make this showing through conclusory statements, and the Court has no obligation to credit self-serving denials that are "incredible in context." *Huber*, 51 F.3d at 10–11 (upholding district court's finding that a contemnor's inability-to-pay defense was "incredible" given his demonstrated ability to finance litigation); *see also, e.g., Aragon*, 2011 WL 3278907, at *7 (rejecting inability-to-pay defense where the contemnor failed to come forward with sufficient evidence and instead proffered the "bald assertion that he does not have the present ability to satisfy the [f]inal [j]udgment" (record citation, alteration, and internal quotation marks omitted)). The Court's task, therefore, is to weigh the credibility of Bronson's denial "in the light of his present circumstances." *Huber*, 51 F.3d at 10.

Bronson has invoked the inability-to-pay defense, albeit in somewhat oblique fashion.[10] Properly understood, Bronson's defense appears to consist of two arguments.[11] Bronson's first—and principal—argument is that he cannot pay the Judgment because V2IP's earnings do not belong to him. (*See* Bronson Aff. I ¶ 23.) More specifically, Bronson appears to contend

---

[10] The Court agrees with the SEC's observation that "although Bronson does not explicitly state that he cannot pay the Judgment's disgorgement obligation or any portion of it, he appears to contend that he cannot." (Pl.'s Reply 3.)

[11] Although Bronson has also raised an argument related to his alleged compliance with the SEC's pre- and post-Judgment discovery efforts, (*see* Bronson Aff. I ¶¶ 4–22), as noted *supra*, even if the Court were to credit Bronson's assertions, the SEC has still made a prima facie showing of contempt based on his failure to pay the Court's disgorgement Order.

that because the company is owned and controlled by his wife, any earnings generated through V2IP's business cannot be considered for purposes of evaluating his ability to pay the Judgment. (*See id.* ¶¶ 23–26; Bronson Aff. II ¶ 10.)  Second, Bronson also asserts that his household expenses are reasonable and non-exorbitant.  (*See* Bronson Aff. I ¶¶ 34–38.)  The Court construes this averment as an alternative argument that, even if V2IP's funds—which, Bronson concedes, are used to pay for his household's expenses, (*see* Bronson Aff. II ¶ 6)—were attributed to him personally, he still does not possess sufficient resources to satisfy the Court's Judgment.  The Court will consider each argument in turn.

<u>a.  Income Generated Through V2IP</u>

As stated, Bronson's main assertion is that V2IP is owned and controlled by his wife. (*See* Bronson Aff. I ¶¶ 3, 23; Bronson Aff. II ¶¶ 4–6.)  Thus, he seems to argue, any funds belonging to V2IP, and any income it generates, do not belong to him, and cannot be considered when evaluating his ability to satisfy the Court's Judgment.  (*See, e.g.,* Bronson Aff. I ¶ 23 (disputing that he "ha[s] access to [V2IP's] income"); *id.* ¶ 26 (arguing that although "[his] wife's income from V2IP supports [his] family[,]" this does "not support a finding of contempt"); *id.* ¶ 27 (arguing that "the funds sent to V2IP were not [his]"); Bronson Aff. II ¶ 4 (asserting that "[he] do[es] not have control of [V2IP's] finances"); *id.* ¶ 6 (arguing that "Dawn Bronson's payment of household expenses from the bank account she controls of the company she owns does not lead to the conclusion that V2IP is either owned or controlled by [him]"); *id.* ¶ 7 (asserting that V2IP's funds should not be used to satisfy the Court's Judgment).)  In his second affidavit, Bronson also raises two derivative arguments: first, that if V2IP's income is attributable to him, the SEC should have to garnish his income, (*see* Bronson Aff. II ¶¶ 10–11);

and, second, that insofar as the SEC seeks to use V2IP's funds to satisfy the Judgment, it should have to join V2IP and his wife to this Action, (*see id.* ¶ 9).

As a factual matter, Bronson's primary argument rests on the patently incredible premise that his wife controls V2IP. Bronson asserts—and the SEC does not dispute—that Dawn Bronson is the registered owner of V2IP, (*see, e.g.*, Bronson Aff. I ¶ 23), and is able to access and control its accounts, (*see, e.g.*, Bronson Aff. II ¶ 6). But her involvement in the company appears to end there. In practice, the evidence shows, V2IP is Bronson's business. Although Bronson, as noted, concedes working on multiple deals for V2IP, (*see* Bronson Aff. I ¶ 31), it is clear his role goes far beyond helping out on the sidelines. Bronson is the person corresponding with clients, (*see* Pl.'s Reply 3–4; King Decl. II Ex. 31); leading V2IP's business deals, including, for example, the development project in the Turks and Caicos Islands, (*see* Pl.'s Mem. 5; Bronson Aff. I ¶¶ 31–32); overseeing the receipt and disbursement of funds, (*see* Pl.'s Reply 3–4; King Decl. II Ex. 31); and coordinating bookkeeping with the company's accountant, (*see* Pl.'s Mem. 3 n.3; Nadler Tr. 145). In short, Bronson indisputably is running the show. It is telling indeed that Bronson cannot name a single substantive role his wife performs. There is no evidence, for example, that Dawn Bronson communicates with clients, originates or oversees deals, makes strategic decisions, or even performs more minor, functionary roles such as managing V2IP's books—a task apparently handled by Nadler, (*see* Pl.'s Mem. 3 n.3; Pl.'s Reply 3; King Decl. I Ex. 14, at 139–40). The proffered evidence is consistent with an attorney's sworn representation, in November 2016, that Dawn Bronson has no independent source of income and is a stay-at-home mother, (*see* King Decl. I Ex. 26 ¶ 17). Dawn Bronson's only role is apparently to serve as the nominal owner and controller of the company that her

husband operates.  Put more bluntly, Ms. Bronson's role is the ruse Bronson is using to avoid compliance with the Court's order.

As a legal matter, Bronson's position is untenable in the face of relevant case law.  The Court notes at the outset that Bronson has cited no legal authority for the argument that V2IP's assets may not be considered when evaluating his alleged inability to pay.  Such an omission comes as no surprise, for courts in this district have reached precisely the opposite conclusion when confronted with similar facts.  In *Spotnana Inc. v. American Talent Agency, Inc.*, No. 09-CV-3698, 2014 WL 7191400 (S.D.N.Y. Dec. 3, 2014), for example, then-Chief Judge Loretta Preska considered whether a judgment debtor, like Bronson, could successfully establish his complete inability to comply with a previous judgment.  *Id.* at *7–9.  There, as here, the judgment debtor operated a company that was "technically owned" by his wife.  *Id.* at *3.[12] There, as here, the judgment debtor and his wife used the company's account "to pay personal and family expenses."  *Id.*  And there, as here, the judgment debtor "claim[ed] that he [could not] answer for [the company he operated] because it [was] his wife's company."  *Id.* at *8 (record citation and internal quotation marks omitted).  Judge Preska concluded—as this Court concludes with respect to V2IP—that the company owned by the judgment debtor's wife "appear[ed] calculated to funnel proceeds away from the [judgment creditor's] grasp."  *Id.* at *3. Accordingly, the court did not hesitate to consider this company—and the fact that "[the judgment debtor] and his wife use[d] that company's account to pay personal and family

---

[12] The court in *Spotnana* also observed that the judgment debtor's wife "ha[d] no experience or contacts" in the business's relevant field, 2014 WL 7191400, at *3—an observation that appears to be equally apt here.

expenses"—in concluding that the judgment debtor failed to establish "plainly and unmistakably that compliance [was] impossible." *Id.* at *8 (italics and citation omitted).

The conclusion in *Spotnana* accords with that in *SEC v. Durante*, where the judgment debtor received generous financial support from two corporations formed by a friend. *See* 2013 WL 6800226, at *4 (noting that the friend's corporations "fund[ed] [the judgment debtor's] lifestyle, including $17,000 in bills at Bloomingdale's and Bergdorf Goodman, college tuition for his children, a Porsche Cayenne for his wife, and lavish trips to Europe").[13] The court did not hesitate to consider the money "these businesses [were] funneling . . . to [the judgment debtor's] family" in concluding that the judgment debtor had failed to establish his inability to comply with the court's judgment. *Id.* at *9. The court's decision in *Durante* was subsequently upheld by the Second Circuit. *See* 641 F. App'x at 77. In view of these decisions, the Court rejects Bronson's argument that it may not consider V2IP's resources when evaluating his ability to comply with the Judgment. Taking these resources into account, as the Court will do here, it is clear Bronson has not come close to establishing his complete inability to comply with the Court's disgorgement Order.

Bronson's related arguments—that the SEC should have to garnish his income and join V2IP and Dawn Bronson as parties, (*see* Bronson Aff. II ¶¶ 9–12)—are equally without merit. Bronson has failed to cite persuasive, let alone relevant case law for either proposition. That the

---

[13] In *Durante*, the judgment debtor's friend was involved with the formation of both companies. Specifically, the friend was named as the Director, Secretary, and Treasurer of one of the two companies, "Zenith Estates," and had opened a bank account for this company and a second company, "New Market Enterprises Inc." *See* Mem. of Law in Supp. of Pl.'s Mot. for Order to Show Cause 7–9, *SEC v. Durante* (No. 01-CV-9056 (Dkt. No. 252)). The SEC argued that both companies were merely serving as nominees for the judgment debtor. *See id.* at 10. For his part, the judgment debtor claimed that this "generosity stem[med] from friendship," 2013 WL 6800226, at *4, an explanation the court called "fanciful," *id.* at *14.

SEC has not served a garnishment on V2IP, (*see* Bronson Aff. II ¶¶ 10–11), does not lead to the conclusion that the Court may not consider V2IP's assets when evaluating Bronson's ability to comply with the Judgment.  Bronson cites no authority to the contrary.  Insofar as Bronson contends that the SEC must serve a garnishment on V2IP to enforce the Court's Judgment, the Court is aware of no such requirement, and Bronson's inapposite citations fail to persuade it otherwise.

      Bronson's joinder argument—that Rule 19 of the Federal Rules of Civil Procedure "requires joinder of V2IP and Dawn Bronson to this action in order for the SEC to receive the relief it is seeking," (*id.* ¶ 9)—is similarly baseless.  The relief sought here, as in *Spotnana* and *Durante*, is civil contempt.  Yet in neither of those two cases were the movants required to join the separate corporate entities through which the contemnors were funneling their assets.  Moreover, even though the SEC has requested relief only with respect to Bronson, the Court has the authority to order relief with respect to a nonparty such as Dawn Bronson or V2IP, even without their joinder.  *See, e.g.*, *Zubkis*, 2003 WL 22118978, at *5 (noting that "the inherent equitable power of a district court allows it to freeze the assets of a nonparty when that nonparty is dominated and controlled by a defendant against whom relief has been obtained in a securities fraud enforcement action" (quoting *SEC v. Hickey*, 322 F.3d 1123, 1125 (9th Cir. 2003))); *Spectacular Venture, L.P. v. World Star Int'l, Inc.*, 927 F. Supp. 683, 684 (S.D.N.Y. 1996) ("A nonparty respondent may be held in contempt of a court order if the respondent abets the party named in the order in its noncompliance or if it is legally identified with that party.").

      In sum, the Court will consider V2IP's assets when evaluating Bronson's alleged inability to comply with the Court's Judgment.  "The [SEC] has made a strong showing that [Bronson] is adept at using the protections afforded by the corporate form to obscure the assets

he has at his disposal," *Zubkis*, 2003 WL 22118978, at *5, and, as noted, V2IP "appears calculated to funnel proceeds away from the [SEC's] grasp," *Spotnana*, 2014 WL 7191400, at *3. With these considerations in mind, the Court turns to consider Bronson's alleged inability to comply with the Court's Judgment.

### b. Bronson's Alleged Inability to Pay

As noted, a judgment debtor's inability to pay the entire amount of a disgorgement order by the court-imposed deadline is "insufficient to avoid a finding of contempt." *Musella*, 818 F. Supp. at 602. As particularly relevant here, the judgment debtor still "must pay what he is capable of paying, even if making the payment results in a diminution of his income or his relatively comfortable standard of living." *Id.*; *see also Aragon*, 2011 WL 3278907, at *9 ("That [a judgment debtor's] standard of living . . . may suffer [as a result of his compliance] does not change the fact that [he] must pay what he is capable of paying." (citation and internal quotation marks omitted)). The SEC has produced compelling evidence that Bronson, despite owing more than $12 million in disgorgement, continues to maintain a lifestyle of luxury. (*See* Pl.'s Mem. 6; Pl.'s Reply 5.) Insofar as Bronson tries to portray his expenditures as ordinary and necessary living expenses, (*see* Bronson Aff. I ¶¶ 34–37), his argument is unpersuasive.

As Bronson has acknowledged, he and his family use V2IP to cover household expenses. (*See id.* ¶ 26; Bronson Aff. II ¶ 6). But as the SEC argues, (*see* Pl.'s Mem. 6; Pl.'s Reply 5), these expenditures go well beyond ordinary and necessary living expenses, particularly for someone who "has been ordered by this [C]ourt to disgorge money that he gained illegally," *see Musella*, 818 F. Supp. at 602. In the span of three months, V2IP's Citibank account included charges for $3,313.29 at Bloomingdale's department store; $456.34 at a bicycle shop in Mount Kisco, NY; $445.44 at various pet stores; and $439.70 at a jewelry retailer in Chappaqua, NY.

(*See* King Decl. I Ex. 5, at 82–88.)  In the month of January 2019 alone, the statement for V2IP's

Wells Fargo account reflects purchases of $1,032.34 from women's fashion retailers.  (*See* King

Decl. II Ex. 32, at 2.)  Even if the Court were generously to assume that V2IP's sizeable

expenditures on dining, limousines, and alcohol were all somehow related to entertaining V2IP's

clients (which would represent quite a busy social schedule for Ms. Bronson, the purported

rainmaker and operator of the company), the company's account statements for other periods

paint a similar picture of non-business exorbitance.  However much Bronson's work for V2IP

generates, it is clearly sufficient to sustain a lifestyle of relative opulence.

But "profligate spending does not shield one from a judgment of contempt," and V2IP's

account statements betray any contention that Bronson cannot begin paying the Judgment.  *See*

*Universal Express*, 546 F. Supp. 2d at 137–38, 139, 142 (rejecting inability-to-pay defense with

respect to a judgment debtor whose expenditures on furnishings, automobile maintenance, fine

dining, luxury hotels, and consumer electronic goods, among other things, showed that the

debtor could "pay some significant amount" toward his outstanding disgorgement order);

*Bremont*, 2003 WL 21398932, at *6 (same with respect to a judgment debtor who, "[r]ather than

acting diligently to disgorge illicit profits, . . . repeatedly ha[d] flouted the [j]udgment by using

his available funds to purchase luxury goods"); *Musella*, 818 F. Supp. at 609 (same with respect

to a judgement debtor who, "since entry of the [court's] [j]udgment, . . . ha[d] continued to live

what [was], in essence, a quite comfortable lifestyle with no apparent thought of cutting back to

meet some of his obligation"); *see also Safeco Ins. Co. of Am. v. M.E.S., Inc.*, No. 09-CV-3312,

2014 WL 12834210, at *13, *25–26 (E.D.N.Y. June 27, 2014) (same with respect to judgment

debtors who spent money on "luxury items, dinners at expensive restaurants, frequent golf

outings, housekeeping services, an expensive family vacation to Six Flags amusement park, top-

of-the-line cable television packages, video games, the latest iPhone, repairs to an automatic

sprinkler system, repairs to an automatic garage door opener, a new and/or repaired deck,

clothes, jewelry," and more).

The SEC has also pointed to other expenditures and assets that undermine Bronson's

inability-to-pay defense.  For example, Bronson appears to drive a top-end luxury vehicle.  (Pl.'s

Mem. 6; King Decl. I Ex. 24.)  *Cf. Universal Express*, 546 F. Supp. 2d at 138 (holding in

contempt a judgment debtor who "ha[d] not documented any efforts, let alone adequate efforts,

to negotiate an end to [his luxury] automobile leases and to secure a less ostentatious form of

personal mobility"); *Musella*, 818 F. Supp. at 611 (noting that the judgment debtors could

"driv[e] less expensive automobiles that will also be less expensive to maintain"); *cf. Safeco Ins.

Co.*, 2014 WL 12834210, at *11 ("Luxury cars are not 'ordinary and necessary' living

expenses.").  In addition, the Bronsons own an expensive home in Westchester County.  (Pl.'s

Mem. 6; King Decl. I Ex. 21.)  *Cf. Universal Express*, 546 F. Supp. 2d at 136–37 (examining the

value of the alleged contemnor's properties to determine whether he was unable to comply with

a disgorgement order); *Bremont*, 2003 WL 21398932, at *6 (noting that a court "may consider an

alleged contemnor's homestead as well as jointly owned assets in determining his ability to

comply with its disgorgement order"); *Safeco Ins. Co.*, 2014 WL 12834210, at *14, *26

("Perhaps obviously, there are many people who do not live in homes valued at nearly

$900,000.00. . . . Yet there is no evidence that [judgment debtors] are in the process of selling or

renting the house.").  And finally, Bronson sends two of his children to private schools, one of

which costs over $50,000 per year.  (*See* King Decl. I Ex. 23.)  *Cf. Safeco Ins. Co.*, 2014 WL

12834210, at *21 (rejecting inability-to-pay defense with respect to judgment debtors who

provided their adult child with "a plentiful allowance and a free higher education").

It requires little effort, based on this record, to conclude that Bronson has failed to carry his burden of showing "clearly, plainly, and unmistakably" that he cannot comply with the Court's Judgment. *See Huber*, 51 F.3d at 10. Far from suggesting that compliance is "literally impossible," *Badgley*, 800 F.2d at 37, Bronson's financial records indicate that he has access to substantial resources. Bronson is "not entitled to satisfy the disgorgement judgment at his convenience and only insofar as it does not cause him any discomfort," and his "effort to depict his luxurious living arrangements as liabilities, or as necessary living expenses, is a classic example of chutzpah." *Universal Express*, 546 F. Supp. 2d at 136, 140.

Bronson has failed to comply with this Court's clear and unambiguous Order. He has made no reasonably diligent efforts to attempt to comply. And he has failed to show that compliance would be impossible. Accordingly, Bronson is in civil contempt of this Court.

### 5. Contempt Sanctions

Having found Bronson in contempt, this Court has authority to impose sanctions, including incarceration or other coercive measures. *Schwarz*, 2015 WL 4040558, at *20 (citing 18 U.S.C. § 401; *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006)); *Bremont*, 2003 WL 21398932, at *7 ("Incarceration under a civil contempt order pending compliance with the [c]ourt's orders is within the [c]ourt's authority and is a well-recognized method of coercing compliance with court orders."). "In determining an appropriate sanction for civil contempt, a court must consider: (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction." *Bremont*, 2003 WL 21398932, at *7 (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). The Court's "ultimate consideration"

must be "whether the coercive sanction is reasonable in relation to the facts." *Schwarz*, 2015 WL 4040558, at *20 (citation omitted).

It has been over three years since this Court ordered Bronson to disgorge his illegal profits. In that time, Bronson has been hard at work investing clients' funds and working on multiple international and domestic projects, the proceeds from which have gone to support an extravagant lifestyle for Bronson and his family. Bronson, however, has not paid a penny toward his financial obligations in this case. In such circumstances, it is appropriate for courts to consider seriously the possibility of incarceration. "Imposing escalating fines on a defendant who has brazenly refused to pay an already large judgment would be an empty gesture. Only the most powerful coercive sanction offers any prospect of producing compliance." *Universal Express*, 546 F. Supp. 2d at 142 (ordering incarceration for a contemnor who had paid only $60,000 of a $1.4 million disgorgement order less than two years after the order); *see also Schwarz*, 2015 WL 4040558, at *21 (ordering incarceration for a contemnor who had paid nothing toward a $4.9 million disgorgement order three years after the order, and who had provided the court with misrepresentations regarding his total assets); *Durante*, 2013 WL 6800226, at *14 ("Because [the contemnor] has failed to comply, despite being given every opportunity to do so, he should be ordered incarcerated until he makes meaningful payments toward the disgorgement amount and provides a current and accurate accounting of his income and assets."); *Bremont*, 2003 WL 21398932, at *7 (same with respect to a contemnor who had paid "nothing toward satisfying [a $1 million disgorgement order], ha[d] failed to meet his burden of establishing his inability to pay, and ha[d] lied to the [c]ourt").

The Court's patience is at an end. Bronson has not only flouted the Court's Order for three years, but has also "chosen to make every effort to hide his financial condition and

steadfastly frustrate the SEC's attempts at collection." *See Durante*, 2013 WL 6800226, at *14.

Accordingly, it is hereby ORDERED that:

1. Bronson shall make a good-faith payment of $25,000 to the SEC no later than one week from entry of this Order;

2. Bronson must produce all financial records and other documents requested by the SEC—including records and documents for Dawn Bronson and V2IP—no later than two weeks from entry of this Order, along with a full accounting of all assets and income;

3. Bronson and Dawn Bronson must sit for an SEC deposition no later than February 26, 2021, unless the SEC requests a postponement;

4. Within four weeks of Bronson's or Dawn Bronson's deposition—whichever is later—Bronson shall meet with the SEC to negotiate in good faith a long-term payment plan to satisfy his obligation to the Court. After meeting with Bronson, the SEC shall file with the Court a proposed payment plan, which shall be supported by a detailed and comprehensive accounting of Bronson's financial condition.

The Court's contempt sanctions account for the SEC's allegation that it has not received complete or truthful information from Bronson regarding his financial condition. (*See, e.g.*, Pl.'s Mem. 6; King Letter 1–2.) After the SEC has been able to develop a more comprehensive picture of Bronson's financial condition—including, for example, any assets secreted offshore, (*see* Pl.'s Mem. 4)—the Court will consider amending its contempt Order to impose a specific payment schedule. Doing so now, without a full picture of Bronson's finances, would be premature. However, the financial records already submitted to the Court make clear that Bronson can easily make a good-faith payment of $25,000 while the SEC reviews any additional financial records submitted by Bronson and prepares to take his and his wife's deposition in the near future. Although the Court declines, for now, to order Bronson incarcerated, the Court will revisit this decision if Bronson violates *any* provisions of this Order and Mr. Bronson should not presume he will avoid prison should there be any future violations. Bronson will remain in contempt until he has (1) paid the full amount of disgorgement and prejudgment interest owed to

the Court, or (2) provided documentation, including financial records, "that concretely and unambiguously establishes his inability to pay any greater amount than the portion (if any) he eventually pays." *See Schwarz*, 2015 WL 4040558, at *21.

### III.  Conclusion

For the foregoing reasons, the SEC's Application is granted.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 202).

SO ORDERED.

DATED:      January 19, 2021
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE