

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION**
Brookfield Place, 200 Vesey Street, Suite 400
New York, NY 10281-1022

New York Regional Office

May 11, 2021

**By ECF**
Hon. Kenneth M. Karas
United States District Court
United States Courthouse
300 Quarropas Street, Chambers 533
White Plains, New York 10601-4150

    Re:    *U.S. Securities and Exchange Commission v. Bronson et al.,*
           12-CV-6421 (KMK)

Dear Judge Karas:

    I write to respond to Defendant's April 30 status report and to propose a payment plan. As background, the Court's January 19, 2021 Order ("Order") found Edward Bronson ("Bronson") in contempt for failing to pay ordered disgorgement and prejudgment interest. Docket Entry ("DE") 223. The Court's Judgment imposed a joint and several obligation on Bronson and his firm to pay: (i) disgorgement of $9,355,271.79 and prejudgment interest of $2,177,100.59 and (ii) on Bronson, his firm and a relief defendant to pay disgorgement of $645,000.00 and prejudgment interest in the amount of $151,031.37 ("Disgorgement Obligation").[1] DE 193. The Order required: (i) Bronson to produce all financial records and other documents requested by the SEC; (ii) Bronson and Dawn Bronson ("D. Bronson") to appear for depositions; (iii) Bronson's counsel to submit a status report concerning document production and a full accounting; and (iv) the Commission to submit a proposed payment plan supported by a detailed and comprehensive accounting of Bronson's financial condition. DE 223.

    Certain categories of documents have still not been produced to the Commission. In addition, Bronson's overbroad assertions of attorney-client privilege during his deposition impeded the Commission's ability to gather complete information about his income and assets. Nor has Bronson provided a full accounting as ordered. Due to Bronson's failures, the Commission cannot make a completely informed recommendation for a payment plan. That said, Bronson has not shown an inability to make significant payments. Indeed, as described below, Bronson maintains a lavish lifestyle and documents obtained from third parties suggest that he has access to significant assets. A more substantive discussion of the Commission's findings, conclusions and recommendations is below.

---

[1] Nearly all of the Disgorgement Obligation remains unpaid as Bronson has paid only $25,000 and post-judgment interest continues to accrue. Declaration of Maureen Peyton King ("King Decl.") ¶4.

I. Documents Remain Unproduced.

Bronson has not yet produced all requested documents as ordered by the Court. On April 29, Commission counsel provided Mr. Rachmuth a letter describing examples of documents that remain outstanding. King Decl. ¶5, Exs. 1, A-F. The most significant document production omissions relate to SEC Document Requests 1, 7, 8 and 9. DE 229-1. Collectively, these requests seek documents concerning entities and accounts Bronson controls directly or indirectly.

The Top Knot entities, Top Knot, Inc. and Top Knot Inc. USA, present a key example of entities and accounts Bronson controls through family member nominee(s), for which he has not produced documents.[2] Bronson testified that the Top Knot entities generally engage in speculative transactions. Deposition of Edward Bronson ("Mar. 23 Depo.") Tr. 47.[3] Bronson represented that he and Kellas "started exploring opportunities together to help [Kellas]…make money." *Id*. Bronson further testified that his father-in-law, John Kellas, controls Top Knot and Bronson is merely Top Knot's attorney. Mar. 23 Depo. Tr. 193-4.[4] However, Bronson also testified that his father-in-law has little education and noted no transactional work experience.[5] Mar. 23 Depo. Tr. 47, 82-3. This strongly suggests that Bronson controls the Top Knot entities.

---

[2] Another entity about which the Commission does not yet have sufficient information, Top Knot, Ltd. may also be controlled by Bronson. While the Bronsons produced some account statements for earlier periods, Top Knot, Inc. and Top Knot Inc. USA retained separate counsel after Commission counsel issued document subpoenas to them. Although responses to these subpoenas were due on April 20, 2021, no documents have been produced despite the Commission's repeated requests for them. King Decl. ¶5, Exs. 7, 8.

[3] Commission counsel is filing this letter without transcript excerpts as exhibits to the declaration to allow the Court to rule on Defendant's anticipated motion to seal the transcripts. Copies of these exhibits will be simultaneously emailed to Chambers and to Defendant's counsel. Commission counsel does not believe sealing is warranted and will file them as exhibits at the Court's direction.

[4] Further frustrating the Commission's discovery efforts were Bronson's questionable assertions of attorney-client privilege. Despite apparently conducting business transactions on behalf of the Top Knot entities, during his deposition, Bronson claimed that since all of his work for the Top Knot entities was legal, he was not at liberty to answer Commission counsel's questions on the basis of attorney-client privilege.

[5] The Commission served a deposition subpoena on Kellas on Mar. 22, 2021. Kellas's counsel has been generally unresponsive and has not committed to a deposition date, despite the fact that Commission counsel has attempted to reach him numerous times to schedule the deposition.

An email related to Top Knot Inc.'s prime brokerage account also suggests that Bronson controls Top Knot. King Decl. ¶5, Ex. 1-E. On March 8, 2021, "Edward johnkellas54@gmail.com" emailed Cowen Prime Brokerage seeking a contact for Top Knot Inc., "a Cowen Prime client in London." *Id*. He explained "[W]e would like to execute US equity trades." *Id*. The email was signed "John Kellas CEO Top Knot Inc." But, as shown above, the email address is preceded by Bronson's first name. *Id*. And Bronson – not Kellas – has experience trading securities. The email suggests that Bronson has funds available to execute such trades.

The Bronsons seem to be using Top Knot to fund their family expenses in much the way they used V2IP. D. Bronson testified that Top Knot Inc. pays personal expenses she incurs. March 24 Deposition of Dawn Bronson ("Mar. 24 Depo."), Tr. 29; *see also* King Decl. ¶5, Ex. 2. And Bronson himself testified that "[a]ny money that's come out of Top Knot USA has gone into V2IP or my wife's personal account. It's marginal at best. Maybe $100,000 this year, $150,000, that were put into the companies? Maybe some more money that was paid directly for bills from this entity. We're not taking tons of money. You have all our records." Mar. 23 Depo. Tr. 57-8. Assuming Bronson's estimate is accurate as of March 23, if this trend continues annually, the Bronsons will take $400,000 to $600,000 from Top Knot Inc. USA alone. Based on Bronson's own testimony, Bronson appears to control Top Knot, which pays for his family's expenses. Thus, Bronson should have produced documents to the Commission regarding the Top Knot entities.

Bronson's control over the Top Knot entities should require him to produce documents concerning them. Such documents are significant because Bronson acknowledged that Top Knot is involved in "multiple real estate projects…which will at some point in the immediate future accrue positive revenues." Mar. 23 Depo Tr. 193. Further, documents the Commission obtained from third parties, described more fully below, strongly suggest that Top Knot documents would provide a window into assets and income available to satisfy his Disgorgement Obligation.

Bronson also testified about other potential assets and income to satisfy the Judgment but has not produced related documents. For example, Bronson testified that he is "the beneficiary of a large real estate trust…from his mother's family" but produced no documents related to that trust. Mar. 23 Depo. Tr. 158.

As to tax returns, the latest returns the Bronsons produced were for 2017. These tax returns produced do not include all entities. For example, Bronson did not produce Top Knot tax returns.

The Commission also requested documents at the Bronsons' depositions that the Bronsons have not yet produced.[6] These include: (i) V2IP's Scottsdale trading account (if it remains open); (ii) the name of Stuart Krost's business partner as Krost and his partner's entity did business with V2IP; (iii) the list of entities set up in connection with a North Caicos airport and resort development project; (iv) formation documents for each entity formed in connection with Turks and Caicos including, but not limited to, a Caicos management shareholders agreement; (v) documents sufficient to show any financial account for each entity identified in request (iv); (vi) any Bankruptcy Court filings in connection with a potential Top Knot transaction; (vii) addresses for D. Bronson's partners in an entity, TVED, Ltd., that she explained was set up for a real estate deal in Turks and Caicos; (viii) documents supporting the monthly amount of consulting fees D. Bronson receives from each entity listed in the Feb. 12, 2021 Accounting the Bronsons provided ("Feb. 12 Accounting"); and (ix) trust documents for Bronson. Mar. 23 Depo. Tr. 83-4, 109-12, 126-7; 181-2, 194; Mar. 24 Depo. Tr. 76-77, 95, 105; King Decl. ¶5, Ex. 4.

II.     The Bronsons' Depositions Reveal Their Lavish Lifestyle

Bronson's overly broad assertions of attorney-client privilege impeded the Commission's ability to fully depose him. The depositions did reveal, however, the Bronsons' ability to continue to lead a lavish lifestyle. The Bronsons reside in a 6,000 square foot home which boasts a $300,000 swimming pool on 11.4 acres in Westchester. Mar. 23 Depo. Tr. 15-17. Bronson estimated that the home has six bedrooms and eight bathrooms. *Id.* Tr. 16. D. Bronson owns the $1.35 million dollar home but the mortgage is delinquent. King Decl. ¶5, Ex. 4, Mar. 24 Depo. Tr. 97. Even so, a housekeeper attends to the Bronsons' home 4 days a week. Mar. 23, Depo. Tr. 18. The Bronsons drive a fully paid $80,000 2019 Cadillac owned by an entity created to own their cars.[7] Mar. 23 Depo. Tr. 20-1. The Bronsons took their $18,500 spring break family vacation in March 2019 at the Four Seasons in Punta Mita.[8]

Although, as to expenses, Bronson testified that he lives "very frugally," the Bronsons' Feb. 12 Accounting shows monthly expenses of $25,600 (over $300,000 annually). Mar. 23 Depo. Tr. 189; King Decl. ¶5, Ex. 4. Moreover, Bronson testified that the $1.8 million earned in 2018 and 2019 is "gone" because living in Westchester costs "a tremendous amount of money even if you are living on a shoestring." Mar. 23

---

[6] In response to Mr. Rachmuth's May 11 request, Commission counsel emailed these requests to him.

[7] That the family's luxury SUV is owned through an entity provides a key example of why it is hard to assess Bronson's ability to pay. While Bronson can claim he does not have a car, he is in fact driving an $80,000 vehicle – and complained during his deposition that it is "a three-year-old used car." Mar. 23 Depo, Tr. 20-1, 189.

[8] D. Bronson acknowledges this was a family vacation while Bronson claims it was also in connection with a development project. Mar. 23 Depo Tr. 110; Mar. 24 Depo. Tr. 72.

Depo, Tr. 71. The Bronsons' Feb. 12 Accounting shows staggering home expenses including a mortgage of $10,000 per month and $6,000 a month in utilities. King Decl. ¶5, Ex. 4. At her deposition, D. Bronson detailed a laundry list of expenses that do not even appear to be factored into the sworn financials including: pet care, salon trips every three weeks, gaming expenses and home maintenance expenses. Mar. 24 Depo. Tr. 16-28.

    III.    The Bronsons' Accounting is Misleading as to Their Income and Assets.

The Court ordered Bronson to provide a full accounting by April 30. Yet Bronson refiled the same accounting provided to the Commission on February 12, 2021 ("Feb. 12 Accounting") and described to the Court in a Feb. 19, 2021 filing. DE 236, King Decl. ¶5, Ex. 4. And the Bronsons' own deposition testimony shows that the income stated on the Feb. 12 Accounting is misleading. Bronson testified that he expects his income to go back "to the prior three years' level, so to that $900,000 a year." Mar. 23 Depo Tr. 188. In fact, Bronson expects to earn a million dollars per quarter starting in the second quarter of 2021 and going forward. *Id.* at 200. Based on this projection, Bronson should earn over $3 million this year and $4 million per year thereafter – without even considering that he estimates he will earn "hundreds of millions" from his so-called North Caicos project involving development of resorts and an airport in Turks and Caicos. *Id.* at 177-8.[9] Yet the accounting discloses that Dawn Bronson earns $6,535 per month on average and Bronson earns nothing. King Decl. ¶5, Ex.4. If Bronson had submitted an accurate accounting on April 30, based on his March 23, 2021 testimony, his income should have shown a monthly average of around $333,000 – not zero. Also conspicuously absent from the income disclosed are: (i) contributions made to their household by Mr. Kellas, which Bronson testified varied between zero and $5,000 per month; and (ii) any amounts received from Top Knot.[10] Mar. 23, Depo. Tr. 19, King Decl. ¶5, Ex. 4. For these reasons, the accounting is at best misleading.

Through additional discovery, the Commission obtained documents from third parties that strongly suggest that Bronson has available assets or income that he has not disclosed in his Feb. 12 Accounting. For example, according to a letter from Titan Global Holdings Ltd., Bronson "assured [Titan] that he is…25% owner of a $6B USD regulated hedge fund." King Decl. ¶5, Ex. 3. By way of another example, a May 2019 email estimated Top Knot would have $150m usd "on average." King Decl. ¶5, Ex. 1-B.

---

[9] In contrast, Dawn Bronson is unaware of any activity to advance the project – just discussions – and acknowledged it may not have been the greatest idea. Mar. 24 Depo. Tr. 85-7.

[10] As noted above, Bronson testified that he and his wife have taken $100,000-$150,000 from Top Knot this year. Mar. 23 Depo. Tr. 57-8. This is not reflected as income in the Feb. 12 Accounting. King Decl. ¶5, Ex. 4. D. Bronson pays personal expenses from Top Knot – yet no income from Top Knot is referenced in the accounting. Mar. 2 Depo. Tr. 29.

Top Knot entit(ies) have accounts at Cowen, Barclays, Jeffries, Pershing and Wells Fargo. As Bronson controls Top Knot he also controls these accounts. *See, e.g.*, King Decl. ¶5, Exs. 1-C, 1-D, 2, 5. In addition, documents obtained from a third-party suggest that Bronson made a $50 million verbal commitment for a 50% stake in an entity named TelMax – and a future commitment of $25 million.[11] King Decl. ¶5, Ex. 1-F. The same document suggests other potential income and assets, none of which is disclosed in the Feb. 12 Accounting. Collectively, these documents urge the conclusion that Bronson has access to significant assets that he has not disclosed to the Commission.[12]

    IV.    Payment Plan Recommendation.

Based on available information, Bronson appears to have access to significant sums. He has blocked the Commission from learning the sources and true extent of his wealth. Because it is Bronson's burden to show that significant payments toward the Judgment are impossible and he has utterly failed to meet that burden, the Commission respectfully requests that the Court order Bronson to pay half of the Disgorgement Obligation within 90 days and the balance within one year of entry of the Court's payment plan order. The Commission also requests that the Court impose additional sanctions determined by the Court if Bronson fails to abide by the payment plan Order.

                                       Respectfully submitted,
                                       s/*Maureen Peyton King*

---

[11] Commission counsel does not know whether this transaction was executed or, if so, at what amount.

[12] D. Bronson may also have access to significant funds. D. Bronson testified that she has no trusts. Mar. 24. Depo. Tr. 95. But an email sent in her father's name represented to Cowen that D. Bronson manages her family real estate trust, which holds assets exceeding $500 million. King Decl. ¶5, Ex. 6. Although the Commission cannot know if D. Bronson has a beneficial interest in these funds, and if so, the value of these funds, it may be another example of the Bronsons purporting to have assets that they did not disclose to the Commission.