Dawn Bronson
3/24/2021

## Page 1

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
---------------------------------
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
        Plaintiff,              )
                               ) Case No.:
     v.                         ) 12-CV-6421-KMK
                               )
EDWARD BRONSON, et al.,         )
                               )
        Defendants.             )
                               )
---------------------------------


          REMOTE DEPOSITION OF
              DAWN BRONSON
         Wednesday, March 24, 2021










Reported by:
BRIDGET LOMBARDOZZI,
CSR, RMR, CRR, CLR
Job No. 210324BLO
```

## Page 2

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
---------------------------------
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
        Plaintiff,              )
                               ) Case No.:
     v.                         ) 12-CV-6421-KMK
                               )
EDWARD BRONSON, et al.,         )
                               )
        Defendants.             )
                               )
---------------------------------




        Deposition of DAWN BRONSON taken
remotely on behalf of Plaintiff, commencing at
11:56 a.m. and ending at 2:47 p.m., EST, on
Wednesday, March 24, 2021, before Bridget
Lombardozzi, CCR, RMR, CRR, CLR, and Notary
Public of the States of New York and New Jersey,
pursuant to notice.
```

## Page 3

```
APPEARANCES (All appearing remotely):

For the Plaintiff:

    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    BY:  MAUREEN PEYTON KING, ESQUIRE
         CHRISTOPHER J. DUNNIGAN, ESQUIRE
    New York Regional Office
    200 Vesey Street
    Suite 400
    New York, New York  10281-1022
    Telephone:  212.336.0111
    Email:   kingmp@sec.gov
             dunnigancj@sec.gov

For the Defendants:

    PAUL A. RACHMUTH, ESQUIRE
    66 North Village Avenue
    Rockville Centre, New York  11570
    Telephone:  516.330.0170
    E-Mail:  paul@paresq.com
```

## Page 4

```
              INDEX
WITNESS                        EXAMINATION
DAWN BRONSON
   BY MS. KING                      8



            EXHIBITS
SEC
NUMBER        DESCRIPTION            PAGE

Exhibit G   V2IP Escrow Account       52
            Ledger 11/16/16 - 4/19/16
            SEC-RACHMUTHP-E-0004948-49

Exhibit J   Statement of Financial    87
            Condition as of 2/12/21
            NO BATES, 11 pages

Exhibit K   Statement of Financial    107
            Condition as of 3/30/20
            SEC-BronsonE-E-0000001-11

Exhibit M   Wire Full Transaction Report  63
            Bank Details
            NO BATES, 31 pages
```

**EXHIBIT 4**

Dawn Bronson
3/24/2021

Page 25:

1  do it. You know, I'm going to try. I have the
2  salt. It's a saltwater pool. So I'm going to
3  give it a shot and we'll see. Hopefully when we
4  take off the cover, it's not that bad.
5     Q.  Okay. Are there any expenses for your
6  children other than what we've already
7  discussed?
8     A.  Any expenses for them?
9     Q.  Yeah. Video games --
10    A.  Video games --
11       (Indiscernible cross talk; reporter
12  requests one speaker.)
13    Q.  Sorry.
14    A.  Sorry. Video games, yes. Yes. They
15  buy video games. My youngest, with Apple, he --
16  I don't know what they do. He must have bought
17  a subscription and hit it once, twice. So I
18  recently, you know, took control over that and I
19  had to cancel the card because I couldn't figure
20  out whose cloud it was on, so I just canceled
21  the credit card. It was easier to do that than
22  to go through all their iClouds and figure out
23  who subscribed to all those, you know, videos or
24  whatever it is they do. I don't really know
25  much about their video game.

Page 26:

1     Q.  Got it.
2     A.  I don't love it.
3     Q.  Understood.
4        Do you pay any expenses for any other
5  family member?
6     A.  Any other -- my dad lives with us,
7  yes. So it's -- you know, if he needs
8  something, I'll write a check for his insurance,
9  his life insurance stuff that he has. That's
10  really it. I mean, if he needs it, if I'm out
11  at the store, you know, and he has a list. I
12  buy his groceries and I don't take money for
13  him, but he does the same when he goes to the
14  store. So, yeah.
15    Q.  Okay. Does he also contribute
16  financially to your household?
17    A.  He does. I mean, he doesn't -- he
18  doesn't pay rent. He doesn't give us money for
19  food, but when we needed money, he would, yes.
20  Absolutely. He doesn't have a lot, so he would
21  help out as much as he can. That's about it.
22    Q.  But, like, does he -- for example,
23  like, monthly, does he contribute monthly to the
24  household or is it just sort of ad hoc?
25    A.  No, it's not monthly, but he'll

Page 27:

1  give -- you know, if he goes to the bank and he
2  has a little cash and I'm running out with the
3  kids and I have no cash on me, he will give me
4  $100 or $200, like that, and then not take it
5  back when I try to pay him. That sort of thing.
6     Q.  Understood.
7        And do you -- in terms of, like, when
8  you run out, you mentioned cash. Do you also
9  use debit or credit cards?
10    A.  No, we don't -- I don't have any -- we
11  have any credit cards.
12    Q.  Okay.
13    A.  Debit cards, yes. I use my debit
14  card. I never use cash. I actually use the
15  debit card for everything.
16    Q.  Okay. What bank do you use? What
17  bank is your debit card from?
18    A.  Wells Fargo.
19    Q.  Okay. Any others?
20    A.  Yes, I do. I have another bank
21  account, I keep a small amount of money in
22  there, that I had opened so that the kids would
23  use that account for their gaming, which never
24  happened. That is -- who is that with? Not
25  Wells Fargo. Webster. I'm sorry. Webster.

Page 28:

1     Q.  Got it.
2        And is that essentially what that
3  account is for?
4     A.  That's what -- yeah. I keep $400,
5  $500 in there a month, yes. And I'll use it if
6  I'm out if I need to, yeah.
7     Q.  Okay. And do you use any entity
8  accounts to pay your expenses?
9     A.  The business debit cards? Is that the
10  question?
11    Q.  Yes.
12    A.  Yes. If I'm out and I -- yes.
13    Q.  Okay. So you have personal Wells
14  Fargo and a Webster account. And then what
15  businesses do you have accounts for that you use
16  for personal expenses?
17    A.  V2IP was used in the past for, you
18  know -- not so much -- yeah, I guess so. If I
19  had it on me, I would use it for personal.
20  Staples. I'd use it at Staples. I'd use it at
21  FedEx, you know, when we ship. Things like
22  that.
23    Q.  Okay. Do you use any other entity
24  accounts for your household expenses?
25    A.  No, just the ones -- I use V2IP. I

**Page 29**

```
 1  use my personal.  And I'll use Top Knot if --
 2  you know, if I have that card on me.
 3      Q.  Okay.  Top Knot, Inc. or Top Knot USA
 4  or both?
 5      A.  Top Knot, Inc., yeah.  I don't think
 6  there's -- yeah.  There's one account.
 7      Q.  Okay.
 8      A.  Yeah.
 9      Q.  Okay.  And approximately how much do
10  you -- how much of your personal expenses are
11  paid for through V2IP and Top Knot?
12      A.  Oh, gosh.  Off the top of my head -- I
13  don't know that off the top of my head.
14      Q.  Okay.  Can you estimate?  I mean, is
15  it, you know, $1,000 a month?  $10,000 a more?
16  $30,000 a month?
17      A.  Yeah, no, it's not that high.  I don't
18  want to say something and it's not the right
19  number.
20          MR. RACHMUTH:  Don't guess if you
21      don't know.
22      A.  I don't know.  Yes, I don't know.
23      Q.  Okay.  Do you have any other financial
24  accounts?  So securities accounts or any other
25  accounts?
```

**Page 30**

```
 1      A.  No, I don't.
 2      Q.  Okay.  Do any -- does V2IP or Top Knot
 3  have any securities accounts?
 4      A.  Not that I know of.
 5      Q.  Okay.  Did V2IP ever have a Scottsdale
 6  Capital account?
 7      A.  They did, yes.  Yes.
 8      Q.  Okay.  Does V2IP still have a
 9  Scottsdale Capital account?
10      A.  I don't know that.  Not that I know
11  of.  I don't think so.
12      Q.  Okay.  When is the last time you were
13  aware that there was a Scottsdale Capital
14  account for V2IP?
15      A.  It was in 2016.
16      Q.  Okay.  And did you have access to the
17  Scottsdale trading account?
18      A.  I did, yes, during 2016, part of 2016.
19      Q.  Did anyone else have access to the
20  Scottsdale trading account for V2IP in 2016?
21      A.  It was just me in 2016.
22      Q.  Okay.  Did you close the account?
23      A.  I did not close the account, no.  I
24  don't know if the account was ever closed.
25      Q.  Okay.
```

**Page 31**

```
 1      A.  I don't remember.  Yeah, I don't
 2  remember.
 3      Q.  Okay.  Do you still get statements for
 4  that account?
 5      A.  No.
 6      Q.  When did you stop getting statements
 7  for the Scottsdale Capital account?
 8      A.  You know, I don't know.  I don't know
 9  the date.
10      Q.  Okay.  Do you know the year?
11      A.  2016.  I would say it was 2016, yeah.
12      Q.  Okay.  Let's talk about your -- I'm
13  going to shift gears for a minute.
14          Can you tell me the highest level of
15  education you've achieved?
16      A.  I graduated from high school.
17      Q.  Okay.
18      A.  That's it.
19      Q.  When and where?
20      A.  I graduated -- gosh -- Franklin K.
21  Lane High School in --
22      Q.  You can estimate.  That's fine.
23      A.  Oh, my goodness.  19 -- that's
24  terrible.  1993 I think or '90.  I can't even
25  believe that I don't remember that.  Yes, around
```

**Page 32**

```
 1  there.
 2      Q.  Is early '90s fair?
 3      A.  Yeah, that's perfect.  Yes.
 4      Q.  Okay.  And that's fine.  As long as
 5  you're comfortable with it, that's fine with me.
 6      A.  Yes.
 7      Q.  Okay.  Okay.  And have you taken any
 8  other courses or --
 9      A.  Yes, I have.  I have taken courses.  I
10  did -- I took an 18-month course.  It was like
11  a -- I guess you would call it like a
12  secretarial school for computers and PowerPoint.
13  Sorry about that.  And that was -- let me think
14  of the year.  '97?  1997?  '98?
15      Q.  Okay.  Can you list for me the names
16  of all of your entities?
17      A.  All of my entities?
18      Q.  Yes.
19      A.  V -- Baby China Products, V2IP.  Top
20  Knot was set up.  Ed did all the -- I don't know
21  if he did them or he had the attorney do them,
22  but that's all of them.
23      Q.  Okay.  I'm sorry, when you say "he,"
24  who do you mean?
25      A.  Let me just help you out.  One second.
```

**Page 33**

1  Q. Sure. Sure. Take your time.
2  A. Sorry about that.
3  Q. Not at all. That's fine.
4  A. I'm sorry. Can you repeat that?
5  Q. Sure. I understood you to say you
6  don't know if "he" did them in connection with
7  incorporating Top Knot. I just wanted to know
8  who you meant.
9  A. Oh, I'm sorry. My husband, Edward.
10 Yeah, Edward. I'm not sure if he did it or he
11 had the attorney incorporate them.
12 Q. But as far as you understand, is Top
13 Knot your company?
14 A. Right. Right.
15 Q. Okay. And is that Top Knot, Inc. or
16 Top Knot USA?
17 A. You know, I don't even --
18 Q. Or both.
19 A. Both were -- I don't even -- honestly,
20 I don't know. I really -- I don't know. I
21 don't want to answer -- I'm not sure. I don't
22 have that in front of me.
23 Q. Okay. But at least one Top Knot
24 entity as you understand it is in your name?
25 A. It was -- I'm not sure if it is or it

**Page 34**

1  was or if it's, you know, in my dad's. The
2  whole point of that was to set something up for
3  my dad. I'm not sure which Top Knot it is,
4  though. I haven't --
5  Q. Okay.
6  A. -- been involved in Top Knot in a
7  while.
8  Q. Okay. About how long have you not
9  been involved in Top Knot?
10 A. Since two thousand and -- I'm trying
11 to think when Top Knot -- let me think. 2018 or
12 '19. I don't -- actually, I don't know. I
13 don't know when it was changed, so sorry.
14 Q. When you say "changed," what do you
15 mean?
16 A. I mean changed as far as if it was in
17 my name and now it's in my dad's, I'm not sure
18 how that was set up. I don't know. I don't
19 know how it was set up. That's --
20 Q. Okay. That's fine.
21    Okay. And so you listed three
22 entities.
23    Are there other inactive entities
24 that are in your name?
25 A. Inactive entities in my name. The

**Page 35**

1  only other entity that was in my name was -- I
2  had a gym, a small group training facility, in
3  2009. That was probably in my -- I believe it
4  was in my name. I'm not a hundred percent sure.
5  Ed did the incorporation for me. I ran the gym.
6  That is the only other entity that I worked
7  with.
8  Q. Okay. How about Bornganics?
9  A. Bornganic is -- yeah. Bornganic -- I
10 started Baby China Products and then I brought
11 in -- Ed introduced me to Ryan Bonifacino, who
12 was one of my partners. And he brought in Igor.
13 Yeah, they changed the name to Bornganic.
14 Bornganic LLC, yeah.
15 Q. Got it.
16 A. I don't have any involvement in
17 Bornganic. I never have. That's what this
18 litigation is about.
19 Q. Okay. And how about MadeOf LLC?
20 A. Yeah, that's theirs. I'm litigating
21 with MadeOf and Bornganics now.
22 Q. Okay. And how about Macallan Partners
23 Assets, LLC?
24 A. Macallan Partners Assets? I'm not
25 sure if that's the car insurance, the entity.

**Page 36**

1  Yes. I'm not sure. I'm not sure if it's
2  Assets. Yes, we had -- Ed used to, years ago,
3  build cars. He loved cars. And that's where
4  they were insured, in the -- yeah. I think it's
5  Assets.
6  Q. Okay. Did you understand that entity
7  to be in your name?
8  A. I'm sorry?
9  Q. Did you understand Macallan Partners
10 Assets to be in your name?
11 A. I believe so, yes. I believe it was
12 in my name.
13 Q. Okay. In terms of -- let's focus on
14 Baby China. What was the business?
15 A. Baby China -- I started Baby China --
16 I started creating products. My children have
17 eczema. So I started mixing at home and playing
18 with ingredients and I came up with a
19 formulation that helped my children. And I
20 thought it was a great idea to, you know, create
21 products, create a brand. And that's basically
22 how it got started.
23 Q. Okay. And approximately from when to
24 when did you work on Baby China?
25 A. I started working on Baby China in

```
 1  2015.  November.  October or November of 2015.
 2  By January of two thousand -- late January of
 3  2016, Ed had mentioned to me I should give Ryan
 4  Bonifacino a call.  He's really good with the
 5  online stuff and maybe we could just, you know,
 6  see what he has to say.  And before you know it,
 7  you know, we went into a partnership and then he
 8  brought in Igor Bekker.  So...
 9     Q.  And for how long were you involved
10  with Baby China?
11     A.  So 2015/'16.  We ended the partnership
12  October of 2016.
13     Q.  Okay.  And how -- did your husband
14  have a role in Baby China?
15     A.  No, he didn't have any role -- I mean,
16  he helped me.  You know, Ed was going to help me
17  as far as create -- not create the whole brand,
18  but he would give me advice.  He looked over all
19  the documents that went between, you know,
20  myself and my partners.  And he knew Ryan.  So
21  he actually called the manufacturers.  He, you
22  know -- he's very good at that stuff, making
23  deals with the manufacturers and trying to do
24  that.
25          UNIDENTIFIED SPEAKER:  Love you.

                        37
```

```
 1          THE WITNESS:  Love you.  Be
 2     careful.  Close the door.
 3     A.  My son.  New driver.  I get very
 4  nervous when he leaves the house.
 5     Q.  Okay.  And just circling back to --
 6  actually, never mind.  We'll get to that later.
 7          So with respect to Top Knot, Inc.,
 8  what business did Top Knot, Inc. conduct?
 9     A.  Top Knot, Inc., I'm not even sure what
10  -- one was real estate and one was bonds.  I
11  don't know which -- which is which, though.
12     Q.  One was real estate and one was bonds,
13  did you say?
14     A.  Yes.  Something -- I think.  I'm not a
15  hundred percent sure.
16     Q.  Okay.
17     A.  I'm not involved with Top Knot, so,
18  you know, Ed does the work and I'm not involved
19  with the daily.  I do my thing now.  I'm up
20  here; he's down there.  We have two separate
21  offices.
22     Q.  Got it.
23          When you say you do your thing, what
24  is your thing?
25     A.  I do all -- I do all the research

                        38
```

```
 1  for -- for everything.  Everything that he
 2  needs.  I look at everything from names to
 3  companies to litigation to -- you know, I just
 4  look at everything.  He actually doesn't even
 5  speak to anyone until I look at some
 6  documenta- -- something, you know.
 7          And it's more because of a personal
 8  reason that I started doing this and got into
 9  this.  So that's what I do.  I do a lot of it.
10     Q.  Okay.  And so what type of work do you
11  understand your husband to do for Top Knot?
12     A.  I'm not even sure what he does for Top
13  Knot.
14     Q.  Okay.  And is that true for both Top
15  Knot, Inc. and Top Knot USA, that you're not
16  sure what he does for either?
17     A.  Yeah.  Well, the real estate, we both
18  thought it was a great idea to do that and we
19  started -- we got into that 2017 in the
20  Caribbean.  We were looking at the real estate.
21  And that's how that whole thing got started, the
22  real estate.  Ed wanted to do something
23  different.  We needed to make a living and
24  figure things out and that's how it started.  So
25  which company is used for what, I don't know.

                        39
```

```
 1     Q.  Okay.  What is V2IP's business?
 2     A.  V2IP now?  I don't think V2IP is doing
 3  anything now.
 4     Q.  Okay.  When did V2IP stop doing
 5  anything?
 6     A.  I would say it was -- we had the
 7  account open.  2016 or '17 was the last time.
 8  I'd have to double-check the record, but it's
 9  been a while.  A few years.
10     Q.  Since V2IP did anything?
11     A.  Yeah, I believe so.  It's probably --
12  it's a few years, yes.
13     Q.  Okay.  What was the nature of V2IP's
14  business when it was doing things?
15     A.  Originally V2IP was a company, it was
16  my company, Voice2IP, back in 2001 or '2 it was
17  incorporated.  I don't remember.  And then we
18  changed the name to V2IP either in '15 or '16.
19  I'm not a hundred percent sure.  I don't have
20  the incorporation papers in front of me.  And
21  that's when I was involved with -- it was part
22  of 2016.  It wasn't all of 2016.  And that's
23  when I helped, you know -- I did the trading
24  for -- out of Scottsdale for V2IP.
25     Q.  And so was V2IP essentially a business

                        40
```

**Page 45**

I don't even remember the deals. If I -- if I saw them, it would maybe -- maybe I'd remember, but I don't even remember. This was 2016.

Q. Did you -- have you ever placed a securities transaction -- have you ever made a securities transaction on behalf of your husband?

A. Have I ever made it on behalf of my husband?

Q. Yes.

A. I don't know if it would be on behalf of my husband. I -- I think I called Scottsdale twice and, you know, at the time, it was me and Adam in the office.

Q. Okay. Has your husband ever asked you to execute a stock transaction for him?

A. No, not that I -- not that I recall, no.

Q. Okay. How did -- and, I'm sorry, what's Adam's last name?

A. Didia. It's D-I-D-I-A.

Q. Is he still employed by any of your entities?

A. No. We don't talk to Adam. We haven't spoken to Adam. It's over a year.

**Page 46**

Q. Okay. Approximately how much were you placing securities transactions for?

A. Oh, I don't recall.

Q. Okay. And since 2016, have you placed any securities trades?

A. Since 2016? No, I have not.

Q. Have you asked anyone to place a securities trade for you?

A. No. For me? No.

Q. Have you asked anyone to place a securities trades for any entity?

A. No, none. We haven't -- that was the end of it, I would say, 2016. That was -- I have to think about the timing. 2016, November. I'm trying to think of the bankruptcy. By '17 we were already, you know, looking to do something else. It wasn't until July of 2017 that we had the Turks and Caicos and fell in love with that. We thought it was beautiful and saw an opportunity. And we had never done anything like that. And I kind of pushed Ed. I said, "I think this could be a good -- a good thing for us," you know. And he loves structuring things. And we had friends who owned a house there and they introduced us to

**Page 47**

their, you know, friends or connections, and that's how the whole project got started, which was very exciting.

Q. Got it.
    Who were your friends that owned a house there?

A. Who were my friends that owned a house there?

Q. Yes.

A. They -- you know, I really don't want to involve people in things that they don't need to be. You know, I mean, everyone has -- you know, this whole thing has caused problems over the past few years. I'm not sure.
    THE WITNESS: Paul, do I -- I respect their privacy. And Paul?
    MR. RACHMUTH: Yeah, I don't know that you need to -- they have celebrity friends that they don't want to be brought into the press. So let's leave the names out of it if we can. The fact that they had a friend down there that showed them an island, I don't think you need the names of their friends down there.
    MS. KING: I'm sorry, I missed the

**Page 48**

last part of what you said.
    MR. RACHMUTH: You already know that they went down to the Caymans and attempted to do business. You don't need the names of the friends that introduced them there.
    THE WITNESS: It was Turks and Caicos.
    MS. KING: Thank you. I was going to ask --
    MR. RACHMUTH: Thank you.
    MS. KING: I was going to ask you for the clarification.
    MR. RACHMUTH: Thank you. I get my islands confused.
    MS. KING: I'm not going to get into a debate as to the relevance of the question.
BY MS. KING:

Q. Can you give me the -- for now, can you just give me the last initial of the male friend's name?

A. The last initial?

Q. The last -- I'm sorry, let me clarify. Let me -- is one of the friends a man?