## Page 1

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
---------------------------------
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
         Plaintiff,  ) Case No.:
    v.                ) 12-CV-6421-KMK
                               )
EDWARD BRONSON, et al.,        )
                               )
         Defendants.   )
                               )
---------------------------------


              REMOTE DEPOSITION OF
                EDWARD J. BRONSON
              Tuesday, March 23, 2021








Reported by:
BRIDGET LOMBARDOZZI,
CSR, RMR, CRR, CLR
Job No. 210323BLO
```

## Page 2

```
         UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF NEW YORK
---------------------------------
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
         Plaintiff,  ) Case No.:
    v.                ) 12-CV-6421-KMK
                               )
EDWARD BRONSON, et al.,        )
                               )
         Defendants.   )
                               )
---------------------------------



       Deposition of EDWARD J. BRONSON taken
remotely on behalf of Plaintiff, commencing at
10:02 a.m. and ending at 4:08 p.m., EST, on
Tuesday, March 23, 2021, before Bridget Lombardozzi,
CCR, RMR, CRR, CLR, and Notary Public of the
States of New York and New Jersey, pursuant to
notice.
```

## Page 3

```
APPEARANCES (All appearing remotely):

For the Plaintiff:

    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    BY:  MAUREEN PEYTON KING, ESQUIRE
         CHRISTOPHER J. DUNNIGAN, ESQUIRE
    New York Regional Office
    200 Vesey Street
    Suite 400
    New York, New York  10281-1022
    Telephone:  212.336.0111
    Email:   kingmp@sec.gov
             dunnigancj@sec.gov

For the Defendants:

    PAUL A. RACHMUTH, ESQUIRE
    66 North Village Avenue
    Rockville Centre, New York  11570
    Telephone:  516.330.0170
    E-Mail:  paul@paresq.com
```

## Page 4

```
              INDEX
WITNESS                    EXAMINATION
EDWARD J. BRONSON
  BY MS. KING                    8

              EXHIBITS
SEC
NUMBER       DESCRIPTION              PAGE

Exhibit B   White and Williams Invoice    118
     No. 739900 9-12-19
     WWBRONSON000036-48

Exhibit C   White and Williams Invoice    135
     No. 738287 8-16-19
     WWBRONSON000022-29

Exhibit D   Wells Fargo Checking Account  207
     Statements - Top Knot, Inc.
     NO BATES, 4 pages

Exhibit G   V2IP Escrow Account           88
     Ledger 11/16/16 - 4/19/16
     SEC-RachmuthP-E-0004948-49
```

EXHIBIT 5

**Page 45**

I tried to be supportive to my wife to the best extent of my ability. But I had no assets -- I had no ownership role.
   Q.   Did Baby China ever compensate you in any way for your --
   A.   No, Baby China -- no, it was a pre-revenue company.
   Q.   Did MadeOf LLC ever compensate you for any of the services you just described?
   A.   No. It was also a pre-revenue company that had no funding.
   Q.   What, if any, role did you have or do you have in Bornganics, LLC?
   A.   None. Just -- just so you understand, all three entities revolved around the same project that my wife was working on. I paid -- my role for all three entities all was the same. I had no ownership in any of those entities. I just tried to help my wife.
   Q.   Correct me if I'm wrong, B-O-R-N-G-A-N-I-C-S?
   A.   That's correct.
   Q.   What, if any, role do you have or have you had in Top Knot, Inc.?
   A.   I -- Top Knot, Inc.? In Top Knot,

**Page 46**

Inc. I was working with the company both as a lawyer and also as an investment -- reviewing investments and trying to structure transactions.
   Q.   What compensation did you receive for those services?
   A.   I received cash that -- or not cash, but I received no direct compensation. My father-in-law contributed to the household.
   Q.   Okay. Apart from what you already described, what was the nature of Top Knot, Inc.'s business?
   A.   Top Knot, Inc. was set up as a general purpose vehicle to explore opportunities for my father-in-law through my assistance wherever we thought I would advise him on. So if I thought there was a good opportunity in real estate, we would start looking at real estate transactions together. If I thought there was a good opportunity in Hong Kong bonds, we would look at Hong Kong bonds together.
       So it was a general purpose company specifically to explore opportunities for my father-in-law.
   Q.   What is your father-in-law's

**Page 47**

educational background?
   A.   He had a very limited educational background.
   Q.   Okay. What is his work history generally?
   A.   He has very limited work history from -- that's -- let me rephrase that. My father-in-law's work history is that originally he was in the Navy. When he left the Navy, he went to work in the diesel repair field. And when my father-in-law met me, over a ten-year period, we started exploring opportunities together because I was trying to look for opportunities to help my father-in-law and my mother-in-law make money.
   Q.   Okay. Who funded those opportunities?
   A.   Generally most of those opportunities were funded on speculation. So they were -- they were opportunities which utilized my unique ability to structure transactions on a credit basis.
   Q.   So who funded those opportunities?
   A.   They were -- any opportunities that we saw we would attempt to structure through structured payments over a period of time.

**Page 48**

   Q.   What was the source of the funds?
   A.   There were no funds.
   Q.   So you mentioned Hong Kong bonds, for example. How -- what opportunities did you look at with Hong Kong -- I'm trying to understand how you --
   A.   Well, it's very simple.
   Q.   Let me just --
   A.   Let me explain to you.
   Q.   Let me finish my question. I'm trying to understand how you, you know, found real estate that you felt was a good opportunity or a security that you felt was a good opportunity, how you could make money without investing any of your own or your --
   A.   Well, let me ask you a question. All right? When somebody who looks at a -- at a real estate opportunity, what do they do? They make an offer and then they look to structure financing and structure a transaction such that they can pay for the opportunity. Right? That's what we did. We looked for funding. All right? We looked for partners. All right? We looked for partners to fund those transactions. We looked for partners to fund those

## Page 53

1  right?  We are not denying that I work for V2IP.
2  We are not denying that I work for Top Knot.  We
3  are not denying that I assist both those
4  entities.
5     Q.  I'm sorry, you cut out.  I can't hear
6  you.  Hello.
7     A.  Yeah.  I said we are not denying that
8  I work for Top Knot or I've worked for Top Knot,
9  Inc. or Top Knot, Inc. USA and assisted them.
10 We're not denying that I work for V2IP or I've
11 worked for them in the past and helped them.
12 That's my only source of income, is when I get
13 paid when I assist them.  We live in a house
14 together.  All right?  We work together.  You
15 want to address some of that income to me?  Go
16 ahead.  We asked you, make us an offer.  All
17 right?  We don't have a steady income.  I don't
18 have a business like we used to.  All right?
19 It's all about trying to develop something,
20 which is what we're doing.
21    Q.  Again, I can't hear you.
22    A.  All right.  Well, I'm sorry, that's --
23 I'm here.  I'm talking and participating.
24    Q.  I understand that and I don't want to
25 miss what you're saying.  The last thing I --

## Page 54

1  I'm not --
2           MS. KING:  Bridget, are you able
3     to --
4     A.  Excuse me.  Attorney King, I made it
5  very clear.  All right?  There's no steady
6  source of income.  I assist, work as a lawyer
7  for Top Knot, Inc. USA.  For Top Knot, Inc. I
8  did both legal and advisory services for
9  investing and those are my -- that's what I do.
10 All right?  And for V2IP.  All right?  And we
11 don't have a steady source of income.  We don't
12 have tons of money rolling in.  All right?
13         In fact, you limited my ability with
14 this judgment.  All right?  I am trying to build
15 something with my father-in-law and with my
16 wife.
17    Q.  You're cutting out again.
18    A.  I answered.  I'm waiting for the next
19 question.
20    Q.  I couldn't hear your answer.
21    A.  My answer was confirming what I've
22 said three times.  We have no steady income.
23 I'm not paid a salary.  All right?  We work
24 together.  My wife, my father-in-law, myself.
25 All right?  If you want to address income that

## Page 55

1  my father-in-law earns to me, we're happy to
2  discuss that.  All right?  Nobody's hiding that.
3  All right?  Nobody's hiding anything at Top
4  Knot, Inc. or Top Knot, Inc. USA or V2IP.
5     Q.  Okay.
6     A.  I am a transparent book.  All right?
7  I want to be done with this.  I want to come to
8  an agreement with you and be done and pay you.
9     Q.  Okay.  Can you tell me how much in the
10 past year Top Knot, Inc. has earned?
11    A.  Top Knot, Inc.?  Nothing.
12    Q.  All right.  So I'm willing to -- and
13 let's go down this road then.
14    A.  Top Knot, Inc. -- Top Knot, Inc. --
15         MR. RACHMUTH:  Ed, please stop.
16    Do you want to go off the record for a
17    moment, Ms. King, just so we can talk
18    about -- or is what you're talking about
19    just a line of inquiry for your -- I'm
20    confused as to where this is going.
21         MS. KING:  Well, I want to -- is
22    Mr. Bronson -- Mr. Bronson is sort of
23    frozen on my screen.
24         MR. RACHMUTH:  Yeah, he froze on
25    mine -- no, he's moving --

## Page 56

1     Q.  Can you hear us, Mr. Bronson?
2     A.  I can hear you fine.
3     Q.  Okay.  Super.
4          MS. KING:  It's for -- if you need
5     to take a break, that's fine, but I'd like
6     to explore what Mr. Bronson is saying.
7          THE WITNESS:  Go ahead.
8          MR. RACHMUTH:  Ed, why don't you
9     let Ms. King ask specific questions and
10    please answer to the extent you can that
11    does not violate your attorney-client
12    privilege with Top Knot, answer the
13    specific questions.
14         THE WITNESS:  That's fine.
15         MS. KING:  Okay.
16 BY MS. KING:
17    Q.  I'd like -- can you give me a sense,
18 Mr. Bronson, of how much you, your wife and your
19 father-in-law have earned through Top Knot, Inc.
20 in the -- for 2018, '19 and '20?
21    A.  Top Knot, Inc.?
22    Q.  Yeah.  We'll focus on each entity
23 separately first.
24    A.  Top Knot, Inc., probably nothing.
25 Zero.

Edward Bronson
3/23/2021

**Page 57**

Q. Okay. Can you give me a sense of how much income you, your wife and your father-in-law have earned from Top Knot USA in 2018, 2019 and 2020?
A. 2018 and '19, nothing, because the company wasn't formed until 2020.
Q. All right.
A. Top Knot, Inc. was formed in 2019. 2020? I don't know, a couple hundred thousand maybe Top Knot, Inc. USA made. I don't know. Listen, I'm sure Jon Kellas would be happy to tell you the exact amount.
Q. I'm sorry, I heard "I'm sure Jon Kellas" --
A. I'm sure Jon Kellas will be happy to provide you with the exact amount the company's earned. I don't know the exact amount.
Q. Okay. How much have you, your wife -- you and your wife taken out of Top Knot USA since it was formed?
A. You have our bank records. Any money that's come out of Top Knot USA has gone into V2IP or my wife's personal account. It's marginal at best. Maybe $100,000 this year, $150,000, that were put into the companies?

**Page 58**

Maybe some more money that was paid directly for bills from this entity. We're not taking tons of money. You have all our records.
Q. And how much money have you and your wife earned from V2IP?
A. You have our bank records.
Q. The --
A. Since two thousand -- I -- I don't know. The exact amount, I don't know. The records state I think somewhere in the 900,000 range in '18 and '19 and '20 was less, probably 75 or 100,000. I don't know the exact number. And '21, little or nothing.
Q. Okay. Just so I am sure I understand, in 2018 about 900,000?
A. Yes.
Q. And in 2019, another 900,000 you and your wife --
A. That's correct.
Q. -- got from V2IP? Okay. That's helpful.
What changed between 2019 and 2020?
A. Nothing.
Q. How did V2IP go from earning $900,000 a year to 100,000 --

**Page 59**

A. Oh, what happened? Not -- what happened is that the project had slowed to a halt in Turks and Caicos and weren't pursuing -- it was on delay and we weren't earning money. We weren't making any money. We couldn't move forward on it. It was delayed.
Q. What's the current status of the project?
A. It's on hold.
Q. Why?
A. Because there was a new government voted in in September, I believe, and our proposal which was put in for the contract is at the Attorney General's office pending review.
Q. When in 2020 was the project put on hold?
A. The election occurred -- I don't know the exact date. Somewhere in the September range.
Q. What I'm wondering, then, is why this -- this change from 900,000 to 100,000. So if things were consistent for 2018 and '19 and it wasn't until later, 2020, that there was a change that caused the --
A. We were -- we were exclusively working

**Page 60**

on Turks and Caicos and there was no revenue streams from Turks and Caicos for V2IP.
Q. Okay. In 2018 and --
A. The life cycle of a company, sometimes they make money, sometimes they don't make money. All right? What V2IP was focusing on at that point from the end of 2019 through 2020 was the development in the Turks and Caicos project. There was no income to be derived from that.
Q. Okay.
A. There was not a substantive income in V2IP.
Q. What was V2IP working on in 2018 and 2019 to generate about $900,000 income per year for you and your wife?
A. We were working with people on an opportunity. I represented the Krost family and I was advising them legally on opportunities. I can't expand past that because of privilege, but I was working with them and they were paying me a salary, a legal salary, legal fees in connection with my advice, my legal advice.
Q. Were you also involved in trading securities for the Krosts?
A. No.

**Page 81**

1  pursuing.
2  **Q.** Okay.
3  **A.** I can't disclose more than that, but
4  the answer is yes.
5  **Q.** Okay.
6  **A.** The answer is yes.
7  **Q.** Does Top Knot, Inc. have any bank
8  accounts?
9  **A.** Yes. Top Knot, Inc. USA, not Top
10 Knot, Inc.
11 **Q.** Okay. So Top Knot, Inc. does not have
12 any bank accounts. Top Knot, Inc. USA has bank
13 accounts?
14 **A.** Yes.
15 **Q.** Okay. Where are Top Knot, Inc. USA's
16 bank accounts?
17 **A.** Wells Fargo. We told you that. We've
18 provided that, I believe.
19 **Q.** I can still ask about it as part of
20 this deposition.
21 **A.** No, absolutely. I'm just clarifying
22 that we provided that to you.
23 **Q.** Can you approximate for me how many
24 transactions you've worked on with Mrs. Bronson?
25 **A.** My wife?

**Page 82**

1  **Q.** Yes.
2  **A.** I don't know. I mean, you know -- I
3  don't know.
4      MR. RACHMUTH: If you don't know
5    the answer, please don't guess.
6  **A.** I can't guess. I don't know.
7  **Q.** Okay. When you work on a transaction
8  with your wife, are there specific parts of the
9  transaction you handle versus she handles or how
10 do you work together?
11 **A.** Yes. So my wife -- just so you
12 understand -- and this was a question that you
13 had asked about Islay, correct. My wife and I
14 will discuss -- my wife is very good at working
15 Westlaw. So my wife will do diligence research
16 for me if I ask her.
17     So I'll say look up such and such a
18 person in connection with this proposed
19 transaction. We need to check that and make
20 sure they have no criminal history, that there's
21 no civil litigation. You know, we do a
22 background check on everybody and that's what --
23 she handles all that.
24 **Q.** Okay. And is that essentially her
25 role in whatever transactions you've undertaken

**Page 83**

1  together?
2  **A.** Yes. Yeah.
3  **Q.** Okay. Does V2IP have any bank
4  accounts?
5  **A.** Yes.
6  **Q.** Okay. Does V2IP have a savings
7  account?
8  **A.** Yes.
9  **Q.** Okay. Were what -- I don't understand
10 us to have received all of the records for
11 V2IP's savings account.
12 **A.** I believe we gave you all the records.
13 If we didn't, we're happy to provide them.
14 **Q.** Okay.
15     MR. RACHMUTH: I think we've given
16   all of the banking records.
17 **A.** If we haven't, we're happy to provide
18 them. No problem.
19 **Q.** Okay. Yeah, I'm going to request that
20 you go back and provide any savings accounts
21 records.
22 **A.** I apologize for the discovery process
23 because there was so many different e-mails and
24 letters. I tried to be concurrent and diligent
25 in my answer, but we might have missed

**Page 84**

1  something, so I apologize.
2  **Q.** Okay. Does V2IP have any securities
3  accounts?
4  **A.** No.
5  **Q.** Does --
6  **A.** Oh, excuse me. Excuse me. All right?
7  V2IP had an account at Scottsdale. I am not
8  sure that it's actually still open. It hasn't
9  been utilized since 2016. We were frozen from
10 it in connection with the litigation and we've
11 never accessed it since. And I believe in the
12 bankruptcy that they -- that it was closed, but
13 I'm not sure.
14 **Q.** Okay.
15 **A.** But we don't use it. So no. It's at
16 Scottsdale.
17 **Q.** Okay. But it is still --
18 **A.** It was previously disclosed.
19 **Q.** If it's still open, I'd like to
20 request the statements from it.
21 **A.** Absolutely.
22 **Q.** Okay. Does V2IP have any connection
23 to Alpine Securities?
24 **A.** Well, just for the record, Alpine and
25 Scottsdale, up until a year or two ago, when the

Edward Bronson
3/23/2021

**Page 117**

1  be able to.  With respect to Top Knot, Inc. USA,
2  it was done specifically with a target
3  structure, a target investment thesis, and a
4  U.S.A. specific thesis.
5     Q.  Did you direct Mr. Krost to send funds
6  to V2IP instead of to Top Knot?
7     A.  I don't -- I don't remember.
8     Q.  Does Mr. Kellas ever have interactions
9  with the Krosts?
10    A.  No, other than when the Krosts have
11 been over and we -- he hasn't called them on the
12 phone, but he knows them.  They've been in our
13 house many times.
14    Q.  Okay.  But does Mr. Kellas have any
15 business dealings with the Krosts?
16    A.  He doesn't talk to them, no.
17    Q.  Okay.  Does Mrs. Bronson have any
18 business dealings with the Krosts?
19    A.  No.
20    Q.  Okay.  So is there anyone but you that
21 could have directed the funds to V2IP instead of
22 Top Knot?
23    A.  No.
24    Q.  Okay.  Does Deer Valley have any role
25 in the Turks and Caicos project?

**Page 118**

1     A.  No.  Deer Valley is not an operational
2  entity.
3     Q.  Okay.
4         MS. KING:  Chris, can you publish
5     Exhibit B?
6         MR. DUNNIGAN:  It's uploaded.
7         (Whereupon, exhibit is presented
8     and marked Bronson SEC Deposition Exhibit
9     B for identification.)
10        MS. KING:  Okay.
11    A.  One second.
12 BY MS. KING:
13    Q.  Sure.  Take your time.  And take your
14 time looking at the document as well.
15    A.  The famous White and Williams billing
16 statement.  All right.  I got it.
17    Q.  Okay.  All right.  Do you recognize
18 this document?
19    A.  I recognize it as a bill from White
20 and Williams.  I already recognize that there's
21 inaccuracies right on the first page, but that's
22 irrelevant.
23    Q.  Well, what inaccuracy do you recognize
24 on the first page?
25    A.  Well, first off, we haven't been --

**Page 119**

1  Deer Valley hasn't been used since 2000 -- I'd
2  say conservatively '15, but more probably '14.
3     Q.  Okay.
4     A.  Two, I don't have an office at 245
5  Main Street since 2016.
6     Q.  Okay.
7     A.  Three, Richard Stillitino hasn't
8  worked for me since 2016.  He left, started his
9  own firm.
10        Three, Deer Valley was never once ever
11 mentioned in Turks and Caicos and had never been
12 spoken, uttered or utilized at White and
13 Williams.  This, again, speaks to my comments or
14 my response in my disclosure.  All right?
15        An individual, I didn't specifically
16 name Allen Tucci, but an individual who was our
17 attorney for both Deer Valley and other
18 entities, created fraudulent documentation and
19 billing.  Turks and Caicos had nothing to do
20 with Richard Stillitino, has nothing to do with
21 Deer Valley and this is an inaccurate and false
22 report with respect to Deer Valley.
23        Now, the time sheet with respect to
24 Turks and Caicos might be accurate, but was
25 never anything to do with Deer Valley.  And,

**Page 120**

1  listen, I've testified to that or at least I've
2  been deposed, unofficially deposed twice now by
3  Mr. Conway with respect to all those things on
4  those Deer Valley billing statements.
5     Q.  Okay.  I am going to focus on the
6  Turks and Caicos details on the statement.
7     A.  Good.
8     Q.  And just as an initial matter, have
9  you -- in the ordinary course of your business,
10 have you seen this bill before?
11    A.  No.
12    Q.  Did you either directly or through any
13 entities pay White and Williams legal fees in
14 connection with Turks and Caicos?
15    A.  No.
16    Q.  Okay.
17    A.  I paid no legal fees to White and
18 Williams.  In fact, there's substantive
19 correspondence between myself, Mr. Finney, the
20 managing member of the firm, specifically
21 saying, one, you haven't provided me documents
22 for Deer Valley or any of our entities with
23 respect to billing; two, we've been advised by
24 the Securities and Exchange Commission that
25 there's been billing to Deer Valley for multiple