1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    ---------------------------------------x
3   SECURITIES AND EXCHANGE COMMISSION,

4                            Plaintiff,

5                                    12 CV 6421(KMK)
         -vs-
6                                    EVIDENTIARY HEARING
    EDWARD BRONSON,                  (PARTIALLY SEALED)
7
                           Defendant.
8
    ---------------------------------------x
9
                              United States Courthouse
10                            White Plains, New York

11                            December 12, 2022

12
    Before, THE HONORABLE KENNETH M. KARAS, District Judge
13

14  APPEARANCES:

15  SECURITIES AND EXCHANGE COMMISSION
         Attorneys for Plaintiff
16  BY:  MAUREEN PEYTON KING
         MARSHA C. MASSEY
17
    JUDD BURSTEIN, P.C.
18       Attorneys for Defendant
    BY:  JUDD BURSTEIN
19       EMILY C. FINESTONE

20

21

22

23

24

25

1          THE COURT:  So if you want, you can stand up there.

2    If you want to take your mask off, you can use the podium in the

3    back.  It's your call.

4          MS. PEYTON KING:  I will start here.

5          THE COURT:  That's fine.

6          MS. PEYTON KING:  Thank you, Your Honor.

7    DIRECT EXAMINATION

8    BY MS. PEYTON KING:

9    Q.   Good morning, Mr. Bronson.

10   A.   Good morning.

11   Q.   Can I direct your attention to Exhibit 134, please?  It's

12   in Binder 1, toward the way back.

13        Have you seen this letter before?

14   A.   I haven't seen a letter.  I was advised of the substance of

15   the letter.

16   Q.   So your position is that you directed the removal of Top

17   Knot trustees for the UMB account, correct?

18   A.   I am sorry.  Repeat the question, ma'am?

19   Q.   Your position is that you directed the removal of the

20   trustee for Top Knot's UMB account, correct?

21   A.   That's correct, ma'am.  I made an incorrect determination

22   that the Court no longer had jurisdiction once we had filed my

23   appeal to the Second Circuit, and I advised my wife and my

24   father-in-law that we should move forward and try and liquidate

25   the positions to, you know, cover expenses.

1  A.   I said to my wife, inquire as to the ability to remove the

2  trustee, which she did, and we then -- or she then drafted a

3  letter, as requested by UMB, for my father-in-law; sent the

4  letter to UMB, and copied the trustee on it, and advised the

5  trustee that he was being removed.

6  Q.   Who signed the letter?

7  A.   I believe my father-in-law did.

8          MS. PEYTON KING:  Okay.  Could I just ask if the

9  witness could adjust his microphone slightly?  Thank you.

10          THE COURT:  Sure.

11          MS. PEYTON KING:  Thank you.

12  Q.   Your position is that you directed the sale of $2 million

13  in securities from the UMB account, correct?

14  A.   That's correct.

15  Q.   How did you direct the sale of the securities from the UMB

16  account?

17  A.   Well, your characterization is direct the sale.  There is

18  no direction of sale.  If we have a buyer, the buyer -- which I

19  believe is on the record as Bruce Bent.  Bruce Bent -- my wife

20  would communicate with Bruce Bent if he was ready to purchase

21  positions, and she would carry out the security purchase

22  agreements with him.  With respect to the sales, it was private

23  sales, and then Mr. Bent traded the securities as he deemed fit.

24  Q.   Okay.  Just to be clear, can you read from the second

25  paragraph?  The sentence, the second sentence that begins

1  Q.   Okay.  And just to circle back to the expenses for a

2  moment, who -- out of what account are the expenses associated

3  with the transactions paid?

4  A.   Everything comes from the Top Knot account.

5  Q.   Okay.  Did there come a point where Top Knot assigned any

6  securities from the UMB account to any third party?

7  A.   I don't -- yes.  I mean, there's -- no.  There was debt

8  assigned to Phase I.  It wasn't from the UMB account.  Debt and

9  securities are two separate things.  I mean, obviously, debt is

10 deemed a security under the Securities and Exchange law, but it

11 was never held in the UMB account.

12 Q.   Where was the debt held?

13 A.   It's just essentially just paperwork.  I mean, you have --

14 you have a court order granting -- deeming the debt convertible,

15 and that debt is held by us, and it's -- as it's sold, it's

16 converted and transferred.

17 Q.   So if Top Knot had wanted to, it could have converted the

18 debt to shares?

19 A.   The debt that was transferred to Phase I, yes.  Those could

20 have been converted to shares, yes.

21 Q.   And what is Phase I?

22 A.   Phase I is a company owned by Paul Rachmuth.

23 Q.   And the full name of Phase I?

24 A.   I am not sure.  I believe -- I just know it as Phase I.

25 Q.   Is there more than one Phase I entity?

1  A.   I don't know.

2  Q.   Okay.  And what did -- what consideration did Top Knot get

3  for transferring this debt to Phase I?

4  A.   No longer have the obligation associated with paying for

5  the debt.

6  Q.   And when does that obligation kick in?

7  A.   It -- it's on a deal-per-deal basis.  So some deals is at

8  the end.  Some deals it's scheduled periodically or

9  sequentially.  It -- it's depends on the deal and the

10 individual.

11 Q.   Is it always after the shares are sold?

12 A.   No.  Not always, no.

13 Q.   How often is it after the shares are sold?

14 A.   In the instance of this -- the debt in question, probably

15 85 percent of the time.

16 Q.   Okay.

17 A.   Ninety percent of the time.

18 Q.   I am so sorry.  I am having a little trouble hearing you.

19 Can I just ask you to move the microphone?

20 A.   Yes.  I am sorry.

21 Q.   Thank you.  That's --

22 A.   Is that better?

23 Q.   Much.  Thank you.

24 A.   Sure.

25 Q.   So Phase I is now engaged in essentially the same types of

1  transactions that Top Knot was engaged in?

2          MR. BURSTEIN:  I am going to object to the form.

3          THE COURT:  Yes.  Rephrase it.  I agree.

4  Q.  Is Top Knot engaged -- sorry.

5      Is Phase I, do you know if Phase I is engaged in selling

6  the securities that were assigned to it?

7  A.  Yes.

8          MR. BURSTEIN:  Objection.  I am going to object, and

9  it's really -- you have Mr. Rachmuth coming, and it strikes me

10 that it calls for hearsay and as opposed to direct knowledge.

11 And there are ways she could ask the question, but --

12         THE COURT:  But I am not sure it does call for

13 hearsay.  I mean, it could be he has direct knowledge, but he

14 answered the question.  So I think overruled.  Go ahead.

15 Q.  Why did Top Knot transfer the debt to Phase I?

16 A.  Because when it became evident that I was incorrect in my

17 assumption with respect to the jurisdiction of this Court, I

18 recognized that Top Knot could no longer be in business and

19 could no longer support the debt that we would have to -- or it

20 would have to pay and looked for a resolution such that the debt

21 could be taken care of, and Top Knot would be relieved of its

22 obligation.

23     You have to understand that the debt -- that debt

24 obligation is there whether Top Knot sells the debt or not --

25 whether Top Knot converts and sells it or not.  So there was a

1    Q.    Did Top Knot explore selling the debt to anyone other than

2    Mr. Rachmuth?

3    A.    No.

4    Q.    Did Top Knot explore selling the debt to Mr. Bent?

5    A.    Mr. Bent was purchasing it.  The securities at that time,

6    the market for those securities had dissipated is probably the

7    word I would use.  There was very little trading volume in those

8    securities.

9    Q.    Is Top Knot entitled to receive anything from Phase I if

10   Phase I successfully converts and sells the shares?

11   A.    No.

12   Q.    So I mean, is it fair to say you essentially gave an asset

13   of Top Knot away?

14   A.    If you call relieving Top Knot of over a million dollars of

15   debt obligations, which they were -- are obligated to pay

16   pursuant to a court order, the court judgment, then that's your

17   characterization, but, you know, that saddled the company with

18   additional obligations.  I thought it was a wise decision to

19   unburden it.

20   Q.    Would Top Knot have been able to unwind the transactions by

21   which it acquired the debt?

22   A.    I don't believe so.  They are pursuant to a court judgment.

23   Q.    But could you have reached out to the other parties to that

24   judgment and returned the debt?

25   A.    That might have been an option, but I -- I don't -- you

1 account, and you have stipulated to the amount over $62,000, and

2 this is between May and September.  So it seems like the

3 transfers were ongoing; is that fair?

4 A.   Again, I have been incarcerated for ten months.  I have not

5 seen this.  I am not privy to my wife's daily banking.  I know

6 she handless everything.  As I testified previously just a

7 minute ago, I told her, take care of what needs to be taken care

8 of, and she handled it.

9 Q.   Okay.  Did you ever direct her to make any payments to the

10 SEC out of the $2 million?

11 A.   No.

12 Q.   Is it your contention that $120,000 is a reasonable amount

13 of expenses?

14 A.   My answer is, reasonable is relative, but to, you know,

15 each situation.  Is my living expenses reasonable based upon the

16 situation that I currently find myself in?  No.  It's probably

17 not reasonable, and do I recognize that there need to be changes

18 with respect to that?  Yes, I do.

19      Ten years -- 10 months of being incarcerated has made me

20 come to a realization that while what I deemed reasonable in the

21 past is probably not reasonable with respect to the current

22 situation regarding the judgment that I find myself under or the

23 situation of your enforcement action.

24      So no, it's probably not reasonable, and I recognize that

25 we probably need to make changes.  We probably need to sell the

1   car that we have.  We probably need to lower our expenses.  We

2   probably need to explore fairly quickly the liquidation or the

3   sale of the house if it's economically feasible, and make

4   changes, and I recognize that.  You know, as I said, ten months

5   of incarceration in a prison makes you come to rationalizations

6   that you probably never recognized before.  So the answer is,

7   no, it's probably not reasonable.

8   Q.   At the last hearing, didn't you stand before the Court and

9   recognize exactly what you are saying right now?

10  A.   I am sorry?

11  Q.   At the last hearing, didn't you stand before the Court and

12  explain that you understood that life-style changes needed to be

13  made?

14  A.   Well, we did make life-style changes, but those changes,

15  obviously, based upon my current situation, weren't substantive

16  enough.  We removed ███████████████████████    ████████

17  ████████████████   We curtailed -- at least my wife attempted to

18  curtail the spending as much as possible.  Probably still can be

19  curtailed.  We eliminated the housekeeper.  We no longer have a

20  housekeeper.  We have tried to be frugal, but when you are --

21  when you're saddled with a situation that -- financial situation

22  that is untenable based upon the current market situation for

23  house sales, interest rates, we were making decisions that

24  were -- we were trying to be economically intelligent.

25       Perhaps we could have moved faster, and one of the things,

1  aid, he will be taking over completely the payment of his

2  school.

3  Q.   You said you have an obligation to pay for a semester?

4  A.   He was already in --

5  Q.   Let me just finish the question.  From what did that

6  obligation arise?

7  A.   My████ enrolled ██████████  █████████████████████████

8  ████████████████████████████████████████████████████████

9  █████████████████████████.  We have applied for

10 financial aid ███████████████ applied for financial aid, and

11 he will be taking over those payments.

12 Q.   And of the payments that you did make you stipulated were

13 about $27,900?

14 A.   If that's what was stipulated in the agreement, in the

15 letter, yes.

16 Q.   Did some of the funds -- were some of the funds also used

17 for travel?

18 A.   Yes.

19 Q.   To where?

20 A.   My wife went for a week ████████████ to -- they went to

21 Spain.  They got a very good deal on a trip because ████████ was

22 traveling with friends.

23 Q.   And the travel expenses that you stipulated to were over

24 $25,000, correct?

25 A.   I guess, yes.

1  is -- I don't believe it's receiving any money anymore from

2  Bruce Bent because there is no more securities that I am aware

3  of, and my wife is -- doesn't have any more money.

4  Q.   With respect to the house, you mentioned potential

5  liquidation.  Have you taken -- have any steps been taken to

6  talk to a real estate broker?

7  A.   Yes.

8  Q.   Who?

9  A.   I don't remember the name.

10 Q.   Who took the steps?

11 A.   My wife --

12 Q.   And what steps were taken?

13 A.   -- contacted multiple real estate brokers with my

14 assistance, and they came in and gave us appraisals; told us

15 what the comps were in the market, and told us what would need

16 to be done to sell the house.

17 Q.   When was this?

18 A.   Right before I was incarcerated.

19 Q.   So in the past ten months, are you aware of any steps that

20 were taken to put the house on the market?

21 A.   No.

22 Q.   Do you know that no steps were taken or you just don't

23 know?

24 A.   No.  There's -- there have been no further steps.  We have

25 been focused on my incarceration and my appeal.

1  Q.   Have any funds been transferred to Mr. Rachmuth's escrow

2  account for the benefit of Top Knot?

3  A.   Yes.

4  Q.   What does that mean, for the benefit of Top Knot?

5  A.   Mr. Rachmuth handled settlements for Top Knot with

6  connection to Marc Peña, and other individuals, which I believe

7  he has provided information regarding.

8  Q.   And other than for settlements have -- has Top Knot

9  transferred any funds to Mr. Rachmuth for your benefit?

10 A.   To hold for us on our benefit?

11 Q.   Yes.

12 A.   To hide from the government?  No.

13 Q.   To hold for --

14 A.   No.

15 Q.   -- you?

16 A.   No.

17 Q.   Or any family members?

18 A.   No.

19 Q.   Have you ever transferred any assets to Mr. Rachmuth?

20 A.   The -- Mr. Rachmuth was owed several hundred thousand

21 dollars in legal fees for the last seven years or 10 years of

22 service.  In connection with that, we gave him the Ford Bronco

23 as partial payment.

24 Q.   Would the Ford Bronco, is that the car you previously

25 testified was purchased through Macallan for ███████?

1  A.   Yes.

2  Q.   How much is the Ford Bronco worth?

3  A.   It was a $40,000 new car.  It's probably worth 22,000,

4  25,000.

5  Q.   Was the -- were there -- was there any writing related to

6  the transfer?

7  A.   I don't know.  I didn't handle it.

8  Q.   Who handled it?

9  A.   Mr. Rachmuth handled it.

10  Q.   Mr. Rachmuth handled the transferring an asset from

11  Macallan to himself?

12  A.   Yes.  I was incarcerated.  Mr. Rachmuth initially used the

13  car without doing the actual transfer, and while I was

14  incarcerated, he handled the transfer.  So he will have to speak

15  with respect to the documentation.

16  Q.   Was the transfer papered as a gift?

17  A.   I don't know.  Again, I haven't seen any of the paperwork.

18  I don't know anything about it.  Mr. Rachmuth handled it

19  directly himself.

20  Q.   Okay.  And where is the Bronco now?

21  A.   You have to ask him.

22  Q.   Does ███████ still have access to it?

23  A.   No.

24  Q.   Why did you not pay Mr. Rachmuth over the past several

25  years?

1  A.   I did pay Mr. Rachmuth, but I owed him lots of money.  He's

2  been working for me since my bankruptcy filing in 2017.  He does

3  a substantial amount of work for me, for my wife, for my wife's

4  entity when she had a litigation.  He's basically worked for

5  free notwithstanding any payments made to him for almost ten

6  years.  When I told him that I needed a $250,000 loan because I

7  was short on my payment to the government, he went out and got

8  me a loan, but Mr. Rachmuth has gone above and beyond attorney-

9  client friendship or relationship to, you know, acting as a

10 friend to my family.

11 Q.   Did Mr. Rachmuth procure you a loan or did Mr. Rachmuth

12 make you a loan personally?

13 A.   No.  He made me a loan personally.  He secured -- he

14 borrowed the money, then lent it to me.

15          MS. PEYTON KING:  Okay.  May I have a moment, Your

16 Honor?

17          THE COURT:  Yes.

18          MS. PEYTON KING:  Thank you.

19          (Pause)

20          MS. PEYTON KING:  ███████████████████████

21 ████████████████████████████████████████████

22 ████████████████████████

23          ███████     ███████

24          ███████████     ████████████████

25          █████████  ███████████  █████████████████

1           THE COURT:  State your name for the record, please.

2           THE WITNESS:  I am sorry?

3           THE COURT:  State and spell your name for the record,

4  please.

5           THE WITNESS:  Dawn Bronson, D-A-W-N, B-R-O-N-S-O-N.

6  DIRECT EXAMINATION

7  BY MS. PEYTON KING:

8  Q.   Good afternoon, Mrs. Bronson.

9       You are aware that the Court entered an order that the Top

10 Knot shares be liquidated to pay the SEC's judgment in SEC v.

11 Bronson, correct?

12 A.   Correct.

13 Q.   Is the Top Knot Wells Fargo account ended 73079 the primary

14 account the family uses to pay its expenses?

15 A.   Yes.

16 Q.   You have access to that account?

17 A.   I do have access to that account.

18 Q.   Does anyone else have access to that account?

19 A.   No one else has access.

20 Q.   I am sorry?

21 A.   No.

22 Q.   Okay.  And so any of the transactions between mid February

23 and September 30, 2022, or through the present, are transactions

24 you initiated, correct?

25 A.   Yes.

```
 1  A.   ████████████    ██████████████████
 2  Q.   Okay.  That was your trip to Spain, August 2022?
 3  A.   I believe so, yes.  Because I am thinking of ████████
 4  ██████████  yes.  Uh-huh.
 5  Q.   The ███████████  are when?  █████████████  ███████████
 6  ██████████████████████    Or, actually, just the month would
 7  be fine.
 8  A.   ████████████  ██████████████████████████████
 9  ███████████
10       ████████████  ██████  ███████████  ███████████████████
11  ████████████████████████████
12            THE WITNESS:  Everyone --
13            THE COURT:  Please answer the question.
14            THE WITNESS:  What do you want to know?  What?
15  Q.   I just want to know the month ██████████████████████████.
16  A.   Oh, the month.  █████████████████████  ██████████  █████
17  █████████████
18  ██  █████████████
19  ██  █████████████████  ██████████████████████
20  Q.   █████████████████████████████████████████
21  A.   Yes.
22  Q.   Okay.  What is MT --
23  A.   Maureen, there were two that I --  ████████████████████
24  ██████████████████████████████████
25  Q.   Okay.
```

1   A.   I gave the car to him.  Edward said that we had owed him

2   money, which we did.  He did some of my litigation with my baby

3   company, and he was not paid, and I am sure he did work for

4   Edward.  And at first -- actually, let me start from the

5   beginning.

6        I wasn't told that the car was in exchange for money owed.

7   I was told that his son, Paul's son, needed the car, ███████

8   ████████     So --

9   Q.   Okay.  Do you have a direct or indirect interest in any

10  other accounts other than what we have already talked about or

11  assets of any kind in your name or through the use of an entity

12  or person acting with you?

13  A.   I only heard -- I didn't hear the last sentence.  What?

14  The last part?  I am sorry.  I didn't hear that.

15  Q.   That's okay.  Do you have a direct or indirect interest in

16  any other accounts or assets of any kind in your name or through

17  the use of an entity or person acting for you?

18  A.   No.  I do not.

19  Q.   Do you have any aliases through which you have an interest

20  in any account or asset?

21  A.   No.

22  Q.   Can you describe for me all of the real property in which

23  you, your family members, or an entity associated with you or a

24  family member have an interest?

25  A.   I'm sorry.  Can you repeat that again?

1  Q.   And this was a turnoff notice that you had in February of

2  2022?

3  A.   Yes.

4  Q.   And if we look at the second page, what is that payment?

5  What is that current balance due?

6  A.   Well, that's the balance as of now, the 25,291.69, if I am

7  correct.

8  Q.   And how is it that you avoided -- did they turn off your

9  electricity?

10 A.   No.  They did not.  I had made a payment agreement with

11 them a few months ago, and the payment agreement is to pay 1660

12 a month, plus the electric, the electricity used, the charges.

13 So it's, you know, different every month.  But I was late, and

14 that's when I received this.

15 Q.   In February of 2022, you knew that there was an order in

16 place putting a liquidating trustee in to take control over the

17 UMB account, correct?

18 A.   I did.

19 Q.   And is there a reason why, notwithstanding that order, you

20 took money from that account and paid all of these bills?

21 A.   Is there a reason why?  I needed money for the bills, and

22 I, you know, discussed it with my husband and -- and I had to

23 pay the lawyers, and that's exactly what we did.

24 Q.   Well, did you make this decision on your own or did your

25 husband --

 1  A.   They sent those certificates back to me.

 2  Q.   But those stocks haven't been -- haven't been sold,

 3  correct?

 4  A.   A -- A -- ABVG, it's worthless.  So it's sitting at the --

 5  I believe it's still at the transfer -- transfer agent.

 6  Q.   And are you trying to sell the PPJ now?

 7  A.   JE, yes, was sold.

 8  Q.   Okay.  But have you been paid yet?

 9  A.   Half, yes.  Yes, I did.

10  Q.   Okay.  Do you have any other source of income besides --

11  A.   No.

12  Q.   -- what you realized from these sales?

13  A.   No.

14  Q.   And have you been supporting your family paying whatever

15  bills you can based upon what you yielded from --

16  A.   Yes.

17  Q.   -- the V2IP?

18  A.   Yes.

19  Q.   Do you have any -- sitting here today, do you have an

20  understanding as to whether you were authorized to take money

21  from the sales of the stock in the UMB account just because you

22  needed it for family?

23  A.   No, I know it was wrong -- I didn't realize it until after

24  that it was wrong.

25            MR. BURSTEIN:  I have nothing further, Your Honor.

1            THE COURT:  Okay.

2            MS. PEYTON KING:  Thank you, Your Honor.  I just have

3  a few questions.

4            THE COURT:  Okay.

5  REDIRECT EXAMINATION

6  BY MS. PEYTON KING:

7  Q.   Ms. Bronson, I understood you to say that you wanted to

8  work out essentially an arrangement that is reasonable to your

9  family, as well as to the SEC; is that fair?

10  A.   To you as well, yes.  Yes, that's what I said.

11  Q.   What does that look like?

12  A.   What does it look --

13  Q.   What's reasonable for your family in terms of a budget?

14  A.   I can survive on a very low budget.  You need a large sum

15  of money to --

16  Q.   I am asking a really specific question.  I would like you

17  to quantify, what does your monthly budget look like?  What's in

18  it?

19  A.   I haven't -- you know, I have not sat down yet and gone

20  through bills and planned on a monthly budget yet.  I don't know

21  what you want from the house.  I mean, if you would like to sit

22  down and go over that, that would make sense for all of us.

23  Q.   Well, I am trying to get a sense of what you mean by

24  reasonable given the expenses you have paid over the last

25  several months.

1  A.   If I sell my house, which I haven't yet, I need a place to

2  live.  I don't know.  I can't give you a number.  I don't know

3  what my expenses are going to be.  I don't know if I am going to

4  live in a rental.  I don't know if I am going to buy a small

5  house.  I can't answer that.  But I can tell you that they will

6  be -- they have to be cut down.  It's not --

7  Q.   Are there specific expenses you are considering cutting?

8  A.   Of course.

9  Q.   Like what?

10  A.   Anything silly that -- that, you know, wasn't needed.

11  Q.   What -- that's what I am trying to get at.  What do you

12  consider silly?

13  A.   The ███████████ things like that.  ██████ buy things.  ██████

14  collect things.

15  Q.   What about expenses that you incur?  Are any of those

16  things you are willing to cut?

17  A.   Any of -- I am sorry?

18  Q.   Are there any expenses you are going to cut for yourself?

19  A.   Yes.

20  Q.   Like what?

21  A.   Some -- I mean, I haven't really bought anything for myself

22  recently.  I hate to say my hair, but yeah, things like that.  A

23  little here and there.  I mean, you can be -- financially you

24  can change a lot if we were all more conscious of our spending.

25          MS. PEYTON KING:  All right.  Just a moment, Your

 1   in front of you?

 2   A.   Binder, Exhibit 3.

 3   Q.   Yes.

 4   A.   Tell you the truth, Exhibit --

 5             MS. PEYTON KING:  May I assist?

 6             THE COURT:  Yes.

 7             MS. PEYTON KING:  Can I help you, sir?

 8             THE WITNESS:  You can come and help me, sure.

 9             MS. PEYTON KING:  Thank you.

10             THE WITNESS:  Exhibit 3.

11   Q.   I'm just going to ask you questions about that page.  Okay?

12   A.   You may have to come up here a couple more.

13   Q.   Okay.  Mr. Kellas, did you sign this document?

14   A.   Yes, I do.

15   Q.   Okay.  And did you understand what the document was for?

16   A.   I don't read the document.  My daughter goes through it;

17   says, "Okay, Dad.  Sign."

18   Q.   Okay.

19   A.   That's what I do.

20   Q.   Okay.  Are you an officer of Macallan?  Did you transfer a

21   car to Mr. Rachmuth through an entity?

22   A.   Did I -- okay.  Slow down.

23   Q.   Okay.

24   A.   Let me think.

25   Q.   Sure.

1  Q.   Okay.  Is this a fair summary of the steps that Phase I

2  Operations needs to take to convert debts into shares and then

3  sell the shares?

4  A.   No.

5  Q.   Okay.  What's different?

6  A.   If Phase I actually incurs the debt and holds that debt for

7  two years, then Phase I may convert that debt without bringing

8  litigation so that -- so where it says, B, sues the company; C

9  settles with the company; and D, receives share issuance, that

10 would be -- that's something that, you know, Top Knot would do

11 through, you know, its mechanisms.  I did not go that route.

12 Q.   Okay.  Did there come a point where Top Knot assigned Phase

13 I some debt?

14 A.   Yes.

15 Q.   Okay.  Did you need to go through steps B through D in

16 stipulated fact 25 --

17 A.   No.

18 Q.   -- for in those instances?

19 A.   No.  Because Top Knot assigned it -- to be clear, Top Knot

20 assigned debt.  The transactions were -- were -- they assigned

21 the debt somewhere between D and E or D or by C and D, they had

22 already committed the -- done the litigation.

23 Q.   Okay.

24 A.   Received orders or otherwise obtained debts that could be

25 converted into stock.  They were convertible.  If you received

1  Q.    What loan repayment are you referring to?

2  A.    In December of 2021, Mr. Bronson was seeking to raise funds

3  to pay the SEC to avoid going to jail.  He had made some

4  payments.  He owed a payment.  Originally it was -- I think it

5  was originally due, I think -- I don't remember the exact

6  dates -- but he was short.  He had conducted some transactions.

7  He was waiting for the funds to clear.  He asked me if I knew

8  anyone who could lend him money.  I, looking in hindsight, made

9  a poor business decision there.  I borrowed money from somebody;

10 told him the situation; told him that the money was promised

11 back.  And then I funded $200,000 to Top Knot so that it can pay

12 the SEC to avoid going to jail, for Mr. Bronson to go to jail.

13       Mr. Bronson was supposed to -- Top Knot was supposed to pay

14 that back within a series of days.  It actually took closer to

15 six months or four months to pay that money back.  I had

16 borrowed that money.  It was supposed to be a very short-term

17 debt, and it turned out the person understood.  I ended up

18 having to repay the money from some -- but before it was even

19 repaid to me, borrow it from another person and then -- and then

20 repay that.  So fortunately for me, at least in that situation,

21 I eventually was repaid the money I had lent Mr. Bronson.

22 Q.    So you are talking about a loan you made to Mr. Bronson?

23 A.    Yes.

24 Q.    And if you look at Exhibit 124, is this your record of the

25 loan to Mr. Bronson?

```
 1  A.   Yes.
 2  Q.   And did Top Knot make all the repayments?  Did the funds
 3  for the repayments come from Top Knot?
 4  A.   Yes.
 5  Q.   Okay.  If you look at the Top Knot escrow balance at 125?
 6  A.   Yes.
 7  Q.   Sorry.  If you look at the Ed Bronson Account Ledger at
 8  125?
 9  A.   Yes.
10  Q.   There is an entry on July 5th that says "loan payment from
11  Top Knot."  Is that the same loan?
12          THE COURT:  July 5th of 2022.
13          MS. PEYTON KING:  Yes.  Thank you.
14          THE WITNESS:  It's an error in my accounting, but yes.
15  Q.   Okay.  And if you look at Exhibit 124, there is an entry on
16  July 22, 2022 that says "loan payment from Top Knot, minus 50."
17  But there is no entry in Top Knot for that date.  There is,
18  however -- there are two entries in August that are not
19  reflected on the loan ledger.
20  A.   I am -- I will believe you.  I have to.  I have to.
21  Q.   Take a look at 126.
22  A.   126.
23  Q.   Right.  Do you see an entry on July 22nd for $50,000?
24  A.   Well, then it wouldn't have come from the escrow account.
25  Q.   Well, where did it come from?
```

1  A.   I would have to look at the bank account.

2  Q.   Okay.  But also your loan ledger does not reflect

3  additional transfers, re loan payments on Exhibit 126 in August.

4  A.   I am sorry.

5  Q.   In August --

6  A.   Yes.

7  Q.   -- there are two entries at the bottom:  August 8th and

8  August 24, 2022.

9  A.   On 126?

10  Q.   Yes.

11  A.   Okay.

12  Q.   Do those relate to the same loan?

13  A.   There is only one loan.

14  Q.   Okay.  But they are not on the loan ledger, and neither is

15  the entry for -- oh, no.  That is.  Oh, no.  Actually, no.  The

16  Ed Bronson has it minus 25,000 as well.

17      There's three entries that aren't on the loan ledger, but

18  one entry -- there was no July 22nd in the records.

19  A.   July 20 -- on which -- I mean, I can go back to the -- I

20  would have to go back to the bank statements themselves

21  because --

22  Q.   Sure.

23  A.   But show me what you are referencing, and I will try to

24  figure this out.

25  Q.   The loan ledger July 22, 2022.

1  Q.   Does he engage in transactions with Top Knot?

2  A.   He had in the past.

3  Q.   What kinds of transactions?

4  A.   He would -- similar to what we described before -- he would

5  buy securities or buy, you know, get -- the debt would be

6  transferred -- would -- debt would be converted into securities,

7  transferred to Mr. Bursey, and Mr. Bursey would then sell the

8  debt, and would then -- in Mr. Bursey's case, there was other

9  financial transactions that he had -- he was going to be

10  conducting with -- with Top Knot.

11  Q.   What other kinds of transactions?

12  A.   Investments in Turks & Caicos and other Caribbean

13  countries.

14  Q.   Okay.

15          THE COURT:  Are you offering this?

16          MS. PEYTON KING:  Yes.

17          THE COURT:  Mr. Burstein?  115 is what we are talking

18  about.

19          MR. BURSTEIN:  Oh, I am sorry.  Was it my turn?  115?

20  No, I object to 115.

21          THE COURT:  It's an email from your client.

22          MR. BURSTEIN:  Well, it's actually -- Your Honor, it's

23  a summary from Mr. Bursey to my client.  All my client says is,

24  "Thank you for the summary."  That's not an acknowledgment.

25          THE COURT:  Right.  But your client is saying, thank

1              MS. PEYTON KING:  No, thank you.

2              THE COURT:  Okay.

3  Q.   Have you received any assets from the Bronsons?

4  A.   If you -- I received, in addition to cash, both -- you

5  know, in payment and as well as repayment of the debt, I also

6  received a car.

7  Q.   And specifically from what entity or person did you receive

8  the car?

9  A.   The car was technically owned by an entity called Macallan

10  Partners Assets.

11  Q.   Okay.  And that's an LLC?

12  A.   Yes.

13  Q.   Okay.  And can you turn to Exhibit 139?

14  A.   Yes.

15  Q.   When you say you received it from Macallan, do you have any

16  interest in Macallan?

17  A.   The way I received it was -- did I receive an interest in

18  Macallan?  Ed directed his father to add me as a member of the

19  entity.

20              THE COURT:  Father or father-in-law?

21              THE WITNESS:  Father-in-law.  I apologize.  His father

22  is not with us.

23  Q.   Okay.  Did the transfer on Exhibit 139 indicate that the

24  car was a gift?

25  A.   Well, it's actually when I went to the Department of Motor