UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

       v.

EDWARD BRONSON and
E-LIONHEART ASSOCIATES, LLC,
d/b/a FAIRHILLS CAPITAL,

                              Defendants,

       -and-

FAIRHILLS CAPITAL, INC.,

                              Relief Defendant.

---

No. 12-CV-6421 (KMK)

ORDER

KENNETH M. KARAS, United States District Judge:

       On February 2, 2023, Plaintiff Securities and Exchange Commission ("SEC" or

"Plaintiff") filed a Motion for an Order To Show Cause Why Defendants Edward Bronson ("Mr.

Bronson") and Dawn Bronson ("Mrs. Bronson," and together, the "Bronsons") Should Not Be

Held in Contempt (the "Motion"), alleging that the Bronsons have violated the terms of this

Court's Judgment, (Dkt. Nos. 186, 193), Payment Plan Order, (Dkt. No. 272), and Liquidation

Orders, (Dkt. No. 278).  (*See* Pl.'s Mot. for Order To Show Cause ("Pl.'s Mot.") 1 (Dkt.

No. 468).)

       For the reasons stated herein, the SEC's Motion is granted.

<u>I.  Background</u>

A.  <u>Factual Background</u>

The Court has set forth the protracted history of this Action in its previous Opinions and

Orders, and includes here only the facts relevant to deciding the instant Motion.  (*See*

Op. & Order (Dkt. No. 178); Order (Dkt. No. 223); Op. & Order (Dkt. No. 347).)

1.  <u>The Court's Previous Orders, Relevant Agreements, and Mr. Bronson's
Incarceration for Contempt</u>

On June 8, 2017, the Court entered Final Judgment against Defendants: (i) permanently

enjoining Defendants from violating § 5 of the Securities Act of 1933, 15 U.S.C. § 77e;

(ii) permanently barring Defendants from participating in any offering of penny stock, including

engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing

or attempting to induce the purchase or sale of any penny stock (the "penny stock bar");

(iii) ordering that Mr. Bronson, E-Lionheart Associates, and Fairhills Capital, Inc. ("FCI") be

held jointly and severally liable for disgorgement of $9,355,271.79 and prejudgment interest

thereon in the amount of $2,177,100.59; and (iv) ordering that Mr. Bronson be held liable for a

civil penalty in the amount of $150,000 and E-Lionheart be held liable for a civil penalty in the

amount of $725,000.  (*See* Order 4 (Dkt. No. 186).)  On July 5, 2017, Defendants filed a Notice

of Appeal to the Second Circuit from the Court's Final Judgment.  (Dkt. No. 189.)

On August 28, 2017, this Court entered an Amended Final Judgment (the "Judgment"):

(i) permanently enjoining Defendants from violating § 5 of the Securities Act of 1933, 15 U.S.C.

§ 77e; (ii) permanently barring Defendants from participating in any offering of penny stock,

including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading,

or inducing or attempting to induce the purchase or sale of any penny stock; (iii) ordering that

Mr. Bronson, E-Lionheart Associates, and FCI be held jointly and severally liable for

disgorgement of $9,355,271.79 and prejudgment interest thereon in the amount of $2,177,100.59; (iv) ordering that Mr. Bronson be held liable for a civil penalty in the amount of $150,000 and E-Lionheart be held liable for a civil penalty in the amount of $725,000; and (v) ordering that FCI be held jointly and severally liable for disgorgement of $645,000.00 and prejudgment interest thereon in the amount of $151,031.37.  (Order ("Am. Final J.") 4 (Dkt. No. 193).)  The Second Circuit affirmed the Court's Final Judgment on November 20, 2018. (Dkt. No. 198.)

On January 19, 2021, after Mr. Bronson had failed to pay anything toward the Judgment, the Court issued a Contempt Order against Mr. Bronson.  (*See* Dkt. No. 223.)

On July 7, 2021, the Parties reached a settlement regarding Defendant's payment obligations (the "Payment Plan Order"), which the Court So Ordered. (Dkt. (minute entry for July 7, 2021); Order (Dkt. No. 272).)  The Payment Plan Order required that Mr. Bronson pay:

> (i) $1.1 million dollars by August 13, 2021[,] credited first to the penalties and post-judgment interest thereon owed by [Mr.] Bronson and E-Lionheart as set forth in the Judgment.  Prior to making the payment, counsel for [Mr.] Bronson shall contact the Commission and obtain the payoff figures for both penalties, and then pay the full balance owed thereon directly to the Commission as set forth below.  Any amount remaining from the $1.1 million payment following the payment of the penalties shall be paid directly to the Court's Registry Investment System account (hereinafter 'CRIS account') established for this action as set forth below.  Those funds shall be credited to the prejudgment interest and disgorgement ordered to be paid in the Judgment;
>
> (ii) Following the initial payment on or before August 13, 2021, ten (10) installments of $1.1 million dollars per month are due on the 13th of each month: September 13, 2021, October 13, 2021, November 13, 2021, December 13, 2021, January 13, 2022, February 13, 2022, March 13, 2022, April 13, 2022, May 13, 2022 and June 13, 2022; and
>
> (iii) a final payment including the balance of prejudgment interest and disgorgement and all post-judgment interest (which shall continue to accrue until payment is made in full) on July 13, 2022.

(Order 1–2 (Dkt. No. 272).)  The Payment Plan Order also provided that "the Court shall appoint a liquidator to whom neither party objects to sell securities in the Top Knot Inc. USA [("Top Knot")] brokerage account held at UMB–168.1 [(the "UMB Account")] (and any other account that [Mr.] Bronson designates) to facilitate the satisfaction of any portion of the Judgment and payments ordered herein."  (*Id*. at 2)  Accordingly, on August 17, 2021, the Court appointed Ryan Stumphauzer ("Stumphauzer") as Liquidating Trustee.  (Order 2 (Dkt. No. 278).)[1]

On November 24, 2021, the Court issued another Contempt Order.  (*See* Dkt. No. 302.) On January 27, 2022, and January 28, 2022, the Court issued additional Contempt Orders regarding Mr. Bronson's failure to meet the payment requirements and directed that Mr. Bronson be taken into custody.  (*See* Dkt. Nos. 318, 321.)  On February 16, 2022, Mr. Bronson was arrested pursuant to an arrest warrant for his continued contempt of the Court's Orders.  (*See* Dkt. No. 328.)[2]

### 2. Mr. Bronson's Post-Incarceration Actions[3]

In an April 22, 2022 letter motion, Mr. Bronson proposed selling securities in the UMB Account to Bruce Bent ("Bent").  (Letter from Ryan O'Quinn, Esq. to Court ("O'Quinn Letter")

---

[1] As relevant here, at a hearing on June 6, 2021, prior to the Liquidation Order being approved by the Court, Mr. Bronson's counsel noted that the Liquidation Order was necessary to avoid causing Mr. Bronson's violation of the penny stock bar imposed by the Court's judgment: "the assets [of Top Knot] are penny stocks that, if they were deemed to be Mr. Bronson's assets, would be subject to [the penny stock] bar. . . . [H]e is barred from trading in penny stocks and, therefore, could not offer to sell those assets to make that payment."  (Decl. of Maureen Peyton King, Esq. ("King Decl.") Ex. 1 at 2–3 (Dkt. No. 470-1).)

[2] The Court has described in detail Mr. Bronson's actions in defiance of the Court's Orders leading up to his February 16, 2022 arrest in a previous Order and incorporates that account by reference here.  (*See* Order 5–13 (Dkt. No. 347).)

[3] The Court addresses only the most egregious of Mr. Bronson's actions; Plaintiff has also identified other instances that are unnecessary to recount at this juncture.  (Pl's Mem. of Law in Supp. of Mots. for Contempt and Sanctions ("Pl's Contempt Mem.") 12–14 (Dkt. No. 469).)

(Apr. 22, 2022) (Dkt. No 342).)  Mr. Bronson's letter motion stated that the Liquidation Trustee was in place "[t]o ensure Top Knot's assets could be sold in a manner that would not violate the [penny stock bar]."  (*Id.* at 2.)  The Court ordered a hearing on the proposed sale.  (Order (Dkt. No. 348).)  On May 2, 2022, Mr. Bronson then informed the Court that the purchase offer had been withdrawn.  (Letter from Ryan O'Quinn, Esq. to Court (May 2, 2022) (Dkt. No. 349).)

On June 5, 2022—without seeking leave of the Court or notifying the SEC—Mr. Bronson acted to remove the Court-appointed Trustee in violation of the Liquidation Order. (Letter from Maureen Peyton King, Esq. to Court (Sept. 9, 2022) Ex. 1 at 1 (Dkt. No. 364-1).) Although the June 5 letter is signed by Mr. Bronson's father-in-law John Kellas, Mr. Bronson has admitted that he directed the removal of the Court-appointed Trustee.  (Letter from Judd Burstein, Esq. to Court ("Burstein Letter") (Dec. 9, 2022) 2 (Dkt. No. 433).)

Beginning on February 22, 2022 through August 8, 2022—that is, both before and after the removal of the Trustee—Mr. Bronson has admitted that he directed sales of approximately $2 million in shares from the UMB Account in violation of the Liquidation Order.  (*Id.*)  Mr. Bronson has also admitted that his direction of these sales required him to engage in activities that violated the penny stock bar.  (*See generally* Burstein Letter; Not. of Stipulated Facts (Dkt. No. 436).)  As for the execution of these sales, Mr. Bronson has admitted that Mrs. Bronson executed the trades that liquidated the securities.  (King Decl. Ex. 3 at 3.)  Mr. Bronson has also admitted that nothing from the proceeds from these sales was paid to the SEC.  (Burstein Letter 2; Not. of Stipulated Facts 3.)

Additionally, Mr. Bronson has admitted that, after completing these sales, he then acted to have the UMB Account replenished with penny stock shares from the same issuers as those shares that had been sold.  (Burstein Letter 2; Not. of Stipulated Facts 4.)

### 3.  Mrs. Bronson's Actions

Mrs. Bronson has testified that in February 2022 she was aware that the Court entered the Liquidation Order.  (King Decl. Ex. 3 at 18.)  Additionally, John Kellas, Mrs. Bronson's father, has testified that he signed the June 5 letter removing the Liquidating Trustee without reading it after Dawn Bronson said, "Okay, Dad.  Sign."  (Burstein Letter 2; King Decl. Ex. 3 at 22.)[4]

Mrs. Bronson used the proceeds from the sales Mr. Bronson had directed after they were transferred to Top Knot's Wells Fargo Bank Account (ending in x7379) ("Top Knot Account"). (Burstein Letter 2; Not. of Stipulated Facts 5–6.)  Mrs. Bronson has testified that she alone has access to the Top Knot Account and the record evidence demonstrates that she used this account to pay certain family expenses, including her own salon visits, a European summer vacation for her and some of her children, and the mortgage on her and Mr. Bronson's home.  (King Decl. Ex. 3 at 10, 15–16; Not. of Stipulated Facts 5–6; Hr'g Tr. 95 (Dec. 12, 2022 Hr'g).)  Mrs. Bronson also transferred hundreds of thousands of dollars of the proceeds for her personal benefit, including over $170,000 in wires and another $13,500 to an entity, V2IP, Inc. held in her name.  (Not. of Stipulated Facts 5–6; Decl. of Maureen P. King, Esq. in Supp. of Emergency Order To Show Cause ("King OSC Decl.") Exs. 5–6 (Dkt. 440-5-6).)  From February 25, 2022 to September 29, 2022, Mrs. Bronson also withdrew $157,537.48 in cash from the Top Knot Account.  (King OSC Decl. Ex. 4.)

---

[4] Mr. Bronson has averred that "[a]t all relevant times (including since his incarceration), neither [Mrs. Bronson] nor [John] Kellas have acted with respect to both the conduct of Top Knot's business and the disposition of its income other than at Mr. Bronson's direction." (Burstein Letter 2.)

B.  Procedural History[5]

On February 2, 2023, the SEC filed its Motion for an Order To Show Cause and accompanying papers.  (*See* Mot. for Order To Show Cause (Dkt. No. 468)); Mem. of Law in Supp. of Mot. for Order To Show Cause ("SEC Mem.") (Dkt. No. 469); King Decl.)  On February 8, 2023, the Bronsons responded in four letters.  (Letters from Dawn M. Bronson to Court (Feb. 8, 2023) (Dkt. Nos. 476–79).)  On February 17, 2023, the Bronsons filed a further response.  (Letter from Dawn M. Bronson to Court ("Bronson's Opp'n") (Feb. 17, 2023) (Dkt. No. 490).)  On March 7, 2023, the SEC replied.  (Reply Mem. of Law in Supp. of Mot. for Order To Show Cause ("SEC Reply") (Dkt. No. 494).)

On June 7, 2023, Mrs. Bronson submitted a letter to the Court requesting Mr. Bronson's immediate release.  (Letter from Dawn M. Bronson to Court (June 7, 2023) (Dkt. No. 506).)  On June 12, 2023, the SEC filed a letter in response.  (Letter from Maureen P. King, Esq. to Court (June 12, 2023) (Dkt. No. 509).)  On June 15, 2023, Mrs. Bronson replied.  (Letter from Dawn M. Bronson to Court (June 15, 2023) (Dkt. No. 510).)

On June 29, 2023, based on conditions to which Mr. Bronson consented, the SEC submitted an order permitting Mr. Bronson's release from prison, which the Court endorsed. (*See* Order (Dkt. 521).)  Among other promises, Mr. Bronson committed to (i) providing a verified accounting to the SEC, (ii) make certain payments based on his gross monthly earnings, (iii) provide financial account statements for himself, Mrs. Bronson, their children, and Mr. Bronson's father-in-law, (iv) provide a "reasonable budget" to the SEC within two months of his release, and (v) remain in contempt until he fully pays the outstanding disgorgement in the Judgment.  (*Id.*)

---

[5] The Court recounts only the procedural history relevant to deciding the instant Motion.

## II.  Discussion

### A.  Contempt – General Principles

A court has "power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority," including "[d]isobedience or resistance" to its lawful orders. 18 U.S.C. § 401(3); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").  Unlike criminal contempt, civil contempt is remedial in nature, and "seeks only to coerce the defendant to do what a court had previously ordered him to do." *Turner v. Rogers*, 564 U.S. 431, 441 (2011) (alteration omitted) (internal quotation marks omitted); *Shillitani*, 384 U.S. at 368 (observing that civil contemnors "carry the keys of their prison in their own pockets" (internal quotation marks omitted)); *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) (noting that "[a] civil contempt order is designed to be coercive rather than punitive").  But despite its non-punitive nature, a civil contempt order is still a "potent weapon," and should be granted only where the movant can establish "by clear and convincing evidence that the alleged contemnor violated the district court's edict." *Latino Officers Ass'n City of N.Y., Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009) (citations omitted); *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (admonishing district courts not to impose contempt sanctions "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct" (citation omitted)); *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 (S.D.N.Y. 2012) (same).  The "clear and convincing" standard is more demanding than the preponderance-of-the-evidence standard normally applied to civil cases. *Aquavit Pharm., Inc. v. U-Bio Med, Inc.*, No. 19-CV-3351, 2020 WL 1900502, at *5 (S.D.N.Y. Apr. 17, 2020) (citing *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1174 (2d Cir. 1996)).

A court may hold a party in civil contempt for disobeying a lawful order only if three elements are satisfied: "(1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 207 (S.D.N.Y. 2020) (quoting *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (reciting and applying the three-part test)); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (applying the three-part test and upholding the district court's contempt finding where each element was satisfied); *Huber*, 51 F.3d at 10–11 (same). The movant bears the initial burden of establishing these elements. *See Latino Officers*, 558 F.3d at 164 ("[W]e underscore that it is the moving party . . . who bears the burden of establishing the three factors . . . ." (citing *King*, 65 F.3d at 1058)). Each element must be satisfied before a court imposes a contempt sanction. *See id.* at 164–65 (upholding district court's denial of contempt motion where the movant failed to establish "clear and convincing" proof of noncompliance); *Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332, 2008 WL 1775410, at *8–13 (S.D.N.Y. Apr. 17, 2008) (declining to hold a party in contempt where the movant failed to establish a lack of reasonably diligent efforts toward compliance). However, the movant need not show that the alleged contemnor violated the court's orders willfully. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 587 F. Supp. 2d 594, 615 (S.D.N.Y. 2008); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, No. 03-CV-5562, 2006 WL 1206372, at *5–6 & n.7 (S.D.N.Y. May 1, 2006) (finding a party in contempt without reaching the question of whether her noncompliance was willful).

"To hold a nonparty in contempt, the nonparty must 'either abet the party named in the order, or must be legally identified with them.'" *Fox v. Lee*, No. 15-CV-390, 2018 WL 1187404, at *3 (N.D.N.Y. Feb. 5, 2018) (alteration and footnote omitted) (quoting *People of State of N.Y. v. Operational Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996)), *report and recommendation adopted*, No. 15-CV-390, 2018 WL 1185237 (N.D.N.Y. Mar. 6, 2018); *Drywall Tapers of Greater N.Y. Loc. 1974, of I.B.P.A.T., AFL-CIO v. Loc. 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, No. 81-CV-337, 1986 WL 14711, at *13 (E.D.N.Y. Dec. 16, 1986) (same). "Before a party can be found guilty of aiding and abetting civil contempt, the court must find: (1) that the party subject to the court's mandate committed contempt; and (2) that another party assisted the enjoined party." *Trepel v. Dippold*, No. 04-CV-8310, 2006 WL 3054336, at *6 (S.D.N.Y. Oct. 27, 2006) (quoting *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002)). "The party seeking to hold another in civil contempt bears the burden of proof to establish the offense by clear and convincing evidence." *Levin*, 277 F.3d at 250 (alteration and quotation marks omitted).

If the movant has made a prima facie showing of contempt, "a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt." *Huber*, 51 F.3d at 10; *see also A.V. By Versace, Inc. v. Gianni Versace S.p.A.*, 446 F. Supp. 2d 252, 258–59 (S.D.N.Y. 2006) (same). Thus, once the movant has carried its burden and established the three elements necessary for a finding of contempt, the burden shifts to the alleged contemnor, who must produce evidence establishing a complete inability to pay. *See Schwarz v. ThinkStrategy Cap. Mgmt. LLC*, Nos. 09-CV-9346, 11-CV-8094, 2015 WL 4040558, at *10 (S.D.N.Y. July 1, 2015) (noting burden shift); *S.E.C. v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008) (stating that a party who

alleges he is unable to pay a judgment "'bears the burden of producing evidence of his inability to comply' with [a] disgorgement order" (quoting *Huber*, 51 F.3d at 10)); *S.E.C. v. Zubkis*, No. 97-CV-8086, 2003 WL 22118978, at *4 (S.D.N.Y. Sept. 11, 2003) (noting, where "[t]he S.E.C. ha[d] [] made a prima facie showing of civil contempt[,]" that the defendant "[bore] the burden of proving that he [was] unable to comply with the disgorgement order" to avoid a contempt finding).  To carry this burden and prevail on an inability-to-pay defense, the alleged contemnor must "establish his inability clearly, plainly, and unmistakably."  *Kim v. Ji Sung Yoo*, No. 15-CV-3110, 2019 WL 3162128, at *3 (S.D.N.Y. May 17, 2019) (quoting *Huber*, 51 F.3d at 10); *see also S.E.C. v. Musella*, 818 F. Supp. 600, 609 (S.D.N.Y. 1993) (observing that an alleged contemnor must establish his inability to pay "categorically and in detail" (citation omitted)).

    B.  Application

       1.  Mr. Bronson

The SEC asserts that Mr. Bronson has "unabashedly admitted to violating several Court orders including: the Liquidation Order by removing the Court-appointed [T]rustee, the Payment Plan Order by selling the securities in the UMB account – and dissipating $2 million dollars, and the Judgment and Payment Plan Order by failing to pay the SEC with available funds."  (SEC Mem. 18.)  The SEC also asserts that "[Mr.] Bronson repeatedly over the past year engaged in activities through Top Knot which he has now admitted, and which constitute violations of the penny stock bar [and has] admitted that he engaged in penny stock trading through Top Knot's UMB Account – transactions from which [Mr.] Bronson is clearly banned as they violate the penny stock bar."  (*Id.* at 19.)

The Court agrees that the undisputed record, as summarized above, reflects—by clear and convincing evidence—that since his incarceration, Mr. Bronson has repeatedly acted to defy

11

each of the Orders identified by the SEC and also directed Top Knot to take actions which resulted in his violating the penny stock bar, *see* § I.A.2 *supra*.  The Court also notes that there is no question that the Judgment and the Payment Plan Order were clear and unambiguous, as Mr. Bronson was *already incarcerated for repeatedly violating* those Orders at the time he directed the penny stocks be sold.[6]

Mr. Bronson argues that he did not believe he was violating the penny stock bar because he did not think "the SEC intended to bar [him] from selling . . . securities held in [his] own account." (Bronson's Opp'n 2.)  However, as the SEC has pointed out, Mr. Bronson's representation is controverted by the undisputed record, which demonstrates that at the same time he was surreptitiously selling securities from the UMB account, his counsel was requesting leave from the Court to make sales in compliance with the Liquidation Order, which had expressly been put in place to prevent Mr. Bronson from violating the bar.  Thus, the Court has little difficulty in holding that the penny stock bar was clear and unambiguous.  *See S.E.C. v. Universal Express, Inc.*, No. 04-CV-2322, 2007 WL 2469452, at *6 (S.D.N.Y. Aug. 31, 2007) (holding that a penny stock bar was clear and unambiguous where the bar specifically proscribed the activities defendant engaged in).[7]

---

[6] The Court notes that it has previously reviewed the judgment and found it to be clear and unambiguous.  *See S.E.C. v. Bronson*, No. 12-CV-6421, 2021 WL 3167853, at *6 (S.D.N.Y. Jan. 19, 2021), *motion for relief from judgment denied*, 602 F. Supp. 3d 599 (S.D.N.Y. 2022), *aff'd*, No. 22-CV-1045, 2022 WL 5237474 (2d Cir. Oct. 6, 2022).

[7] Mr. Bronson also argues that "[t]he penny stock ban only applies to me.  It does not apply to Top Knot or John Kellas.  Neither have been banned or restricted.  Further, there was no ruling by the court restricting them.  Finally, there's no direct order or ruling, claiming that Top Knot as my vehicle, notwithstanding the SEC's assertions." (Bronson's Opp'n 2.)  Mr. Bronson is correct that there is no ruling that Top Knot is his vehicle.  However, Mr. Bronson ignores that the Liquidation Order was put in place to avoid any issues with his directing sales of stock held by Top Knot, *see supra* footnote 1, and also that Mr. Bronson's counsel requested approval from the Court of a sale of stock from Top Knot in April 2022 so that the sale would not violate the

Accordingly, the Court finds that there is more than sufficient evidence that Mr. Bronson should again be held in contempt. *See Bronson*, 602 F. Supp. 3d at 615 (explaining that "[c]ourts in this district have consistently found defendants to be in contempt for failure to comply with disgorgement orders in SEC civil enforcement actions" and collecting cases); *S.E.C. v. Montle*, 248 F. Supp. 2d 271, 279–80 (S.D.N.Y. 2003) (finding defendant in contempt for failing to comply with three separate court orders).

### 2.  Mrs. Bronson

The SEC argues that Mrs. Bronson should be held in contempt because, "[d]espite knowing that the liquidation of securities from Top Knot's UMB account were to be accomplished by a liquidator and paid to the SEC to satisfy the Judgment," Mrs. Bronson instead "paid personal bills and used the funds for endless indulgences . . . . [and] siphoned hundreds of thousands of dollars to her accounts for her personal benefit."  (SEC Mem. 19.)

The Court agrees that the undisputed record, again as summarized above, *see* § I.A.3 *supra*, establishes that Mr. Bronson engaged in contempt and that Mrs. Bronson was aware of the Court's Orders and acted to assist Mr. Bronson by directing Mr. Kellas to remove the Liquidating Trustee and by diverting funds resulting from the stock sales from paying the Judgment to her and Mr. Bronson's own personal expenses, *see Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., L.L.C.*, No. 01-CV-2691, 2002 WL 726666, at *3 (S.D.N.Y. Apr. 24, 2002) (finding bank aided and abetted defendants' contempt where, after receiving notice of court's order freezing defendants' assets, it then distributed funds at defendants' request); *Weston Cap. Advisors, Inc. v. PT Bank Mutiara, TBK*, No. 13-CV-6945,

---

penny stock bar, (O'Quinn Letter 2).  Moreover, Mr. Bronson's claim that there was no restriction on Top Knot or John Kellas is irrelevant because it is undisputed that Mr. Bronson directed the sales of stock from the UMB account held by Top Knot and that he was the ultimate beneficiary of those sales.  (Burstein Letter 2.)

2015 WL 5246984, at *2 (S.D.N.Y. Sept. 8, 2015) (holding head of corporate group liable for

aiding and abetting corporate subsidiary's contempt where he directed transfer of attached funds

from contumacious subsidiary to another subsidiary), *aff'd in relevant part sub nom. Weston*

*Cap. Advisors, Inc. v. PT Bank Mutiara*, 667 F. App'x 15 (2d Cir. 2016); *United States v. Dist.*

*Council of N.Y.C.*, No. 90-CV-5722, 2007 WL 2697135, at *14 (S.D.N.Y. Sept. 17, 2007)

(holding party in civil contempt where record demonstrated that the party had knowingly assisted

contemnor in violating the court's order).

### 3.  Sanctions

The SEC has requested, if the Court finds the Bronsons in contempt, that coercive and

remedial sanctions be granted as to each of them.  (SEC Mem. 20–23; SEC Reply 7–9.)  The

Court agrees that such sanctions are both necessary and appropriate given the Bronsons'

continued contumacious behavior.

"The imposition of civil contempt sanctions may serve dual purposes: to secure future

compliance with court orders and to compensate the party that has been wronged." *Paramedics*

*Electromedicina*, 369 F.3d at 657 (citing cases).  "Such sanctions may not be imposed as a

purely punitive measure." *Id.*  "To the extent that a contempt sanction is coercive, the court has

'broad discretion to design a remedy that will bring about compliance.'" *Id.* (quoting *Perfect Fit*

*Indus., Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 57 (2d Cir.1982)).  "When imposing

coercive sanctions, a court should consider (1) the character and magnitude of the harm

threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing

about compliance, and (3) the contemnor's financial resources and the consequent seriousness of

the sanction's burden." *Weston Cap.*, 2015 WL 5246984, at *5 (quoting *N.Y. State Nat'l Org.*

*for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989)).

As to the first factor, the Court entered the Judgment against Mr. Bronson on August 28, 2017, which directed him to pay the SEC almost $12 million.  (*See* Am. Final J.)  In the over six years since the Judgment was entered, Mr. Bronson has failed to pay any appreciable part of the Judgment and has engaged in an unflagging campaign of delay and obfuscation that has only intensified since he was incarcerated in February 2022.  *See supra* § I.A.  After his incarceration, Mr. Bronson worked with Mrs. Bronson to remove the Liquidating Trustee so that he could liquidate stock in direct violation of the Court's Orders; Mrs. Bronson then promptly spent the proceeds of those sales on personal expenses.  Thus, Mr. and Mrs. Bronson's conduct shows a brazen lack of respect for this Court's Orders and there is a clear threat that if their contumacious behavior is not curbed, the Judgment will never be paid.

As to the second factor, the Court finds that given the Bronsons' clear and unequivocal disregard for the Court's Orders, only a significant coercive sanction is likely to have any effect in bringing them into compliance with the Court's Orders.  Mr. Bronson chose to act in direct defiance of this Court's Orders *after he was already incarcerated* for his previous contumacious actions and Mrs. Bronson chose to assist her husband without any apparent qualm; thus, the Court must make clear to the Bronsons that *they will not benefit in any way* from their contumacious behavior.

Finally, due to the Bronsons' blunt refusal to disclose all relevant information to the SEC, the extent of their financial resources is unclear, so the Court cannot with any certainty estimate the seriousness of the burden of any sanctions it imposes.  However, the Court finds that, given that the Bronsons were able to quickly marshal $2 million for their own personal expenses when they felt it was convenient, the Court will not presume that they lack the resources to pay a

15

significant sum absent a fulsome accounting of the assets controlled by them and any entities they directly or indirectly control.

Having found that significant monetary and non-monetary sanctions are both necessary and appropriate, the Court imposes the below sanctions.  Mr. and Mrs. Bronson are to provide the information below to the SEC so that a complete accounting may be made:

(i) complete, sworn accountings of all of the Bronsons' foreign and domestic assets for themselves and their children (in which they own, control directly or indirectly, or have a beneficial interest), and any entities they are connected with directly or indirectly, including all liquid and illiquid assets, personal, intangible and real property, cash, and financial accounts including but not limited to Wells Fargo, Webster Bank, Scottsdale Alpine Securities, Three Brothers Trading LLC, Seven Mile Securities, and Liberty held in their names or to which they have access or control, including accounts in the names of John Kellas or their children;

(ii) complete sworn accountings (and supporting documentation for the past two years) for every entity the Bronsons control, including but not limited to: V2IP, Inc., Top Knot Inc., Top Knot Inc. USA, MacCallan Partners Assets, LLC, and Baby China;

(iii) provide to the SEC by the 15th of every month until the Judgment is paid in full:

> (a) monthly statements for every account controlled by the Bronsons directly or indirectly;
>
> (b) monthly statements for any method used to pay expenses, including but not limited to all debit card, credit card, Venmo and like mechanisms; held in their names or the names of any third party, including John Kellas and their children;
>
> (c) mortgage statements along with the source of funds used to make any mortgage payment;
>
> (d) ConEd bills along with the source of funds used to make any payment thereon;
>
> (e) property tax bills along with the source of funds used to make any payment thereon;

(f) health insurance bills along with the source of funds used to make any payment thereon;

(g) legal bills along with the source of funds used to make any payment for representation;

(v) proof of permission obtained from the Court prior to opening any new account, line of credit, or entity (and the Bronsons must provide statements on any new accounts or lines of credit to the SEC thereafter); and

(vi) prompt notice of any funds received from any source in an amount of $1,000 or more (whether received in one lump sum or in any series of payments).

As to Mr. Bronson, the Court directs that he disgorge the approximately $2 million dollars that constitute ill-gotten gains from his contemptuous conduct in violation of the penny stock bar, plus prejudgment interest thereon. This amount is *in addition to* the amount Mr. Bronson owes under the Court's Judgments in this Action and is imposed as a coercive sanction in light of Mr. Bronson's repeated, willful, and egregious contempt of the Court's Orders. The Court directs the SEC to submit a proposed disgorgement order for the Court's approval.

As to Mrs. Bronson, the Court directs that she disgorge interest on the approximately $2 million dollars in proceeds from the sales of shares in the UMB Account at the statutory rate referenced in 28 U.S.C. § 1961 for the period from February 16, 2022 until Mr. Bronson repays the $2 million that he must now repay. The Court orders the SEC to submit a proposed disgorgement order for the Court's approval.

### 4. Turnover

The SEC has also requested that the Court issue Turnover Orders for several outstanding sums of cash that the Bronsons have accrued from sales of assets and that are currently being held by various custodians. (SEC Mem. 23–24; SEC Reply 9–10.) The Court directs the SEC to submit to the Court an accounting of the funds which remain outstanding and also to submit

proposed Turnover Orders for those funds that the SEC seeks to have directed to them for the Court's review and approval.

### III.  Conclusion

For the foregoing reasons, the Court finds that Mr. and Mrs. Bronson are in contempt of the Court's Orders and imposes the additional coercive and remedial sanctions described above. The Court also directs that the SEC provide the above-specified proposed disgorgement and turnover orders.  The Clerk of Court is respectfully directed to terminate the pending motions. (*See* Dkt. Nos. 468, 501, 506.)

SO ORDERED.

Dated:    September 26, 2023
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge